Frank J. Wright
Texas Bar No. 22028800
Jeffery M. Veteto
Texas Bar No. 24098548
Jay A. Ferguson
Texas Bar No. 24094648
**LAW OFFICES OF FRANK J. WRIGHT, PLLC**
2323 Ross Avenue, Suite 730
Dallas, Texas 75201
Telephone: (214) 935-9100

**PROPOSED COUNSEL TO DEBTOR**
**STUDIO MOVIE GRILL HOLDINGS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-32633-SGJ-11 |
| | § | |
| **STUDIO MOVIE GRILL HOLDINGS, LLC,** | § | **Chapter 11** |
| *et al.*,[1] | § | |
| DEBTOR. | § | **Joint Administration Requested** |

## DECLARATION OF WILLIAM SNYDER, CRO OF THE DEBTORS,
## IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Studio Movie Grill Holdings, LLC (6546) ("SMG Holdings"); OHAM Holdings, LLC (0966); Movie Grill Concepts Trademark Holdings, LLC (3096); Movie Grill Concepts I, Ltd. (6645); Movie Grill Concepts III, Ltd. (2793); Movie Grill Concepts IV, Ltd. (1454); Movie Grill Concepts IX, LLC (3736); Movie Grill Concepts VI, Ltd. (6895); Movie Grill Concepts VII, LLC (2291); Movie Grill Concepts X, LLC (6906); Movie Grill Concepts XI, LLC (2837); Movie Grill Concepts XII, LLC (6040); Movie Grill Concepts XIII, LLC (5299); Movie Grill Concepts XIV, LLC (4709); Movie Grill Concepts XIX, LLC (9646); Movie Grill Concepts XL, LLC (4454); Movie Grill Concepts XLI, LLC (4624); Movie Grill Concepts XLII, LLC (2309); Movie Grill Concepts XLIII, LLC (9721); Movie Grill Concepts XLIV, LLC (8783); Movie Grill Concepts XLV, LLC (2570); Movie Grill Concepts XV, LLC (4939); Movie Grill Concepts XVI, LLC (1033); Movie Grill Concepts XVII, LLC (1733); Movie Grill Concepts XVIII, LLC (8322); Movie Grill Concepts XX, LLC (7300); Movie Grill Concepts XXI, LLC (1508); Movie Grill Concepts XXII, LLC (6748); Movie Grill Concepts XXIV, LLC (5114); Movie Grill Concepts XXIX, LLC (5857); Movie Grill Concepts XXV, LLC (4985); Movie Grill Concepts XXVI, LLC (5233); Movie Grill Concepts XXVII, LLC (4427); Movie Grill Concepts XXVIII, LLC (1554); Movie Grill Concepts XXX, LLC (1431); Movie Grill Concepts XXXI, LLC (3223); Movie Grill Concepts XXXII, LLC (0196); Movie Grill Concepts XXXIII, LLC (1505); Movie Grill Concepts XXXIV, LLC (9770); Movie Grill Concepts XXXIX, LLC (3605); Movie Grill Concepts XXXV, LLC (0571); Movie Grill Concepts XXXVI, LLC (6927); Movie Grill Concepts XXXVII, LLC (6401); Movie Grill Concepts XXXVIII, LLC (9657); Movie Grill Concepts XXIII, LLC (7893); Studio Club, LLC (3023); Studio Club IV, LLC (9440); Movie Grill Concepts XLI, LLC (2837); Movie Grill Concepts XLI, LLC (4624); Movie Grill Concepts XLVI, LLC (2344); Movie Grill Concepts XLVII, LLC (5866); Movie Grill Concepts XLVIII, LLC (8601); Movie Grill Concepts XLIX, LLC (0537); Movie Grill Concepts L, LLC (5940); Movie Grill Concepts LI, LLC (7754); Movie Grill Concepts LII, LLC (8624); Movie Grill Concepts LIII, LLC (3066); Movie Grill Concepts LIV, LLC (2018); Movie Grill Concepts LV, LLC (4699); Movie Grill Partners 3, LLC (4200); Movie Grill Partners 4, LLC (1363); Movie Grill Partners 6, LLC (3334); and MGC Management I, LLC (3224).

I, William Snyder, submit this declaration pursuant to 28 U.S.C. § 1746 ("Declaration") in support of the Chapter 11 Petitions and First Day Motions for Studio Movie Grill Holdings, LLC ("SMG Holdings") and its debtor affiliates (collectively, the "Debtors" or "SMG"), and state as follows:

1.      I am the proposed Chief Restructuring Officer (the "CRO") of the Debtors. I am a partner of CR3 Partners, LLC ("CR3"). I have nearly 40 years of executive and entrepreneurial experience and I have guided a multitude of companies through management and restructuring events, in a wide range of industries. Some of my representative experience includes, without limitation: (i) acting as CRO of the Texas Rangers Baseball team; (ii) acting as CRO of the multi-billion-dollar poultry company Pilgrim's Pride; (iii) acting as the court-appointed Examiner of Mirant, a multi-billion-dollar merchant energy company; and (iv) acting as Interim-CEO of a multi-million-dollar mattress retailer.

2.      I graduated *cum laude* with a Bachelor of Science from Texas A&M University. I am a Certified Turnaround Professional and I am a Fellow with the American College of Bankruptcy.

3.      CR3 and I first became involved with SMG in early September 2020. In the course of our engagement thus far, SMG has provided CR3 and I with access to their operational and financial information.

4.      SMG was founded by Brian Schultz in 1993. Mr. Schultz has been the CEO of SMG from its inception. In that nearly three (3) decades, SMG has grown from a single screen to more than 300 screens today.

5.      On October 23, 2020 (the "Petition Date"), the Debtors filed for bankruptcy under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") in this Court ("Chapter 11 Cases").

3.     Under my direction as CRO, SMG intends to operate its business and manage its assets as a debtor-in-possession as defined under the Bankruptcy Code.

4.     To minimize the adverse effects of the Chapter 11 Cases, SMG has prepared and filed, with the assistance of its bankruptcy counsel, motions and applications discussed in this Declaration seeking "first day" relief (collectively, "First Day Motions"). Through the First Day Motions, SMG seeks authority from the Court to allow it to continue to do certain things, such as use its existing bank accounts and maintain insurance policy coverage by paying premiums, that are necessary to ongoing operations and to enable SMG to fulfill its duties as a debtor-in-possession.

5.     I am familiar with the contents of the First Day Motions and what pleadings are typically filed at the onset of a bankruptcy case such as this. To the best of my knowledge after reasonable inquiry, I believe that the relief sought in each First Day Motion: (i) is necessary to enable SMG to transition smoothly into Chapter 11 with minimal disruption; (ii) is critical to SMG's efforts to preserve its value and maximize creditor and stakeholder recoveries; and (iii) best serves SMG's estate and the interests of its employees, creditors and stakeholders. Further, it is my belief that the relief sought in the First Day Motions is tailored and necessary to achieve the goals of the Chapter 11 Cases.

6.     Except as otherwise indicated, the facts set forth in this Declaration are based upon (i) representations by executives or employees of SMG to CR3 and I; and (ii) review of relevant SMG business records and other information by myself of other CR3 employees under my direction and control. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and, due to the exigent circumstances facing SMG and the urgent need to file these Chapter 11 Cases, certain of the information contained in this Declaration is subject to change. Notwithstanding, I am not aware of any information contained in this Declaration that is inaccurate.

7. I submit this Declaration in support of SMG's (i) Chapter 11 Petitions; and (ii) the First Day Motions. I have become personally knowledgeable about, and familiar with, the business and financial affairs of SMG and am authorized by SMG to submit this Declaration on its behalf. If called upon to testify, I would testify that the facts set forth in this Declaration are true and correct.

## INTRODUCTORY STATEMENT

8. SMG is engaged in the dine-in movie theater business. In addition to its movie offerings, SMG's theaters include a bar and lounge area, with direct to seat service for guests before and during their movies.

9. Specifically, SMG operates 33 movies theaters in 10 states, including Arizona, California, Florida, Georgia, Illinois, Indiana, North Carolina, Pennsylvania, Texas, and Virginia. All theaters operate under the brand name "Studio Movie Grill."

10. SMG was conceived in 1993 to modernize the traditional movie-going experience through its combination of first-run movies, alternate, and family programming together with full-service, in theater dining from an extensive American grill menu and full-service bar. SMG strives for an immersive movie-going experience with its custom luxury recliners, laser projection, studio extreme large format auditoriums, and advanced sound system. Service buttons are located at every seat, enabling servers to know instantly when guests need to place an order or request assistance. Servers then deliver food and drinks to guests' seats anytime during the show.

11. In 2018, SMG was the fastest growing company-owned theater chain and had built the largest hospitality-centric platform in the exhibition industry. Under the leadership of its founder and Chief Executive Officer, Brian Schultz, SMG swiftly grew from a single location to 353 screens across 10 states, was named to Inc. Magazine's List of "Fastest Growing Private Companies" three years in a row, placed 11th in Box Office Magazine's Giants of the Industry and, in 2019, 50 films put SMG in the Top 10 at the Box Office with key titles grossing as high as #5 in box office receipts.

12.     In June 2018, SMG introduced its unique loyalty program, SMG Access, which allows loyal guests to earn rewards, allows them to join SMG in offering movies and meals to underserved community members. To date, this program has earned over 40,000 movies and meals. Prior to the rapid national spread of the novel coronavirus commonly known as COVID-19, SMG had an over twenty-five (25) years of year-to-year growth.

13.     The organizational structure of SMG is diagramed in the attached organizational chart. *See* **Exhibit "A"**.

14.     Since mid-March 2020, COVID-19 has resulted in significant adverse business effects on SMG, its operations, and the entire movie industry. Through its Chapter 11 Cases, SMG is but the next in a line of movie theater chains and other in-person entertainment businesses seeking bankruptcy relief.

15.     During the pandemic, state and local government order, alongside drastic decreases in immediate demand, resulted in the shuttering of the entire SMG operation for a period of 3 months. Beginning on March 19, 2020, SMG started reopening theaters at limited capacity. At present, 21 theaters are open at a limited capacity and 13 theaters remain closed.

16.     It remains unknown how long the COVID-19 pandemic will persist and how long the market effects will continue thereafter. SMG anticipates that demand for its services will remain very tenuous until theaters are able to return to full capacity and major motion pictures resume being released for first-run theater showings.

17.     SMG has made, and continues to make, necessary adjustments to its operations in light of the resulting declines in revenue. SMG has sought to reduce operating expenses, lease expenses, and sought a variety of creative solutions to provide interim cash flow, including offering private theater rentals to the public. SMG files these Chapter 11 Cases as part of its ongoing efforts,

in order to preserve the value of its assets for the benefit of all stakeholders, including employees, creditors, and equity.

18.    As is customary in the industry, SMG pays film studios a set percentage of box office sales on a weekly basis pursuant to master licensing agreement (the "MLA[s]"), in addition to other negotiated terms for particular films issued by each studio.

19.    Through the Chapter 11 process, SMG seeks to (i) further deduce the profitability of each theater; and (ii) renegotiate lease with landlord and the MLAs with film studios. SMG seeks to use these mechanisms, in conjunction with a restructuring of other debt, to overcome this temporary downturn in the fil industry and maximize future profitability. These Chapter 11 Cases will enable SMG to perform this restructuring while protecting its employees. I anticipate that SMG will exit bankruptcy in better form and continue to provide a superb movie-going experience to its customers.

20.    SMG enters these Chapter 11 Cases with certain financial support of existing lenders who has agreed to provide emergency debtor-in-possession financing to satisfy its continuing obligations during the bankruptcy proceedings.

21.    In an effort to inform the Court on the business of SMG and the relief sought in its First Day Motions, this Declaration is offered. The Declaration has been organized into four sections, entitled as follows:

**Section I:** The Corporate Structure and Employee Operations

**Section II:** SMG's Assets, Liabilities, and Financial Condition

**Section III:** Events Leading to Bankruptcy

**Section IV:** First Day Relief Sought

# I.
# THE CORPORATE STRUCTURE AND EMPLOYEE OPERATIONS

## THE CORPORATE STRUCTURE

22.     In summation of the organizational chart provided as **Exhibit "A"**, the SMG corporate structure can be described as follows:

23.     OHAM Holdings is a Texas limited liability company, whose last four (4) digits of its federal tax identification number are 0966. The membership equity of OHAM Holdings is owned as of the Petition Date as follows:

| MEMBER | OWNED PERCENTAGE |
|---|---|
| Brian Schultz | 77.5% |
| Virginia Schultz | 1.0% |
| Theodore Croft | 1.0% |
| SMG Team Equity Holdings, LLC | 7.0% |
| TSO SMG Warrant Investment Aggregator | 13.185% |
| Michael Lambert Trust | 0.315% |

24.     SMG Holdings is a Texas limited liability company, whose last four (4) digits of its federal tax identification number are 6546. The membership equity of SMG Holdings is owned in totality (100%) by OHAM Holdings.

25.     All other Debtors are owned in totality either directly or indirectly by SMG Holdings. All non-debtor affiliates are also owned in totality either directly or indirectly by SMG Holdings.

26.     Accordingly, Brian Schultz and TSO SMG Warrant Investment Aggregator are the only persons that directly or indirectly own 10% or more of any class of OHAM Holdings' equity interests. As detailed above, OHAM Holdings owns 10% or more of SMG Holdings' equity interests and SMG Holdings owns 10% or more of all the other Debtor's equity interests.

<u>EMPLOYEE OPERATIONS</u>

27.     SMG is engaged in the dine-in movie theater business. In addition to its movie offerings, SMG's theaters include a bar and lounge area, with direct to seat service for guests before and during their movies. In the course of these operations, SMG employs at each location servers, bartenders, ticket host, runners, line cooks, cleaning crew, dishwashers, and managers thereover. SMG also employs an ordinary variety of corporate office staff to handle the shared services necessary to

operate the locations. As of October 23, 2020, the Debtors employed approximately 9222 individuals, including 800 individuals at Debtors' movie theater locations, 82 individuals operating in the field, and 40 individuals at the corporate office (collectively the "Employees").

28. Prior to the Petition Date, founder Brian Schultz was the Chief Executive Officer for SMG.

29. The large majority of the Debtors' employees are paid hourly on a bi-weekly pay period. The Debtors currently have 6 independent contractors working for them pursuant to consulting agreements. Wages accrue for Employee over a two-week pay period, with remittal of such wage obligations coming one week following the end of the pay period. The Debtors' use two alternating pay cycles with wage obligations for each having been paid out one week after each date. The Debtors pay their independent contractors for the services on a pay period that runs for one week prior to the date compensation is paid.

30. The Debtors maintain two bonus incentive programs, one for general managers, unit managers, and kitchen managers at the Debtors' movie theater locations (the "Field Management Bonus Plan") and a second for corporate office Employees. The Field Management Bonus Plan is an annual bonus structure based on performance measured against specified key financial and operational metrics during the year. The Field Management Bonus Plan creates a bonus pool at each location, which is then split on a percentage basis amongst that locations managers. The corporate bonuses are historically based on business-wide performance and are paid as a function of percentage of annual wages. Theses bonuses are tied to employment agreements which include restrictive covenants, including confidentiality provisions, that protect the Debtors' business.

31. In addition, the Debtors maintain and offer various employee benefit plans, policies, and programs for health care, health savings, dental, vision, life, long and short-term disability, and critical illness, and provide eligible Employees access to a 401(k) plan.

## II.
## SMG's ASSETS, LIABILITIES, AND FINANCIAL CONDITION

### SECURED AND UNSECURED LIABILITIES

32.     SMG estimates that secured claim as of the Petition Date in respect of its pre-petition secured credit facility in an approximate amount of at least $104,123,984.28 for unpaid principal, plus any and all interest, fees, costs, expenses, charges, and other claims, debts, or obligations of the Debtors to the agent and lenders under the pre-petition secured credit facility.

33.     SMG's unsecured obligations consist of, among other things, payments still due under leases that have not been terminated, payments due to film studios in licensing fees, and taxes that accrued before the Petition Dates but were not paid. As of the Petition Dates, SMG estimates that its collective outstanding unsecured obligations totaled approximately $231.1 million ("Estimated Unsecured Claim Amount"), which includes loans from TSO SMG Note Investment Aggregator L.P. in the approximate amount of $82.0 million.

## III.
## EVENTS LEADING UP TO THE CHAPTER 11 CASES

### BEFORE COVID-19

34.     Prior to the onset of the novel coronavirus pandemic known as COVID-19, SMG was a viable business enterprise, managing its operational costs and working on the development of additional movie theater locations.

### THE EFFECT OF COVID-19 ON THE MOVIE THEATER INDUSTRY AND SMG

35.     As a result of the national pandemic, state and local governments imposed restrictions on the social, dining, and theater operations regular and necessary to the SMG business. Following the Center for Disease Control COVID-19 guidelines and in compliance with the localized restrictions, SMG shut down all of its theaters for a period of 3 months beginning on March 20, 2020.

36.     During the shutdown, SMG sought out creative ways to attempt to generate revenue,

including an attempt to provide carry-out dining services.

37. Fortunately, beginning on June 19, 2020, SMG, again operating in accordance with CDC guidelines and lifted restrictions, began reopening locations with limited capacity. Currently, SMG has 21 locations that are operational in this capacity. That being said, demand and supply of films remains limited. Again, SMG has sought creative ways to generate additional revenue within the confines of the CDC guidelines, including open sales to individuals and group to rent out an entire auditorium for a screening or special event.

38. With still-diminished revenues, SMG has sought to manage its costs, including renegotiating certain of its location leases prior to the Petition Date to obtain more workable terms. Nevertheless, SMG's cash assets have dwindled. As of the Petition Date, SMG had current cash assets of approximately $100,000 in its bank accounts, not including drawer cash in its theaters.

39. Fixed and operational expenses have continued to accrue and because of SMG's lack of liquidity, it has been forced to accumulate certain prepetition obligations.

## IV.
## FIRST DAY MOTIONS AND APPLICATIONS

40. Contemporaneously with the filing of this Declaration, SMG has filed or intends to file a number of essential First Day Motions, seeking emergency orders from the Court for various relief targeted at (i) facilitating an efficient transition into the Chapter 11 Cases; (ii) minimizing the operational impact of the Chapter 11 Cases; (iii) streamlining the administration of the Chapter 11 Cases; and (iv) taking the initial steps towards a successful reorganization of SMG.

41. I have reviewed the First Day Motions and confirm that the facts set forth therein are true and correct to the best of my knowledge, review of information, and belief. I believe that this Court's approval of the relief requested in the First Day Motions is essential to avoid immediate and irreparable harm to SMG.

## A. Joint Administration Motion

42. Pursuant to their *Emergency Motion for Entry of Order Authorizing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure* (the "Joint Administration Motion"), SMG requests that all of the Chapter 11 Cases be jointly administered under the Studio Movie Grill Holdings, LLC case number. I believe joint administration will reduce unnecessary duplication of efforts by the Debtors, creditors, U.S. Trustee, and the other parties-in-interest. Such relief is common to complex Chapter 11 proceedings and a business enterprise the size and makeup of SMG.

**B.      Case Procedures Motion**

43. Pursuant to their *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Top 30 Unsecured Creditors and a Consolidated List of Creditors; (II) Authorizing the Debtors to Redact Certain Personal Identification Information of Individual Creditors and Current and Former Employees; and (III) Approving the Proof of Claim Form* (the "Case Procedures Motion"), the Debtors have sought (i) authority to file a consolidated list of the top 30 unsecured creditors and a consolidated list of creditors; (ii) authority to redact certain personal identification information of individual creditors and current and former employees; and (iii) approval of a customized proof of claim form.

44. I believe that filing only one consolidated list of the thirty largest general unsecured creditors will alleviate administrative burdens, costs, and minimize the possibility of duplicative service. Such cost savings will benefit the Debtors' estates and all constituents involved. Redaction of personal identification information will serve the clear purpose of protecting individuals caught up in these proceedings to unnecessary, and will minimize any potential legal exposure to SMG resulting therefrom. Approval of customized proof of claim form will also improve the process for all those involved, helping to streamline the claims process. All such relief is common to complex Chapter 11 proceedings and a business enterprise the size and makeup of SMG.

**C.** **Bank Account and Cash Management Motion**

60.     Pursuant to their *Emergency Motion Pursuant to Sections 105, 345, 364, 363, 503, 1107 and 1108, Authorizing (i) Maintenance of Existing Bank Accounts; (ii) Continuance of Existing Cash Management System, Bank Accounts and Checks and Related Forms; (iii) Continued Performance of Intercompany Transactions; (iv) Limited Waiver of Section 345(b) Deposit and Investment Requirements; and (v) Granting Related Relief* (the "Bank Account and Cash Management Motion"), the Debtor sought court approval to maintain and continue the use of their bank accounts and existing cash management system.

61.     Prior to the Petition Date, in the ordinary course of its business, SMG used its Cash Management System to efficiently collect, transfer and disburse funds generated by its business operations. The Cash Management System consists of forty-seven (47) accounts that are booked at Capital One, seven (7) accounts that are booked at JP Morgan Chase and one (1) that is booked at Regions.

62.     I believe that SMG's continued use of the bank accounts with the same account numbers and same checks is necessary for a smooth and orderly transition into Chapter 11, with minimal interference with continuing operations. Requiring SMG to open new bank accounts and obtain new checks for those accounts will cause delay and disruption to its business. SMG believes that its transition to Chapter 11 will be more orderly and result in a minimum of harm to operations if all of the bank accounts are maintained.

63.     By preserving business continuity and avoiding the disruption and delay that would result from closing the bank accounts and opening new accounts, all parties in interest, including employees and vendors, will be best served. The benefit to SMG, its business operations and all parties in interest will be considerable, while the confusion that would result if the Court did not grant the relief would adversely impact SMG's rehabilitative efforts. The bank accounts are in a financially stable

institution that is insured by the Federal Deposit Insurance Corporation up to the applicable limit. Moreover, I and SMG will work with its financial institutions to ensure that no obligations that accrued before the Debtors filed for Chapter 11 are paid from any of the bank accounts unless authorized by the Court.

64.     In addition, I believe that SMG's Cash Management System constitutes an ordinary course, essential business practice that provides significant benefits to SMG including, among other things, the ability to (i) control funds; (ii) ensure the availability of funds when necessary; and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.

65.     I believe that any disruption of the Cash Management System would have a severe and adverse impact on SMG's reorganization efforts. The relief requested in the Cash Management Motion is vital to ensuring SMG's seamless transition into bankruptcy. I believe that authorizing SMG to maintain the Cash Management System will avoid many of the possible disruptions and distractions that could divert SMG's attention from more pressing matters during the initial days and weeks of the Chapter 11 Cases.

66.     In addition, SMG seeks a permitted deviation from the U.S. Trustee Guidelines ("Trustee Guidelines") to the extent that the requirements of any guidelines otherwise conflict with (i) SMG continuing to use its existing bank accounts and the existing practices under the Cash Management System; or (ii) any action taken by SMG in accordance with any order granting the Bank Account and Cash Management Motion or other order entered in the Chapter 11 Cases. I believe the use of the Cash Management System is an ordinary course, customary and essential business practice. Requiring SMG to alter its current practices to comply with the Trustee Guidelines would risk disruption to SMG's business at this precarious time and be inefficient.

67.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable SMG to continue to operate its business without interruption during the Chapter 11 proceedings.

**D.      Tax Motion**

68.     Pursuant to their *Emergency Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments; (II) to Assume Prepetition Tax Agreements; and (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers Pursuant to Sections 105(a), 363(b), 365, 507(a)(8) and 541(d) of the Bankruptcy Code* (the "Tax Motion"), SMG requests approval to pay, in its sole discretion, certain sales, property and other taxes and similar obligations, as detailed in the Tax Motion, in the ordinary course of SMG's business, without regard to whether such obligations accrued or arose before or after the Petition Date.

69.     In the ordinary course of operating its business, SMG collects and remits a variety of taxes and fees, including sales and use taxes (collectively, "Taxes and Fees"). The Taxes and Fees include certain "trust fund" taxes, which SMG is required to collect from its customers and hold in trust for payment to various federal, state and local tax, licensing and other governmental authorities (collectively, "Authorities"). SMG remits the Taxes and Fees to the Authorities on a periodic basis.

70.     As of the Petition Date, SMG estimates that it owes Authorities an amount equal to approximately $3,560,386 in pre-petition Taxes and Fees as detailed in the Tax Motion. Through the Tax Motion, SMG seeks only the authorization to pay the Authorities the Taxes and Fees when they become due in the ordinary course and subject, in certain instances, to the receipt of monies from third parties.

71.     It is my understanding that SMG's failure to pay the Taxes and Fees could adversely affect its business operations because Authorities could assert penalties or interest on past-due taxes, or possibly bring personal liability actions against officers of SMG for non-payment. This would be

to the severe detriment of SMG's reorganization efforts because those officers are integral to driving SMG's reorganization and its success. In addition, I understand that SMG will need to pay the Taxes and Fees under any plan of reorganization that is filed and confirmed by the Court.

### E. Utilities Motion

72. Pursuant to their *Emergency Motion Interim and Final Order Providing Adequate Assurance of Utility Payments* (the "Utilities Motion"), the Debtors seek an order from this Court relating to the continued maintenance of services from Utility Providers (as defined in the Utilities Motion). This includes an order prohibiting the Utility Providers from, among other things, changing, discontinuing or refusing to provide SMG with key services (such as electricity and water) because SMG was not able to pay their bills prior to the Petition Dates.

73. In connection with the operation of the movie theaters, SMG needs electric, gas, waste/sewer, telecommunications, and other services on a daily basis. SMG depends upon uninterrupted services in order to continue operations and it is critical that utility services remain uninterrupted in order to ensure the success of SMG's Chapter 11 Cases. I believe that interrupted or even modified services will jeopardize the reorganization efforts.

74. SMG intends to fully pay all obligations that accrue and are owed to the Utility Providers in a timely manner. SMG expects to have sufficient cash during the Chapter 11 proceeding to pay for these utility obligations.

75. However, out of an abundance of caution, SMG proposes to provide a deposit to any Utility Provider who requests one in writing. This Adequate Assurance Deposit (which is defined in the Utility Motion) would be equal to two weeks of services based on a historical average over the past year. I believe that the Adequate Assurance Deposit, combined with SMG's prior history of payment of utility bills and availability of cash during the Chapter 11 proceedings, will provide sufficient assurance to the Utility Providers.

**F.    Insurance Motion**

76.    Pursuant to their *Emergency Motion for Authorization to (I) Continue to Administer All Insurance Policies and Related Agreements; and (II) Honor Certain Obligations in Respect Thereof* (the "Insurance Motion"), the Debtors request approval from this Court to continue maintaining Insurance Policies (defined in the Insurance Motion) that are necessary to continuation of its business operations. This includes paying premiums that will come due during the pendency of the Chapter 11 Cases. Specifically, SMG maintains Insurance Policies that provide coverage for, among other things, SMG's property (including all of the theaters and SMG's offices in Dallas, Texas), general liability and workers compensation. While the specific amount of each Insurance Policy varies year-by-year, on average, the total amount of premiums that SMG pays for the Insurance Policies is approximately $1,883391.90.

77.    It is essential for SMG to maintain its Insurance Policies, which provide a comprehensive range of coverage for SMG and its business. If these Insurance Policies were allowed to lapse, SMG would be exposed to substantial liability for any damages resulting to persons or property of SMG and others.

**G.    Customer Programs Motion**

78.    Pursuant to their *Emergency Motion for Order Authorizing Post-Petition Redemption and Honor of Pre-Petition (I) Gift Cards; (II) Customer Loyalty Program; (III) Membership Program; (IV) Groupon Sales; (V) Gold Ticket Coupons; and (VI) Advanced Ticket Sales* (the "Customer Programs Motion"), the Debtors seek authority to continue to honor the redemption of existing gift cards, advanced sales, and other customer loyalty programs. The reputation of SMG with its customers is contingent upon its ability to honor these existing programs, for which customers have already paid into. I believe continuing these programs is in the best interest of the estates as it will aid in generating revenue, and likewise, interruption thereof would likely result in both short and long term revenue losses.

Case 20-32633-sgj11 Doc 14 Filed 10/23/20    Entered 10/23/20 21:11:17    Page 17 of 20

**H.    Employment Motions**

79.       Pursuant to several other First Day Motions, the Debtors seek court approval to retain the professionals necessary and beneficial to the successful conduct of the Chapter 11 Case and also professionals employed in the ordinary course of their business that are not associated with the bankruptcy proceedings. In totality and based on my personal experience in the industry, I believe that the number of professionals and the scope of their retention is reasonable under the circumstances and in light of SMG's size as a business enterprise. Further, I believe that the retention of these firms and entities will aid in an efficient reorganization and will enable to Debtors to preserve value and maximize their bankruptcy estates.

**I.    DIP Motion**

80.       Pursuant to the *Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 (I) Authorizing Debtors to (A) Use Cash Collateral on a Limited Basis and (B) Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Granting Adequate Protection, (III) Scheduling Final Hearing, and (IV) Granting Related Relief* (the "DIP Motion")[2], the Debtors seek, among other things, authorization to obtain the DIP Facility (as defined in the DIP Motion) and use Cash Collateral (as defined in the DIP Motion). The Debtors also seek authorization to refinance a portion of their outstanding secured indebtedness and to grant priming liens and superpriority claims on account of the DIP Facility, in addition to providing the adequate protection set forth in the proposed interim order attached to the DIP Motion.

81.       The Debtors are filing the DIP Motion on an emergency basis given the immediate and irreparable harm that they will potentially suffer if they are denied the ability to obtain credit and use Cash Collateral, which is necessary to sustain the Debtors' ongoing business operations and to achieve their future business objectives. The DIP Facility and Cash Collateral will permit the Debtors

---

[2]    Capitalized terms used but not otherwise defined in this subsection I have the meanings ascribed to such terms in the DIP Motion.

DECLARATION OF WILLIAM SNYDER                                                      Page 17 of 21

to, among other things, preserve the value of their bankruptcy estates, continue operating their business in an orderly fashion, maintain business relationships with vendors, suppliers, and customers, meet ongoing business payroll disbursements, maintain employee morale, and satisfy other working capital and operational needs.

82.     Absent immediate access to the loans under the DIP Facility and use of Cash Collateral, I believe the Debtors would likely have to curtail or even cease business operations to the material detriment of creditors, employees, and other parties in interest. Accordingly, I believe it is critically important that the Debtors have access to the funds made available under the DIP Facility and authorization to use Cash Collateral at the onset of the Chapter 11 Cases. The Debtors anticipate using the DIP Facility to fund their day-to-day operations and refinance a portion of the Prepetition Secured Indebtedness, all to preserve value for their bankruptcy estates.  This available liquidity (either through the DIP Facility or Cash Collateral use or both) is necessary for the Debtors to demonstrate to their customers, suppliers, vendors, and employees that they have sufficient capital to ensure continuation of ongoing operations.

83.     I believe the Debtors need immediate access to post-petition financing and use of Cash Collateral to preserve estate assets and facilitate the Debtors' ability to either continue their business or implement an orderly wind-down, whichever is justified.  I understand that the liens securing the DIP Facility will prime the liens granted to secure payment under the Prepetition Credit Agreement to the Prepetition Lenders, and will prime any other liens that might be asserted by other creditors other than any Prior Permitted Liens (as defined in the Interim Order), if any.

84.     From my perspective as CRO, I have concluded, along with the Debtors, that the universe of lenders who could commit to meet the Debtors' post-petition financing requirements was quite limited for two reasons. First, the DIP Facility required both underwriting capacity and sophisticated syndication capabilities. Second, any other lender would have had to either gain the

cooperation of the Prepetition Agent and Prepetition Lenders, refinance the Prepetition Secured Indebtedness (as such term is defined in the DIP Credit Agreement), or undertake a priming fight. After carefully evaluating the foregoing requirements, I understand that the Debtors determined that their efforts to arrange post-petition financing should be focused on the Prepetition Agent the Prepetition Lenders.

85.     The terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arms' length. I believe the Debtors have reasonably exercised sound business judgment in determining that the DIP Facility is the best financing option available under the Debtors' present circumstances. The purpose of the DIP Facility is to refinance the Prepetition Secured Indebtedness and enable the Debtors to continue normal business operations during the Chapter 11 Cases.

86.     I submit that the DIP Documents and the DIP Orders are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain critical postpetition financing and arm's-length, good-faith negotiations between the Debtors and the DIP Agent and DIP Lenders.  I believe the terms and conditions of the DIP Documents, including the DIP Refinancing, are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.

87.     For all of the foregoing reasons, I submit that authorization to obtain the DIP Facility and use Cash Collateral is essential for the Debtors to avoid immediate and irreparable harm to their estates.

## J.     Critical Vendors Motion

88.     Pursuant to the *Debtors' Emergency Motion for Authority to Pay All or a Portion of the Prepetition Claims of Certain Critical Vendors* (the "Critical Vendors Motion"), the Debtors seek the authority, but not the direction, to pay all or a portion of the prepetition outstanding amounts owed

to certain critical vendor. Due to the centrality to the Debtors' operations as a movie theater enterprise that provide dine-in and bar services, I believe the relief sought in the Critical Vendors Motion is critical to the Debtors' reorganization and operational efforts. The Debtors need access to food and liquor deliveries on the same terms as existing on the Petition Date in order to generate revenue. If such requested relief is not granted and the critical vendors ultimately refuse to continue to provide goods, I believe it is uncertain whether the Debtors will be able to continue operations, which will imperil the Debtors' reorganization, damage the estates, and diminish any returns to creditors.

89.    I believe that the failure to satisfy these unsecured claims, in whole or in part, is likely to result in the critical vendors refusing to provide critical goods to the Debtors during the post-petition period. I submit that this outcome would have an immediate effect on the Debtors' ability to operate their business. The Debtors estimate the maximum amount needed to pay the prepetition claims of the critical vendor counterparties is approximately $___ million, which represents only a small percentage of the total amount of the prepetition claims in these Chapter 11 Cases. The funds for this amount will be available under the current DIP financing budget being contemporaneously proposed to the Court.



William Snyder, *CRO*
CR3 Partners, LLC, *acting on behalf of*
Studio Movie Grill Holdings, LLC and its Debtor Affilates

**SUBSCRIBED AND SWORN TO BEFORE ME** this the 23rd day of October, 2020.

Notary Public in and for
the State of Texas

[seal]

SHERI HOWE LAWRENCE
Notary Public, State of Texas
Comm. Expires 05-20-2024
Notary ID 128779785

---