

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 27, 2020**

_United States Bankruptcy Judge_

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **Studio Movie Grill Holdings, LLC, *et al.*,**[1] | § | **Case No. 20-32633-SGJ-11** |
| | § | |
| **Debtors.** | § | **Joint Administration Requested** |

---

[1]   The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Studio Movie Grill Holdings, LLC (6546) ("SMG Holdings"); OHAM Holdings, LLC (0966); Movie Grill Concepts Trademark Holdings, LLC (3096); Movie Grill Concepts I, Ltd. (6645); Movie Grill Concepts III, Ltd. (2793); Movie Grill Concepts IV, Ltd. (1454); Movie Grill Concepts IX, LLC (3736); Movie Grill Concepts VI, Ltd. (6895); Movie Grill Concepts VII, LLC (2291); Movie Grill Concepts X, LLC (6906); Movie Grill Concepts XI, LLC (2837); Movie Grill Concepts XII, LLC (6040); Movie Grill Concepts XIII, LLC (5299); Movie Grill Concepts XIV, LLC (4709); Movie Grill Concepts XIX, LLC (9646); Movie Grill Concepts XL, LLC (4454); Movie Grill Concepts XLI, LLC (4624); Movie Grill Concepts XLII, LLC (2309); Movie Grill Concepts XLIII, LLC (9721); Movie Grill Concepts XLIV, LLC (8783); Movie Grill Concepts XLV, LLC (2570); Movie Grill Concepts XV, LLC (4939); Movie Grill Concepts XVI, LLC (1033); Movie Grill Concepts XVII, LLC (1733); Movie Grill Concepts XVIII, LLC (8322); Movie Grill Concepts XX, LLC (7300); Movie Grill Concepts XXI, LLC (1508); Movie Grill Concepts XXII, LLC (6748); Movie Grill Concepts XXIV, LLC (5114); Movie Grill Concepts XXIX, LLC (5857); Movie Grill Concepts XXV, LLC (4985); Movie Grill Concepts XXVI, LLC (5233); Movie Grill Concepts XXVII, LLC (4427); Movie Grill Concepts XXVIII, LLC (1554); Movie Grill Concepts XXX, LLC (1431); Movie Grill Concepts XXXI, LLC (3223); Movie Grill Concepts XXXII, LLC (0196); Movie Grill Concepts XXXIII, LLC (1505); Movie Grill Concepts XXXIV, LLC (9770); Movie Grill Concepts XXXIX, LLC (3605); Movie Grill Concepts XXXV, LLC (0571); Movie Grill Concepts XXXVI, LLC (6927); Movie Grill Concepts XXXVII, LLC (6401); Movie Grill Concepts XXXVIII, LLC (9657); Movie Grill Concepts XXIII, LLC (7893); Studio Club, LLC (3023); Studio Club IV, LLC (9440); Movie Grill Concepts XI, LLC (2837); Movie Grill Concepts XLI, LLC (4624); Movie Grill Concepts XLVI, LLC (2344); Movie Grill Concepts XLVII, LLC (5866); Movie Grill Concepts XLVIII, LLC (8601); Movie Grill Concepts XLIX, LLC (0537); Movie Grill Concepts L, LLC (5940); Movie Grill Concepts LI, LLC (7754); Movie Grill Concepts LII, LLC (8624); Movie Grill Concepts LIII, LLC (3066); Movie Grill Concepts LIV, LLC (2018); Movie Grill Concepts LV, LLC (4699); Movie Grill Partners 3, LLC (4200); Movie Grill Partners 4, LLC (1363); Movie Grill Partners 6, LLC (3334); and MGC Management I, LLC (3224).

**INTERIM ORDER
(I) AUTHORIZING DEBTORS TO
(A) USE CASH COLLATERAL ON A LIMITED BASIS
AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED,
SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION,
(III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

**CAME ON FOR CONSIDERATION** on October 26, 2020, the *Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 (I) Authorizing Debtors to (A) Use Cash Collateral on a Limited Basis and (B) Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 15] (the "***Motion***")[2] filed by the above-captioned debtors, as debtors-in-possession (collectively, the "***Debtors***") seeking entry of an interim order (this "***Interim Order***") pursuant to Sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 503(b), and 507 of title 11 of the United States Code (the "***Bankruptcy Code***"), and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas (the "***Local Rules***"), and the Procedures for Complex Chapter 11 Cases (the "***Complex Case Procedures***"), inter alia:

(i)     authorizing the Debtors to obtain a priming secured and superpriority debtor-in-possession delayed-draw term loan facility (the "***DIP Facility***", and the loan commitments thereunder, the "***DIP Loan Commitments***") consisting of up to $22,800,000 of new money commitments (the "***DIP New Money Commitments***"), comprised of (A)(1) an initial amount to be available upon entry of this Interim Order in an amount not to exceed $7,000,000 (the "***Interim DIP Loans***") and (2) the remaining DIP New Money Commitments (as reduced after giving effect to any funded new money DIP Loans (as defined below)), to be available upon entry of the Final Order (the "***Final DIP Loans***"), and (B) a deemed refinancing of obligations under the Prepetition Credit Agreement (1) in

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Motion.

the amount equal to two times the Interim DIP Loans plus $2,200,000 on account of obligations under the Prepetition Credit Agreement relating to advances made in connection with the *Third Amendment and Limited Consent to Second Amended and Restated Credit and Guaranty Agreement* dated October 22, 2020 (the "***Third Amendment***") authorized upon the entry of this Interim Order (the "***Interim DIP Refinancing***"), and (2) in the amount equal to two times the DIP Loan Commitments minus the Interim DIP Loans upon entry of the Final Order (together with the Interim DIP Refinancing, the "***DIP Refinancing***", and each funding of the term loans made under the DIP Facility, including the Interim DIP Loans and the Final DIP Loans, plus the DIP Refinancing, collectively, the "***DIP Loans***"), and each such funding plus the DIP Refinancing shall be deemed to be a DIP Loan advance under the DIP Documents, pursuant to the terms and conditions set forth herein and in that certain *Senior Secured Superpriority Debtor-in-Possession Financing Amendment* dated as of October 27, 2020 to the Prepetition Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "***DIP Credit Agreement***"),[3] by and among the Borrowers (as defined therein), the Guarantors (as defined therein), Goldman Sachs Specialty Lending Group, L.P., as administrative agent (in such capacity, the "***DIP Agent***"), for itself and for and on behalf of the other lenders party thereto (collectively, including the DIP Agent in its capacity as a lender under the DIP Credit Agreement, the "***DIP Lenders***"), and all other related agreements and documents;

(ii)     authorizing the Debtors to execute, deliver, and perform under the DIP Credit Agreement and the other Credit Documents (as defined in the Prepetition Credit Agreement, but as may be modified by the DIP Credit Agreement), the DIP Orders (as defined below), and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to the DIP Agent and the DIP Lenders on account of the DIP Facility or granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the DIP Agent, for itself and for and on behalf of the DIP Lenders, on account of the DIP Facility, in each case as the same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the agreements and documents currently executed or to be executed in connection therewith or related to any of the foregoing, by and among any of the Debtors, the DIP Agent, and the DIP Lenders, and all of which must be in form and substance acceptable to the Agent (as defined below), the terms of which are referenced and incorporated herein as if set forth *in haec verba* (collectively, the "***DIP Documents***");

(iii)    approving the terms and conditions of the DIP Credit Agreement and the DIP Documents;

---

[3]    A copy of the DIP Credit Agreement is attached hereto as **Exhibit 1**, and incorporated herein as if set forth *in haec verba*.

(iv)     authorizing the Debtors to use Cash Collateral (as defined below) of the DIP Agent, for itself and for and on behalf of the DIP Lenders, and Goldman Sachs Special Lending Group, L.P., in its capacity as administrative agent (in such capacity, the "***Prepetition Agent***," and in such capacity and in its capacity as the DIP Agent, collectively, the "***Agent***") for itself and for and on behalf of the other lenders (collectively, including the Prepetition Agent in its capacity as a lender under the Prepetition Credit Agreement, the "***Prepetition Lenders***," and together with the DIP Lenders, collectively, the "***Lenders***") under that certain *Second Amended and Restated Credit and Guaranty Agreement* dated as of March 29, 2019, by and among, among others, the Debtors, the Prepetition Agent, and the Prepetition Lenders (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "***Prepetition Credit Agreement***") in accordance with the terms and conditions set forth herein;

(v)      modifying the automatic stay of section 362 of the Bankruptcy Code (the "***Automatic Stay***") to the extent provided herein;

(vi)     granting (i) continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected first-priority priming liens on and security interests in the DIP Collateral (as defined below) to the DIP Agent, for itself and for and on behalf of the DIP Lenders, to secure all obligations and indebtedness of any of the Debtors to the DIP Agent and the DIP Lenders under the DIP Documents (the "***DIP Obligations***") and (ii) superpriority claims with priority over all other administrative expense claims and other postpetition claims against the Debtors and their estates, to the DIP Agent, for itself and for and on behalf of the DIP Lenders, to secure the DIP Obligations;

(vii)    granting automatically perfected liens, security interests, and other adequate protection to the Prepetition Agent, for itself and for and on behalf of the Prepetition Lenders, with respect to their interests in the DIP Collateral and the Prepetition Lenders' Collateral (as defined below);

(viii)   authorizing the indefeasible transfer of Cash Collateral to and for the benefit of the Agent, for itself and for and on behalf of the Lenders, as set forth herein;

(ix)     scheduling the Final Hearing (as defined below) within thirty (30) days of the Petition Date and approving notice with respect thereto in accordance with Bankruptcy Rule 4001(c)(2); and

(x)      waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order.

The Court having considered the Motion, the terms of the DIP Credit Agreement and the

DIP Documents, the *Declaration of William Snyder, CRO of the Debtors, in Support of*

*Chapter 11 Petition and First Day Motions* [Docket No. 20], and the evidence submitted at the interim hearing held before this Court on October 26, 2020 to consider entry of this Interim Order (the "***Interim Hearing***"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and the Local Rules, notice of the Motion and the Interim Hearing having been given; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing (as defined below) and is otherwise fair and reasonable and in the best interests of the Debtors, their creditors and their estates, and essential for the continued operation of the Debtors' businesses; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

1.      The Debtors have represented to this Court that they have agreed in good faith to the terms and conditions of the DIP Credit Agreement and this Interim Order.

2.      The Debtors have stipulated and agreed as follows, and based upon the pleadings and evidence at the Interim Hearing before this Court, this Court hereby acknowledges such stipulations, and grants the relief herein, on an interim basis, pursuant to Bankruptcy Rule 4001 to prevent immediate and irreparable harm to the Debtors and their estates. Therefore, consistent with sections 361, 362, 363, 364, 503(b), and 507 of the Bankruptcy Code, this Court hereby finds and orders:

<u>**OPPORTUNITY TO OBJECT**</u>

3.      A final hearing on the Motion shall take place on **<u>November 17, 2020 at 9:30 a.m. (prevailing Central Time)</u>** before the Honorable Stacey G. C. Jernigan, United States

Bankruptcy Judge, at the United States Bankruptcy Court, Northern District of Texas, Earl Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom #1, Dallas, Texas 75242, which shall be noticed by the Debtors to all parties in interest in a subsequent notice of hearing (the "***Final Hearing***"). Objections shall be in writing and shall be filed with the Clerk of the Court so that any such objections are received on or before the Objection Deadline. Pursuant to Bankruptcy Rule 4001(d)(2), any objection to the entry of a final order on the Motion (the "***Final Order***," and together with the Interim Order, the "***DIP Orders***") must be filed on or before **November 10, 2020 at 5:00 p.m. (prevailing Central Time)**.

4. The Debtors have represented to the Court that they have negotiated at arm's length and have acted in good faith in the negotiation and preparation of the DIP Credit Agreement and this Interim Order, have been represented by counsel, and intend to be and are bound by their respective terms. The terms and conditions of this Interim Order and the DIP Documents reflect the Debtors' exercise of prudent business judgment under exigent circumstances and are consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

## STATEMENT OF JURISDICTION

5. This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (D), (G), (K), (M) and (O).

## NOTICE

6. Sufficient and adequate notice of the Motion and the Interim Hearing has been given to prevent immediate and irreparable harm pursuant to Bankruptcy Rules 2002, 4001, 9006, and 9014 and the Local Rules, and as required by sections 102, 105, 361, 362, 363, and

364 of the Bankruptcy Code. Other than the notice provided for herein, no further notice of the interim relief sought in the Motion or of the Final Hearing is necessary.

## FACTUAL AND PROCEDURAL BACKGROUND

7. On October 23, 2020 (the "***Petition Date***"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the management and possession of their business and property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8. On October 26, 2020, the Court conducted the Interim Hearing on the Motion and pronounced interim approval of the Motion as set forth herein.

9. An official committee of unsecured creditors (the "***Committee***") has not been appointed in these chapter 11 cases (the "***Cases***").

## PREPETITION CREDIT AGREEMENT

### The Prepetition Lenders' Claims

10. The Debtors admit, stipulate, and agree that, pursuant to the Prepetition Claim Documents (as defined below) and applicable law, the Prepetition Agent and the Prepetition Lenders held valid, enforceable, and allowable claims against the Debtors as of the Petition Date in an aggregate amount equal to at least $104,123,984.28 for unpaid principal, plus any and all interest, fees, costs, expenses, charges, and other claims, debts or obligations of the Debtors to the Prepetition Agent and the Prepetition Lenders that have accrued as of the Petition Date under the Prepetition Claim Documents (as defined below) and applicable law (the "***Prepetition Secured Indebtedness***," and together with all post-Petition Date interest, fees, costs, and charges allowed to the Prepetition Agent and the Prepetition Lenders on such claim pursuant to section 506(b) of the Bankruptcy Code, collectively the "***Prepetition Lenders' Claim***").

11.     The Debtors admit, stipulate, and agree that the Prepetition Lenders' Claim constitutes an allowed, legal, valid, binding, enforceable, and non-avoidable obligation of and claim against the Debtors, and shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors and their estates do not possess and shall not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, allowance, and non-avoidability of the Prepetition Lenders' Claim.

### The Prepetition Claim Documents

12.     The Debtors admit, stipulate, and agree that the Prepetition Lenders' Claim is evidenced by certain documents executed and delivered to the Prepetition Agent and the Prepetition Lenders by the Debtors, including, without limitation, the Prepetition Credit Agreement and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, letters of credit, and other instruments or documents executed in connection therewith or related thereto (collectively the "***Prepetition Claim Documents***").  True and correct copies of certain of the Prepetition Claim Documents are maintained by the Debtors and the Prepetition Agent and will be made available to interested parties upon request.

13.     The Debtors admit, stipulate, and agree that the Prepetition Claim Documents are genuine, valid, existing, legally enforceable and admissible in the Cases for all purposes.

### The Prepetition Lenders' Collateral

14.     The Debtors admit, stipulate, and agree that the Prepetition Lenders' Claim evidenced by the Prepetition Claim Documents is secured by perfected first-priority liens and security interests in substantially all assets of the Debtors, including, without limitation, the

following property wherever located and now-owned or at any time hereafter acquired or in which such Debtor now has or at any time in the future may acquire any right, title, or interest (collectively, the "***Prepetition Lenders' Collateral***"):    (a) all Receivables and Receivable Records,[4] (b) all cash, Money, Deposit Accounts, Securities Accounts, Commodity Accounts, and other Accounts, (c) all Intellectual Property, (d) all Investment Related Property (e) all Insurance, (f) all Goods, (g) Letter of Credit Rights, (h) Commercial Tort Claims, (i) all General Intangibles, Chattel Paper, Instruments and Documents evidencing any of the foregoing Prepetition Lenders' Collateral or related to the foregoing Prepetition Lenders' Collateral and Equity Interests held by any Debtor, (j) certain Leasehold Properties and other properties subject to Mortgages, (k) 100% of the issued and outstanding Capital Stock of each Debtor other than OHAM Holdings, LLC, and (l) to the extent not otherwise included above, any "Collateral" (for this reference only, as defined in the Prepetition Claim Documents notwithstanding footnote 4), all Proceeds, products, accessions, substitutions, replacements, rents and profits of any and all of the foregoing and all collateral security, Collateral Records, Collateral Support and Supporting Obligations and guarantees given by any person with respect to any of the foregoing.  The Prepetition Lenders' liens and security interests in the Prepetition Lenders' Collateral were granted pursuant to, *inter alia*, the Prepetition Claim Documents.

15.    The Debtors admit, stipulate, and agree that the Prepetition Agent and the Prepetition Lenders properly perfected their first-priority liens and security interests and other liens in the applicable Prepetition Lenders' Collateral as evidenced by, among other things, the

---

[4]    Capitalized terms used in this paragraph 14 but not otherwise defined herein shall have the meanings set forth in the Prepetition Claim Documents.

Prepetition Claim Documents, documents held in possession of the Prepetition Agent and the Prepetition Lenders, and documents filed with the appropriate state, county, and other offices.

### Defaults by the Debtors

16.     The Debtors admit, stipulate, and agree that they are in default of their debts and obligations to the Prepetition Agent and the Prepetition Lenders under the terms and provisions of the Prepetition Claim Documents.  The Debtors stipulate that these defaults exist, have not been timely cured, and are continuing.  The Debtors stipulate that the filing of these Cases has accelerated the Prepetition Lenders' Claim for all purposes in these Cases and in connection with the Prepetition Agent's and the Prepetition Lenders' enforcement of their rights and remedies under the Prepetition Claim Documents and applicable law.  The Debtors admit, stipulate, and agree that each of the Debtors is indebted and liable under the terms and provisions of the Prepetition Claim Documents without defense, counterclaim, or offset of any kind, and the Prepetition Lenders' Claim remains fully due and owing.  The Debtors admit, stipulate, and agree that no payments or other transfers made by or on behalf of the Debtors to the Prepetition Agent or the Prepetition Lenders prior to the Petition Date are avoidable or recoverable from the Prepetition Agent or any of the Prepetition Lenders under any section of the Bankruptcy Code, any other federal, state, or other appliable law, or otherwise.  The Debtors admit, stipulate, and agree that from and after the Petition Date, except as set forth in this Interim Order and in the DIP Credit Agreement, neither the Prepetition Agent nor the Prepetition Lenders shall have any obligation to lend or advance funds to the Debtors or their estates.

## CASH COLLATERAL

### Lenders' Cash Collateral

17.     The Debtors admit, stipulate, and agree that all cash of each of the Debtors' bankruptcy estates, wherever located, and all cash equivalents, whether in the form of negotiable

US 7428642v.20

instruments, documents of title, securities, deposit accounts, investment accounts, or in any other form, that were on the Petition Date in any of the Debtors' possession, custody or control, or in which any of the Debtors will obtain an interest during the pendency of these Cases whether via advances under the DIP Facility or otherwise, or which represent income, proceeds, products, rents, or profits of any of the Collateral shall constitute the cash collateral (collectively, "*Cash Collateral*") of the Agent, for itself and for and on behalf of the Lenders. The Agent and the Lenders have, subject to the Carve-Out (as defined below), first-priority perfected liens and security interests in the Cash Collateral pursuant to the applicable provisions of the Prepetition Claim Documents, the DIP Documents, sections 363(a) and 552(b) of the Bankruptcy Code, and this Interim Order, and, the "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply.

18. Each Debtor shall account to the Agent for all Cash Collateral that it now possesses, that it has permitted to be transferred into the possession of others (if any), that is being held by those in privity with the Debtors, or that any Debtor might hereafter obtain or have any interest in. Each Debtor shall account to the Agent for the receipt and use, if any, of the Cash Collateral received by the Debtors since the Petition Date and prior to the entry of this Interim Order. Absent a further order of this Court or the consent of the Agent, the Debtors are strictly prohibited from using the Cash Collateral except as expressly provided for herein.

### Need For and Consent to Limited Use of Cash Collateral

19. The Lenders do not consent to the Debtors' use of Cash Collateral except in strict accordance with the terms and conditions contained in this Interim Order. The relief hereunder is necessary to avoid immediate and irreparable harm to the Debtors' estates because, without the use of Cash Collateral, the Debtors will not have the funds necessary to maintain their assets, sell or otherwise liquidate their assets, provide financial information, and pay employee

compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtors' estates. The Debtors require the use of Cash Collateral as provided herein.

20. Good, adequate, and sufficient cause has been shown to justify the granting of the relief requested herein. The use of Cash Collateral will benefit the Debtors and their estates. The ability of the Debtors to maximize the value of their estates depends upon the Debtors' ability to use Cash Collateral. Accordingly, the use of Cash Collateral by the Debtors is actual and necessary to preserving their estates.

## **Authorization for Limited Use of Cash Collateral**

21. The Debtors are hereby authorized, on a limited basis, to use Cash Collateral only in strict accordance with the terms and conditions provided in this Interim Order and the Budget (as defined below). Except on the terms and conditions of this Interim Order, the Debtors are prohibited from using the Cash Collateral at any time absent consent of the Agent or further order of the Court.

## **DIP FACILITY**

### **Need for DIP Facility**

22. Without the ability to use Cash Collateral and obtain the loans under the DIP Facility, the Debtors will not have sufficient funds to maintain their assets, operate their businesses, reorganize, sell or otherwise liquidate their assets, provide financial information, or pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtors' estates. The use of Cash Collateral and the loans provided under the DIP Facility is actual and necessary to preserving the Debtors and their estates. The DIP Agent and the DIP Lenders are willing to provide the DIP Facility to or for the benefit of the Debtors only in accordance with the terms of the DIP Credit Agreement and this Interim Order.

US 7428642v.20

23.     The Debtors have requested that the Agent and the DIP Lenders and Prepetition Lenders, as applicable, provide use of Cash Collateral and the DIP Facility in order to provide funds to be used for the purposes set forth in the Budget, and such other purposes as permitted by this Interim Order and to which the DIP Agent, for itself and for and on behalf of the DIP Lenders, consents in writing.

24.     As set forth in the Motion and in the declaration in support thereof, the DIP Facility is the best source of debtor-in-possession financing available to the Debtors. The Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility. The Debtors have also been unable to obtain:  (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders:  (a) perfected security interests in and DIP Liens on (each as provided herein) the DIP Collateral (as defined below) as set forth herein, (b) superpriority claims with the priorities set forth herein, and (c) the other protections set forth in this Interim Order.

25.     The terms of the DIP Facility and this Interim Order, including, without limitation, the related fees and priming liens in accordance therewith, are fair, just, and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair

consideration. Any credit extended under the terms of this Interim Order and the DIP Facility shall be deemed to have been extended in good faith by the DIP Agent and the DIP Lenders, as the term "good faith" is used in section 364(e) of the Bankruptcy Code. Except as expressly permitted by this Interim Order, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agent and/or the DIP Lenders (including their representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity.

### Authorization to Obtain Credit

26. The Debtors are hereby authorized to obtain credit under the DIP Facility only in accordance with the DIP Credit Agreement, the DIP Facility, this Interim Order, and the Budget.

27. The Debtors are hereby authorized (a) on an interim basis, to obtain (i) the Interim DIP Loans in an amount not to exceed $7,000,000 and (ii) the DIP Refinancing in the amount equal to two times the Interim DIP Loans plus $2,200,000 on account of obligations under the Prepetition Credit Agreement relating to advances made in connection with the Third Amendment, and (b) subject to entry of the Final Order, to obtain (i) the Final DIP Loans in an amount not to exceed $22,800,000 (cumulative of the Interim DIP Loans) as provided in the DIP Credit Agreement and (ii) the DIP Refinancing in the amount equal to two times the DIP Loan

US 7428642v.20

Commitments minus the Interim DIP Loans, in each case in accordance with the terms and conditions set forth herein and in the DIP Credit Agreement and the DIP Documents.

28.     Effective upon entry of this Interim Order, the Interim DIP Refinancing will be deemed to refinance and repay the Prepetition Lenders' Claim held by the DIP Lenders in the amount of the Interim DIP Refinancing, and such Interim DIP Refinancing shall become DIP Obligations.  Subject to and effective upon entry of the Final Order, the DIP Refinancing will be deemed to refinance and repay the Prepetition Lenders' Claim held by the DIP Lenders in the amount of the DIP Refinancing, and such DIP Refinancing shall become DIP Obligations.

29.     The DIP Documents and the terms therein, including, without limitation, the fees, indemnification provisions, and priming lien provisions, are approved in their entirety.  The Debtors are authorized to execute, deliver, and perform under the DIP Documents.

**DIP Liens and Superpriority Administrative Claims**

30.     Effective as of the Petition Date, the DIP Agent, for itself and for and on behalf of the DIP Lenders, is entitled to and is hereby granted first priority liens on and security interests in all property of the Debtors' estates, including any property not subject to a lien, and priming liens on and security interests in such Collateral (as defined below) (collectively, the "***DIP Liens***"), and the protections of good-faith credit providers under sections 364(c)(1), (c)(2), and (c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code to secure the DIP Facility, senior to all other liens and security interests, including adequate protection and replacement liens granted pursuant to the terms of this Interim Order, which DIP Liens shall secure all DIP Obligations (and including, without limitation, principal and any other extensions of credit, interest, fees, expenses, and any fees and expenses of the DIP Agent and the DIP Lenders in these Cases, however incurred), but subject only to Prior Permitted Liens (as defined below) (if any), any

amounts in a Professional Fee Escrow (as defined below) set forth in this Interim Order, and the Carve-Out.

31.     All liens and security interests granted hereby and under the DIP Documents securing the DIP Facility, including the DIP Liens, are effective as of the Petition Date and are valid and automatically perfected first-priority priming liens and security interests, subject only to any Prior Permitted Liens (if any), any amounts in a Professional Fee Escrow set forth in this Interim Order, and the Carve-Out, in and upon, and hereby are granted in and attach to, all real and personal property of the Debtors and their bankruptcy estates, tangible or intangible, wherever located, including, but not limited to, all cash, cash equivalents, deposit accounts (including the Segregated DIP Account (as defined below)), commodity accounts, securities accounts, accounts receivable, chattel paper, letters of credit, letter of credit rights, supporting obligations, documents, fixtures, goods, instruments, investment property, inventory, equipment, patents, trademarks, copyrights, other general intangibles and equity interests, subject to entry of the Final Order, any proceeds of avoidance actions under chapter 5 of the Bankruptcy Code, in each case, whether now existing or hereafter acquired by the Debtors and the Debtors' bankruptcy estates, and all proceeds, products, rents, revenues, and profits of any of the foregoing (the "***DIP Collateral***," and together with the Prepetition Lenders' Collateral, Adequate Protection Collateral, and the Cash Collateral, the "***Collateral***"); *provided, however*, for the avoidance of doubt, to the extent permitted by the Bankruptcy Code or applicable law, the DIP Liens shall attach to and DIP Collateral shall include the Debtors' interest in its leases of nonresidential real property, and in any event shall include any proceeds or value of such leasehold interests obtained whether by sale, financing, or other disposition or form of transfer or transaction; provided that for purposes of any requirement in any lease that a consent to the DIP

US 7428642v.20

Lien not be unreasonably withheld by a landlord, any failure to withhold consent to a DIP Lien is found to be unreasonable under the circumstances of these Cases; and provided further that the DIP Liens shall not attach to the Debtors' interests in a lease of nonresidential real property to the extent that the attachment of such DIP Lien is expressly prohibited under such lease and cannot be cured or resolved by consent or other process under such lease, or would cause a default under the landlord's financing agreement. Landlords seeking to assert that such a default would occur shall reasonably cooperate to provide written evidence of such a loan default, including applicable loan documentation, to the Debtors, the Agent, and the U.S. Trustee, and in the event of a dispute regarding whether such a default would be caused, such dispute will be determined by the Court.

32.     Additionally, on account of the DIP Facility and use of Cash Collateral, the DIP Agent, for itself and for and on behalf of the DIP Lenders, is hereby granted superpriority administrative claims (the "***DIP Superpriority Claims***") and all other benefits and protections allowable under sections 507(b) and 503(b)(1) of the Bankruptcy Code, senior in right to all other administrative claims against the Debtors' estates, subject to any amounts in a Professional Fee Escrow set forth in this Interim Order and the Carve-Out.

### Segregated DIP Account

33.     All proceeds of the DIP Loans shall be deposited into a segregated deposit account subject to a deposit account control agreement in favor of the DIP Agent (such depository institution, the "***Segregated DIP Account Depository***," and such deposit account, the "***Segregated DIP Account***").  The Segregated DIP Account shall not be subject to the liens of any person or entity other than (x) the valid perfected first priority priming lien of the DIP Agent for itself and for and on behalf of the DIP Lenders, (y) the valid perfected lien of the Prepetition Agent for itself and for and on behalf of the Prepetition Lenders, and (z) customary bankers'

liens of the Segregated DIP Account Depository. The Debtors shall be prohibited from withdrawing funds from the Segregated DIP Account except in strict compliance with the terms of this Interim Order and the DIP Documents.

34. The proceeds from any sale of any of the Debtors' assets, any settlement, casualty, or condemnation proceeds relating to any of the Debtors' assets shall be paid to the Agent for application to the Prepetition Lenders' Claim and DIP Obligations allocated as determined by the Agent.

35. All funds transferred to Agent hereunder constitute Cash Collateral of the Lenders. In the event that any funds so transferred are ever determined not to be Cash Collateral, the Lenders expressly reserve all rights and remedies in connection with any such determination, and such funds as transferred shall be subject to the DIP Liens and DIP Superpriority Claims granted to the DIP Agent and the DIP Lenders hereunder.

36. To the extent there exists or comes to exist any cash of the Debtors' estates that is not Cash Collateral, wherever located and however held, such cash shall be deemed to have been used first by the Debtors' estates, and such cash shall be subject to the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens (as defined below), and Adequate Protection Superpriority Claims (as defined below) granted to the Agent and the Lenders hereunder.

## ADEQUATE PROTECTION

### Budgeted Cash Collateral Usage

37. As adequate protection of the DIP Lenders' interests in the DIP Collateral and for the Debtors' use of Cash Collateral and as a condition precedent to the DIP Lenders' agreement to provide the DIP Facility, there shall be established a 13-week cash flow budget (the "***Budget***"), the initial version of which is attached hereto as **Exhibit 2**, updated on a weekly basis, for the Debtors' cash receipts and expenses (including professional fees and expenses),

which shall provide, among other things, for the payment of interest in respect of the DIP Facility on a monthly basis to the DIP Lenders, and the adequate protection amounts set forth herein. Any updates or revisions to the Budget shall require the prior written consent of the DIP Agent. Only so long as a Postpetition Default (as defined below) shall not have occurred, the Debtors are authorized to and shall use the Cash Collateral (including the advances under the DIP Facility) strictly in accordance with the Budget. Notwithstanding anything to the contrary herein, the Budget shall not be construed as a cap on the fees and expenses payable to professionals of the Agent or the Lenders.

38. The Debtors hereby covenant and agree that (i) the actual amount of aggregate receipts for each Measurement Period (as defined below) shall not be less than 85% of the amount projected in the Budget for such Measurement Period; (ii) the actual amount of disbursements (on a line item basis) for any Measurement Period shall not be more than 105% in aggregate and 115% by line item of the amount projected in the Budget for such Measurement Period (variances permitted under the foregoing clauses (i) and (ii), each, a "***Permitted Variance***"). Not later than 9:00 a.m. (Eastern time) on the Wednesday of each week commencing on November 4, 2020, the Debtors shall furnish to the DIP Lenders a weekly Budget update and reconciliation report, in form and substance acceptable to the DIP Agent (the "***Budget Report***") that sets forth as of the preceding Sunday of each such week, for the prior rolling 4 weeks (each such period referred to herein as a "***Measurement Period***", *provided* that if less than 4 weeks have passed since the approval of the most recent Budget, then the Budget amounts and actual amounts for the weeks preceding that Budget shall be the same for the purpose of calculating Permitted Variances), and on a cumulative basis from the Petition Date through the current week, variances of Budget amounts to actual amounts, including details of

the Debtors' revenue, receipts and disbursements for the previous calendar week and a comparison to the amounts set forth in the Budget therefor for the relevant Measurement Period ending on the last day of such week (on an aggregate and a line item by line item basis in the case of disbursements).

39.     The Lenders' consent to use of Cash Collateral and the DIP Lenders' agreement to extend credit extends only to (i) amounts due under the DIP Facility and (ii) amounts actually incurred in accordance with the Budget.  Subject to the amounts in a Professional Fee Escrow and the Carve-Out, upon the occurrence of a Postpetition Default, the Lenders' consent to use of Cash Collateral or agreement to extend credit shall automatically and immediately terminate and any consent for use of Cash Collateral or agreement to extend credit to satisfy projected, budgeted expenditures shall be immediately terminated and deemed withdrawn unless such Postpetition Default is waived by the Agent, for itself and for and on behalf of the Lenders.

40.     Except as may specifically be provided in the Budget including, without limitation, for ordinary course payroll, benefits, and expense reimbursements, the Debtors agree that no transfer of Cash Collateral shall be made to any of the Debtors' insiders, as that term is defined in section 101(31) of the Bankruptcy Code.  Any transfers to insiders shall be so identified in the Budget.

41.     The Budget may be modified in writing only with the prior written consent of the Agent.

## **Adequate Protection Liens**

42.     Taking into account all factors in these Cases, as adequate protection of the Lenders' interests in the Collateral and for the Debtors' use of Cash Collateral, and subject only to Prior Permitted Liens, if any, any amounts in a Professional Fee Escrow set forth in this Interim Order, the Carve-Out, and the DIP Liens, the Agent and the Lenders are hereby granted,

US 7428642v.20

effective as of the Petition Date, valid and automatically perfected first-priority replacement liens and security interests (the "***Adequate Protection Liens***") in and upon the DIP Collateral (the "***Adequate Protection Collateral***") that shall secure any diminution in value of the Agent's and Lenders' interests in the Collateral and for the Debtors' use of Cash Collateral.

### Adequate Protection Payments

43.     As additional adequate protection of the Lenders' interests in the Collateral and for the Debtors' use of Cash Collateral, and subject only to Prior Permitted Liens, if any, any amounts in a Professional Fee Escrow set forth in this Interim Order, the Carve-Out, the DIP Superpriority Claims, and the DIP Liens, the Agent and the Lenders are hereby granted, effective as of the Petition Date, adequate protection payments consisting of (i) except to the extent paid under the DIP Facility, cash reimbursement of the reasonable and documented (in summary format) fees, costs, and expenses (including reasonable professional fees) of the Prepetition Agent and the Prepetition Lenders (including, without limitation, the fees and expenses of Vinson & Elkins L.L.P., FTI Consulting, Inc., and Jones Day), subject to the procedures set forth in paragraph 65 hereof for payment of Lenders' Costs (as defined below) and (ii) monthly payment of interest owed under the Prepetition Claim Documents at the applicable default rate except as otherwise agreed in writing by the Agent.

44.     The Agent may elect that such monthly adequate protection interest be paid in kind and added to the principal balance of the Prepetition Secured Indebtedness rather than in cash.  Notwithstanding the foregoing, in the event the payment of such interest is (a) determined by final order of the Court not to be allowable under section 506 of the Bankruptcy Code, or (b) not provided to be paid under a confirmed plan, then any party in interest as provided herein may assert that any adequate protection interest payments made in respect of the Prepetition

Secured Indebtedness constitute and may be recharacterized as principal repayments rather than payment of interest.

### Adequate Protection Superpriority Claims

45. To the extent of any diminution in value of the Prepetition Lenders' interest in the Prepetition Lenders' Collateral, the Prepetition Lenders are hereby granted superpriority administrative expense claims (the "***Adequate Protection Superpriority Claims***") and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, junior only in right to any DIP Superpriority Claims, any amounts in a Professional Fee Escrow set forth in this Interim Order, and the Carve-Out, that shall protect against any diminution in value of the Prepetition Agent's and Prepetition Lenders' interests in the Prepetition Lenders' Collateral and for the Debtors' use of Cash Collateral.

### Automatic Perfection

46. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of all of the DIP Lenders and the Prepetition Lenders' security interests in and liens on the Collateral granted and created hereunder, and such security interests and liens shall constitute valid, automatically perfected and unavoidable security interests and liens, with the priorities granted hereunder, effective as of the Petition Date, without the necessity of creating, filing, recording, or serving any financing statements, continuation statements, mortgages, or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to the Agent, for itself and for and on behalf of the DIP Lenders and the Prepetition Lenders, by this Interim Order.

47. To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of the liens and security interests

US 7428642v.20

granted and created by this Interim Order or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal law, and the judicial power of the United States Bankruptcy Court.

48.     By virtue of the terms of this Interim Order, (a) to the extent that the Agent has filed Uniform Commercial Code financing statements or other security or perfection documents under the names of any of the Debtors, such filings shall be deemed to properly perfect the liens and security interests granted under this Interim Order and (b) to the extent that the Agent has entered into deposit account control agreements with any of the Debtors, such agreements shall remain in effect and the Agent shall continue to have control over the accounts subject thereto as set forth therein, in each case without further action by the Agent.

49.     If the Agent shall elect, in its determination, for any reason to file any Uniform Commercial Code financing statements or other recordable documents, or execute or enter into deposit account control agreements, to further evidence perfection of its interests in property of the estates, the Agent, or, upon the request of the Agent, the Debtors, are authorized and directed to execute, enter into, and/or file, or cause to be executed, entered into, and/or filed, all such financing statements or deposit account control agreements and other such documents, and the execution, entering into, filing, recording, or service (as the case may be) of such financing statements, deposit control agreements, or similar documents shall be deemed to have been made at the time of and on the Petition Date, and the signature(s) of any person(s) designated by the Debtors, whether by letter to the Agent or by appearing on any one or more of the agreements or other documents respecting the security interests and liens granted hereunder shall bind the Debtors and their estates. The Agent may execute such documents on behalf of the Debtors as

the Debtors' attorney-in-fact or file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which any of the Debtors have real or personal property, and, in such event, the subject filing or recording officer is authorized and directed to file or record such documents or certified copy of this Interim Order.

## Authorization to Act

50. The Debtors are hereby authorized and directed to perform all acts, take any action, and execute and comply with the terms of such other documents, instruments and agreements, as the Agent may require as evidence of and for the protection of the Collateral, or that may be otherwise deemed necessary by the Agent to effectuate the terms and conditions of this Interim Order and the DIP Facility.

51. Until such time as the Prepetition Lenders' Claim and the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the terms of the Prepetition Claim Documents and the DIP Documents, and without further order of the Court: (a) the Debtors shall use the proceeds of the DIP Facility and all Cash Collateral strictly in accordance with the terms of the Budget requirements and the other terms of this Interim Order; (b) the Debtors shall not, without prior order of the Court (after notice to Agent), engage in any transaction that is not in the ordinary course of the Debtors' business, and (c) the Debtors shall timely comply with all of the covenants set forth in the DIP Documents.

## Prior Permitted Liens

52. The security interests and liens granted pursuant to the terms of this Interim Order are subject to any other valid, perfected and unavoidable liens and security interests of any other secured creditor in any assets of any of the Debtors existing on the Petition Date that are senior in priority under applicable law to the liens and security interests granted under the Prepetition Claim Documents in the Prepetition Lenders' Collateral (collectively, the "***Prior Permitted***

*Liens*").  The Debtors or any other party in interest, including the Agent, the DIP Lenders, and the Prepetition Lenders, shall have the right to object to the validity, priority, or extent of any such Prior Permitted Liens, or the allowance of such debts secured thereby, or to institute any actions or adversary proceedings with respect thereto.  The DIP Liens granted to the DIP Agent and the DIP Lenders, and the Adequate Protection Liens granted to the Prepetition Agent and the Prepetition Lenders, each as pursuant to this Interim Order, shall not at any time be (a) made subject or subordinated to, or made *pari passu* with, any other lien or security interest existing on the Petition Date, or any claim, lien, or security interest created under sections 363 or 364(d) of the Bankruptcy Code or otherwise (except with respect to any Prior Permitted Liens), or (b) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.

### No Additional Liens

53.    Until such time as the Prepetition Lenders' Claim and the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the terms of the Prepetition Claim Documents and the DIP Documents, the Debtors shall not be authorized to obtain credit secured by a lien or security interest in the Collateral, other than the DIP Facility, without the prior written consent of the DIP Agent, for itself and for and on behalf of the DIP Lenders, or by order of the Court upon reasonable notice.

### No Liability

54.    No act committed or action taken by the Lenders or by the Agent, for itself and for and on behalf of the DIP Lenders or the Prepetition Lenders, as applicable, under this Interim Order, the DIP Facility, the DIP Documents, the Prepetition Claim Documents, or the collection of the Prepetition Lenders' Claim or the DIP Obligations, shall be used, construed, or deemed to hold the Agent and/or the DIP Lenders or Prepetition Lenders, as applicable, to be in "control" of

US 7428642v.20

or participating in the governance, management, or operations of the Debtors for any purpose, without limitation, or to be acting as a "responsible person(s)" or "owner(s) or operator(s)" or a person(s) in "control" with respect to the governance, management, or operation of the Debtors or their businesses (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, Comprehensive Environmental Response, Compensation and Liability Act, or the Bankruptcy Code, each as may be amended from time to time, or any other federal or state statute, at law, in equity, or otherwise) by virtue of the interests, rights, and remedies granted to or conferred upon the Agent and the DIP Lender or Prepetition Lenders, as applicable, under the Prepetition Claim Documents, the DIP Documents, or this Interim Order including, without limitation, such rights and remedies as may be exercisable by the Agent and the DIP Lenders or Prepetition Lenders, as applicable, in connection with this Interim Order, the DIP Facility, the DIP Documents, or the Prepetition Claim Documents.

## **Automatic Stay**

55.     The Automatic Stay is hereby modified to the extent necessary to permit (a) the Debtors, the Agent, and the DIP Lenders or Prepetition Lenders, as applicable, to commit all acts and take all actions necessary to implement the DIP Facility and this Interim Order, (b) all acts, actions, and transfers contemplated herein, including, without limitation, transfers of Cash Collateral and other funds and payment of fees and expenses to and on behalf of the Agent and the Lenders by the Debtors as provided herein, and (c) consistent with the terms of this Interim Order, to permit the Agent and/or the DIP Lenders or Prepetition Lenders, as applicable, at their option, to pursue their rights and remedies as to the Collateral in accordance with the Prepetition Claim Documents, the DIP Documents, and applicable law.

**Collateral Insurance, Maintenance, Taxes, and Deposits**

56.     The Debtors shall maintain, with financially sound and reputable insurance companies, insurance of the kind covering the Collateral, and in accordance with the Prepetition Claim Documents and the DIP Documents (covering such risks in amounts as shall be satisfactory to the Agent and shall name the Agent, for itself and for and on behalf of the DIP Lenders or Prepetition Lenders, as applicable, as loss payee thereunder), including, without limitation, insurance covering the Collateral and such other collateral of the DIP Lenders and Prepetition Lenders, if any, as the Agent may from time to time request; and, at the Agent's request, the Debtors shall deliver to the Agent evidence of the maintenance of such insurance.

57.     Upon receipt of notification (written or oral) that an insurance policy covering any Collateral will not be renewed by the respective carrier, the Debtors will promptly, but in no event later than four (4) business days following such notification, notify the Agent in writing of such occurrence and thereafter provide the Agent with the status of all negotiations, if any, regarding such policy on a weekly basis.

58.     To the extent permitted by the Budget, the Debtors shall make any and all payments necessary to keep the Collateral and their other property in good repair and condition and not permit or commit any waste thereof.  The Debtors shall exercise their business judgment and use commercially reasonable efforts to preserve, maintain, and continue all material patents, licenses, privileges, franchises, certificates and the like necessary for the operation of their businesses.

59.     To the extent the Debtors have made or make any deposits for the benefit of utility companies or any other entity, or otherwise set aside funds for the benefit of any entity (and the Debtors shall not make any such deposits or otherwise set aside funds which are not included in the Budget without first obtaining prior written consent of the Agent), such deposits

US 7428642v.20

shall be, and hereby are, upon any return of same to the Debtors, subject to the first-priority perfected liens and security interests of the Agent granted pursuant to this Interim Order, including (without limitation) the adequate protection liens granted herein and the Agent's liens in respect of the DIP Facility and the Prepetition Claim Documents and the Debtors' use of Cash Collateral granted by this Interim Order.

## Reporting Requirements

60.     The Debtors are authorized and directed to provide to the Agent and the Lenders all of the documentation and reports required under the Prepetition Credit Agreement, DIP Credit Agreement, and the other DIP Documents unless the Agent waives or modifies such requirements in writing (the "***Reporting Information***").

61.     The Reporting Information shall also include:  (a) weekly reports of receipts and budgeted cash usage that also identify any variances from the Budget on a line item basis, with sufficient supporting detail as required by the DIP Agent; (b) copies of all reports submitted or filed with the Office of the United States Trustee within two (2) days after such submission or filing; and (c) such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and transactions of the Debtors, or concerning any matter that may affect the administration of the Debtors' estates, as the Agent may from time to time request.   All Reporting Information shall be in accordance with accounting principles and bookkeeping practices consistently applied with past accounting principles and bookkeeping practices and reporting of the Debtors to the Agent.

62.     The Debtors shall promptly deliver to the Agent and the Lenders (in either case, through counsel) any and all documentation that in any way relates to a solicitation, offer, or proposed sale or disposition of a material amount of property of the Debtors' estates, including, but not limited to, letters of inquiry, solicitations, letters of intent, or asset purchase agreements.

The Debtors shall provide access to the DIP Agent, the DIP Lenders and their advisors to any data room maintained to share information with potential investors or buyers of assets of the Debtors.

63.     The Agent, the Lenders, and their respective representatives, agents, consultants and other professionals, shall be permitted, in coordination with the Debtors' counsel, to contact and communicate with the Debtors and their financial and sale advisors regarding potential transactions for the sale or other disposition of assets of the Debtors' estates. The Debtors shall be responsive and employ commercially reasonable efforts to cooperate in the coordination of all such contacts and communications, including, without limitation, by conducting update telephone conferences with the Debtors, their financial and sale advisors, the Agent and the Lenders upon request regarding any potential transactions for the sale or other disposition of the assets of the Debtors' estates. In the event the Debtors are not responsive and/or do not employ their best efforts to cooperate in the coordination of all such contacts and communications, then, upon notice of same by the Agent to the Debtors, the Debtors consent to an expedited hearing upon the Agent's motion in which the Agent, on behalf of its representatives, agents, consultants and other professionals, may seek to be permitted to conduct such contacts and communications without the Debtors' consent.

64.     The Agent and the Lenders, and their respective representatives, agents and advisors, shall have full access, upon reasonable notice during normal business hours, to the Debtors' business records, business premises, and to the Collateral to enable the Agent, the Lenders or their respective representatives, agents and advisors to (a) review, appraise, and evaluate the physical condition of the Collateral, (b) inspect and review the financial records and all other records of the Debtors concerning the operation of the Debtors' businesses, and

US 7428642v.20

(c) evaluate the Debtors' overall financial condition and all other records relating to the operations of the Debtors. The Debtors shall fully cooperate with the Agent and the Lenders regarding such reviews, evaluations, and inspections, and shall make their employees and professionals available to the Agent and the Lenders and their representatives, agents and advisors upon reasonable notice and during normal business hours, to conduct such reviews, evaluations, and inspections.

### Interest, Fees, Costs and Expenses of the DIP Lenders and Prepetition Lenders

65. During the Cases, as additional adequate protection, all interest, fees, costs, and expenses, including attorneys' fees and expenses, due at any time to the Agent and the DIP Lenders or Prepetition Lenders, as applicable, under the Prepetition Claim Documents and/or the DIP Documents, as applicable, or that are incurred as a result of or are in any way related to the Debtors' Cases (collectively, the "***Lenders' Costs***"), including, without limitation, the fees and expenses of Vinson & Elkins L.L.P., FTI Consulting, Inc., and Jones Day, may be charged under the DIP Facility by the DIP Lenders and the Prepetition Lenders, as applicable, and shall be paid by the Debtors out of the Cash Collateral or out of any DIP Facility advances. The Debtors are hereby authorized to pay such Lenders' Costs without the Agent or the DIP Lenders or Prepetition Lenders, as applicable, or their counsel either (a) having to file any further application with this Court for approval or payment or (b) having to comply with any guidelines established by the U.S. Trustee. Any such Lenders' Costs that are incurred after the Petition Date that constitute fees and expenses incurred by any professional retained by the Agent or the Lenders shall be paid within ten (10) business days of delivery of a summary invoice to the Debtors, which invoice need not contain detailed time entries and may be redacted for privilege as determined by the Agent and the Lenders (as applicable), with a copy to the U.S. Trustee and any official Committee appointed in these Cases; *provided*, *however*, that (i) any redacted fee

US 7428642v.20

statements shall retain all privileges irrespective of any disclosure of any privileged matter, and any such disclosure shall be deemed inadvertent for all purposes and deemed stricken from any record in these Cases or otherwise, (ii) if the Debtors, the U.S. Trustee, or any official Committee objects to the reasonableness of such fees and expenses and cannot resolve such objection within five (5) business days of service of such summary invoice(s), the Debtors, the U.S. Trustee, or any official Committee, as the case may be, shall file and serve upon such professional an objection with the Court (a "***Fee Objection***") limited to the issue of the reasonableness of the disputed fees and expenses within ten (10) calendar days of the delivery of such summary invoice; (iii) if the Debtors, the U.S. Trustee, or any official Committee fails to object to the reasonableness of such fees and expenses within ten (10) calendar days, any objection of the Debtors, the U.S. Trustee, or any official Committee, as the case may be, shall be waived, (iv) the Debtors shall timely pay in accordance with this Interim Order the undisputed fees and expenses reflected on any invoice to which a Fee Objection has been timely filed, and (v) notwithstanding the foregoing (i) – (iv) of this sentence, the Lenders' Costs incurred prior to and unpaid as of the Petition Date shall be paid indefeasibly upon entry of this Interim Order. Payments of Lenders' Costs may be effectuated directly by the Agent and all such payments shall constitute advances under the DIP Facility. All Lenders' Costs owed to the Agent and the Lenders, regardless of whether or not such Lenders' Costs are set forth in the Budget and including, without limitation, all fees referred to in the DIP Documents (including, without limitation, all attorneys' and other professionals' fees and expenses), shall constitute obligations under the DIP Facility and shall be secured by the DIP Collateral and afforded all priorities and protections afforded to the DIP Facility under this Interim Order and the DIP Documents.

**Professional Fees of the Estates; Carve-Out**

66.     The Debtors shall be deemed to first use any unencumbered cash they may have, if any; further, the DIP Liens, Adequate Protection Liens, and all other liens on the DIP Collateral will be subject to:  (a) the payment of unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (b) to the extent (i) provided for in the Budget, and (ii) allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Court, all unpaid fees and expenses (the "*Allowed Professional Fees*") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "*Debtor Professionals*"), and any appointed Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "*Committee Professionals*" and, together with the Debtor Professionals, the "*Estate Professionals*") at any time before the delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below); and (c) Allowed Professional Fees of all Estate Professionals in an aggregate amount, after application of all retainers, not to exceed $100,000 incurred on or after the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (such amount, the "*Post-Carve-Out Trigger Notice Cap*") (the foregoing clauses (a) through (c), collectively, the "*Carve-Out*"). The Term "*Carve-Out Trigger Notice*" shall mean a written notice stating that the Post-Carve-Out Trigger Notice Cap has been invoked, delivered by hard copy or email by the DIP Agent to lead bankruptcy counsel for the Debtors, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and continued existence of a Postpetition Default under the terms of this Interim Order.

67.     Amounts to be paid for Allowed Professional Fees, in compliance with amounts designated for such in the Budget, and subject to any terms and conditions of applicable

US 7428642v.20

engagement agreements and appurtenant orders for the employment of such Estate Professionals, for periods prior to the delivery of a Carve-Out Trigger Notice shall be set aside weekly and held by the Debtors' bankruptcy counsel in a trust account for the Estate Professionals (each, a "**Professional Fee Escrow**") for the sole purpose of funding Allowed Professional Fees incurred prior to delivery of a Carve-Out Trigger Notice. To the extent funds in the Professional Fee Escrow are not used for such purposes, any such unused funds shall be refunded to the Debtors, subject to the liens and claims of the Agent.

68. Any payment or reimbursement made to any Estate Professional in respect of any Allowed Professional Fees prior to the delivery of the Carve-Out Trigger Notice shall not reduce the Carve-Out; *provided*, *however*, that no amounts paid prior to any Postpetition Default or under the Carve-Out shall be used for the purpose of: objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of the Prepetition Secured Indebtedness or any liens or security interests with respect thereto, or any other rights or interests of the Prepetition Agent or DIP Agent or the Prepetition Lenders or DIP Lenders, or in asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code against the Prepetition Agent or DIP Agent, or the Prepetition Lenders or DIP Lenders; preventing, hindering, or delaying the DIP Agent's or DIP Lenders' enforcement of realization upon any of the DIP Collateral after the occurrence of a Postpetition Default; using Cash Collateral or selling any Collateral except as specifically permitted in this Interim Order or by order of the Court with the consent of the Agent; incurring indebtedness except as permitted by this Interim Order and the DIP Credit Agreement; modifying the DIP Agent's or DIP Lenders' rights under the DIP Credit Agreement; or committing any other act or taking any other action that is materially adverse to the Agent or the

Lenders; *provided*, *however*, that the Committee may utilize up to $25,000 to investigate the liens and claims of the Prepetition Agent and the Prepetition Lenders and any actions that the estates may have against the Prepetition Agent and the Prepetition Lenders. Any payment or reimbursement made to any Estate Professional in respect of any Allowed Professional Fees after delivery of the Carve-Out Trigger Notice shall reduce the Carve-Out dollar-for-dollar.

69.     Payments from the Carve-Out shall be subject to any terms and conditions of the engagement agreements and appurtenant orders for the employment of each Estate Professional. The Debtors shall be permitted to pay compensation and reimbursement of expenses incurred prior to the occurrence of a Postpetition Default in accordance with the Budget and allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable solely from the applicable Professional Fee Escrow. Other than the Carve-Out set forth above, the Agent, for itself and for and on behalf of the DIP Lenders and the Prepetition Lenders, does not consent to any carve-out from the Collateral for payment of any fees and expenses of the Estate Professionals.

70.     Until such time as the Prepetition Lenders' Claim and the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the Prepetition Claim Documents and the DIP Documents, any remaining unapplied retainer funds at the conclusion of an Estate Professional's engagement shall be immediately returned to the Agent, for itself and for and on behalf of the DIP Lenders and the Prepetition Lenders, as the DIP Lenders' and Prepetition Lenders' Cash Collateral. Any and all payments of fees and expenses to any Estate Professionals or use of Cash Collateral shall constitute diminution in the value of the Prepetition Lenders' Collateral and the DIP Collateral for all purposes including all adequate protection and superpriority claims granted under the Bankruptcy Code and this Interim Order. The Agent, for

itself and for and on behalf of the DIP Lenders and the Prepetition Lenders, expressly retains the right to object to any fees or expenses of any Estate Professional as to reasonableness or on any other grounds. None of the Agent, the DIP Lenders or the Prepetition Lenders shall be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with the Cases or any case arising upon the conversion of any of these Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing. Nothing in this Interim Order or otherwise shall be construed to obligate the Agent, the DIP Lenders or the Prepetition Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Estate Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

71.     Notwithstanding the foregoing, and irrespective of the Carve-Out, in no event shall Cash Collateral, the Carve-Out, each Professional Fee Escrow, or the proceeds of any loans, advances, or other funds made available by the DIP Lenders or the Prepetition Lenders to or for the benefit of the Debtors be used for the payment or reimbursement of any fees, expenses, costs or disbursements of any Estate Professional or other persons incurred with the purpose of: (a) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of the Prepetition Lenders' Claim, the Prepetition Claim Documents, the DIP Facility, the DIP Documents, this Interim Order, or any liens or security interests granted thereby or with respect thereto, or any other rights or interests of the Agent or the DIP Lenders or Prepetition Lenders under any Prepetition Claim Document or DIP Document, (b) investigating, asserting, prosecuting, or the joinder in any claims or causes of action against the Agent or the DIP Lenders or Prepetition Lenders, or any of their officers, directors, employees, affiliates, agents, attorneys, or equity holders (whether arising under state

law, the Bankruptcy Code, or any other federal or foreign law); (c) preventing, enjoining, hindering or otherwise delaying the Agent's or the DIP Lenders' or Prepetition Lenders' enforcement of the Prepetition Claim Documents, the DIP Documents or this Interim Order or any realization upon any Collateral (unless such enforcement or realization is in direct violation of an explicit provision in any DIP Document or this Interim Order); (d) incurring indebtedness except as permitted by the DIP Documents or this Interim Order; (e) modifying the DIP Agent's or the DIP Lenders' rights under any DIP Documents or this Interim Order without the DIP Agent's or the DIP Lenders' consent in their determination; (f) asserting or declaring any liens or security interests granted under any of the Prepetition Claim Documents, the DIP Documents, or this Interim Order to have a priority other than the priority set forth herein or therein; (g) asserting, prosecuting or the joinder in, any action or other proceeding seeking to grant a lien or security interest senior to, or on parity with, the liens and security interests of the Agent and the DIP Lenders and Prepetition Lenders in the Collateral, as applicable, or any portion thereof without the Agent's and the DIP Lenders' or Prepetition Lenders', as applicable, consent in their determination; (h) asserting or declaring any of the Prepetition Claim Documents, DIP Documents, or this Interim Order to be invalid, not binding or unenforceable in any respect; or (i) using Cash Collateral or selling any Collateral except as specifically permitted in the DIP Documents or this Interim Order.

## **No Surcharge**

72. Subject to entry of the Final Order, no costs or expenses of administration which have or may at any time be incurred in these Cases (or in any successor chapter 7 case) shall be charged against or recovered from the Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the Agent and the DIP Lenders or Prepetition Lenders, as applicable, in their determination, and no such consent

US 7428642v.20

shall be implied from any other action, inaction, or acquiescence by the Agent or the DIP Lenders or Prepetition Lenders, as applicable. Nothing contained in this Interim Order shall be deemed to be a consent by the Agent or the DIP Lenders or Prepetition Lenders to any charge, lien, assessment, or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

## No Marshaling

73.     Subject to entry of the Final Order, the Agent and the DIP Lenders and Prepetition Lenders shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

## Section 552(b) of the Bankruptcy Code

74.     The Agent and the Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Agent or the Lenders with respect to proceeds, products, offspring, or profits of any of the Collateral.

## No Proofs of Claim

75.     Neither the Agent nor the DIP Lenders or Prepetition Lenders shall be required to file proofs of claim in respect of the DIP Loans or the Prepetition Lenders' Claim in any of the Cases or subsequent cases of the Debtors under any chapter of the Bankruptcy Code, and this Interim Order, including the Debtors' stipulations in this Interim Order, shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s). Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation, administrative expense claims and priority claims) in any of the Cases or subsequent cases shall not apply to the Agent or the DIP Lenders or Prepetition Lenders with respect to the Prepetition Lenders' Claim or the DIP Obligations. Notwithstanding the foregoing, for

administrative convenience, the Agent (on behalf of itself and the Prepetition Lenders) is hereby authorized and entitled, in its determination, but not required, to file (and amend and/or supplement, as applicable) a master proof of claim for any claims of any of the Prepetition Lenders or DIP Lenders in respect of the Prepetition Lenders' Claim or the DIP Obligations, as applicable; *provided*, *however*, that nothing in this Interim Order shall waive the right of any Prepetition Lender or DIP Lender to file its own proof of claim against any of the Debtors.

## POSTPETITION DEFAULT/REMEDIES

### Postpetition Defaults

76.     The occurrence of any of the following shall constitute a Postpetition Default under this Interim Order and the DIP Documents upon notice to the Debtors by the Agent, for itself and for and on behalf of the DIP Lenders:  (a) any default, violation, or breach by any of the Debtors of any of the terms of this Interim Order or any of the DIP Documents; (b) the occurrence of the Expiration Date (as defined below), maturity, termination, expiration, or non-renewal of this Interim Order or the DIP Facility as provided for herein or in any of the DIP Documents; (c) the Debtors shall fail to pay any principal or other extensions of credit of the DIP Facility when the same becomes due and payable; (d) the Debtors shall fail to pay any interest on the DIP Facility or any fee or other amount due with respect to the DIP Facility after such interest, fee, or other amount becomes due and payable; (e) the Debtors shall fail to obtain, on or before thirty (30) days after the Petition Date, an order by the Court approving the Motion on a final basis in form and substance satisfactory to the Agent, for itself and for and on behalf of the DIP Lenders; (f) any representation or warranty made by the Debtors in any DIP Document or in any statement or certificate given after the Effective Date of the DIP Documents by the Debtors in writing pursuant to any DIP Document or in connection with any DIP Document shall be false in any material respect on the date as of which made; (g) any of these Cases shall be dismissed or

converted to a case under chapter 7 of the Bankruptcy Code, except as agreed to by the Agent; (h) the appointment of a trustee or examiner with expanded powers in any of these Cases, or a change in the independent directors, sale agent, or CRO of the Debtors that is not approved by the Agent; (i) any security interest, lien, claim, or encumbrance, excluding any Prior Permitted Liens, shall be granted in any of the Collateral which is *pari passu* with or senior to the liens (including adequate protection liens), security interests, or claims of the Agent or the DIP Lenders or Prepetition Lenders, as applicable, including any surcharge of the Collateral pursuant to section 506(c) of the Bankruptcy Code; (j) the entry of an order granting relief from the Automatic Stay to the holder or holders of any other security interest or lien (other than the Agent or the DIP Lenders or Prepetition Lenders) in any Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the Prepetition Lenders' Collateral or DIP Collateral, in each case involving assets with a value in excess of $50,000; (k) any provision of the DIP Documents shall cease to be valid and binding on the Debtors, or the Debtors shall so assert in any pleading filed with any court; (l) the Debtors shall attempt to vacate or modify this Interim Order over the objection of the Agent, for itself and for and on behalf of the DIP Lenders and Prepetition Lenders; (m) the entry of an order pursuant to section 363 of the Bankruptcy Code approving the sale of a material portion of the Debtors' assets unless such order contemplates either indefeasible payment in full in cash of the DIP Facility upon consummation of the sale or is otherwise consented to in writing by the Agent; (n) the failure to meet any of the Milestones (as defined below), absent the consent of the Agent; (o) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending this Interim Order; (p) the filing or confirmation of a plan of reorganization that is not acceptable to the Agent in the treatment of the Prepetition Lenders' Claim or the claims arising in

connection with the DIP Facility; or (q) any challenge to the extent, validity, priority, or unavoidability of the liens securing the Prepetition Lenders' Claim and/or the DIP Obligations is commenced by the Debtors or an order is entered sustaining any such challenge commenced by any party other than the Debtors (any of the foregoing postpetition defaults being referred to in this Interim Order, individually, as a "***Postpetition Default***", and collectively, as "***Postpetition Defaults***").

## Remedies

77. Upon the occurrence of any Postpetition Default, and at all times thereafter, but subject to the Carve-Out: (a) any and all obligations of the DIP Agent and the DIP Lenders in connection with the DIP Facility or under this Interim Order and the DIP Documents shall immediately terminate, (b) the DIP Agent, for itself and for and on behalf of the DIP Lenders may declare all or any part of the DIP Facility to be immediately accelerated and due and payable for all purposes, rights, and remedies, and (c) the Debtors' authority to use Cash Collateral shall immediately terminate.

78. Furthermore, upon any occurrence of any Postpetition Default, and after the giving of three (3) days' notice by the Agent to the Debtors, any Committee, and the U.S. Trustee, then without further act, notice, or action by the Agent, or any further notice, hearing or order of this Court, the Automatic Stay shall be immediately modified and the Agent shall be and is hereby authorized, to take any and all actions and remedies that the Agent may deem appropriate to proceed against, take possession of, protect, and realize upon the Collateral and any other property of any of the Debtors' estates, including, without limitation, (a) any right or remedy set forth in the DIP Documents, (b) any right or remedy that the Agent may deem appropriate to proceed against, take possession of, foreclose upon, sell (in whole or in part), protect, and realize upon the Collateral and any other property of any of the Debtors' estates

US 7428642v.20

upon which the Agent and the Prepetition Lenders or DIP Lenders have been or may hereafter be granted liens and security interests to obtain repayment of the DIP Obligations and the Prepetition Lenders' Claim, (c) the commencement of actions for specific performance and for the foreclosure upon any Collateral, (d) the sale of the Collateral, or any portion thereof, either as a whole or in part, at private or public auction, and the Agent, for itself and for and on behalf of the Prepetition Lenders and DIP Lenders, shall have the right to purchase the Collateral at same by credit bidding all or a part of their debt or otherwise, (e) taking possession of the Collateral and the exercise, without interference, and, if necessary, as the attorney-in-fact for the Debtors, of any rights of the Debtors in the management, possession, operation, protection or preservation of the Collateral, (f) the receipt of proceeds from the sale of any Collateral, (g) the direction of the payment for any purchase of the Collateral directly to the Agent, for itself and for and on behalf of the DIP Lenders or Prepetition Lenders, as applicable, (h) the right of setoff and recoupment as to any funds of the Debtors' estates held by the Agent, for itself and for and on behalf of the DIP Lenders or Prepetition Lenders, as applicable, and (i) the right to seek and obtain the appointment of a receiver, chief restructuring officer, or trustee over the Debtors and/or the Collateral; *provided* that the Agent and the DIP Lenders or Prepetition Lenders, as applicable, shall not be obligated to take title to any of the Collateral in the pursuit of any of the Agent's or the DIP Lenders' or Prepetition Lenders' rights and remedies and the Debtors shall cooperate with the Agent and the DIP Lenders and Prepetition Lenders, as applicable, in conjunction with the exercise of any right and the pursuit of any remedy by the Agent or the DIP Lenders or Prepetition Lenders, as applicable, without limitation. With respect to any of the Debtors' leasehold locations, the Agent's rights and remedies shall be limited to such rights and remedies (i) as may be ordered by this Court upon motion and notice to the applicable landlord

with an opportunity to respond that is reasonable under the circumstances; (ii) to which the applicable landlord agrees in writing with the Agent; or (iii) which the Agent has by agreement or under the Bankruptcy Code or applicable law, all of which are expressly reserved and are not waived, modified, or limited by immediately preceding (i) and (ii).

79.     Upon or after the occurrence of any Postpetition Default, the Agent and the DIP Lenders or Prepetition Lenders, as applicable, may, in their determination, advance funds to the Debtors or consent to the Debtors' use of Cash Collateral, and all such advances or consent to use of Cash Collateral (a) shall not constitute a waiver, limitation, or modification of the Agent's and the DIP Lenders' or  Prepetition Lenders', as applicable, rights and remedies pursuant to the Prepetition Claim Documents, the DIP Documents, this Interim Order, and applicable law and (b) shall be and hereby are granted all of the protections granted to the Agent and the DIP Lenders and Prepetition Lenders under this Interim Order in connection with the DIP Facility and use of Cash Collateral.

## **Milestones**

80.     The Debtors shall achieve each of the following milestones (as the same may be extended from time to time with the written consent of the DIP Agent (the "***Milestones***"):

DIP Facility Milestones

(i)     Not later than three (3) business days after the Petition Date, the Debtors shall have obtained entry of this Interim Order by the Court, in form and substance acceptable to the Agent, granting the Motion on an interim basis as set forth herein;

(ii)     Not later than thirty (30) days after the Petition Date, the Debtors shall have obtained entry of the Final Order by the Court, in form and substance acceptable to the Agent, granting the Motion on a final basis;

Plan Milestones

(iii)     Not later than sixty (60) days after the Petition Date, the Debtors shall file a chapter 11 plan on terms acceptable to the Agent in all respects (the "***Plan***"), a

corresponding disclosure statement (the "***Disclosure Statement***"), and a motion seeking approval of the Disclosure Statement, in each case, in form and substance acceptable to the Agent;

(iv) Not later than eighty-five (85) days after the Petition Date, the hearing on approval of the Disclosure Statement shall have occurred, and the Debtors shall have obtained entry of an order by the Court, in form and substance acceptable to the Agent, approving the Disclosure Statement;

(v) Not later than one hundred twenty (120) days after the Petition Date, the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***") shall occur;

(vi) Not later than three (3) business days following the Confirmation Hearing, the Debtors shall have obtained entry by the Bankruptcy Court of an order, in form and substance acceptable to the Agent, confirming the Plan (the "***Confirmation Order***");

(vii) Not later than one hundred thirty-five (135) days after the Petition Date, the effective date of the Plan and the discharge of the obligations under the DIP Facility by (a) indefeasible payment in full in cash or (b) such other treatment as may be agreed to by the DIP Lenders and the Debtors shall have occurred;

Sale Process Milestones. As a potential part of the Plan and separately and simultaneously with the Plan, by motion under section 363 of the Bankruptcy Code (a "***363 Sale***") to be effectuated as determined by Agent if the Plan is not timely confirmed and effectuated, the Debtors shall pursue a sale of substantially all of the equity in or operating assets of the Debtors on terms acceptable to the Agent, which may be pursuant to a Plan or a 363 Sale as determined by the Agent and the potential purchaser (a "***Plan/Sale Transaction***"). The following Milestones shall apply with respect to such Plan/Sale Transaction process:

(viii) Not later than ten (10) days after the Petition Date, the Debtors shall have filed a motion, in form and substance acceptable to the Agent, seeking approval of, among other things, (a) a Plan/Sale Transaction, (b) bidding procedures, (c) required minimum bid levels, (d) credit bid rights, and (e) Plan toggle rights, in each case, subject to the consent of the Agent (the "***Bidding Procedures***") and related relief in connection with a Plan/Sale Transaction (the "***Bidding Procedures and Sale Motion***");

(ix) Not later than forty-five (45) days after the Petition Date, (a) the hearing on the Bidding Procedures and Sale Motion shall have occurred and (b) the Debtors shall have obtained entry of an order of the Court, in form and substance acceptable to the Agent (the "***Bidding Procedures Order***"), approving the Bidding Procedures and setting a date for the hearing to approve a Plan/Sale Transaction;

(x) Not later than seventy-five (75) days after the Petition Date, the final deadline to submit qualified bids (the "***Bid Deadline***") shall have occurred;

(xi) Not later than five (5) days after the Bid Deadline, the Debtors shall have

commenced the auction contemplated by the Bidding Procedures;

(xii)     Not later than ten (10) days after the Bid Deadline, the Debtors shall have obtained entry by the Court of an order, in form and substance acceptable to the Agent, approving a Plan/Sale Transaction (the "*Sale Order*"); and

(xiii)    Not later than ninety (90) days after the Petition Date, the closing of a Plan/Sale Transaction shall have occurred, and substantially contemporaneously therewith, the Debtors shall pay to the DIP Agent and/or Prepetition Agent (as applicable) the net proceeds of the Plan/Sale Transaction to the full extent of the claims of the Prepetition Agent, the Prepetition Lenders, the DIP Agent, and the DIP Lenders, including but not limited to principal, interest, premium, fees (including but not limited to counsel and advisor fees), and costs.

81.     The Debtors covenant and agree that they will comply with each of the Milestones. Each of the Milestones may be extended or waived in writing by the Agent. The Debtors shall promptly file with the Court a notice of any extension or waiver of any Milestone granted by the Agent.

## Right to Credit Bid

82.     The Agent, for itself and for and on behalf of the DIP Lenders or the Prepetition Lenders, as applicable, may credit bid any portion and up to the entire amount of the Prepetition Lenders' Claim and the DIP Obligations, as applicable, at any time on any individual asset, portion of the assets, or all assets constituting their respective Collateral in conjunction with any Plan/Sale Transaction, with the Prepetition Lenders' Claim and the DIP Obligations allocated among such assets as determined by the Agent, subject to any applicable challenge rights (the "*Credit Bid Right*"). The Agent shall be a qualified and permitted bidder in all respects at any auction, and shall not be required to submit a deposit, purchase agreement, or any other deliverable or documentation to the Debtors or their representatives or agents. Upon exercise of the Credit Bid Right, the DIP Lenders or the Prepetition Lenders, as applicable, shall not be required to take title to any individual asset, portion of the assets, or all of the assets, and the Agent shall have the right to designate any person or entity that shall take title to the individual

asset, portion of the assets, or all of the assets that are subject to the Credit Bid Right. Except for the holders of any Prior Permitted Liens, no other person may credit bid unless the entire amount of the Prepetition Lenders' Claim and the DIP Obligations will be indefeasibly paid in full in cash on the closing of a Plan/Sale Transaction. In the event the Agent, for itself and for and on behalf of the DIP Lenders or Prepetition Lenders, as applicable, exercises its Credit Bid Right and the amount of the Agent's credit bid exceeds the total amount of the highest bids for the assets subject to the Credit Bid Right, the Agent's credit bid, for itself and for and on behalf of the DIP Lenders or Prepetition Lenders, as applicable, shall be deemed the highest and best bid and such credit bid shall be accepted by the Debtors and be presented for approval to the Court.

## OTHER TERMS

83.     The Debtors, the Agent and the DIP Lenders are authorized to implement, in accordance with the terms of the DIP Documents, any modifications or amendments to any DIP Document which are not material and adverse to the Debtors. Any modifications or amendments of any DIP Document which are material and adverse to the Debtors shall be subject to prior approval by this Court upon motion by the Debtors.

84.     The Agent and the DIP Lenders or Prepetition Lenders, as applicable, may assign or participate any portion of their Prepetition Lenders' Claims or the DIP Obligations and enter into an intercreditor agreement or other documentation related to same as determined by the Agent and the DIP Lenders or Prepetition Lenders, as applicable.

85.     Other than any Prior Permitted Liens and the Carve-Out, no priority claims shall be allowed that are or will be prior to or on parity with the superpriority claims or secured claims of the Agent and the DIP Lenders or Prepetition Lenders, as applicable, against the Debtors and their estates arising from the Prepetition Claim Documents, the DIP Documents, and this Interim Order.

86.     No obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facility shall be avoidable or recoverable from the DIP Agent or the DIP Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law.

87.     Except for the reasonable and necessary sale of inventory in the ordinary course of the Debtors' business and as may be provided for in the Budget and consistent with the terms of the DIP Credit Agreement, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any of the Collateral, without the prior written consent of the Agent as set forth herein. The Debtors shall not enter into any amendments to the leases for their theaters or authorize their agents or advisors to agree to the terms of such amendments without the prior written consent of the DIP Agent.

88.     All advances under the DIP Credit Agreement are made in reliance on this Interim Order, and so long as the DIP Obligations and the Prepetition Lenders' Claim remain unpaid, there shall not at any time be entered in these Cases any other order that, except as consented to by the Agent in writing, (a) authorizes the use of Cash Collateral or the sale, lease, or other disposition of the Collateral unless the cash proceeds will indefeasibly pay the Prepetition Lenders' Claim and the DIP Obligations in full, (b) authorizes the obtaining of credit or the incurring of indebtedness secured by a lien or security interest in property in which the Agent or the DIP Lenders or Prepetition Lenders, as applicable, hold or assert liens or security interests, or (c) grants to any claim a priority administrative claim status that is equal or superior to the superpriority status granted to the Agent and the DIP Lenders or Prepetition Lenders, as applicable, herein.

US 7428642v.20

89.     The terms hereunder and under the DIP Documents, the security interests and liens granted to the Agent and the DIP Lenders and Prepetition Lenders under this Interim Order, and the rights of the Agent and the DIP Lenders and Prepetition Lenders pursuant to this Interim Order with respect to the Collateral, and treatment of the Prepetition Lenders' Claim shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of the Debtors without the prior written approval of the Agent.

90.     The terms and provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order that may be entered converting to chapter 7 or dismissing these Cases, except for the Debtors' authority to use Cash Collateral and any obligations of the DIP Agent and the DIP Lenders under the DIP Documents (all of which shall immediately terminate upon entry of such an order).  The terms and provisions of this Interim Order, as well as the priorities in payment, liens, and security interests granted pursuant to this Interim Order and the DIP Documents, shall continue in this or any subsequent case under the Bankruptcy Code of the Debtors, and such priorities in payment, liens, and security interests shall maintain their priority as provided by this Interim Order until such time as the Prepetition Lenders' Claim and the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the terms of the Prepetition Claim Documents and the DIP Documents and the Agent and the DIP Lenders and Prepetition Lenders shall have no further obligation or financial accommodation to the Debtors.

91.     The provisions of this Interim Order shall inure to the benefit of the Debtors, the Agent, the DIP Lenders, and the Prepetition Lenders, and they shall be binding upon (a) the Debtors and their successors and assigns, including any trustee or other fiduciary hereafter appointed as legal representative of the Debtors or with respect to property of the estates of the

US 7428642v.20

Debtors, whether under chapter 11 of the Bankruptcy Code, any confirmed plan, or any subsequent chapter 7 case, and (b) all creditors of the Debtors and other parties in interest.

92. If any or all of the provisions of this Interim Order are hereafter modified, vacated, or stayed without the prior written agreement of the Agent, such modification, vacation, or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtors to the Agent and the DIP Lenders or Prepetition Lenders before the effective date of such modification, vacation, or stay or (b) the validity or enforceability of any security interest, lien, priority or other protection authorized, granted, or created hereby or pursuant to any of the DIP Documents. Notwithstanding any such modification, vacation, or stay, any indebtedness, obligations, or liabilities incurred by the Debtors to the Lenders or the Agent, for itself or for and on behalf of the DIP Lenders or Prepetition Lenders, as applicable, before the effective date of such modification, vacation, or stay shall be governed in all respects by the original provisions of this Interim Order, and the Agent, for itself and for and on behalf of the DIP Lenders or Prepetition Lenders, as applicable, shall be entitled to all the liens, rights, remedies, privileges, and benefits granted herein and pursuant to the DIP Documents with respect to all such indebtedness, obligations, or liabilities.

93. To the extent the terms and conditions of the DIP Documents are in express conflict (as opposed to being additive, limiting, or more specific than this Interim Order) with the terms and conditions of this Interim Order, the terms and conditions of this Interim Order shall control.

94. No determination, agreement, decision, consent, election, approval, acceptance, waiver, designation, authorization, or other similar circumstance or matter of or by the Agent or the DIP Lenders or Prepetition Lenders hereunder or related hereto (the "*Agent Consent*")

requested of the Agent by the Debtors pursuant to the terms of this Interim Order or otherwise shall be inferred from any action, inaction, or acquiescence of the Agent, and shall require a writing acceptable to the Agent that is signed by the Agent or its authorized representative or attorney and expressly states such Agent Consent, without limitation. Any act committed or action taken by the Agent hereunder shall be deemed to be made for itself and for and on behalf of the Prepetition Lenders or DIP Lenders, as applicable. Any authority or other right, benefit, or interest granted to the Agent hereunder is deemed to be granted to the Agent for itself and for and on behalf of the DIP Lenders or the Prepetition Lenders, as applicable. Except as otherwise agreed in the DIP Credit Agreement, any Agent Consent hereunder shall require the approval of the Requisite Lenders (as defined in the DIP Credit Agreement).

95. Nothing herein shall be deemed or construed to waive, limit, or modify the rights of the Agent, for itself and for and on behalf of the DIP Lenders or Prepetition Lenders, to obtain further adequate protection and other statutory protections for the use of the Collateral, including Cash Collateral, or to seek other relief in these Cases in accordance with any provision of the Bankruptcy Code or applicable law. Nothing herein shall in any way affect the rights of the Agent or the DIP Lenders or Prepetition Lenders as to any non-Debtor entity, without limitation.

96. Unless expressly and specifically provided otherwise herein, nothing herein shall be deemed or construed to waive, limit, modify or prejudice the claims, rights, protections, privileges and defenses of the Agent and the DIP Lenders or Prepetition Lenders afforded pursuant to the Bankruptcy Code.

97. This Interim Order, and the findings of fact and conclusions of law contained herein, shall be effective upon signature by the Court, and may be relied upon by the Agent, the DIP Lenders, the Prepetition Lenders, and the Debtors without the necessity of entry into the

US 7428642v.20

docket sheet of these Cases. To the extent any findings may constitute conclusions, and vice versa, they are hereby deemed as such.

98. This Court hereby expressly retains jurisdiction over all persons and entities, co-extensive with the powers granted to the United States Bankruptcy Court under the Bankruptcy Code, to enforce the terms of this Interim Order and to adjudicate any and all disputes in connection therewith by motion and without necessity of an adversary proceeding.

99. All headings in this Interim Order are descriptive and for reference only, and do not have separate meaning or change any terms therein.

## <u>RESERVATION OF RIGHTS OF PARTIES IN INTEREST/DEADLINE TO ACT</u>

100. The stipulations and releases contained in paragraphs 10-17 and 101 of this Interim Order in respect of the Prepetition Agent and Prepetition Lenders (a) shall be binding upon the Debtors for all purposes; and (b) shall be binding upon all other parties in interest, including the Committee, if any, for all purposes unless (1) a party (subject in all respects to any agreement or applicable law which may limit or affect such entities right or ability to do so) has properly filed an adversary proceeding or contested matter by no later than the earlier of (i) five (5) days prior to any confirmation hearing or (ii) seventy-five (75) days from the date of entry of this Interim Order (or, in the case of any Committee, if appointed within thirty (30) days of the Petition Date, no later than the earlier of (i) 5 days prior to any confirmation hearing or (ii) sixty (60) days from the date of such appointment) (such applicable period of time, the "***Challenge Deadline***"), (x) challenging the extent, priority, validity, perfection, amount, or allowability of the Prepetition Claim Documents or the Prepetition Agent's or the Prepetition Lenders' security interests in and liens upon the Prepetition Lenders' Collateral, or (y) otherwise asserting any claims or causes of action against the Prepetition Agent or the Prepetition Lenders on behalf of the Debtors' estates; and (2) the Court rules in favor of the plaintiff in any such timely and

properly filed adversary proceeding or contested matter. If no such adversary proceeding or contested matter is properly filed as of such dates or the Court does not rule in favor of the plaintiff in any such proceeding, then: (a) the stipulations and releases contained paragraphs 10-17 and 101 of in this Interim Order in respect of the Prepetition Agent and Prepetition Lenders shall be binding on all parties in interest, including the Committee; (b) the obligations of the Debtors under the Prepetition Claim Documents shall constitute allowed claims for all purposes in these Cases, and any subsequent chapter 7 case(s); (c) the Prepetition Agent's and the Prepetition Lenders' security interests in and liens upon the Prepetition Lenders' Collateral shall be deemed to have been, as of Petition Date, legal, valid, binding, perfected, first-priority security interests and liens, not subject to recharacterization, subordination (except to the extent permitted in this Interim Order) or otherwise avoidable; and (d) the Prepetition Lenders' Claim and the Prepetition Agent's and the Prepetition Lenders' security interests in and liens on the Prepetition Lenders' Collateral shall not be subject to any other or further challenge by the Committee or any other party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto. If any such adversary proceeding or contested matter is properly filed as of such dates, the stipulations and releases contained in paragraphs 10-17 and 101 of this Interim Order in respect of the Prepetition Agent and Prepetition Lenders shall remain binding and preclusive (i) on any party who did not file such adversary proceeding or contested matter and (ii) as to any party who did file such adversary proceeding or contested matter, except to the extent that such admissions and releases were expressly challenged in such adversary proceeding or contested matter. Nothing contained in this Interim Order shall be deemed to grant standing to any party to commence any such adversary proceeding or contested matter.

## **RELEASE OF CLAIMS**

101.    EACH OF THE DEBTORS (IN THEIR OWN RIGHT AND, SUBJECT TO THE RESERVATION OF RIGHTS OF PARTIES IN INTEREST/DEADLINE TO ACT SECTION IMMEDIATELY ABOVE, ON BEHALF OF THEIR ESTATES, REPRESENTATIVES, DIRECTORS, OFFICERS, EMPLOYEES, INDEPENDENT CONTRACTORS, ATTORNEYS AND AGENTS, AND THEIR SUCCESSORS AND ASSIGNS, IN EACH CASE TO THE EXTENT PERMITTED BY APPLICABLE LAW) (COLLECTIVELY, THE "***RELEASING PARTIES***") HEREBY RELEASES, ACQUITS, FOREVER DISCHARGES AND COVENANTS NOT TO SUE THE AGENT, THE DIP LENDERS,  THE PREPETITION LENDERS, AND THE AGENT'S AND THE DIP LENDERS' AND PREPETITION LENDERS' RESPECTIVE REPRESENTATIVES, DIRECTORS, MEMBERS, PRINCIPALS, OFFICERS, EMPLOYEES, INDEPENDENT CONTRACTORS, AGENTS, ADVISORS, PROFESSIONALS  (INCLUDING BUT NOT LIMITED TO COUNSEL), SUBSIDIARIES, AND AFFILIATES AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS (THE "***RELEASED PARTIES***") FROM ANY AND ALL ACTS AND OMISSIONS OF THE RELEASED PARTIES, AND FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, AVOIDANCE ACTIONS, COUNTERCLAIMS, DEMANDS, CONTROVERSIES, COSTS, DEBTS, SUMS OF MONEY, ACCOUNTS, RECKONINGS, BONDS, BILLS, DAMAGES, OBLIGATIONS, LIABILITIES, OBJECTIONS, LEGAL PROCEEDINGS, EQUITABLE PROCEEDINGS, AND EXECUTIONS OF ANY NATURE, TYPE, OR DESCRIPTION WHICH THE RELEASING PARTIES HAVE OR MAY COME TO HAVE AGAINST THE RELEASED PARTIES, AT LAW OR IN EQUITY, BY STATUTE OR COMMON LAW, IN CONTRACT, IN TORT, INCLUDING BANKRUPTCY CODE CHAPTER 5 CAUSES OF ACTION, WHETHER THE LAW OF THE UNITED STATES OR ANY OTHER COUNTRY,

US 7428642v.20

UNION, ORGANIZATION OF FOREIGN COUNTRIES OR OTHERWISE, KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, BUT EXCLUDING OBLIGATIONS UNDER THE DIP FACILITY ARISING AFTER THE DATE OF THIS INTERIM ORDER (COLLECTIVELY, THE "***RELEASED CLAIMS***"). THE DEBTORS ON BEHALF OF THE RELEASING PARTIES FURTHER COVENANT NOT TO SUE THE RELEASED PARTIES ON ACCOUNT OF ANY RELEASED CLAIM. THIS PARAGRAPH IS IN ADDITION TO AND SHALL NOT IN ANY WAY LIMIT ANY OTHER RELEASE, COVENANT NOT TO SUE, OR WAIVER BY THE RELEASING PARTIES IN FAVOR OF THE RELEASED PARTIES. NOTWITHSTANDING THE RELEASES AND COVENANTS IN FAVOR OF THE RELEASED PARTIES CONTAINED ABOVE IN THIS PARAGRAPH, SUCH RELEASES AND COVENANTS IN FAVOR OF THE RELEASED PARTIES SHALL BE DEEMED ACKNOWLEDGED AND REAFFIRMED BY THE DEBTORS EACH TIME THERE IS AN ADVANCE OF FUNDS, EXTENSION OF CREDIT, OR FINANCIAL ACCOMMODATION UNDER THIS INTERIM ORDER AND THE DIP DOCUMENTS. THIS SECTION SHALL REMAIN IN FULL FORCE AND EFFECT AND SHALL SURVIVE ANY DELIVERY AND PAYMENT ON THE OBLIGATIONS OR TERMINATION OF THE PREPETITION CREDIT AGREEMENT, THE DIP CREDIT AGREEMENT, OR THIS INTERIM ORDER.

## <u>INDEMNIFICATION</u>

102. IN ADDITION TO, AND WITHOUT LIMITATION OF, ANY AND ALL INDEMNITIES PROVIDED IN THE PREPETITION CLAIM DOCUMENTS, EACH RELEASING PARTY SHALL AND DOES HEREBY, JOINTLY AND SEVERALLY, INDEMNIFY AND HOLD EACH OF THE RELEASED PARTIES HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, LIABILITIES, LOSSES, DAMAGES, CAUSES OF

ACTION, SUITS, JUDGMENTS, COSTS, AND EXPENSES, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND OTHER ADVISORY FEES (INCLUDING, WITHOUT LIMITATION, FEES AND EXPENSES OF VINSON & ELKINS L.L.P., FTI CONSULTING, INC., AND JONES DAY), ARISING OUT OF OR FROM OR RELATED TO ANY OF THE PREPETITION CLAIM DOCUMENTS, IN EACH CASE INCLUDING THE LOSSES ARISING FROM THE SOLE OR THE CONTRIBUTORY NEGLIGENCE OF ANY PREPETITION AGENT AND PREPETITION LENDER, BE AVAILABLE TO THE EXTENT THAT SUCH CLAIMS, LIABILITIES, LOSSES, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, COSTS, AND EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FORM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH PREPETITION AGENT OR PREPETITION LENDER. IF ANY ACTION, SUIT, OR PROCEEDING IS BROUGHT AGAINST ANY OF THE RELEASED PARTIES, DEBTORS SHALL, AT THE AGENT'S OR THE DIP LENDERS' OR PREPETITION LENDERS' (AS APPLICABLE) REQUEST, DEFEND THE SAME AT THEIR SOLE COST AND EXPENSE, SUCH COST AND EXPENSE TO BE A JOINT AND SEVERAL LIABILITY OF DEBTORS, BY COUNSEL SELECTED BY THE AGENT. THIS SECTION SHALL REMAIN IN FULL FORCE AND EFFECT AND SHALL SURVIVE ANY DELIVERY AND PAYMENT ON THE OBLIGATIONS OR TERMINATION OF THE PREPETITION CREDIT AGREEMENT, THE DIP CREDIT AGREEMENT, OR THIS INTERIM ORDER.

103.    Notwithstanding any due diligence period granted to other parties in interest herein, as a result of the Debtors' review of the Prepetition Claim Documents and the facts related thereto, the Debtors shall have no right to file a complaint pursuant to Bankruptcy Rule

US 7428642v.20

7001 or otherwise, or any other pleading asserting a claim or cause of action arising out of or related to the Prepetition Claim Documents, the DIP Documents, or any transactions or dealings related to same.

## NOTICE

104.    The Debtors' proposed counsel shall serve this Interim Order on all of the following parties:  (a) the Office of the United States Trustee; (b) the attorneys for the Agent and the DIP Lenders and Prepetition Lenders; (c) all creditors known to the Debtors who have or may assert liens against any of the Debtors' assets; (d) the United States Internal Revenue Service; (e) the 40 largest unsecured creditors of the Debtors; and (f) all parties in interest who have filed a notice of appearance or upon whom service must be effected under the Federal Rules of Bankruptcy Procedure or the Local Rules.

## EXPIRATION DATE/MATURITY

105.    The Agent's consent and Debtors' authority to use Cash Collateral and the DIP Lenders' commitment to provide credit under the DIP Credit Agreement and this Interim Order, subject to the funding and Budget limitations above, shall be effective upon entry of this Interim Order to and including the earlier of:  (a) notice of the occurrence of a Postpetition Default or (b) November 22, 2020, at 5:00 p.m. Central Time, at which time all of the Debtors' authority to use Cash Collateral and to obtain credit under the DIP Credit Agreement and this Interim Order shall terminate, as shall the DIP Agent's and the DIP Lenders' obligation to continue funding the DIP Facility, unless extended by written agreement of the parties hereto, a copy of which with an updated Budget shall be promptly filed with this Court by the Debtors (the "***Expiration Date***").

106.    THIS ORDER IS EFFECTIVE IMMEDIATELY.

### # # # END OF ORDER # # #

## **EXHIBIT 1**

## **FORM OF DIP CREDIT AGREEMENT**

**Exhibit 1**

US 7428642v.20

## SENIOR SECURED SUPERPRIORITY
## DEBTOR-IN-POSSESSION FINANCING AMENDMENT TO
## SECOND AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FINANCING AMENDMENT TO SECOND AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT (this "**DIP Financing Amendment**") is entered into as of October 27, 2020, among **OHAM HOLDINGS, LLC**, a Texas limited liability company ("**Holdings**"), **STUDIO MOVIE GRILL HOLDINGS, LLC**, a Texas limited liability company ("**SMG**"), the other parties signatory hereto as DIP Borrowers (together with SMG, collectively, the "**DIP Borrowers**" and, each individually, a "**DIP Borrower**"), **GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.**, in its capacity as administrative agent (in such capacity, "**Administrative Agent**") and in its capacity as collateral agent (in such capacity, "**Collateral Agent**"), and the undersigned Lenders. Unless otherwise defined herein, all capitalized terms used herein that are defined in the Credit Agreement referred to below shall have the meanings given to such terms in the Credit Agreement, as amended hereby.

## RECITALS

WHEREAS, Holdings, the DIP Borrowers, Administrative Agent and the financial institutions party thereto as Lenders are parties to that certain Second Amended and Restated Credit and Guaranty Agreement dated as of March 29, 2019 (as amended by that certain Waiver, Consent and First Amendment to Second Amended and Restated Credit and Guaranty Agreement dated as of March 13, 2020, that certain Second Amendment to Second Amended and Restated Credit Agreement dated as of June 30, 2020, that certain Third Amendment and Limited Consent to Second Amended and Restated Credit Agreement dated as of October 22, 2020 and as further amended, restated, supplemented or otherwise modified from time to time, including pursuant to this DIP Financing Amendment and any subsequent amendment, the "**Credit Agreement**");

WHEREAS, pursuant to the terms of the Credit Agreement, the Lenders have made loans and granted other financial accommodations to the DIP Borrowers, which loans are secured by a first priority and properly perfected lien upon substantially all of the personal property and certain real property of the Credit Parties;

WHEREAS, the Credit Parties acknowledge that the Events of Default set forth on Exhibit A attached hereto (collectively, the "**Prepetition Defaults**") occurred under the Credit Documents prior to giving effect to this DIP Financing Amendment and may be continuing;

WHEREAS, each of the Credit Parties filed a voluntary petition for relief under Chapter 11, Title 11, United States Code, on October 23, 2020, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division;

WHEREAS, the Credit Parties have insufficient unencumbered cash or liquid assets with which to operate their respective businesses;

WHEREAS, the Credit Parties are unable to obtain credit on an unsecured basis or as an administrative expense pursuant to 11 U.S.C. §§ 364(a) and (b), and 503(b)(1);

WHEREAS, an immediate need exists for the Credit Parties to obtain funds to continue operation of their respective businesses;

WHEREAS, the Credit Parties have requested that the Lenders extend additional credit to the DIP Borrowers in the form of new money delayed draw term loans up to an aggregate amount not to exceed the DIP New Money Commitment for Budgeted Expenses from the DIP Financing Amendment Effective Date until the Post-Petition Termination Date;

WHEREAS, Administrative Agent and the undersigned DIP Lenders have agreed to grant the request of the Credit Parties to extend such additional credit, but only upon the terms and conditions set forth in this DIP Financing Amendment and the Financing Orders; and

WHEREAS, the DIP Borrowers have agreed to secure their obligations to Administrative Agent and the Lenders in connection with such additional credit with, among other things, a first priority priming perfected security interest in all of the Credit Parties' existing and future personal and real property, as set forth in the Financing Orders and subject to the Carve-Out.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  **Amendments**.  In reliance on the representations, warranties, covenants and agreements contained in this DIP Financing Amendment, the Credit Agreement shall be amended effective as of the DIP Financing Amendment Effective Date as follows:

1.1.    **Amended Definitions**.  The definition of "Adjusted LIBOR Rate" contained in Section 1.1 of the Credit Agreement shall be amended by deleting the last paragraph thereof in its entirety.

1.2.    **Amended and Restated Definitions**.  The definitions of the following terms contained in Section 1.1 of the Credit Agreement shall each be amended and restated to read in full as follows:

"**Affected Lender**" as defined in Section 2.17(c).

"**Affected Loans**" as defined in Section 2.17(c).

"**Borrower**" or "**Borrowers**" as defined in the preamble hereto.  For the avoidance of doubt, the term Borrowers shall also include the DIP Borrowers, as applicable.

"**Change of Control**" means, at any time, (i) Schultz shall cease to beneficially own and control at least 51.0% on a fully diluted basis of the economic and voting interests in the Capital Stock of Holdings; (ii) Holdings shall cease to beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Capital Stock of each of its Subsidiaries, including SMG (subject, in the case of the Capital Stock of Subsidiaries of SMG, to transactions permitted under Section 6.9 or Section 6.10); or (iii) the majority of the seats (other

2

than vacant seats) on the board of managers of Holdings cease to be occupied by Persons who either (a) were members of the board of managers of Holdings on the DIP Financing Amendment Effective Date, or (b) were nominated for election by the board of managers of Holdings, a majority of whom were on the board of managers on the DIP Financing Amendment Effective Date or whose election or nomination for election was previously approved by a majority of such managers.

"**Class**" means (i) with respect to Lenders, each of the following classes of Lenders: (a) Lenders having MDTL Exposure, (b) Lenders having Revolving Exposure and (c) Lenders having DIP Loan Exposure, and (ii) with respect to Loans, each of the following classes of Loans: (a) MDT Loans, (b) Revolving Loans, and (c) DIP Loans.

"**Commitment**" means, as the context requires, any Revolving Commitment, any MDTL Commitment and/or any DIP New Money Commitment of a Lender, and "**Commitments**" means all such commitments of all Lenders.

"**Credit Documents**" means any of this Agreement, the First Amendment, the Second Amendment, the Third Amendment, the DIP Financing Amendment, the Notes, if any, the Collateral Documents, the Fee Letter, the Reaffirmation Agreements, the TowerBrook Subordination Agreement, any other Subordination Agreements and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent or any Lender in connection herewith (including in connection with the Original Credit Agreement or Existing Credit Agreement), in each case, as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof.

"**Credit Party**" means Holdings, each DIP Borrower and each of their respective direct and indirect Subsidiaries.

"**Guarantor**" means Holdings and each of its Subsidiaries.

"**Lender**" means, as the context requires, each financial institution listed on the signature pages hereto as a Prepetition Lender or a DIP Lender and any other Person that becomes a party hereto as a DIP Lender pursuant to an Assignment Agreement or any other DIP Financing Document.

"**Loan**" means, as the context requires, any MDT Loan, any Revolving Loan and/or any DIP Loan.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the business operations, properties, assets, condition (financial or otherwise) or prospects of the Credit Parties, taken as a whole; (ii) a significant portion of the industry or business segment in which the Credit Parties operate or rely upon if such effect or development is reasonably likely to have a material adverse effect on the Credit Parties taken as a whole, (iii) the ability of any Credit Party to fully and timely perform its Obligations; (iii) the legality, validity, binding effect, or enforceability

against a Credit Party of a DIP Facility Document to which it is a party, or the perfection or priority of any security interest or other Lien granted therein with respect to any DIP Collateral; or (iv) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any DIP Facility Document; *provided* that the occurrence of the Prepetition Defaults and the commencement of the Cases shall not constitute a Material Adverse Effect.

"**MDTL Commitment**" means the commitment of a Lender to make any MDT Loans during the MDTL Commitment Period, and "**MDTL Commitments**" means such commitments of all such Lenders. The amount of each Lender's MDTL Commitment as of the DIP Financing Amendment Effective Date is zero.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2 in existence and validly perfected immediately prior to the Petition Date.

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to any Prepetition Loan of any Lender, the percentage obtained by dividing (a) the Prepetition Loan Exposure of that Lender, by (b) the aggregate Prepetition Loan Exposure of all Lenders; (ii) with respect to all payments, computations and other matters relating to the DIP Loans of any DIP Lender, the percentage obtained by dividing (a) the DIP Loan Exposure of that DIP Lender, by (b) the aggregate DIP Loan Exposure of all DIP Lenders; (iii) with respect to all payments, computations and other matters relating to the DIP New Money Loans of any DIP Lender, the percentage obtained by dividing (a) the DIP New Money Loan Exposure of that DIP Lender, by (b) the aggregate DIP New Money Loan Exposure of all DIP Lenders; (iv) with respect to all payments, computations and other matters relating to the New Money Protective Advances of any DIP Lender, the percentage obtained by dividing (a) the New Money Protective Advances of that DIP Lender, by (b) the aggregate New Money Protective Advances of all DIP Lenders; and (v) with respect to all payments, computations and other matters relating to any DIP Refinancing Loan of any DIP Lender, the percentage obtained by dividing (a) the DIP Refinancing Loan Exposure of that DIP Lender, by (b) the aggregate DIP Refinancing Loan Exposure of all DIP Lenders. For all other purposes with respect to each DIP Lender, "**Pro Rata Share**" means the percentage obtained by dividing (A) an amount equal to the sum of the Prepetition Loan Exposure, the DIP New Money Loan Exposure and the DIP Refinancing Loan Exposure of that DIP Lender, by (B) an amount equal to the sum of the aggregate Prepetition Loan Exposure, the aggregate DIP New Money Loan Exposure and the aggregate DIP Refinancing Loan Exposure of all DIP Lenders.

"**Requisite Class Lenders**" means, at any time of determination, but subject to the provisions of Section 2.21, (i) for the Class of Lenders having MDTL Exposure, Lenders holding more than 50% of the aggregate MDTL Exposure of all Lenders, (ii) for the Class of Lenders having Revolving Exposure, Lenders holding more than 50% of the aggregate Revolving Exposure of all Lenders, and (iii) for the Class of Lenders having DIP Loan Exposure, Lenders holding more than 50% of the aggregate DIP Loan Exposure of all Lenders. To the extent there is more

than one (1) Lender with respect to any Class of Loans, "**Requisite Class Lenders**" for such Class must include at least two (2) Lenders of such Class of Lenders; *provided*, that any Lenders that are Affiliates or Related Funds as of any date of determination shall constitute one (1) Lender for such purposes. If, at any time, a Goldman Sachs Lender is a Lender with respect to any Class of Loans at such time, "**Requisite Class Lenders**" shall include such Goldman Sachs Lender at such time with respect to such Class of Loans unless after the Petition Date such Goldman Sachs Lender assigned or otherwise transferred any of its Prepetition Loan Exposure and/or DIP Loan Exposure to a non-Goldman Sachs Lender such that the total aggregate amount of its Prepetition Loan Exposure and DIP Loan Exposure at such time is less than the total aggregate amount of its Prepetition Loan Exposure and DIP Loan Exposure as of the Petition Date (and assuming entry of the applicable Financing Orders). If, at any time, a Crestline Lender is a Lender with respect to any Class of Loans at such time, "**Requisite Class Lenders**" shall include such Crestline Lender at such time with respect to the Class of Loans unless after the Petition Date such Crestline Lender assigned or otherwise transferred any of its Prepetition Loan Exposure and/or DIP Loan Exposure to a non-Crestline Lender such that the total aggregate amount of its Prepetition Loan Exposure and DIP Loan Exposure at such time is less than the total aggregate amount of its Prepetition Loan Exposure and DIP Loan Exposure as of the Petition Date (and assuming entry of the applicable Financing Orders).

"**Requisite Lenders**" means, at any time of determination, but subject to Section 2.21, one or more Lenders having or holding MDTL Exposure, Revolving Exposure and/or DIP Loan Exposure and representing more than 50% of the sum of (i) the aggregate MDTL Exposure of all Lenders, (ii) the aggregate Revolving Exposure of all Lenders, and (iii) the aggregate DIP Loan Exposure of all Lenders. To the extent there is more than one (1) Lender hereunder, "**Requisite Lenders**" must include at least two (2) Lenders; *provided*, that any Lenders that are Affiliates or Related Funds as of any date of determination shall constitute one (1) Lender for such purposes. If, at any time, Goldman Sachs Bank USA or any of its affiliates is a Lender at such time (each, a "**Goldman Sachs Lender**"), "**Requisite Lenders**" shall include such Goldman Sachs Lender at such time unless after the Petition Date such Goldman Sachs Lender assigned or otherwise transferred any of its Prepetition Loan Exposure and/or DIP Loan Exposure to a non-Goldman Sachs Lender such that the total aggregate amount of its Prepetition Loan Exposure and DIP Loan Exposure at such time is less than the total aggregate amount of its Prepetition Loan Exposure and DIP Loan Exposure as of the Petition Date (and assuming entry of the applicable Financing Orders). If, at any time, any affiliate of Crestline Management, L.P. or fund or other institution with respect to which Crestline Management, L.P. serves as investment manager is a Lender at such time (each, a "**Crestline Lender**"), "**Requisite Lenders**" shall include such Crestline Lender at such time unless after the Petition Date such Crestline Lender assigned or otherwise transferred any of its Prepetition Loan Exposure and/or DIP Loan Exposure to a non-Crestline Lender such that the total aggregate amount of its Prepetition Loan Exposure and DIP Loan Exposure at such time is less than the total aggregate

5

amount of its Prepetition Loan Exposure and DIP Loan Exposure as of the Petition Date (and assuming entry of the applicable Financing Orders).

"**Revolving Commitment**" means the commitment of a Lender to make or otherwise fund a Revolving Loan and "**Revolving Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Revolving Commitment as of the DIP Financing Amendment Effective Date is zero.

"**S&P**" means S&P Global Ratings, or any successor to its rating agency business.

1.3.    **Additional Definitions**. Section 1.1 of the Credit Agreement shall be amended to add each of the following definitions to such section in appropriate alphabetical order:

"**Acceptable Plan of Reorganization**" means a chapter 11 plan of reorganization in form and substance satisfactory to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in all respects and consented to by Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders), confirmed by an order (in form and substance satisfactory to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders)) of the Bankruptcy Court under the Cases, (i) containing a release in favor of Administrative Agent, Collateral Agent and the Lenders and their respective Indemnitees, (ii) containing provisions acceptable to the Administrative Agent and Requisite Lenders with respect to the settlement or discharge of all claims and other debts and liabilities of the Credit Parties, (iii) providing for the payment in full in cash of the Post-Petition Obligations (unless otherwise consented to by Administrative Agent and the Requisite Lenders in respect of DIP Loans (or Administrative Agent with the consent or direction of such Requisite Lenders)), and (iv) such Acceptable Plan of Reorganization shall not have been modified, altered, amended or otherwise changed or supplemented without the prior written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders).

"**Adequate Protection Lien**" as defined in the Financing Orders.

"**Advisor**" as defined in Section 5.23.

"**Avoidance Action**" any claims and causes of action arising under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code or any other similar state or federal law.

"**Avoidance Proceeds**" the proceeds and property recovered in respect of any Avoidance Actions.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division or any other court with competent jurisdiction over the Cases.

"**Benchmark Delayed Discontinuance Event**" means the occurrence of one or more of the following events with respect to the Adjusted LIBOR Rate: (1) a public statement or publication of information by or on behalf of the administrator of the Adjusted LIBOR Rate announcing that such administrator will cease at a future date to provide the Adjusted LIBOR Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Adjusted LIBOR Rate; (2) a public statement or publication of information by the regulatory supervisor for the administrator of the Adjusted LIBOR Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the Adjusted LIBOR Rate, a resolution authority with jurisdiction over the administrator for the Adjusted LIBOR Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the Adjusted LIBOR Rate, which states that the administrator of the Adjusted LIBOR Rate will cease to provide the Adjusted LIBOR Rate permanently or indefinitely, provided that, at the time of the statement or publication, there is no successor administrator that will continue to provide the Adjusted LIBOR Rate; or (3) a public statement or publication of information by the administrator of the Adjusted LIBOR Rate that it will invoke, permanently or indefinitely, its insufficient submissions policy.

"**Benchmark Discontinuance Event**" means a Benchmark Delayed Discontinuance Event or a Benchmark Immediate Discontinuance Event.

"**Benchmark Immediate Discontinuance Event**" means (1) a public statement by the regulatory supervisor for the administrator of the Adjusted LIBOR Rate or any Governmental Authority having jurisdiction over the Lender announcing that the Adjusted LIBOR Rate is no longer representative or may no longer be used; (2) a public statement or publication of information by or on behalf of the administrator of the Adjusted LIBOR Rate announcing that such administrator has ceased to provide the Adjusted LIBOR Rate, permanently or indefinitely, and there is no successor administrator that will continue to provide the Adjusted LIBOR Rate; (3) a public statement or publication of information by the regulatory supervisor for the administrator of the Adjusted LIBOR Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the Adjusted LIBOR Rate, a resolution authority with jurisdiction over the administrator for the Adjusted LIBOR Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the Adjusted LIBOR Rate, which states that the administrator of the Adjusted LIBOR Rate has ceased to provide the Adjusted LIBOR Rate permanently or indefinitely, and there is no successor administrator that will continue to provide the Adjusted LIBOR Rate; (4) the Adjusted LIBOR Rate is not published by the administrator of the Adjusted LIBOR Rate for five consecutive Business Days and such failure is not the result of a temporary moratorium, embargo or disruption declared by the

administrator of the Adjusted LIBOR Rate or by the regulatory supervisor for the administrator of the Adjusted LIBOR Rate; (5) a public statement or publication of information by the administrator of the Adjusted LIBOR Rate that it has invoked, permanently or indefinitely, its insufficient submissions policy; or (6) a Benchmark Delayed Discontinuance Event has occurred and the Adjusted LIBOR Rate event about which a public statement or publication of information is made giving rise to such Benchmark Delayed Discontinuance Event has actually occurred or transpired.

"**Bid Deadline**" as defined in <u>Section 5.24(e)(v)</u>.

"**Bid Procedure**" as defined in <u>Section 5.24(e)(iii)</u>.

"**Bid Procedures Order**" as defined in <u>Section 5.24(e)(iv)</u>.

"**Bid Procedures and Sale Motion**" as defined in <u>Section 5.24(e)(iii)</u>.

"**Budget**" means a rolling 13-week cash flow budget detailing the Credit Parties' projected receipts, operating disbursements (including payroll and benefit expenses and general and administrative expenses), non-operating disbursements (including capital expenditures, debt service, adequate protection payments, and professional fees and expenses), and net cash flows as amended, restated, supplemented or otherwise modified from time to time, which budget (and any such modifications thereto) shall be (i) in form and substance acceptable to and approved in writing (including email) by Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole and absolute discretion, (ii) incorporated into the Financing Orders, and (iii) attached as <u>Exhibit B</u> to the DIP Financing Amendment (as in effect on the DIP Financing Amendment Effective Date).

"**Budget Test Period**" means the week most recently ended on the last Sunday prior to the delivery of each Budget Variance Report (or, if a week has not elapsed since the Petition Date, the cumulative period since the Petition Date).

"**Budget Variance Report**" means a variance report in substantially the same line-item detail as the related Budget and otherwise in form and detail reasonably satisfactory to Administrative Agent and the Requisite Lenders, which variance report shall (i) reconcile the Budget to the actual sources and uses of cash for the relevant Budget Test Period, (ii) show, for such periods, actual results for the same line items included in the Budget, in any event including the following items: (a) receipts, (b) operating disbursements, (c) payroll and benefit expenses, (d) general and administrative expenses, (e) professional fees, (f) capital expenditures, (g) debt service, (h) adequate protection payments, and (i) net cash flow, (iii) reconcile variances from values set forth for such periods in the relevant Budget (on a line-by-line basis with respect to disbursements), (iv) provide a reasonably detailed explanation for all material variances, and (v) be certified as

being true correct and complete by the Financial Officers of DIP Borrower Representative.

"**Budgeted Expenses**" means expenses permitted to be paid by the Credit Parties in accordance with the Budget, subject to the Permitted Variances.

"**Carve-Out**" as defined in the Financing Orders.

"**Cases**" means the Chapter 11 bankruptcy cases of the Credit Parties pending before the Bankruptcy Court captioned "In re Studio Movie Grill Holdings, LLC, et al.", jointly administered, Case No. 20-32633-SGJ-11, including any adversary proceedings or other ancillary proceedings related thereto.

"**Cash Collateral**" means cash collateral, as such term is defined in Section 363(a) of the Bankruptcy Code and as defined in the Financing Orders, arising from or relating to Collateral granted to Administrative Agent for the benefit of the Lenders and any other Secured Parties.

"**Cash Management Order**" shall mean the order of the Bankruptcy Court entered in the Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole discretion, which among other matters authorizes the Credit Parties to maintain their existing cash management and treasury arrangements or such other arrangements as shall be acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole discretion.

"**Confirmation Hearing**" as defined in Section 5.24(d)(iii).

"**Confirmation Order**" as defined in Section 5.24(d)(iv).

"**Crestline Lender**" as defined in the definition of "**Requisite Lenders**".

"**DIP Borrowers**" means Studio Movie Grill Holdings, LLC, a Texas limited liability company, and each of its direct and indirect Subsidiaries that are or become borrowers of DIP Loans from time to time in accordance with this Agreement.

"**DIP Borrower Representative**" as defined in Section 2.27(c).

"**DIP Collateral**" means, subject to the terms of the Financing Orders, any and all assets and properties of the Credit Parties and the Credit Parties' bankruptcy estates, wherever located, including property subject to avoided liens, now owned or after acquired, real and personal, tangible and intangible, and all proceeds, substitutions, products, rents or profits thereof, including, without limitation, (a) the following presently-owned and after-acquired personal property: (i) accounts, (ii)

9

accessions, (iii) chattel paper (both tangible and electronic), (iv) commercial tort claims, (v) commodity accounts, (vi) commodity contracts, (vii) deposit accounts (including the DIP Funding Account), (viii) documents, (ix) equipment, (x) financial assets, (xi) fixtures, (xii) general intangibles, (xiii) goods, (xiv) intellectual property (including patents, trademarks and copyrights), (xv) instruments, (xvi) inventory, (xvii) investment property, (xviii) letters of credit, (xix) letters of credit rights, (xx) payment intangibles, (xxi) permits, (xxii) farm products, (xxiii) crops, (xxiv) timber, (xxv) as-extracted collateral, (xxvi) mobile homes, (xxvii) health care insurance receivables, (xxviii) notes, (xxix) promissory notes, (xxx) securities (certificated and uncertificated), (xxxi) securities accounts, (xxxii) securities entitlements, (xxxiii) software, (xxxiv) supporting obligations, (xxxv) collateral records, (xxxvi) insurance, (xxxvii) causes of action, (xxxviii) subject to the entry of the Final Order, any Avoidance Proceeds, and (xxxix) money (as each such term used in clause (a) of this definition may be defined in the UCC), (b) all Collateral, (c) all "Collateral" (or any equivalent or similar term describing property in which Liens are granted as security for the DIP Loans) under and as defined in any Financing Order, and (d) all presently owned or after-acquired real property and improvements thereon and leases of real property; *provided*, however, for the avoidance of doubt, and to the extent permitted by the Bankruptcy Code or applicable law, the DIP Liens shall attach to and the DIP Collateral shall include the Credit Parties' interest in its leases of nonresidential real property, and in any event shall include any proceeds or value of such leasehold interests obtained whether by sale, financing, or other disposition or form of transfer or transaction; *provided* that for purposes of any requirement in any lease that a consent to the DIP Liens not be unreasonably withheld by a landlord, any failure to consent to a DIP Lien is found to be unreasonable under the circumstances of the Cases; *provided*, further, that the DIP Liens shall not attach to the Credit Parties' interests in a lease of nonresidential real property to the extent that the attachment of such DIP Lien (x) is expressly prohibited under such lease and cannot be cured or resolved by consent or other process under such lease or (y) would cause a default in the landlord's financing agreement. Landlords seeking to assert that such a default would occur shall reasonably cooperate to provide written evidence of such a loan default, including applicable loan documentation, to the Credit Parties, Administrative Agent and the U.S. Trustee, and in the event of a dispute regarding whether such a default would be caused, such dispute will be determined by the Bankruptcy Court.

"**DIP Facility Documents**" means, collectively, the DIP Financing Amendment and the other Credit Documents, the Financing Orders and all other documents, mortgages, instruments and agreements entered into by a Credit Party or an Affiliate of a Credit Party in favor of Administrative Agent, Collateral Agent or any DIP Lender in connection with the DIP Financing Amendment from time to time, as any or all of the same may be amended, restated, supplemented, replaced, substituted or otherwise modified from time to time, including any such amendments, restatements, supplements, replacements, substitutions and other modifications.

10

"**DIP Financing Amendment**" means that certain Senior Secured Superpriority Debtor-In-Possession Financing Amendment to this Agreement dated as of the DIP Financing Amendment Effective Date, by and among the Credit Parties, Administrative Agent and the Lenders signatory thereto.

"**DIP Financing Amendment Effective Date**" means October 27, 2020.

"**DIP Funding Account**" means that certain Controlled Account of SMG held with Capital One, National Association, Account No. XXXXXX-8769.

"**DIP Lenders**" means the Lenders providing DIP New Money Commitments in the percentages as set forth in the DIP Financing Amendment.

"**DIP Liens**" as defined in the Interim Order.

"**DIP Loan**" means any DIP New Money Loan and any DIP Refinancing Loan.

"**DIP Loan Exposure**" means, with respect to any DIP Lender, as of any date of determination, the sum of (i) such DIP Lender's DIP New Money Loan Exposure, plus (ii) such DIP Lender's DIP Refinancing Loan Exposure.

"**DIP Motion**" as defined in Section 5.24(a).

"**DIP New Money Commitment**" means, with respect to each DIP Lender, the commitment of such DIP Lender to make DIP New Money Loans to the DIP Borrowers in an aggregate principal amount not to exceed the amount set forth opposite such DIP Lender's name on Exhibit C to the DIP Financing Amendment, as such amount may be adjusted or reduced from time to time in accordance with this Agreement. The aggregate amount of the DIP Lenders' DIP New Money Commitments on the DIP Financing Amendment Effective Date is $22,800,000.

"**DIP New Money Commitment Period**" means the period commencing on (and including) the DIP Amendment Effective Date and ending on (but excluding) the Post-Petition Termination Date.

"**DIP New Money Loan Exposure**" means, with respect to any DIP Lender, as of any date of determination, the sum of (i) the outstanding principal amount of the DIP New Money Loans of such DIP Lender plus (ii) the remaining unused portion of such DIP Lender's DIP New Money Commitment; *provided* that, at any time prior to the making of any DIP New Money Loan, the DIP New Money Loan Exposure of any DIP Lender shall be equal to such DIP Lender's DIP New Money Commitment.

"**DIP New Money Loans**" as defined in Section 2.26(a).

"**DIP Refinancing Loan Exposure**" means, with respect to any DIP Lender, as of any date of determination, the outstanding principal amount of the DIP Refinancing Loans of such DIP Lender.

"**DIP Refinancing Loans**" as defined in Section 2.26(b).

"**Disclosure Statement**" as defined in Section 5.24(d)(i).

"**Estate Professionals**" as defined in the Financing Orders.

"**Expiration Date**" as defined in the Financing Orders.

"**Extraordinary Receipts**" means any Cash, Cash Equivalents, or other proceeds received by or paid for the account of any Credit Party or any of its Subsidiaries outside of the ordinary course of such Person's business, including any such payments in respect of purchase price adjustments, foreign, United States, state or local tax refunds, judgments, settlements for actual or potential litigation or similar claims or other consideration of any kind in connection with any cause of action, pension plan reversions, proceeds of insurance, indemnity payments, payments in respect of earn out obligations or seller financing indebtedness, security deposits and other refunds, and payments similar to any of the foregoing receipts; *provided*, however, that "**Extraordinary Receipts**" shall not include proceeds otherwise subject to Sections 2.13(a) through 2.13(e).

"**Final Order**" means an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the DIP Loans contemplated by this Agreement in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order, to authorize and approve the DIP Refinancing Loans and such other modifications as are satisfactory to the Credit Parties and Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole discretion) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Credit Parties and Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole discretion) as to which no stay has been entered.

"**Final Order Entry Date**" as defined in Section 2.26(b)(ii).

"**Final DIP Refinancing Amount**" means, with respect to the entry of the Final Order, an amount equal to the product of (a) the sum of (x) the aggregate principal amount of DIP New Money Commitments, minus (y) the Interim DIP New Money Availability Amount, multiplied by (b) two.

"**Financial Officers**" means, collectively, the chief financial officer and the chief restructuring officer, if any, of any Person.

"**Financing Orders**" means any of the one or more orders of the Bankruptcy Court authorizing and approving, on either an interim or final basis, (a) the financing contemplated by the DIP Financing Amendment, including the DIP New Money Loans and the DIP Refinancing Loans, (b) the use of Cash Collateral, (c) the granting of Liens and claims by the Credit Parties in favor of Collateral Agent, (d) the payment by the Credit Parties of the fees contemplated by the DIP Financing Amendment and this Agreement, and (e) other obligations of the Credit Parties under this Agreement and the other DIP Facility Documents, in each case, in form and substance satisfactory to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders), and including the Interim Order and the Final Order.

"**First Amendment**" means that certain Waiver, Consent and First Amendment to Second Amended and Restated Credit and Guaranty Agreement dated as of the First Amendment Effective Date, by and among the Credit Parties, Administrative Agent and the Lenders signatory thereto.

"**Fraudulent Transfer Law**" as defined in Section 2.27(a).

"**Funding Borrower**" as defined in Section 2.27(b).

"**Goldman Sachs Lender**" as defined in the definition of "**Requisite Lenders**".

"**Interim DIP Refinancing Amount**" means, with respect to the entry of the Interim Order, an amount equal to the sum of (a) the aggregate principal amount of New Money Protective Advances, which aggregate principal amount is $2,200,000, plus (b) the product of (x) the Interim DIP New Money Availability Amount, multiplied by (y) two.

"**Interim DIP New Money Availability Amount**" means $7,000,000.

"**Interim DIP New Money Undrawn Amount**" means an amount equal to the sum of (a) the Interim DIP New Money Availability Amount, minus (b) the aggregate principal amount of DIP New Money Loans borrowed prior to the Bankruptcy Court's approval of the Final Order.

"**Interim Order**" means an order of the Bankruptcy Court authorizing on an interim basis, among other things, the DIP Loans contemplated by this Agreement, in form and substance satisfactory to the Credit Parties, Administrative Agent, and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole discretion.

"**Interim Order Entry Date**" as defined in Section 2.26(b)(i).

"**Milestone**" or "**Milestones**" as defined in Section 5.24.

13

"**New Money Protective Advances**" means the "New Money Protective Advances" funded pursuant to (and as defined in) the Third Amendment.

"**Obligation Aggregate Payment**" as defined in <u>Section 2.27(b)</u>.

"**Obligation Fair Share**" as defined in <u>Section 2.27(b)</u>.

"**Obligation Fair Share Contribution Amount**" as defined in <u>Section 2.27(b)</u>.

"**Obligation Fair Share Shortfall**" as defined in <u>Section 2.27(b)</u>.

"**Permitted Variance**" as defined in <u>Section 5.20(a)</u>.

"**Petition Date**" means October 23, 2020.

"**Plan**" as defined in <u>Section 5.24(d)(i)</u>.

"**Plan/Sale Transaction**" as defined in <u>Section 5.24(e)(iii)</u>.

"**Plan/Sale Transaction Milestone**" or "**Plan/Sale Transaction Milestones**" as defined in <u>Section 5.24(e)</u>.

"**Post-Petition Default**" means the occurrence of any of the following events on or after the Petition Date:

    (a)    The DIP Borrowers shall fail to pay any principal of the DIP Loans when the same becomes due and payable.

    (b)    The maturity, termination, expiration or non-renewal of the Financing Orders or the DIP New Money Commitments, including the occurrence of the Expiration Date.

    (c)    The DIP Borrowers shall fail to pay any interest on the DIP Loans or any fee or other amount due with respect to the Post-Petition Obligations when such interest, fee, or other amount becomes due and payable.

    (d)    Any representation or warranty made by any Credit Party in the DIP Financing Amendment or in any statement or certificate given after the DIP Financing Amendment Effective Date by any Credit Party in writing pursuant to any DIP Facility Document or in connection with any DIP Facility Document shall be false in any material respect on the date as of which made.

    (e)    Any Credit Party shall breach or violate any term, covenant or agreement contained in the Financing Orders, the DIP Financing Amendment, Sections 5 or 6 of this Agreement, or in any of the other

14

DIP Facility Documents (in each case, excluding the Prepetition Defaults).

(f)     Any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; or a Chapter 11 trustee, examiner or other fiduciary with decision making authority with expanded power (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) under 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases without the express prior written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders).

(g)     The Bankruptcy Court shall not have entered, within thirty (30) days following the Petition Date, a Final Order in form and substance satisfactory to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders).

(h)     Any security interest, lien or encumbrance, excluding Permitted Liens, shall be granted in any of the DIP Collateral which is pari passu with or senior to the liens of Administrative Agent or the Lenders (including (x) the liens securing the DIP Loans, (y) the liens securing the other Obligations hereunder, and (z) the Adequate Protection Liens), including any surcharge of the DIP Collateral pursuant to Bankruptcy Code § 506(c), or otherwise, without the express prior written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole and absolute discretion.

(i)     The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or lien (other than the DIP Lenders) in any DIP Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any assets of the Credit Parties constituting DIP Collateral, in each case, involving assets with value in excess of $50,000, without the express written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole and absolute discretion.

(j)     Any provision of the documents relating to the DIP Loans shall cease to be valid and binding on any Credit Party, or any Credit Party shall so assert in any pleading filed in any court.

(k)     The Credit Parties shall for any reason fail to timely meet any of the Milestones or the Plan/Sale Transaction Milestones without the

15

express written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole and absolute discretion.

(l)     The Credit Parties shall fail to timely deliver any report or information, or timely meet any other deadline under the Interim Order, Final Order, or DIP Facility Documents.

(m)    The Credit Parties shall attempt to vacate or modify the Financing Orders over the objection of Administrative Agent (with the consent or at the direction of Requisite Lenders), for itself and for and on behalf of the DIP Lenders.

(n)    Any of the Credit Parties shall institute any proceeding or support the same by any other Person (including, without limitation, any official committee of unsecured creditors appointed in the Cases) who seeks to challenge the extent, validity priority or unavoidability of Administrative Agent's or the Lenders' liens or security interests securing the Obligations, or an order is entered sustaining any such challenge commenced by any party other than the Credit Parties.

(o)    The entry of an order pursuant to Bankruptcy Code § 363 approving the sale of a material portion of the Credit Parties' assets without the prior written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) to such sale in their respective sole and absolute discretion, unless such order contemplates indefeasible payment in full in cash of the DIP Loans upon consummation of such sale.

(p)    The entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders without the prior written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole and absolute discretion.

(q)    The filing by any of the Credit Parties, or the confirmation, of any plan of reorganization that is not an Acceptable Plan of Reorganization.

(r)    The chief restructuring officer, independent directors or sale advisor of the Credit Parties shall be changed without the express written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders).

(s)    Any "Postpetition Defaults" under and as defined in the Financing Orders.

16

    (t)      An application shall be filed by any Credit Party for the approval of any claim, or an order of the Bankruptcy Court shall be entered granting any claim (other than the Carve Out), in any of the cases that is pari passu with or senior to (i) the adequate protection claims provided for in the Financing Orders or (ii) the claims (as such term is defined in the Bankruptcy Code) of any Agent or the Lenders in respect of the DIP Loans.

"**Post-Petition Funding Notice**" as defined in Section 2.26(b).

"**Post-Petition Obligations**" means all present and future obligations, indebtedness and other liabilities of the Credit Parties or any of them arising with respect to any Financing Orders or the DIP Loans, including without limitation the principal amount thereof, and any interest, fees, expenses, indemnification obligations, and other charges related thereto or in connection therewith, and any and all renewals, extensions, rearrangements, and refundings of the foregoing.

"**Post-Petition Termination Date**" means the earliest of (i) February 20, 2021; (ii) either (A) the entry of an order pursuant to section 363 of the Bankruptcy Code approving a sale not otherwise consented to by the Credit Parties, Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) of substantially all of the Credit Parties' assets or (B) the closing of a sale consented to by the DIP Lenders, Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) of substantially all of the Credit Parties' assets pursuant to section 363 of the Bankruptcy Code; (iii) the effective date of any plan of reorganization of any of the Credit Parties; (iv) the entry of an order for the conversion of any of the Credit Parties' Cases to a case under Chapter 7 of the Bankruptcy Code; (v) the entry of an order for the dismissal of any of the Credit Parties' bankruptcy Cases; (vi) the date the DIP Loans become due and payable in full under the DIP Facility Documents, whether by acceleration or otherwise; (vii) November 22, 2020, if the Final Order has not been entered by such date (which date may be extended with the prior written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole and absolute discretion); (viii) appointment of a chapter 11 trustee; (ix) the date following the occurrence of a Post-Petition Default and the giving by Administrative Agent (with the consent or at the direction of Requisite Lenders) of five (5) days' prior written notice of termination to DIP Borrower Representative, *provided* that no such notice shall be required if the "Expiration Date" under and as defined in the Financing Orders occurs; or (x) the date on which the Bankruptcy Court approves the extension of any other credit facilities to any of the Credit Parties over the objection of Administrative Agent (with the consent or at the direction of Requisite Lenders).

"**Prepetition Defaults**" has the meaning assigned to that term in the DIP Financing Amendment.

"**Prepetition Lenders**" means, at any time, the Lenders and the Lender Counterparties that are owed outstanding Prepetition Obligations.

"**Prepetition Loans**" means, at any time of determination, any outstanding Revolving Loan and any outstanding MDT Loans.

"**Prepetition Loan Exposure**" means, with respect to any Lender, as of any time of determination, the outstanding principal amount of any Prepetition Loans of such Lender.

"**Prepetition Obligations**" means all Obligations outstanding immediately prior to the Petition Date.

"**Prepetition Outstanding Amounts**" means (a) those amounts as set forth in Exhibit D to the DIP Financing Amendment, (b) any reimbursable costs or other expenses under Section 10.2 of this Agreement, and (c) any other Obligations under the Credit Documents outstanding immediately prior to the execution of the DIP Financing Amendment.

"**Professional Fee Escrow**" as defined in the Financing Orders.

"**Restructuring Committee**" as defined in the DIP Financing Amendment.

"**Sale Approval Order**" as defined in Section 5.24(e)(vii).

"**Second Amendment**" means that certain Second Amendment to Second Amended and Restated Credit and Guaranty Agreement dated as of the Second Amendment Date, by and among the Credit Parties, Administrative Agent and the Lenders signatory thereto.

"**Superpriority Claim**" means, subject to the Financing Orders, a superpriority administrative expense claim in the case of any Credit Party having priority over any and all administrative expenses, diminution claims and all other priority claims against the Credit Party, subject only to the Carve-Out, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, in each case whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment.

"**Third Amendment**" means that certain Third Amendment and Limited Consent to Second Amended and Restated Credit and Guaranty Agreement dated as of October 22, 2020, by and among the Credit Parties, Administrative Agent and the Lenders signatory thereto.

"**Total Liquidity**" means the total unfunded DIP New Money Commitments under this Agreement.

"**U.S. Trustee**" shall mean the United States Trustee applicable in the Cases.

1.4.    **Amendment to Fees Section**.

(a)    Section 2.10(c) of the Credit Agreement is hereby amended by amending and restating such section, which Section 2.10(c) will read in full as follows:

(c)    The DIP Borrowers jointly and severally agree to pay to DIP Lenders having DIP New Money Commitments commitment fees equal to (i) the average of the daily aggregate DIP New Money Commitments then in effect, multiplied by (ii) 1.00% per annum.  All fees referred to in this Section 2.10(c) shall be paid to Administrative Agent as set forth in Section 2.15(a) and upon receipt, Administrative Agent shall promptly distribute to each DIP Lender its Pro Rata Share thereof.

(b)    Section 2.10(d) of the Credit Agreement is hereby amended by amending and restating such section, which Section 2.10(d) will read in full as follows:

(d)    All fees referred to in Sections 2.10(a), (b) and (c) shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable monthly in arrears on the last day of each month during the Revolving Commitment Period, MDTL Commitment Period or the DIP New Money Commitment Period, as applicable, commencing on the first such date to occur after the Restatement Effective Date or the DIP Amendment Effective Date, as applicable, and on the Revolving Commitment Termination Date, the MDTL Commitment Termination Date or the Post-Petition Termination Date, as applicable.

(c)    Section 2.10 of the Credit Agreement is hereby amended by adding a new clause (f) immediately after clause (e) therein, which new clause (f) will read in full as follows:

(f)    The DIP Borrowers jointly and severally agree to pay to DIP Lenders having DIP New Money Commitments exit fees equal to two percent (2.00%) of the DIP New Money Commitments (prior to giving effect the funding of any DIP New Money Loans) on the earlier to occur of (x) acceleration of the DIP Loans or (y) the Post-Petition Termination Date. All fees referred to in this Section 2.10(f) shall be paid to Administrative Agent as set forth in Section 2.15(a) and upon receipt, Administrative Agent shall promptly distribute to each DIP Lender its Pro Rata Share thereof.

1.5.    **Amendment to Voluntary Prepayments Section**.  Section 2.12(a) of the Credit Agreement is hereby amended by replacing both references to "Section 2.17(c)" therein with references to "Section 2.17(d)".

19

1.6.    **Amendment to Mandatory Prepayments/Commitment Reductions Section**. Section 2.13 of the Credit Agreement is hereby amended by amending and restating such section, which Section 2.13 will read in full as follows:

2.13.    Mandatory Prepayments/Commitment Reductions.

(a)    Asset Sales.  On the date of receipt by any Credit Party or any of its Subsidiaries of any Net Asset Sale Proceeds of any DIP Collateral, the DIP Borrowers shall prepay the Obligations as set forth in Section 2.14(b) in an aggregate amount equal to 100% of such Net Asset Sale Proceeds.

(b)    Insurance/Condemnation Proceeds.  On the date of receipt by any Credit Party or any of its Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, the DIP Borrowers shall prepay the Obligations as set forth in Section 2.14(b) in an aggregate amount equal to 100% of such Net Insurance/Condemnation Proceeds.

(c)    Issuance of Equity Securities.  On the date of receipt by any Credit Party or any of its Subsidiaries of any Cash proceeds from a capital contribution to, or the issuance of any Capital Stock of, any Credit Party or any of its Subsidiaries, the DIP Borrowers shall prepay the Obligations as set forth in Section 2.14(b) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, in each case, paid to non-Affiliates, including reasonable legal fees and expenses.

(d)    Issuance of Debt.  On the date of receipt by any Credit Party or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of any Credit Party (other than DIP New Money Loans), the DIP Borrowers shall prepay the Obligations as set forth in Section 2.14(b) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, in each case, paid to non-Affiliates, including reasonable legal fees and expenses.

(e)    [Intentionally Reserved]

(f)    Extraordinary Receipts.  On the date of receipt by any Credit Party or any of its Subsidiaries of Extraordinary Receipts, the DIP Borrowers shall prepay the Obligations as set forth in Section 2.14(b) in an aggregate amount equal to 100% of such Extraordinary Receipts.

(g)    Prepayment Certificate.  Concurrently with any prepayment of the DIP Loans and/or reduction of the DIP New Money Commitments pursuant to Sections 2.13(a) through 2.13(f), DIP Borrower Representative shall deliver to Administrative Agent a certificate of its Financial Officers demonstrating the calculation of the amount of the applicable net proceeds or other amount required to be applied as a prepayment, as the case may be.  In the event that the DIP Borrowers shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, DIP Borrower Representative shall

promptly make an additional prepayment of the Obligations as set forth in <u>Section 2.14(b)</u> in an amount equal to 100% of such excess, and DIP Borrower Representative shall concurrently therewith deliver to Administrative Agent a certificate of Financial Officers demonstrating the derivation of such excess.

1.7. **<u>Amendment to Application of Prepayments/Reductions Section</u>**.

(a)     Sections 2.14(a) and 2.14(b) of the Credit Agreement are each hereby amended by amending and restating such sections, which Sections 2.14(a) and 2.14(b) will read in full as follows:

(a)     [Intentionally Reserved]

(b)     <u>Application of Prepayments to Loans</u>.     Any voluntary prepayments of Loans pursuant to <u>Section 2.12</u> and any mandatory prepayment of any Loan pursuant to <u>Section 2.13</u> shall be applied in accordance with the waterfall set forth in <u>Section 2.15(h)</u>.

(b)     Section 2.14(d) of the Credit Agreement is hereby amending by replacing the reference to "<u>Section 2.17(c)</u>" therein with a reference to "<u>Section 2.17(d)</u>".

1.8. **<u>Amendment to Post-Default Collateral Proceeds Waterfall Section</u>**.  Section 2.15(h) of the Credit Agreement is hereby amended by amending and restating such section, which Section 2.15(h) will read in full as follows:

(h)     Notwithstanding anything to the contrary in any Credit Document, if an Event of Default shall have occurred and not otherwise been waived, and the Obligations have become due and payable in full hereunder, whether by acceleration, maturity or otherwise, and, in any event, at any time from and after the Petition Date, all payments or proceeds received by any Agent hereunder or under any DIP Facility Document in respect of any of the Obligations (including, but not limited to, Obligations arising under any Interest Rate Agreement that are owing to any Lender or Lender Counterparty), including, but not limited to, all proceeds received by any Agent in respect of any Plan/Sale Transaction or any other sale, collection from, or other realization upon all or any part of the DIP Collateral, shall be applied in full or in part as follows:

<u>first</u>, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to each Agent and Lender and their respective agents and counsel, and all other expenses, liabilities and advances made or incurred by any Agent or Lender in connection therewith, and all amounts for which any Agent is entitled to indemnification hereunder or under any DIP Facility Document (in its capacity as an Agent and not as a Lender) and all advances made by any Agent at the direction of Requisite Lenders (other than Loans) under any DIP Facility Document for the account of the applicable Credit Party, and to the payment of all costs and expenses paid or incurred by any Agent or Lender in

connection with the exercise of any right or remedy hereunder or under any DIP Facility Document, all in accordance with the terms hereof or thereof;

second, to the extent of any excess of such proceeds, to the payment of all other Post-Petition Obligations to the DIP Lenders and/or Prepetition Obligations to the Prepetition Lenders in accordance with their Pro Rata Shares and in such order of payment as determined by Requisite Lenders in their sole discretion; and

third, to the extent of any excess of such proceeds, to the payment to or upon the order of the DIP Borrowers or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

1.9. **Amendment to Ratable Sharing Section**. Section 2.16 of the Credit Agreement is hereby amended by amending and restating such section, which Section 2.16 will read in full as follows:

2.16. Ratable Sharing. Lenders hereby agree among themselves that, except as otherwise provided in any DIP Facility Document, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of DIP Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the DIP Facility Documents or otherwise, or as adequate protection of a deposit treated as Cash Collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other DIP Facility Documents (collectively, the "**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; *provided*, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of any Credit Party or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Each Credit Party expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by such Credit Party to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

1.10. **Amendment to Making or Maintain LIBOR Rate Loans Section**.

(a)     Section 2.17 of the Credit Agreement is hereby amended by re-lettering clause (e) therein as clause (f), clause (d) therein as clause (e), clause (c) therein as clause (d), clause (b) therein as clause (c) and adding a new clause (b) immediately after clause (a) therein, which new clause (b) will read in full as follows:

(b)     LIBOR Discontinuation.

(i)     If at any time the Administrative Agent determines (which determination shall be final and conclusive absent manifest error) that (i) the circumstances set forth in clause (a) above have arisen and such circumstances are unlikely to be temporary or (ii) a Benchmark Discontinuation Event has occurred, the Administrative Agent and DIP Borrower Representative shall endeavor to establish an alternate replacement rate of interest to the Adjusted LIBOR Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for bank loans in the United States at such time as well as to the Administrative Agent's operational requirements, and the Administrative Agent and DIP Borrower Representative shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable. If such replacement rate of interest as so determined would be less than one percent (1.00%), such rate shall be deemed to be one percent (1.00%). In order to account for the relationship of the replacement interest rate to the Adjusted LIBOR Rate, additional spread adjustment and/or other adjustments may be taken into account in the replacement rate of interest to preserve the economic yield of the Lenders in effect as of, and as contemplated on, the DIP Financing Amendment Effective Date.

(ii)     Notwithstanding anything to the contrary in Section 10.5, the amendment referred to in clause (i) above shall become effective without any further action or consent of any other party to this Agreement so long as the Lenders shall have received at least five (5) Business Days' prior written notice of such amendment thereof and the Administrative Agent shall not have received, within five (5) Business Days of the date of such notice to the Lenders, a written notice from the Requisite Lenders stating that the Requisite Lenders object to such amendment.

(iii)     To the extent that a Benchmark Immediate Discontinuance Event has occurred, until an alternate rate of interest shall be determined in accordance with this paragraph, (x) no Loans may be made as, or converted to, LIBOR Rate Loans, and (y) any Funding Notice or Conversion/Continuation Notice given by DIP Borrower Representative with respect to LIBOR Rate Loans shall be deemed to be rescinded by DIP Borrower Representative.

(b)     Section 2.17(c) of the Credit Agreement is hereby amended by replacing (i) the reference to "Section 2.17(c)" therein with a reference to "Section 2.17(d)" and (ii) the reference to "Section 2.17(b)" therein with a reference to "Section 2.17(c)".

1.11.    **Additional DIP Loans Section**.  Section 2 of the Credit Agreement is hereby amended by adding a new Section 2.26 immediately after Section 2.25 therein, which new Section 2.26 will read in full as follows:

2.26    DIP Loans.

(a)     DIP New Money Loans.

(i)     Subject to the terms and conditions of this Agreement and in the Financing Orders, each DIP Lender agrees, severally and not jointly, to make, from time to time commencing on the DIP Financing Amendment Effective Date until but not including the Post-Petition Termination Date, one or more delayed draw term loans (any such loans advanced pursuant to this Section 2.26(a) or as contemplated by Sections 2.10 or 5.4 of the DIP Financing Amendment, "**DIP New Money Loans**") to the DIP Borrowers in an aggregate principal amount not to exceed such DIP Lender's DIP New Money Commitment.

(ii)     The initial portion of the DIP New Money Commitments shall be available in multiple draws in an aggregate amount equal to the Interim DIP New Money Availability Amount during the period commencing on the Bankruptcy Court's entry of the Interim Order and ending with the Bankruptcy Court's entry of the Final Order, subject to the condition precedent that, as of the funding of any such initial DIP New Money Loan, the Bankruptcy Court shall have entered the Interim Order not later than three (3) Business Days following the Petition Date.  After entry of the Final Order, DIP Borrower Representative may request multiple borrowings of the total remaining DIP New Money Commitments, if any.

(iii)     All borrowings of the DIP New Money Commitment shall be funded on a delayed draw basis in minimum increments of $100,000, subject to the requirements and conditions set forth in Section 2.26(c) and Section 2.26(d), and DIP Borrowers may only request borrowings under this Section 2.26(a) once per week (unless otherwise agreed to in writing by Requisite Lenders).  Any amount borrowed under this Section 2.26(a) and subsequently repaid or prepaid may not be reborrowed.  Each DIP Lender's DIP New Money Commitment shall be automatically and permanently reduced without further action (A) on each applicable Credit Date by the aggregate principal amount of the DIP New Money Loan made by such DIP Lender on such Credit Date, and (B) to $0 on the Post-Petition Termination Date to the extent of any remaining unused portion of the DIP New Money Commitment on such date.

24

(iv) All proceeds of the DIP New Money Loans will be funded into and maintained in the DIP Funding Account until being used in accordance with this Agreement.

(b) DIP Refinancing Loans. The parties hereto acknowledge and agree that immediately prior to the effectiveness of the DIP Financing Amendment, the DIP Borrowers owed the Lenders the Prepetition Outstanding Amounts. Subject to the terms and conditions hereof and the Financing Orders, the following loans shall be deemed funded as DIP Loans pursuant to this Section 2.26(b) (collectively, the "**DIP Refinancing Loans**"):

(i) Upon the Bankruptcy Court's approval of the Interim Order (the "**Interim Order Entry Date**"), Prepetition Loans owing to DIP Lenders in an aggregate amount equal to the Interim DIP Refinancing Amount shall be automatically substituted and exchanged for (and deemed repaid by) term loans hereunder. Without limiting the foregoing, such DIP Refinancing Loans shall be deemed funded on the Interim Order Entry Date and shall be allocated among the DIP Lenders based on each DIP Lender's Pro Rata Share of the New Money Protective Advances and initial DIP New Money Loan advances, respectively, in each case without constituting a novation or satisfaction of the exchanged Prepetition Term Loans.

(ii) Upon the Bankruptcy Court's approval of the Final Order on a final basis (the "**Final Order Entry Date**"), Prepetition Loans owing to DIP Lenders in an aggregate amount equal to the Final DIP Refinancing Amount shall be automatically substituted and exchanged for (and deemed repaid by) term loans hereunder. Without limiting the foregoing, such DIP Refinancing Loans shall be deemed funded on the Final Order Entry Date and shall be allocated among the DIP Lenders based on each DIP Lender's Pro Rata Share of the DIP New Money Loan Exposure, in each case without constituting a novation or satisfaction of the exchanged Prepetition Term Loans.

(c) DIP Loan Borrowing Mechanics. To request a DIP New Money Loan, the Financial Officers of DIP Borrower Representative shall submit a notice substantially in the form of Exhibit E to the DIP Financing Amendment (a "**Post-Petition Funding Notice**") to Administrative Agent not later than 10:00 a.m. Eastern Time at least two (2) Business Days prior to the date of the proposed Borrowing. Each such notice shall be irrevocable.

Administrative Agent may condition the disbursement of DIP New Money Loans on receipt of such documentation as it shall reasonably require to evidence that the proceeds of such DIP New Money Loans shall be used in accordance with the Budget (subject to Permitted Variances) both as to the amount of such DIP New Money Loans and as to the timing of such DIP New Money Loans. Each Post-Petition Funding Notice shall constitute a representation by the Credit Parties that each of the requirements and conditions applicable to DIP New Money Loans,

including those set forth in <u>Section 2.26(a)</u> and <u>Section 2.26(d)</u>, are satisfied. Promptly following receipt of a Post-Petition Funding Notice in accordance with this <u>Section 2.20(c)</u>, Administrative Agent shall advise each DIP Lender of the details thereof and of the amount of such DIP Lender's DIP New Money Loan to be made as part of the requested Borrowing.

(d) <u>Conditions Precedent to Each DIP New Money Loan</u>. The obligation of the DIP Lenders to make any DIP New Money Loan (including any DIP New Money Loan funded on the DIP Financing Amendment Effective Date) shall be subject to the following conditions precedent:

(i) DIP Borrower Representative shall deliver to Administrative Agent an executed Post-Petition Funding Notice in accordance with <u>Section 2.26(c)</u>;

(ii) as of the relevant Credit Date, and immediately after giving effect to such Credit Extension and the application of the proceeds thereof, no Post-Petition Default as to the DIP Loans shall have occurred and be continuing (except for (x) any Post-Petition Default arising solely as a result of the commencement of the Cases and (y) the Prepetition Defaults);

(iii) satisfaction of each of the following conditions, as certified by the Financial Officers of DIP Borrower Representative in the Post-Petition Funding Notice: (A) all representations and warranties made by each Credit Party in the DIP Financing Amendment or in any statement or certificate after the DIP Financing Amendment Effective Date by such Credit Party in writing pursuant to any DIP Facility Document shall be true and correct in all material respects (except to the extent qualified by materiality or Material Adverse Effect, in which case, true and correct in all respects), (B) the Credit Parties shall be in compliance with the Budget subject to the Permitted Variances and shall have attached a schedule demonstrating such compliance in reasonable detail, and (C) the DIP Borrowers shall apply the proceeds of the DIP New Money Loans only to Budgeted Expenses;

(iv) Administrative Agent and DIP Lenders shall have received such other documents as Administrative Agent or any DIP Lender requests or requires, in each case in their respective reasonable discretion;

(v) no Bankruptcy Court order shall have been entered authorizing the Credit Parties to obtain financing or credit pursuant to Section 364 of the Bankruptcy Code from any Person other than the DIP Lenders unless otherwise consented to in writing by Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders);

(vi) not later than thirty (30) days following the Petition Date, the Final Order shall have been entered by the Bankruptcy Court, in form and substance acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole discretion in all respects;

(vii) the Financing Orders shall be in full force and effect and shall not have been vacated, reversed, modified, or amended and, in the event that such order is the subject of any pending appeal, no performance of any obligation of any party hereto shall have been stayed pending appeal;

(viii) the requested DIP New Money Loans shall not exceed the undrawn DIP New Money Commitments and, solely with respect to any borrowing of DIP New Money Loans requested prior to the Bankruptcy Court's approval of the Final Order, the requested DIP New Money Loans shall not exceed the Interim DIP New Money Undrawn Amount;

(ix) Administrative Agent and the DIP Lenders shall have each been reimbursed for all fees and expenses incurred by Administrative Agent and the DIP Lenders, as applicable, on or prior to the date of the requested DIP New Money Loan, including without limitation the fees and expenses of Vinson & Elkins L.L.P., FTI Consulting, Inc. and Jones Day; and

(x) as of the relevant Credit Date, and immediately after giving effect to such Credit Extension, Holdings and its Subsidiaries shall have no greater than $1,000,000 of balance sheet Cash.

(e) _Interest_. The DIP Borrowers shall pay interest on the unpaid principal amount of each DIP Loan from the date made (or deemed made, as the case may be) until the principal amount thereof shall have been paid in full at a rate per annum equal to the sum of (x) the Adjusted LIBOR Rate determined based on successive one-month Interest Periods commencing with the calendar month in which the Petition Date occurs (without any ability to convert to or otherwise elect alternative Interest Periods) plus (y) eight percent (8.00%), which accrued interest shall be payable monthly in arrears on the last Business Day of each calendar month; _provided_ however that (i) all principal outstanding on account of DIP Loans after the occurrence of a Post-Petition Default shall bear interest, from the date of such Post-Petition Default until the date on which such amount is paid in full or such Post-Petition Default is waived or cured, payable on demand, at the rate otherwise applicable pursuant to this clause (e) plus two percent (2.00%) per annum, and (ii) all interest on DIP Refinancing Loans (including any additional interest accruing as a result of any Post-Petition Default under subclause (i) of this clause (e)) shall be paid in kind on the last Business Day of each calendar month in lieu of being paid in cash.

(f)    _Final Repayment_.  The DIP Borrowers are jointly and severally liable for each DIP Loan, and the DIP Borrowers shall repay the entire unpaid principal amount of the DIP Loans, together with all accrued and unpaid interest thereon, in full in cash on the Post-Petition Termination Date.

(g)    _Grant of Security Interest_.

(i)    _Grant of Security_.  As security for the prompt payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all Post-Petition Obligations and to induce the DIP Lenders to make the DIP New Money Loans in accordance with the terms hereof, each Credit Party shall, pursuant to the Financing Orders, and does hereby, assign, convey, mortgage, pledge, hypothecate and grant to Collateral Agent, for the benefit of the DIP Lenders, a first priority priming perfected security interest in the DIP Collateral, in each case, subject to Permitted Liens, rights of Estate Professionals to amounts in the Professional Fee Escrow and the Carve-Out.  Furthermore, in the event any unapplied remaining retainer funds paid to any of the Credit Parties' Bankruptcy Court approved professionals are returned to the Credit Parties, such returned unapplied remaining retainer funds shall be applied to the Obligations as Administrative Agent (with the consent or at the direction of Requisite Lenders) may determine.  Subject to entry of the Final Order, no cost or surcharge shall be imposed against any DIP Collateral under Section 506(c) of the Bankruptcy Code, as provided in the Financing Orders.

(ii)    _Certain Limited Exclusions_.  Notwithstanding anything to the contrary herein, in no event shall any security interest granted under Section 2.26(g)(i) hereof or pursuant to the Financing Orders attach, in either case, to any license to which any Credit Party is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (x) the abandonment, invalidation or unenforceability of any right, title or interest of any Credit Party therein or (y) in a breach or termination pursuant to the terms of, or a default under, any such license (other than to the extent that such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity); _provided,_ however, that such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such license that does not result in any of the consequences specified in (x) or (y) above; _provided_ that notwithstanding anything in this Section 2.26(g)(ii) to the

28

contrary, the foregoing exclusions shall not in any way limit, impair or otherwise affect Collateral Agent's continuing Liens upon any rights or interests of any Credit Party in or to (A) monies due or to become due to such Credit Party in respect of such license or (B) any and all proceeds from the sale, transfer, assignment, license, lease or other dispositions of such license.

(h)     Post-Petition Default.  Subject to the Financing Orders, upon the occurrence and during the continuance of any Post-Petition Default and after Administrative Agent (with the consent or at the direction of Requisite Lenders) shall have provided written notice to DIP Borrower Representative of such Post-Petition Default, (a) Administrative Agent (with the consent or at the direction of Requisite Lenders) may immediately declare all or any portion of the Post-Petition Obligations to be, and the same shall forthwith become, due and payable for all purposes, rights and remedies, together with accrued interest thereon, (b) the obligation of the DIP Lenders to make any further DIP New Money Loans and any other obligations of Administrative Agent and the DIP Lenders in connection with the DIP New Money Commitments shall thereupon terminate, (c) the Credit Parties' authority to use Cash Collateral shall immediately terminate, except as provided in the Financing Orders with respect to certain allowed professional fees, and (d) Administrative Agent, Collateral Agent and DIP Lenders shall have all rights and remedies provided them in any of the DIP Facility Documents or the Financing Orders.

1.12.    **Additional Co-Borrowers Section**.  Section 2 of the Credit Agreement is hereby amended by adding a new Section 2.27 immediately after Section 2.26 therein, which new Section 2.27 will read in full as follows:

2.27    Co-Borrowers.

(a)     Joint and Several Liability.  All Post-Petition Obligations of the DIP Borrowers under this Agreement and the other DIP Facility Documents shall be joint and several Post-Petition Obligations of each DIP Borrower.  Anything contained in this Agreement and the other DIP Facility Documents to the contrary notwithstanding, the Post-Petition Obligations of each DIP Borrower hereunder, solely to the extent that such DIP Borrower did not receive proceeds of Loans from any borrowing hereunder, shall be limited to a maximum aggregate amount equal to the largest amount that would not render its Post-Petition Obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under §548 of the Bankruptcy Code, 11 U.S.C. §548, or any applicable provisions of comparable state law (collectively, the "**Fraudulent Transfer Laws**"), in each case after giving effect to all other liabilities of such DIP Borrower, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws (specifically excluding, however, any liabilities of such DIP Borrower in respect of intercompany Indebtedness to any other DIP Borrower or Affiliates of any other DIP Borrower to the extent that such Indebtedness would be discharged in an amount equal to the amount paid by such DIP Borrower hereunder) and after giving effect as assets to the value (as

29

determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation or contribution of such DIP Borrower pursuant to (i) applicable law or (ii) any agreement providing for an equitable allocation among such DIP Borrower and other Affiliates of any DIP Borrower of Post-Petition Obligations arising under Guaranties by such parties.

(b)    Subrogation.  Until the Post-Petition Obligations shall have been paid in full, each DIP Borrower shall withhold exercise of any right of subrogation, contribution or any other right to enforce any remedy that it now has or may hereafter have against another DIP Borrower or any other guarantor of the Post-Petition Obligations.  Each DIP Borrower further agrees that, to the extent the waiver of its rights of subrogation, contribution and remedies as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any such rights such DIP Borrower may have against another DIP Borrower, any collateral or security or any such other guarantor, shall be junior and subordinate to any rights Administrative Agent may have against the other DIP Borrower, any such collateral or security, and any such other guarantor. The DIP Borrowers under this Agreement and the other DIP Facility Documents together desire to allocate among themselves, in a fair and equitable manner, their Post-Petition Obligations arising under this Agreement and the other DIP Facility Documents. Accordingly, in the event any payment or distribution is made on any date by any DIP Borrower under this Agreement and the other DIP Facility Documents (a "**Funding Borrower**") that exceeds its Obligation Fair Share (as defined below) as of such date, that Funding Borrower shall be entitled to a contribution from the other DIP Borrowers in the amount of such other DIP Borrower's Obligation Fair Share Shortfall (as defined below) as of such date, with the result that all such contributions will cause each DIP Borrower's Obligation Aggregate Payments (as defined below) to equal its Obligation Fair Share as of such date. "**Obligation Fair Share**" means, with respect to a DIP Borrower as of any date of determination, an amount equal to (i) the ratio of (x) the Obligation Fair Share Contribution Amount (as defined below) with respect to such DIP Borrower to (y) the aggregate of the Obligation Fair Share Contribution Amounts with respect to all DIP Borrowers, multiplied by (ii) the aggregate amount paid or distributed on or before such date by all Funding Borrowers under this Agreement and the other DIP Facility Documents in respect of the Obligations guaranteed. "**Obligation Fair Share Shortfall**" means, with respect to a DIP Borrower as of any date of determination, the excess, if any, of the Obligation Fair Share of such DIP Borrower over the Obligation Aggregate Payments of such DIP Borrower. "**Obligation Fair Share Contribution Amount**" means, with respect to a DIP Borrower as of any date of determination, the maximum aggregate amount of the Post-Petition Obligations of such DIP Borrower under this Agreement and the other DIP Facility Documents that would not render its Post-Petition Obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under §548 of the Bankruptcy Code, 11 U.S.C. §548, or any comparable applicable provisions of state law; *provided* that, solely for purposes of calculating the Obligation Fair Share Contribution Amount with respect to any DIP Borrowers for purposes of this Section 2.27, any assets or liabilities of such DIP Borrower arising by virtue of any

rights to subrogation, reimbursement or indemnification or any rights to or Post-Petition Obligations of contribution hereunder shall not be considered as assets or liabilities of such DIP Borrower. "**Obligation Aggregate Payments**" means, with respect to a DIP Borrower as of any date of determination, an amount equal to (i) the aggregate amount of all payments and distributions made on or before such date by such DIP Borrower in respect of this Agreement and the other DIP Facility Documents (including in respect of this Section 2.27) minus (ii) the aggregate amount of all payments received on or before such date by such DIP Borrower from the other DIP Borrower as contributions under this Section 2.27. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Borrower. The allocation among DIP Borrowers of their Post-Petition Obligations as set forth in this Section 2.27 shall not be construed in any way to limit the liability of any DIP Borrower hereunder or under any DIP Facility Document.

(c)     Representative of DIP Borrowers. Each DIP Borrower hereby appoints SMG as its agent, attorney-in-fact and representative ("**DIP Borrower Representative**") for the purpose of (i) making any borrowing requests or other requests or certifications required under this Agreement or any other DIP Facility Document, (ii) the giving and receiving of notices by and to DIP Borrowers under this Agreement or any other DIP Facility Document, (iii) the delivery of all documents, reports, financial statements and written materials required to be delivered by the DIP Borrowers under this Agreement or any other DIP Facility Document, and (iv) all other purposes incidental to any of the foregoing. Each DIP Borrower agrees that any action taken by DIP Borrower Representative as the agent, attorney-in-fact and representative of such DIP Borrower shall be binding upon such DIP Borrower to the same extent as if directly taken by such DIP Borrower.

(d)     Allocation of Loans. All Loans shall be made to DIP Borrower Representative as borrower unless a different allocation of the Loans as between DIP Borrower Representative and any other DIP Borrower with respect to any borrowing hereunder is included in the applicable Post-Petition Funding Notice.

(e)     Obligations Absolute. Each DIP Borrower hereby waives, for the benefit of Beneficiaries: (i) any right to require any Beneficiary, as a condition of payment or performance by such DIP Borrower, to (A) proceed against any other DIP Borrower, any guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (B) proceed against or exhaust any security held from any other DIP Borrower, any guarantor or any other Person, (C) proceed against or have resort to any balance of any Deposit Account, Securities Account, or any other credit on the books of any Beneficiary in favor of any other DIP Borrower or any other Person, or (D) pursue any other remedy in the power of any Beneficiary whatsoever; (ii) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of any other DIP Borrower or any Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Obligations or any agreement or instrument relating

thereto or by reason of the cessation of the liability of any other DIP Borrower or any Guarantor from any cause other than payment in full of all Obligations; (iii) any defense based upon any statute or rule of law that provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (iv) any defense based upon any Beneficiary's errors or omissions in the administration of the Obligations, except behavior that amounts to willful misconduct as determined by a non-appealable judgment of a court of competent jurisdiction; (v) (A) any principles or provisions of law, statutory or otherwise, that are or might be in conflict with the terms hereof and any legal or equitable discharge of such DIP Borrower's obligations hereunder, (B) the benefit of any statute of limitations affecting such DIP Borrower's liability hereunder or the enforcement hereof, (C) any rights to set offs, recoupments and counterclaims, and (D) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (vi) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or under any agreement or instrument related thereto, notices of any renewal, extension or modification of the Obligations or any agreement related thereto, notices of any extension of credit to a DIP Borrower and notices of any of the matters referred to in <u>Section 7.4</u> and any right to consent to any thereof; and (vii) any defenses or benefits that may be derived from or afforded by law that limit the liability of or exonerate guarantors or sureties, or that may conflict with the terms hereof.

1.13. **<u>Reports</u>**.

(a)     Section 5.1(c) of the Credit Agreement is hereby amended by (x) deleting the "(i)" and the "; and" appearing in clause (i) of such section and (y) deleting clause (ii) of such section in its entirety.

(b)     Section 5.1 of the Credit Agreement is hereby amended by (x) amending and restating the body text appearing in clause (r) thereof to read "[Intentionally Reserved]" and (b) deleting clause (w) thereof in its entirety.

1.14. **<u>Cash Management</u>**.  Section 5.14(b) of the Credit Agreement is hereby amended by adding a new sentence at the end thereof, which new sentence will read in full as follows:

Notwithstanding the foregoing, during the pendency of the Cases, the cash management system maintained by the Credit Parties shall at all times comply with the Cash Management Order.

1.15. **<u>Additional Budget Covenant</u>**.  Section 5 of the Credit Agreement is hereby amended by adding a new Section 5.20 immediately after Section 5.19 therein, which new Section 5.20 will read in full as follows:

5.20     <u>Budget</u>.

(a)     The Credit Parties shall use all proceeds of DIP Loans and any Cash Collateral, and shall otherwise operate, strictly in accordance with the Budget, as initially attached as <u>Exhibit B</u> to the DIP Financing Amendment and as thereafter modified in accordance with this <u>Section 5.20</u>, in each case subject to the variances allowed pursuant to clauses (b) and (c) of this <u>Section 5.20</u> (the "**Permitted Variances**").

(b)     For each rolling four-week period, (i) the actual total Cash received by the Credit Parties for such period shall be at least eighty-five percent (85%) of the aggregate amount of total Cash receipts projected in the Budget for such period and (ii) the actual total Cash disbursed (on a line item basis) by the Credit Parties during such period shall not exceed one hundred five percent (105%) in the aggregate and one hundred fifteen percent (115%) by line item of the amount of total Cash disbursements projected in the Budget for such period.  Notwithstanding the foregoing, there shall be no variance on the fees and expenses of Estate Professionals.

(c)     No later than 9:00 a.m. Eastern Time on Wednesday of every week commencing with the first such date after delivery of the initial Budget, DIP Borrower Representative shall submit to Administrative Agent and the DIP Lenders a proposed Budget for the rolling 13-week period commencing at the start of the following week in form and substance satisfactory to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole and absolute discretion, which proposed Budget shall replace and supersede the previously delivered Budget upon the approval thereof by Administrative Agent (with the consent or at the direction of Requisite Lenders).

1.16.   **Additional Reporting Covenant**.  Section 5 of the Credit Agreement is hereby amended by adding a new Section 5.21 immediately after Section 5.20 therein, which new Section 5.21 will read in full as follows:

5.21    <u>Post-Petition Reporting</u>.  DIP Borrower Representative shall furnish or cause to be furnished to Administrative Agent and the Lenders the following:

(a)     Not later than 9:00 a.m. Eastern Time on Wednesday of each week commencing with the first such date after delivery of the initial Budget, a Budget Variance Report reviewed and certified by the Financial Officers of DIP Borrower Representative and, to the extent any changes to the then-current Budget most recently approved by Administrative Agent and Requisite Lenders will be requested by the Credit Parties with respect to the following four week period, a proposed revised Budget together with an explanation in reasonable detail as to the reason for such requested revisions.

(b)     Not later than 9:00 a.m. Eastern Time on Wednesday of each week commencing with the first such date after the DIP Amendment Effective Date, a report, in form and substance acceptable to Administrative Agent and Requisite

Lenders (or Administrative Agent with the consent or direction of Requisite Lenders), showing the aggregate number of admission tickets sold and aggregate revenue for the prior week broken out by Theater location, which information will be accompanied by supporting documentation (if necessary) and will set forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year;

(c)     Copies of all reports filed with the Bankruptcy Court or the Office of the United States Trustee on the same calendar day as such filing, including without limitation any monthly reports detailing results of operations and cash flow.

(d)     Within two (2) Business Days after written notice from Administrative Agent or any Lender to DIP Borrower Representative, (i) telephonic or written weekly reports by the Credit Parties and their advisors regarding any potential transactions for the sale or other disposition of all or a substantial portion of property of the Credit Parties or their respective estates, (ii) copies of all offer letters, term sheets, and agreements received or entered into by the Credit Parties in connection with any such potential transactions, and (iii) any other information regarding the Cases reasonably requested by Administrative Agent or any Lender.

(e)     To the extent requested by Administrative Agent or any Lender, meetings between the Credit Parties' senior management and the Lenders on a monthly basis.

(f)     Immediately upon receipt of the same, any and all documentation that in any way relates to a solicitation, offer, or proposed sale or disposition of a material amount of property of the Credit Parties' estates, including, but not limited to, letters of inquiry, solicitations, letters of intent, or asset purchase agreements.

(g)     Not later than three (3) Business Days prior to each funding request, the Credit Parties shall provide Administrative Agent and the DIP Lenders a list identifying the top fifty vendors that the Credit Parties anticipate must be paid in connection with the confirmation of a chapter 11 plan of the Credit Parties, which list shall (i) be approved by the Financial Officers of DIP Borrower Representative and (ii) contain each vendor's name, the amounts owed to each such vendor, and the basis for payment to each such vendor.

(h)     Such other reports, information, or data relating to any of the Credit Parties or their assets or operations that Administrative Agent or any Lender may reasonably request from time to time.

1.17.   **Additional Priority of Liens Covenant**.  Section 5 of the Credit Agreement is hereby amended by adding a new Section 5.22 immediately after Section 5.21 therein, which new Section 5.22 will read in full as follows

5.22   Priority of Liens and Claims.  Each Credit Party hereby covenants, represents and warrants that, upon entry of the Financing Orders, its Post-Petition Obligations hereunder and under the other DIP Facility Documents:

34

(a)     pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim against each of the Credit Parties on a joint and several basis, which will be payable from and have recourse to all pre- and post-petition property of such Credit Parties and all proceeds thereof, subject only to the Carve-Out to the extent provided in the Financing Orders and any payments or proceeds on account of such Superpriority Claim shall be distributed in accordance with Section 2.15(h);

(b)     pursuant to Section 364(c)(2) of the Bankruptcy Code and subject to the Carve-Out to the extent provided in the Financing Orders, shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest and Lien on all of the assets of the Credit Parties, whether currently existing or thereafter acquired, of the same nature, scope and type as the DIP Collateral that are not subject to (x) valid, perfected and non-avoidable liens as of the Petition Date or (y) valid Liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, and, subject to entry of the Final Order, Avoidance Proceeds;

(c)     pursuant to section 364(d)(1) of the Bankruptcy Code and subject only to the Carve-Out to the extent provided in the Financing Orders, shall at all times be secured by a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and Lien upon the property of the Credit Parties of the same nature, scope and type as the DIP Collateral to the extent that such DIP Collateral is subject to existing Liens that secure the obligations of the applicable Credit Parties under the Collateral Documents as in effect prior to the effectiveness of the DIP Financing Amendment and such priming liens shall be senior in all respects to any Adequate Protection Liens;

(d)     pursuant to Section 364(c)(3) of the Bankruptcy Code, subject only to the Carve-Out to the extent provided in the Financing Orders and except as provided in clause (c) above, shall be secured by a valid, binding, continuing, enforceable, fully-perfected junior security interest in and Lien on the DIP Collateral that is subject to valid, perfected and non-avoidable Permitted Liens that were senior to the Liens securing the Prepetition Obligations at the time of the commencement of the Cases; and

(e)     shall not be subject or subordinate to any Lien or security interest that is avoided and preserved for the benefit of the Credit Parties and their estates under section 551 of the Bankruptcy Code or any Liens arising after the Petition Date, including, without limitation, any Liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Credit Parties, unless otherwise expressly provided for in the DIP Facility Documents.

Subject to and effective only upon entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any

future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of applicable law, without the prior written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole discretion, and no consent shall be implied from any action, inaction or acquiescence by Administrative Agent or the DIP Lenders. In no event shall Administrative Agent or the DIP Lenders be subject to the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code, or the equitable doctrine of "marshaling" (subject only to and effective upon entry of the Final Order) or any other similar doctrine with respect to the DIP Collateral.

Except for the Carve-Out, (x) the Superpriority Claims in favor of Administrative Agent and the DIP Lenders and (y) the adequate protection claims granted under the Financing Orders in favor of Administrative Agent and Lenders, in each case shall at all times be senior to the rights of any Credit Party, any Chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any Chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 cases (if any of the Cases are converted to cases under Chapter 7 of the Bankruptcy Code).

1.18. **Additional Advisor Covenant**. Section 5 of the Credit Agreement is hereby amended by adding a new Section 5.23 immediately after Section 5.20 therein, which new Section 5.23 will read in full as follows:

5.23. Advisors. Upon Administrative Agent's request (with the consent or at the direction of Requisite Lenders), the Credit Parties shall engage and thereafter maintain or expand the scope of, as the case may be, such engagement with one or more advisors consisting of a chief restructuring officer, independent director, sale advisor, real estate advisor or other advisor in each case acceptable to Administrative Agent and the DIP Lenders (each, as the case may be, an "**Advisor**") to review and/or be responsible for the governance of the business, financial condition and operations of the Credit Parties (it being acknowledged that the Credit Parties' retention of CR3 Partners, LLC as an Advisor initially satisfies this covenant as to identity, subject to potential amendments to the scope of governance and other rights and duties, replacement, or removal, in each case, as requested by Requisite Lenders from time to time in their respective sole discretion), and, from and after any request by Administrative Agent or Requisite Lenders, the Credit Parties shall grant access to all non-privileged financial and corporate information and books and records of the Credit Parties, shall cooperate and assist each Advisor, and shall authorize each Advisor to communicate freely and cooperate fully with Administrative Agent, the Lenders, and their respective counsel and advisors. Without limiting the foregoing, the Credit Parties hereby authorize Administrative Agent, the Lenders and their respective agents, counsel

36

and other professionals to communicate with any Advisor without notice to, or the presence of, any Credit Party, and the Credit Parties shall cause each Advisor to cooperate with Administrative Agent, the Lenders and their respective agents and professionals. At Administrative Agent's request (with the consent or at the direction of Requisite Lenders), the Credit Parties shall authorize any such Advisor qualified to act as a chief restructuring officer, and shall cause such Advisor to remain authorized, to be primarily responsible for the operation of each Credit Party's business and to sell any assets of any Credit Party or any Credit Party's subsidiaries, in each case in a manner and scope satisfactory to Administrative Agent and the Requisite Lenders in their respective sole discretion. Without limiting the foregoing, the Credit Parties shall, and shall cause each Advisor to:

(a)     Conduct a conference call no less frequently than once a week with Administrative Agent and Lenders and their respective agents and advisors, for the purpose of informing Administrative Agent and Lenders of the status of their restructuring efforts and other status updates;

(b)     On or before ten (10) days after the Petition Date, develop and present to Administrative Agent and Lenders strategy options for the payment or refinancing in full in cash of the Obligations or the sale, in one or more transactions, of all or substantially all of the assets of or equity interests in the Credit Parties, including a marketing plan with an estimated timeline and milestones; and

(c)     Provide such other information, reports, and strategy options as Administrative Agent or Requisite Lenders may reasonably request.

1.19.  **Additional Case Milestones Covenant**. Section 5 of the Credit Agreement is hereby amended by adding a new Section 5.24 immediately after Section 5.23 therein, which new Section 5.24 will read in full as follows:

5.24.  <u>Case Milestones</u>. Each Credit Party shall cause the satisfaction of the following milestones (collectively, the "**Milestones**" and each a "**Milestone**"), unless waived or extended with the consent of Requisite Lenders or Administrative Agent (with the consent or at the direction of Requisite Lenders); *provided* that when the performance of any covenant, duty or obligation is stated to be due or performance required under this <u>Section 5.24</u> falls on a day which is not a Business Day, the date of such performance shall extend to the immediately succeeding Business Day:

(a)     No later than the Petition Date, the Credit Parties shall have filed a motion (the "**DIP Motion**") with the Bankruptcy Court seeking approval of this Agreement and the other DIP Facility Documents and the transactions contemplated hereby, in form and substance acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in all respects.

(b)     Not later than three (3) Business Days following the Petition Date, the Interim Order in form and substance acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in all respects shall have been entered by the Bankruptcy Court granting the DIP Motion on an interim basis as set forth in this Agreement.

(c)     Not later than thirty (30) days following the Petition Date, the Final Order shall have been entered by the Bankruptcy Court, in form and substance acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in all respects, granting the DIP Motion on a final basis.

(d)     The following Milestones in respect of an Acceptable Plan of Reorganization shall be achieved:

(i)     Not later than sixty (60) days after the Petition Date, the Credit Parties shall have filed in the Bankruptcy Court an Acceptable Plan of Reorganization (the "**Plan**"), a corresponding disclosure statement (the "**Disclosure Statement**"), and a motion seeking approval of the Disclosure Statement, in each case in form and substance acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders).

(ii)     Not later than eighty-five days (85) after the Petition Date, the Credit Parties shall have scheduled a hearing on approval of the Disclosure Statement and obtained entry of the order by the Bankruptcy Court approving the Disclosure Statement in form and substance acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders).

(iii)     Not later than one hundred twenty (120) days after the Petition Date, the Credit Parties shall have scheduled a hearing (the "**Confirmation Hearing**") to confirm the Acceptable Plan of Reorganization.

(iv)     Not later than three (3) Business Days after the Confirmation Hearing, the Credit Parties shall have obtained entry by the Bankruptcy Court of the order confirming the Acceptable Plan of Reorganization (the "**Confirmation Order**"), in form and substance acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders).

(v)     Not later than one hundred thirty-five (135) days after the Petition Date, the occurrence of the effective date of the Acceptable Plan of Reorganization shall have occurred and the Credit Parties shall have discharged the Post-Petition Obligations by (i) payment in full of the Post-

Petition Obligations in cash or (ii) such other treatment as acceptable to Requisite Lenders and the Credit Parties.

(e)    The following milestones (collectively, the "**Plan/Sale Transaction Milestones**" and each a "**Plan/Sale Transaction Milestone**") in respect of a Plan/Sale Transaction shall be achieved:

(i)    Not later than the Petition Date, the Credit Parties shall have filed an application to continue the employment of CR3 Partners, LLC as the chief restructuring officer of the Credit Parties pursuant to that certain engagement letter dated September 8, 2020 (as the same may be amended in a manner acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders)) for purposes of advising the Credit Parties pursuant to such engagement letter.

(ii)    Not later than the Petition Date, the Credit Parties shall have filed an application to employ an investment banker and/or sale advisor to engage a third-party investment banker and/or financial advisor acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) for purposes of advising the Credit Parties and conducting a marketing process to solicit potential buyers pursuant to an engagement letter in form and substance acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders).

(iii)    Not later than ten (10) days after the Petition Date, the Credit Parties shall have filed a motion in the Bankruptcy Court, in form and substance acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders), seeking approval of (a) a sale of substantially all of the equity in or operating assets of the Credit Parties on terms acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) which may be pursuant to the Plan or a sale under Section 363 of the Bankruptcy Code as determined by Administrative Agent (with the consent or at the direction of Requisite Lenders) and the potential purchaser (the "**Plan/Sale Transaction**"), (b) bidding procedures, (c) required minimum bid levels, (d) credit bid rights, and (e) Acceptable Plan of Reorganization toggle rights, in each case, subject to the consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) (clauses (b)-(e), collectively, the "**Bid Procedures**"), and related relief in connection with the Plan/Sale Transaction (the "**Bid Procedures and Sale Motion**").

(iv) Not later than forty-five (45) days after the Petition Date, (a) the Credit Parties shall have scheduled a hearing on the Bid Procedures and Sale Motion, and (b) the Credit Parties shall have obtained entry of an order, in form and substance acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) (the "**Bid Procedures Order**"), approving the Bid Procedures and setting a date for the hearing to approve the Plan/Sale Transaction.

(v) Not later than seventy-five (75) days after the Petition Date (the "**Bid Deadline**"), the Credit Parties shall have received qualified bids for the Plan/Sale Transaction.

(vi) Not later than five (5) days after the Bid Deadline, the Credit Parties shall have commenced the auction contemplated by the Bid Procedures or cancelled such auction with the consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction Requisite Lenders).

(vii) Not later than ten (10) days after the Bid Deadline, the Credit Parties shall have obtained entry of an order by the Bankruptcy Court (the "**Sale Approval Order**"), in form and substance acceptable to Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in all respects, approving the Plan/Sale Transaction in the event Administrative Agent (with the consent or at the direction of Requisite Lenders) and the potential purchaser determine to close the Plan/Sale Transaction pursuant to a sale under Section 363 of the Bankruptcy Code.

(viii) Not later than ninety (90) days after the Petition Date, the Plan/Sale Transaction shall have closed.

(ix) Substantially contemporaneously with the closing of the Plan/Sale Transaction, the Credit Parties shall have paid Administrative Agent the net proceeds of the Plan/Sale Transaction to the full extent of the Obligations, including, without limitation, the fees and expenses of Vinson & Elkins L.L.P., FTI Consulting, Inc. and Jones Day.

(f) The Credit Parties covenant and agree that they will use their best efforts to comply with each of the Milestones and the Plan/Sale Transaction Milestones. Each of the Milestones and Plan/Sale Transaction Milestones may be extended or waived in writing by Administrative Agent (with the consent or at the direction of Requisite Lenders). The Credit Parties shall promptly file with the Bankruptcy Court a notice of any such extension or waiver.

1.20.  **Additional Pleadings Covenant**.  Section 5 of the Credit Agreement is hereby amended by adding a new Section 5.25 immediately after Section 5.24 therein, which new Section 5.25 will read in full as follows:

5.25.  Pleadings.  The Credit Parties shall provide Administrative Agent and the DIP Lenders with drafts of all pleadings (together with proposed orders attached thereto, as applicable), including all "first day" and "second day" pleadings to be filed in the Cases, in each case before filing and with reasonable time (in any event no less than five (5) Business Days) for Administrative Agent and the DIP Lenders to comment thereon, and all such pleadings shall not conflict with the terms of the DIP Facility Documents.

1.21.  **Amendment to Indebtedness Covenant**.

(a)  Section 6.1(a) of the Credit Agreement is hereby amended by amending and restating such section, which Section 6.1(a) will read in full as follows:

(a)  the Obligations, including, without limitation, the Post-Petition Obligations;

(b)  Section 6.1(c) of the Credit Agreement is hereby amended by amending and restating such section, which Section 6.1(c) will read in full as follows:

(c)  in the case of Holdings only, the TowerBrook Subordinated Indebtedness, so long as such Indebtedness is at all times subject to the TowerBrook Subordination Agreement;

(c)  Section 6.1 of the Credit Agreement is hereby amended by amending and restating the body text appearing in clauses (l) and (m) thereof to read "[Intentionally Reserved]".

1.22.  **Amendment to Liens Covenant**.

(a)  Section 6.2 of the Credit Agreement is hereby amended by deleting the word "and" at the end of clause (n) therein, re-lettering clause (o) therein as clause (p), and inserting a new clause (o) immediately after clause (n) therein, which new clause (o) will read in full as follows:

(o)  Liens on the DIP Collateral granted pursuant to any DIP Facility Documents, in each case to the extent securing Prepetition Obligations, Post-Petition Obligations, or adequate protection provided to the Secured Parties in accordance with the Financing Orders; and

(b)  Section 6.2(n) of the Credit Agreement is hereby amended by amending and restating such section, which Section 6.2(n) will read in full as follows:

(n)  [Intentionally Reserved]

41

(c)     Section 6.2 of the Credit Agreement is hereby amended by adding a new sentence at the end thereof, which new sentence will read in full as follows:

Notwithstanding anything to the contrary herein, the DIP Funding Account shall not be subject to the Liens of any Person other than (x) the valid perfected first priority priming Lien of Administrative Agent for the benefit of the DIP Lenders, (y) the valid perfected Lien of Administrative Agent for the benefit of the Pre-Petition Lenders, and (z) customary bankers' Liens of the DIP Funding Account depositary bank.

1.23.   **Restricted Junior Payments**.  Section 6.5 of the Credit Agreement is hereby amended by (i) amending and restating the body text appearing in clauses (c), (d), (e), (g) and (h) thereof to read "[Intentionally Reserved]" and (ii) adding the word "and" at the end of clause (f) thereof.

1.24.   **Investments**.  Section 6.7 of the Credit Agreement is hereby amended by (i) adding the word "and" at the end of clause (f) thereof, (ii) amending and restating the body text appearing in clause (g) thereof to read "[Intentionally Reserved]", (iii) replacing the "; and" appearing at the end of clause (h) thereof with ".", and (iv) deleting clause (i) thereof in its entirety.

1.25.   **Amendment to Financial Covenants**.  Section 6.8 of the Credit Agreement is hereby amended by amending and restating such section, which Section 6.18 will read in full as follows:

(a)     Total Liquidity.  Holdings and its Subsidiaries shall not permit Total Liquidity to be less than $1,000,000 at any time.

(b)     Balance Sheet Cash.  Holdings and its Subsidiaries shall not permit balance sheet Cash, as of the close of business of SMG on the last Business Day of each week, to be greater than $1,000,000.

1.26.   **Disposition of Assets; Acquisitions**.  Section 6.9 of the Credit Agreement is hereby amended by (i) adding the word "and" at the end of clause (c) thereof and (ii) amending and restating the body text appearing in clauses (d) and (e) thereof to read "[Intentionally Reserved]".

1.27.   **Material Contracts**.  Section 6.19 of the Credit Agreement is hereby amended by adding the phrase "(with the consent or at the direction of Requisite Lenders)" immediately after each reference to "Administrative Agent" in the second and third sentences thereof.

1.28.   **Additional Negative Covenants**.  Section 6 of the Credit Agreement is hereby amended by adding new Sections 6.23, 6.24, 6.25, 6.26, 6.27 and 6.28 immediately after Section 6.22 therein, which new Section 6.23, 6.24, 6.25, 6.26, 6.27 and 6.28 will each read in full as follows:

6.23   Chapter 11 Claims.  Other than rights of Estate Professionals to amounts in the Professional Fee Escrow and the Carve-Out, the Credit Parties shall not incur, create, assume, suffer to exist, or permit any claim in the Cases (including

42

without limitation any claim under Section 506(c) of the Bankruptcy Code and any deficiency claim remaining after the satisfaction of a Lien that secures a claim) to be on a parity with or senior to (x) the claims of Administrative Agent for the benefit of the DIP Lenders against the Credit Parties hereunder or (y) the adequate protection claims in favor of the Lenders granted pursuant to the Financing Orders, or apply to the Bankruptcy Court for authority to do so unless such relief, if granted, would cause the Post-Petition Obligations to be satisfied in full. The Credit Parties shall not pay fees and expenses to any Estate Professional until such Estate Professional is authorized to be paid pursuant to any fee procedure approved by the Bankruptcy Court.

6.24    <u>Other Financings</u>.  The Credit Parties shall not obtain any financing or credit pursuant to Section 364 of the Bankruptcy Code or any other indebtedness or contingent obligations from any Person other than the DIP Lenders.

6.25    <u>Superpriority Claims</u>.  The Credit Parties shall not create or permit to exist any Superpriority Claim (including any superpriority administrative claim and all other benefits and protections allowable under Sections 507(b) and 503(b)(1) of the Bankruptcy Code) other than in favor of the DIP Lenders with respect to the Post-Petition Obligations or as expressly permitted in writing by Administrative Agent (with the consent or at the direction of Requisite Lenders).

6.26    <u>Budget</u>.  The Credit Parties shall not use the proceeds of DIP Loans nor any Cash Collateral except in accordance with the Budget, subject to Permitted Variances.

6.27    <u>Lease Agreements</u>.  The Credit Parties shall not amend any real property lease agreement without the express prior written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole and absolute discretion.

6.28    <u>Restructuring Committee</u>.  The Credit Parties shall not amend, modify or change the membership, composition, scope, governance rights or authority of the Restructuring Committee without the express prior written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders) in their respective sole and absolute discretion.

1.29.    Powers and Duties.  Sections 9.2 and 9.8(a) of the Credit Agreement are hereby amended to delete the "." at the end of the first sentence of each such section and to add the following proviso at the end thereof:

; *provided*, however, that the authorization of each Lender set forth in this paragraph shall not override any specific instance in this Agreement where an Agent may not act unless it has received the direction or consent of the Requisite Lenders.

1.30.  **Amendment to Participations Section**.  Section 10.6(h) of the Credit Agreement is hereby amending by replacing the reference to "Section 2.17(c)" therein with a reference to "Section 2.17(d)".

1.31.  **Amendment to Survival of Representations, Warranties and Agreements Section**.  Section 10.8 of the Credit Agreement is hereby amending by replacing the reference to "Section 2.17(c)" therein with a reference to "Section 2.17(d)".

SECTION 2.  **Conditions Precedent**.  This DIP Financing Amendment shall not be effective until all corporate actions of the Credit Parties taken in connection herewith and the transactions contemplated hereby shall be satisfactory in form and substance to Administrative Agent and DIP Lenders, and each of the following conditions precedent shall have been satisfied:

2.1.  **Documentation**.  Administrative Agent and each DIP Lender shall have received each of the following, in form and substance satisfactory to Administrative Agent, Administrative Agent's counsel, each DIP Lender and each DIP Lender's counsel, in their respective sole and absolute discretion:

(a)  a certificate of the chief executive officer or other Authorized Officer acceptable to Administrative Agent in its sole discretion of Holdings and DIP Borrower Representative certifying that (i) all representations and warranties in the DIP Financing Amendment are true and correct in all material respects, (ii) there exists no Default, Event of Default or Post-Petition Default before and after giving effect to this DIP Financing Amendment and the borrowings contemplated hereby (other than the Prepetition Defaults), and (iii) no Material Adverse Effect shall have occurred since the Petition Date;

(b)  satisfactory corporate records, documents from public officials, officer's certificates, and resolutions evidencing the Credit Parties' due authorization of the transactions contemplated by the DIP Facility Documents; and

(c)  such other documents, instruments, and certificates as any DIP Lender shall deem necessary or appropriate in connection with this DIP Financing Amendment and the transactions contemplated hereby.

2.2.  **DIP Financing Amendment**.  Administrative Agent shall have received a counterpart of this DIP Financing Amendment duly executed and delivered by a duly authorized officer of each Credit Party and each Lender.

2.3.  **Government and Third Party Approvals**.  All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations of the Credit Parties shall have been obtained on satisfactory terms and shall be in full force and effect.

2.4.  **Petition Date**.  The Petition Date shall have occurred, and each Credit Party shall be a debtor and a debtor-in-possession in the Cases.

2.5. **Financing Orders**. Within three (3) Business Days of the Petition Date, the Bankruptcy Court shall have entered an Interim Order approving the terms of the DIP Financing Amendment, use of Cash Collateral and other arrangements as described therein, which shall be in form and substance satisfactory to Administrative Agent and each DIP Lender, and no later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered a Final Order approving the terms of the DIP Financing Amendment, use of Cash Collateral and other arrangements as described therein, which shall be in form and substance satisfactory to Administrative Agent and each DIP Lender.

2.6. **First Day Orders**. The Bankruptcy Court shall have entered an order approving a cash management system for the Credit Parties and such other "first day" orders as any DIP Lender may require, in each case, in form and substance satisfactory to Administrative Agent and each DIP Lender.

2.7. **Budget**. The Lenders shall have received the initial Budget which shall be in form and substance satisfactory to Administrative Agent and each DIP Lender in their respective sole and absolute discretion.

2.8. **Security and Lien Searches**. Administrative Agent shall have received appropriate UCC search certificates reflecting no prior Liens encumbering the DIP Collateral of the Credit Parties for each jurisdiction requested by Administrative Agent; other than those being assigned or released on or prior to the DIP Amendment Effective Date or Liens permitted by Section 6.2 of the Credit Agreement. Collateral Agent shall have received executed copies of all such Collateral Documents as Collateral Agent may reasonably request to effectuate the grant of security interests by the Credit Parties in the Collateral to Collateral Agent to secure the Obligations.

2.9. **Upfront Fee**. The DIP Borrowers shall have paid to Administrative Agent for the account of each DIP Lender, an upfront fee in an amount equal to two percent (2.00%) of each such DIP Lender's DIP New Money Commitments (prior to giving effect to the funding of any DIP New Money Loan) prior to or on the DIP Financing Amendment Effective Date.

2.10. **Expense Reimbursement**. Administrative Agent and the DIP Lenders shall have each been reimbursed for all fees and expenses incurred by Administrative Agent and the DIP Lenders, as applicable, prior to the DIP Financing Amendment Effective Date, including without limitation the fees and expenses of Vinson & Elkins L.L.P., FTI Consulting, Inc. and Jones Day; *provided* that any such fees and expenses, to the extent not paid by the Credit Parties on or prior to the DIP Financing Amendment Effective Date, may, at the election of Administrative Agent, be funded as DIP New Money Loans even if the conditions precedent set forth in Sections 2.26(a) or 2.26(d) of the Credit Agreement have not been satisfied and paid directly by Administrative Agent and, to the extent so paid, shall thereafter constitute DIP New Money Loans for all purposes under the DIP Facility Documents.

2.11. **Sale Plan**. The Credit Parties shall have engaged and retained CR3 Partners, LLC or another investment bank or sale advisor acceptable to Administrative Agent and each DIP Lender in their respective sole discretion pursuant to an engagement letter with terms and conditions acceptable to Administrative Agent and each DIP Lender (as the same may be amended,

supplemented or otherwise modified from time to time in form and substance acceptable to Administrative Agent and each DIP Lender in their respective sole discretion in all respects) to, among other things, (a) advise the Credit Parties in preparing a plan to pursue a sale of the equity in the Credit Parties or the operating assets of the Credit Parties and (b) deliver to Administrative Agent and each DIP Lender an outline of such plan at a date to be determined by Administrative Agent, which plan will include an estimated timeline and milestones consistent with this DIP Financing Amendment.

2.12. **Restructuring Committee**. Prior to the Petition Date, the Credit Parties shall have formed a restructuring committee of their board of managers (the "**Restructuring Committee**") and vested governance and authority in such Restructuring Committee to manage (x) the Cases, (y) any Plan/Sale Transaction, and (z) any restructuring or other transaction related thereto, pursuant to a delegation of authority and related governance documents in form, substance and scope acceptable to Administrative Agent and each DIP Lender in their respective sole discretion.

2.13. **No Material Adverse Effect**. No Material Adverse Effect shall have occurred since the Petition Date.

SECTION 3. **Representations and Warranties**. Each Credit Party represents and warrants to Administrative Agent and the Lenders that (a) this DIP Financing Amendment constitutes its legal, valid, and binding obligations, enforceable in accordance with the terms hereof (subject as to enforcement of remedies to any applicable bankruptcy, reorganization, moratorium, or other laws or principles of equity affecting the enforcement of creditors' rights generally), (b) the Credit Agreement, as amended hereby, and the other DIP Facility Documents remain in full force and effect, and (c) other than the Prepetition Defaults disclosed on Exhibit A, there exists no Default, Event of Default or Post-Petition Default under the DIP Facility Documents after giving effect to this DIP Financing Amendment.

SECTION 4. **Further Assurances**. The Credit Parties shall execute and deliver such further agreements, documents, instruments, and certificates in form and substance satisfactory to Administrative Agent and each DIP Lender, as Administrative Agent or any DIP Lender may deem necessary or appropriate in connection with this DIP Financing Amendment.

SECTION 5. **Miscellaneous**.

5.1. **Ratifications**. Except as expressly modified by this DIP Financing Amendment, the terms and provisions of the Credit Agreement and the other DIP Facility Documents are ratified and confirmed and shall continue in full force and effect. Except as provided herein, this DIP Financing Amendment shall not constitute an amendment or waiver of any terms and provisions of the Credit Agreement and other DIP Facility Documents nor a waiver of the rights of Administrative Agent, Collateral Agent and the Lenders to insist upon compliance with each term, covenant, condition, or provision of the Credit Agreement and other DIP Facility Documents.

5.2. **No Novation**. This DIP Financing Amendment is not intended by the parties to be, and shall not be construed to be, a novation of the Credit Agreement and the other DIP Facility Documents or an accord and satisfaction in regard thereto.

5.3. **Parties in Interest**. All of the terms and provisions of this DIP Financing Amendment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns. No third party beneficiaries are intended in connection with this Amendment.

5.4. **Fees and Expenses**. Each Credit Party agrees on a joint and several basis to pay all reasonable out-of-pocket costs and expenses of Administrative Agent and the DIP Lenders including, without limitation, those contemplated under Section 10.2 of the Credit Agreement and any other DIP Facility Document, and expressly including reasonable fees, charges and expenses of Vinson & Elkins L.L.P., Jones Day, and any financial advisor (including FTI Consulting, Inc.) to Administrative Agent or the DIP Lenders in connection with the preparation, negotiation, execution, delivery and administration of this DIP Financing Amendment and all other instruments or documents provided for herein or delivered or to be delivered hereunder or in connection herewith (all such costs and expenses, the "**Administrative Agent's and DIP Lenders' Expenses**"). All of Administrative Agent's and the DIP Lenders' Expenses shall be payable by the Credit Parties on a monthly basis. In addition, each Credit Party agrees to save and hold harmless Administrative Agent and the DIP Lenders from all liability for Administrative Agent's and DIP Lenders' Expenses. All of Administrative Agent's and DIP Lenders' Expenses constitute Post-Petition Obligations under the DIP Facility Documents. Each Credit Party acknowledges that it will receive a summary invoice reflecting only the total amount due and that such summary invoice will not contain any narrative description of the services provided by Vinson & Elkins L.L.P., FTI Consulting, Inc., Jones Day, or any other consultant or advisor. Each Credit Party agrees that delivery of such summary invoices shall not, in any way constitute a waiver of any right or privilege of Administrative Agent and DIP Lenders associated with such invoices. Administrative Agent is authorized by each Credit Party and the Lenders, from time to time in Administrative Agent's sole discretion, to make further DIP New Money Loans to DIP Borrowers, on behalf of all Lenders, which Administrative Agent deems necessary or desirable to pay any amount chargeable to or required to be paid by any Credit Party pursuant to the terms of the Credit Agreement and/or the other DIP Facility Documents, including payments of Administrative Agent's and Lenders' Expenses (any of such Loans are herein collectively referred to as "**Protective Advances**"); *provided* that Administrative Agent and the DIP Lenders shall have no obligation to make any Protective Advances, and the aggregate amount of outstanding Protective Advances plus, without duplication, the aggregate other DIP New Money Loans shall not exceed the DIP New Money Commitment. Protective Advances may be made even if the conditions precedent set forth in Section 2.26(d) of the Credit Agreement have not been satisfied. All obligations provided in this Section 5.4 shall survive any termination of this DIP Financing Amendment and the other DIP Facility Documents. Each Credit Party agrees and intends that each transfer to or for the benefit of Administrative Agent and the DIP Lenders made or to be made under this Section 5.4 are (a) made according to ordinary business terms between such Credit Party, Administrative Agent and the DIP Lenders taking into account the Credit Parties' business and financial affairs and (b) intended by such Credit Party, Administrative Agent and the DIP Lenders to be a contemporaneous exchange for new value given to such Credit Party by Administrative Agent and the DIP Lenders as set forth herein.

5.5. **Counterparts**. This DIP Financing Amendment may be executed in counterparts, all of which taken together shall constitute one and the same instrument. Delivery of a counterpart by facsimile or other electronic transmission (e.g., .pdf) shall be effective as delivery of a manually executed original counterpart.

5.6. **COMPLETE AGREEMENT**. **THIS DIP FINANCING AMENDMENT, THE CREDIT AGREEMENT AND THE OTHER DIP FACILITY DOCUMENTS COLLECTIVELY REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES WITH RESPECT TO THE SUBJECT MATTER THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

5.7. **Release**. SUBJECT TO THE FINANCING ORDERS, EACH OF THE CREDIT PARTIES ON THEIR OWN BEHALF AND ON BEHALF OF THEIR ESTATES, REPRESENTATIVES, DIRECTORS, OFFICERS, EMPLOYEES, INDEPENDENT CONTRACTORS, ATTORNEYS AND AGENTS, AND THEIR SUCCESSORS AND ASSIGNS (IN EACH CASE TO THE EXTENT PERMITTED BY APPLICABLE LAW) (COLLECTIVELY, THE "**RELEASING PARTIES**") HEREBY RELEASES, ACQUITS, FOREVER DISCHARGES AND COVENANTS NOT TO SUE THE ADMINISTRATIVE AGENT, THE COLLATERAL AGENT, THE LENDERS AND THEIR RESPECTIVE PARTNERS, EQUITYHOLDERS, DIRECTORS, MEMBERS, PRINCIPALS, AGENTS, ADVISORS, PROFESSIONALS (INCLUDING, BUT NOT LIMITED TO, COUNSEL), SUBSIDIARIES AND AFFILIATES, AND THEIR SUCCESSORS AND ASSIGNS (SOLELY IN THEIR CAPACITIES AS SUCH, THE "**RELEASED PARTIES**") FROM ANY AND ALL ACTS AND OMISSIONS OF THE RELEASED PARTIES, AND FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, AVOIDANCE ACTIONS, COUNTERCLAIMS, DEMANDS, CONTROVERSIES, COSTS, DEBTS, SUMS OF MONEY, ACCOUNTS, RECKONINGS, BONDS, BILLS, DAMAGES, OBLIGATIONS, LIABILITIES, OBJECTIONS, LEGAL PROCEEDINGS, EQUITABLE PROCEEDINGS, AND EXECUTIONS OF ANY NATURE, TYPE, OR DESCRIPTION WHICH THE RELEASING PARTIES HAVE OR MAY COME TO HAVE AGAINST THE RELEASED PARTIES, AT LAW OR IN EQUITY, BY STATUTE OR COMMON LAW, IN CONTRACT, IN TORT, INCLUDING BANKRUPTCY CODE CHAPTER 5 CAUSES OF ACTION, WHETHER THE LAW OF THE UNITED STATES OR ANY OTHER COUNTRY, UNION, ORGANIZATION OF FOREIGN COUNTRIES OR OTHERWISE, KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, BUT EXCLUDING OBLIGATIONS UNDER THE DIP FACILITY DOCUMENTS ARISING AFTER THE DATE OF THE INTERIM ORDER (COLLECTIVELY, THE "**RELEASED CLAIMS**"). THE CREDIT PARTIES ON BEHALF OF THE RELEASING PARTIES FURTHER COVENANT NOT TO SUE THE RELEASED PARTIES ON ACCOUNT OF ANY RELEASED CLAIM. THIS PARAGRAPH IS IN ADDITION TO AND SHALL NOT IN ANY WAY LIMIT ANY OTHER RELEASE, COVENANT NOT TO SUE, OR WAIVER BY THE RELEASING PARTIES IN FAVOR OF THE RELEASED PARTIES. NOTWITHSTANDING THE RELEASES AND COVENANTS IN FAVOR OF THE RELEASED PARTIES CONTAINED ABOVE IN THIS PARAGRAPH, SUCH RELEASES AND COVENANTS IN FAVOR OF THE RELEASED PARTIES SHALL BE DEEMED ACKNOWLEDGED AND REAFFIRMED BY THE CREDIT PARTIES EACH TIME THERE IS AN ADVANCE OF FUNDS, EXTENSION OF CREDIT, OR FINANCIAL ACCOMMODATION UNDER THE INTERIM ORDER AND THE DIP FACILITY DOCUMENTS.

5.8.   **No Implied Waivers**.  No failure or delay on the part of Administrative Agent or the Lenders in exercising, and no course of dealing with respect to, any right, power or privilege under this DIP Financing Amendment, the Credit Agreement or any other DIP Facility Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this DIP Financing Amendment, the Credit Agreement or any other DIP Facility Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

5.9.   **Arms-Length/Good Faith**.  This DIP Financing Amendment has been negotiated at arms-length and in good faith by the parties hereto.

5.10.   **Interpretation**.  Wherever the context hereof shall so require, the singular shall include the plural, the masculine gender shall include the feminine gender and the neuter and vice versa.  The headings, captions and arrangements used in this DIP Financing Amendment are for convenience only, shall not affect the interpretation of this DIP Financing Amendment, and shall not be deemed to limit, amplify or modify the terms of this DIP Financing Amendment, nor affect the meaning thereof.

5.11.   **Severability**.  In case any one or more of the provisions contained in this DIP Financing Amendment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this DIP Financing Amendment shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

5.12.   **Credit Document**.  Each Credit Party acknowledges and agrees that this DIP Financing Amendment is a Credit Document.  To the extent of a conflict or inconsistency between this Agreement and any of the other Credit Documents, this Agreement shall control.

5.13.   **Review and Construction of Documents**.   Each Credit Party hereby acknowledges, represents and warrants to Administrative Agent, Collateral Agent and the Lenders that such Credit Party has (a) had the opportunity to consult with legal counsel of its own choice and has been afforded an opportunity to review this DIP Financing Amendment with its legal counsel, (b) reviewed this DIP Financing Amendment and fully understands the effects thereof and all terms and provisions contained herein, and (c) executed this DIP Financing Amendment of its own free will and volition.  The recitals contained in this DIP Financing Amendment shall be construed to be part of the operative terms and provisions of this Agreement.

5.14.   **INDEMNIFICATION.   EACH CREDIT PARTY**, **ON A JOINT AND SEVERAL BASIS, HEREBY AGREES TO INDEMNIFY EACH AGENT AND EACH DIP LENDER FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES, OR DISBURSEMENTS OF ANY KIND OR NATURE WHATSOEVER WHICH MAY BE IMPOSED ON, INCURRED BY OR ASSERTED AGAINST ANY SUCH AGENT OR DIP LENDER IN ANY WAY RELATING TO OR ARISING OUT OF ANY ACTION TAKEN OR OMITTED BY ANY AGENT OR ANY DIP LENDER UNDER THIS DIP FINANCING AMENDMENT OR IN ANY WAY RELATING TO THE DIP LOANS (THE "INDEMNIFIED LIABILITIES");** *PROVIDED* **THAT, NO CREDIT PARTY**

**SHALL BE LIABLE FOR ANY SUCH INDEMNIFIED LIABILITIES ARISING ON ACCOUNT OF THE APPLICABLE AGENT'S OR DIP LENDER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION. ALL OBLIGATIONS PROVIDED FOR IN THIS <u>SECTION 5.13</u> SHALL SURVIVE REPAYMENT OF THE OBLIGATIONS, ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF THE COLLATERAL DOCUMENTS AND TERMINATION OF THIS DIP FINANCING AMENDMENT.**

5.15. **<u>WAIVER OF JURY TRIAL</u>. TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH CREDIT PARTY HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE (WHETHER A CLAIM IN TORT, CONTRACT, EQUITY, OR OTHERWISE) ARISING UNDER OR RELATING TO THIS DIP FINANCING AMENDMENT, THE DIP FACILITY DOCUMENTS, OR ANY RELATED MATTERS, AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.**

5.16. **<u>GOVERNING LAW</u>.**

(a) **THIS DIP FINANCING AMENDMENT, THE FINANCING ORDERS, AND ALL OTHER DIP FACILITY DOCUMENTS SHALL BE DEEMED CONTRACTS MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT (1) FEDERAL LAWS GOVERN THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF ALL OR ANY PART OF THIS DIP FINANCING AMENDMENT AND ALL DIP FACILITY DOCUMENTS OR (2) STATE LAW GOVERNS UCC COLLATERAL INTERESTS FOR PROPERTIES OUTSIDE THE STATE OF NEW YORK. EACH CREDIT PARTY AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER PROCEEDINGS IN CONNECTION HEREWITH. IF THE BANKRUPTCY COURT ABSTAINS OR OTHERWISE DECLINES JURISDICTION, THE COURTS OF NEW YORK WILL HAVE JURISDICTION OVER PROCEEDINGS IN CONNECTION HEREWITH.**

(b) **EACH CREDIT PARTY HEREBY WAIVES PERSONAL SERVICE OF ANY LEGAL PROCESS UPON IT. IN ADDITION, EACH CREDIT PARTY HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON IT BY EMAIL OR REGISTERED MAIL (IN THE CASE OF REGISTERED MAIL, RETURN RECEIPT REQUESTED) DIRECTED TO IT AT ITS ADDRESS DESIGNATED FOR NOTICE IN ACCORDANCE WITH THE CREDIT AGREEMENT AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON RECEIPT BY IT. NOTHING IN THIS <u>SECTION 5.15</u> SHALL AFFECT THE RIGHT OF ADMINISTRATIVE AGENT OR ANY DIP LENDER TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.**

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers on the date and year first above written.

**DIP BORROWERS**:

STUDIO MOVIE GRILL HOLDINGS, LLC
MOVIE GRILL CONCEPTS VII, LLC
MOVIE GRILL CONCEPTS IX, LLC
MOVIE GRILL CONCEPTS X, LLC
MOVIE GRILL CONCEPTS XI, LLC
MOVIE GRILL CONCEPTS XII, LLC
MOVIE GRILL CONCEPTS XIII, LLC
MOVIE GRILL CONCEPTS XIV, LLC
MOVIE GRILL CONCEPTS XV, LLC
MOVIE GRILL CONCEPTS XVI, LLC
MOVIE GRILL CONCEPTS XVII, LLC
MOVIE GRILL CONCEPTS XVIII, LLC
MOVIE GRILL CONCEPTS XIX, LLC
MOVIE GRILL CONCEPTS XX, LLC
MOVIE GRILL CONCEPTS XXI, LLC
MOVIE GRILL CONCEPTS XXII, LLC
MOVIE GRILL CONCEPTS XXIII, LLC
MOVIE GRILL CONCEPTS XXIV, LLC
MOVIE GRILL CONCEPTS XXV, LLC
MOVIE GRILL CONCEPTS XXVI, LLC
MOVIE GRILL CONCEPTS XXVII, LLC
MOVIE GRILL CONCEPTS XXVIII, LLC
MOVIE GRILL CONCEPTS XXIX, LLC
MOVIE GRILL CONCEPTS XXX, LLC
MOVIE GRILL CONCEPTS XXXI, LLC
MOVIE GRILL CONCEPTS XXXII, LLC
MOVIE GRILL CONCEPTS XXXIII, LLC
MOVIE GRILL CONCEPTS XXXIV, LLC

MOVIE GRILL CONCEPTS XXXV, LLC
MOVIE GRILL CONCEPTS XXXVI, LLC
MOVIE GRILL CONCEPTS XXXVII, LLC
MOVIE GRILL CONCEPTS XXXVIII, LLC
MOVIE GRILL CONCEPTS XXXIX, LLC
MOVIE GRILL CONCEPTS XL, LLC
MOVIE GRILL CONCEPTS XLI, LLC
MOVIE GRILL CONCEPTS XLII, LLC
MOVIE GRILL CONCEPTS XLIII, LLC
MOVIE GRILL CONCEPTS XLIV, LLC
MOVIE GRILL CONCEPTS XLV, LLC
MOVIE GRILL CONCEPTS XLVI, LLC
MOVIE GRILL CONCEPTS XLVII, LLC
MOVIE GRILL CONCEPTS XLVIII, LLC
MOVIE GRILL CONCEPTS XLIX, LLC
MOVIE GRILL CONCEPTS L, LLC
MOVIE GRILL CONCEPTS LI, LLC
MOVIE GRILL CONCEPTS LII, LLC
MOVIE GRILL CONCEPTS LIII, LLC
MOVIE GRILL CONCEPTS LIV, LLC
MOVIE GRILL CONCEPTS LV, LLC
MOVIE GRILL CONCEPTS TRADEMARK
    HOLDINGS, LLC
MOVIE GRILL PARTNERS 3, LLC
MOVIE GRILL PARTNERS 4, LLC
MOVIE GRILL PARTNERS 6, LLC
MGC MANAGEMENT I, LLC

By: _____

Name:

Title:

By: _____

Name:

Title:

**<u>DIP BORROWERS (CONT'D)</u>**:

MOVIE GRILL CONCEPTS I, LTD.

By: MGC MANAGEMENT I, LLC, its general partner


By: _____
Name:
Title:

MOVIE GRILL CONCEPTS III, LTD.

By: Movie Grill Partners 3, LLC, its general partner


By: _____
Name:
Title:

MOVIE GRILL CONCEPTS IV, LTD.

By: Movie Grill Partners 4, LLC, its general partner


By: _____
Name:
Title:

MOVIE GRILL CONCEPTS VI, LTD.

By: Movie Grill Partners 6, LLC, its general partner


By: _____
Name:
Title:

**<u>DIP BORROWERS (CONT'D)</u>**:

STUDIO CLUB, LLC


By: _____
Name:
Title:


STUDIO CLUB 4, LLC


By: _____
Name:
Title:

**<u>GUARANTOR</u>**:

OHAM HOLDINGS, LLC

By: _____
Name:
Title:

**GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P.**,
as Administrative Agent and Collateral Agent


By: _____
Name:
Title:


**GOLDMAN SACHS BANK USA**,
as a Prepetition Lender and a DIP Lender


By: _____
Name:
Title:

**CRESTLINE SPECIALTY LENDING II, L.P.**,
as a Prepetition Lender and a DIP Lender

By: Crestline Management, L.P., its investment manager

By: Crestline Investors, Inc., its general partner


By: _____
Name:
Title:

**AMERICAN NATIONAL INSURANCE COMPANY**,
as a Prepetition Lender and a DIP Lender

By: Crestline Management, L.P., its investment manager

By: Crestline Investors, Inc., its general partner


By: _____
Name:
Title:

[SIGNATURE PAGE TO DIP FINANCING AMENDMENT – STUDIO MOVIE GRILL]

## Exhibit A

## PREPETITION DEFAULTS

Each of the following are existing breaches of the Credit Agreement that are hereby included as Prepetition Defaults:

1.  An Event of Default under Section 8.1(c)(i) of the Credit Agreement has occurred as a result of Holdings' and its Subsidiaries' failure to maintain a Fixed Charge Coverage Ratio of greater than or equal to 1.50:1.00 as of the last day of the Fiscal Quarter ending June 30, 2020 as required by Section 6.8(b) of the Credit Agreement.

2.  An Event of Default under Section 8.1(c)(i) of the Credit Agreement has occurred as a result of Holdings' and its Subsidiaries' failure to maintain a Leverage Ratio of less than or equal to 4.25:1.00 as of the last day of the Fiscal Quarter ending June 30, 2020 as required by Section 6.8(c) of the Credit Agreement.

3.  An Event of Default under Section 8.1(b)(ii) of the Credit Agreement has occurred as a result of OHAM Holdings, LLC's failure to maintain a Total Net Leverage Ratio (as defined in the TowerBrook Securities Purchase Agreement) of less than or equal to 6.50:1.00 for two consecutive Test Periods (as defined in the TowerBrook Securities Purchase Agreement) ending on March 31, 2020 and June 30, 2020, respectively, as required by Section 6.1(b) of the TowerBrook Securities Purchase Agreement.

4.  Events of Default under Section 8.1(c)(i) of the Credit Agreement and Section 2(a)(iv) of the Second Amendment have occurred as a result of (a) the Credit Parties having entered into the "Subject Equipment Leases" (as defined in the First Amendment) in violation of Section 6.21 of the Credit Agreement, (b) SMG having guaranteed the applicable Credit Parties' obligations under each such Subject Equipment Lease in violation of Section 6.1 of the Credit Agreement and (c) Borrower Representative failing to satisfy the conditions set forth in Section 2(a)(iv) of the Second Amendment on or before July 31, 2020 with respect to such Subject Equipment Leases and related guarantees.

5.  One or more Events of Default under Section 8.1(m) of the Credit Agreement have occurred as a result of Theater leases (other than any Theater lease or Theater leases which relate to Theaters which, either individually or in the aggregate, in the trailing twelve month period most recently ended for which financial statements have been delivered pursuant to Section 5.1(a) of the Credit Agreement contributed less than 10% of the Consolidated Adjusted EBITDA of the Credit Parties) (a) being in default as a result of the applicable Credit Party's failure to observe or abide by any of the terms, conditions and covenants contained therein beyond any applicable grace periods allowing the applicable landlord to terminate such Theater lease, or (b) being the subject of a default notice sent by the applicable landlord to the applicable Credit Party or Administrative Agent with respect to a default for which all applicable grace periods have expired.

6.  Events of Default under Section 8.1(a)(iii) of the Credit Agreement have occurred as a result of the Credit Parties failing to pay (a) interest due and owing on September 30, 2020

pursuant to Sections 2.7(e) and 2.9 of the Credit Agreement, and (b) fees due and owing on September 30, 2020 pursuant to Sections 2.10(a) and 2.10(b) of the Credit Agreement.

7.     Events of Default under Section 8.1(c)(ii) of the Credit Agreement have occurred as a result of the Credit Parties failing to timely deliver the financial statements, reports, and certifications required with respect to the month ending on August 30, 2020 pursuant to Sections 5.1(a) and 5.1(p) of the Credit Agreement.

**<u>Exhibit B</u>**

**<u>BUDGET</u>**

[*See attached.*]

**Exhibit C**

**DIP NEW MONEY COMMITMENTS**

| Lender | DIP New Money Commitment | Pro Rata Share |
|---|---|---|
| Goldman Sachs Bank USA | $14,577,943.21 | 63.94% |
| Crestline Specialty Lending II, L.P. | $7,678,553.85 | 33.68% |
| American National Insurance Company | $543,502.93 | 2.38% |
| **Total** | **$22,800,000.00** | **100.00%** |

EXHIBIT C-1

**Exhibit D**

**PREPETITION OUTSTANDING AMOUNTS
(AS OF OCTOBER 23, 2020)**

| Lender | Prepetition Revolving Loan Principal | Prepetition MDT Loan Principal | Prepetition Unpaid Interest and Lender Fees | Total |
|---|---|---|---|---|
| Goldman Sachs Bank USA | $0 | $66,575,154.82 | $1,320,517.42 | $67,895,672.24 |
| Crestline Specialty Lending II, L.P. | N/A | $35,066,737.75 | $694,464.43 | $35,761,202.18 |
| American National Insurance Company | N/A | $2,482,091.71 | $49,155.53 | $2,531,247.24 |
| **Total** | **$0** | **104,123,984.28** | **$2,064,137.39** | **$106,188,121.67** |

Exhibit D-1

**Exhibit E**

**FORM OF POST-PETITION FUNDING NOTICE**

Date: _____

GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P., as Administrative Agent
2001 Ross Avenue, Suite 1800
Dallas, Texas 75201
Attention: Studio Movie Grill Holdings, LLC Account Manager
Re:    Request for DIP New Money Loan

   This Request for DIP New Money Loan has been prepared and is being delivered to Administrative Agent pursuant to Section 2.26(c) of that certain Second Amended and Restated Credit and Guaranty Agreement dated as of March 29, 2019, by and among OHAM HOLDINGS, LLC, a Texas limited liability company ("**Holdings**"), STUDIO MOVIE GRILL HOLDINGS, LLC, a Texas limited liability company ("**SMG**"), the other parties signatory thereto as DIP Borrowers (together with SMG, collectively, the "**DIP Borrowers**" and, each individually, a "**DIP Borrower**"), GOLDMAN SACHS SPECIALTY LENDING GROUP, L.P., as administrative agent (in such capacity, "**Administrative Agent**") and collateral agent for the lenders thereunder, and the Lenders party thereto (as amended, supplemented or otherwise modified to date, the "**Credit Agreement**"). Capitalized terms in this document shall have the meanings assigned to them in the Credit Agreement unless otherwise provided herein or the context hereof otherwise requires.

   The DIP Borrowers hereby request that DIP Lenders make a DIP New Money Loan as follows:

     (i)  Date of requested DIP New Money Loan is [_____], 2020 (the "**Credit Date**")[1].

     (ii)  Aggregate principal amount of requested DIP New Money Loan is $[_____].

   Each undersigned Financial Officer of DIP Borrower Representative (in his or her representative capacity and not in his or her individual capacity) hereby represents, warrants and certifies on behalf of the DIP Borrowers, as of the date hereof and as of the requested and actual Credit Date, that:

     (i)  all representations and warranties made by each Credit Party in the DIP Financing Amendment or in any statement or certificate after the DIP Financing Amendment Effective Date by such Credit Party in writing pursuant to any DIP Facility Document are true and correct in all material respects (except to the extent qualified by

---

[1] Which shall be a Business Day.

materiality, in which case, such representations and warranties are true and correct in all respects);

(ii)     the Credit Parties are in compliance with the Budget subject to the Permitted Variances as demonstrated in <u>Schedule I</u> attached hereto;

(iii)     the DIP Borrowers will apply the proceeds of the DIP New Money Loans only to Budgeted Expenses;

(iv)     as of the relevant Credit Date, and immediately after giving effect to such Credit Extension and the application of the proceeds thereof, no Post-Petition Default as to the DIP Loans shall have occurred and be continuing (except for (z) any Post-Petition Default arising solely as a result of the commencement of the Cases and (y) the Prepetition Defaults);

(v)     no Bankruptcy Court order has been entered authorizing the Credit Parties to obtain financing or credit pursuant to Section 364 of the Bankruptcy Code from any Person other than the DIP Lenders without the express prior written consent of Administrative Agent and Requisite Lenders (or Administrative Agent with the consent or direction of Requisite Lenders);

(vi)     the Final Order has been entered by the Bankruptcy Court not later than 30 days following the Petition Date;

(vii)     the Financing Orders are in full force and effect and have not been vacated, reversed, modified, or amended and, in the event that such order is the subject of any pending appeal, no performance of any obligation of any party to the Credit Agreement has been stayed pending appeal;

(viii)     the requested DIP New Money Loans do not exceed the undrawn DIP New Money Commitments [and the Requested DIP New Money Loans do not exceed the Interim DIP New Money Undrawn Amount][2];

(ix)     Administrative Agent and the DIP Lenders have each been reimbursed for all fees and expenses incurred by Administrative Agent and the DIP Lenders, as applicable, on or prior to the date of the requested DIP New Money Loan, including without limitation the fees and expenses of Vinson & Elkins L.L.P., FTI Consulting, Inc. and Jones Day; and

(x)     as of the relevant Credit Date, and immediately after giving effect to such Credit Extension, Holdings and its Subsidiaries have no greater than $1,000,000 of balance sheet Cash.

The proceeds of the DIP New Money Loans requested on the Credit Date are to be made available by Administrative Agent to DIP Borrowers at the DIP Funding Account as follows:

---

[2] Bracketed language to be included for any borrowing of DIP New Money Loans requested prior to the Bankruptcy Court's approval of the Final Order.

Bank Name:              _____

Bank Address:           _____

ABA Number:             _____

Account Number:         _____

Attention:              _____

Reference:              _____


[Signature Page Follows]

**STUDIO MOVIE GRILL HOLDINGS, LLC**,
as DIP Borrower Representative

By:    _____
Name:
Title:  Chief Financial Officer


By:    _____
Name:  William Snyder
Title:  Chief Restructuring Officer

## SCHEDULE I

[Attach Budget reconciliation.]

<u>SCHEDULE II</u>

[Describe and explain any defaults.]

## **EXHIBIT 2**

### **BUDGET**

**Exhibit 2**

**Studio Movie Grill Holdings, LLC, et. al., the Debtors**
**Weekly Cash Flow Forecast**

| Week --> | Est | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Week End Friday --> | 23-Oct-20 | 30-Oct-20 | 6-Nov-20 | 13-Nov-20 | 20-Nov-20 | 27-Nov-20 | 4-Dec-20 | 11-Dec-20 | 18-Dec-20 | 25-Dec-20 | 1-Jan-21 | 8-Jan-21 | 15-Jan-21 | 22-Jan-21 | 22-Jan |
| **Cash Flow - $000** | | | | | | | | | | | | | | | |
| Collections (incl Sls Tax) | | 373 | 334 | 373 | 373 | 373 | 341 | 373 | 373 | 373 | 373 | 341 | 373 | 373 | 4,750 |
| **Disbursements** | | | | | | | | | | | | | | | |
| Payroll and related | | 228 | 424 | 75 | 390 | 202 | 389 | 73 | 389 | 72 | 517 | 71 | 388 | 71 | 3,290 |
| Studio payments - current | | 74 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 717 |
| Food & Beverage - current | | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 780 |
| Rent, Prop Taxes & Related | | 0 | 0 | 0 | 55 | 120 | 0 | 0 | 2,296 | 0 | 1,279 | 0 | 0 | 34 | 3,784 |
| Utilities, R&M | | 7 | 7 | 7 | 351 | 7 | 7 | 7 | 351 | 7 | 7 | 7 | 7 | 351 | 1,122 |
| Sales tax, alcohol tax, etc. | | 0 | 0 | 0 | 169 | 0 | 0 | 0 | 147 | 0 | 0 | 0 | 0 | 161 | 477 |
| Connectivity and Leases | | 207 | 108 | 78 | 207 | 78 | 108 | 78 | 78 | 207 | 108 | 78 | 78 | 207 | 1,623 |
| Insurance (P&C, GL, WC) | | 218 | 125 | 10 | 0 | 0 | 125 | 0 | 10 | 0 | 125 | 0 | 10 | 0 | 625 |
| All other expenses | | 83 | 63 | 52 | 77 | 56 | 63 | 52 | 73 | 56 | 66 | 52 | 61 | 67 | 822 |
| **Total Operating Disbursements** | | 877 | 841 | 336 | 1,363 | 577 | 806 | 324 | 3,458 | 456 | 2,216 | 322 | 658 | 1,006 | 13,240 |
| **Operating Cash Flow** | | (504) | (507) | 38 | (990) | (204) | (465) | 50 | (3,084) | (83) | (1,843) | 18 | (284) | (633) | (8,490) |
| Pre-petition allowed expenses | | 40 | 40 | 1,268 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 1,750 |
| **Operating Cash Flow (Adj)** | | (544) | (547) | (1,230) | (1,030) | (244) | (505) | 10 | (3,125) | (123) | (1,883) | (22) | (325) | (673) | (10,241) |
| **Non-operating Disbursements** | | | | | | | | | | | | | | | |
| Debtor. Lender Prof Fees (escrow) | | 1,463 | 349 | 221 | 291 | 217 | 236 | 364 | 291 | 143 | 193 | 364 | 291 | 190 | 4,612 |
| UCC Fees (escrow) | | 0 | 0 | 75 | 0 | 0 | 0 | 75 | 0 | 0 | 0 | 75 | 0 | 0 | 225 |
| UST, Claims Agent | | 0 | 0 | 46 | 0 | 0 | 0 | 46 | 0 | 0 | 0 | 0 | 186 | 0 | 278 |
| Normal Course Prof | | 12 | 9 | 8 | 8 | 18 | 8 | 8 | 8 | 8 | 18 | 8 | 8 | 8 | 130 |
| Utility Deposit | | 0 | 0 | 0 | 228 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 228 |
| Debt Service | | 456 | 0 | 0 | 0 | 43 | 0 | 0 | 0 | 68 | 0 | 0 | 0 | 100 | 667 |
| **Total Non-operating** | | 1,931 | 358 | 350 | 526 | 277 | 244 | 493 | 299 | 219 | 211 | 447 | 485 | 298 | 6,140 |
| **Net Cash Flow** | | (2,475) | (906) | (1,580) | (1,556) | (521) | (749) | (484) | (3,423) | (342) | (2,094) | (469) | (809) | (971) | (16,380) |
| DIP Draw | | 2,100 | 900 | 1,600 | 1,500 | 500 | 800 | 500 | 3,400 | 300 | 2,100 | 500 | 800 | 1,000 | 16,000 |
| Ending Cash* | 549 | 174 | 168 | 188 | 132 | 111 | 162 | 178 | 155 | 113 | 119 | 150 | 140 | 169 | 169 |

* 10/23/2020 ending cash is a preliminary estimate subject to final cash reconciliation

# EXHIBIT 3

## SCHEDULE OF PREPETITION CREDIT AGREEMENT DOCUMENTS

| | |
|---|---|
| 1. | Second Amended and Restated Credit and Guaranty Agreement dated as of March 29, 2019, among OHAM Holdings, LLC, a Texas limited liability company ("*Holdings*"), Studio Movie Grill Holdings, LLC, a Texas limited liability company ("*SMG*"), as Borrowers, the other Credit Parties party thereto from time to time, the Lenders party thereto from time to time, and Goldman Sachs Specialty Lending Group, L.P., as administrative agent for the Lenders and collateral agent for the Lenders (the "*Agent*"), (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Prepetition Credit Agreement*"). |
| 2. | Waiver, Consent and First Amendment to Second Amended and Restated Credit and Guaranty Agreement, dated as of March 13, 2020. |
| 3. | Second Amendment to Second Amended and Restated Credit and Guaranty Agreement, dated as of June 30, 2020. |
| 4. | Third Amendment and Limited Consent to Second Amended and Restated Credit and Guaranty Agreement, dated as of October 22, 2020. |
| 5. | Pledge and Security Agreement dated as of October 25, 2011 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Security Agreement*"), by and among the Credit Parties from time to time party thereto and the Agent. |
| 6. | Consent and Joinder under Credit and Guaranty Agreement adding MOVIE GRILL CONCEPTS XVI, LLC, a Texas limited liability company, as a Credit Party, dated July 9, 2012. |
| 7. | Pledge Supplement by MOVIE GRILL CONCEPTS XVI, LLC, a Texas limited liability company, and SMG. |
| 8. | Consent and Joinder under Credit and Guaranty Agreement adding MOVIE GRILL CONCEPTS XV, LLC, a Texas limited liability company, as a Credit Party, dated December 28, 2012. |
| 9. | Consent and Joinder under Credit and Guaranty Agreement adding MOVIE GRILL CONCEPTS XVII, LLC , a Texas limited liability company, as a Credit Party, dated March 26, 2013. |
| 10. | Consent and Joinder under Credit and Guaranty Agreement adding MOVIE GRILL CONCEPTS XVIII, LLC, a Texas limited liability company, as a Credit Party, dated May 28, 2013. |
| 11. | Consent and Joinder under Credit and Guaranty Agreement adding MOVIE GRILL CONCEPTS XIX, LLC, a Texas limited liability company, as a Credit Party, dated August 22, 2013. |
| 12. | Pledge Supplement by Movie Grill Concepts XIX, LLC and SMG, dated August 22, 2013. |
| 13. | Consent and Joinder under Credit and Guaranty Agreement adding MOVIE GRILL CONCEPTS XXI, LLC, a Texas limited liability company, as a Credit Party, dated August 29, 2013. |
| 14. | Pledge Supplement by Movie Grill Concepts XXI, LLC and SMG, dated August 29, 2013. |
| 15. | Consent and Joinder under Credit and Guaranty Agreement adding MOVIE GRILL CONCEPTS XX, LLC, a Texas limited liability company, as a Credit Party, dated September 17, 2013. |
| 16. | Pledge Supplement by Movie Grill Concepts XX, LLC and SMG, dated September 17, 2013. |
| 17. | Consent, Limited Waiver and Joinder under Credit and Guaranty Agreement adding MOVIE GRILL CONCEPTS XXIII, LLC, a Texas limited liability company, as a Credit Party, dated November 13, 2013. |
| 18. | Pledge Supplement by Movie Grill Concepts XXIII, LLC and SMG, dated November 13, 2013. |
| 19. | Consent and Joinder under Credit and Guaranty Agreement adding Movie Grill Concepts XXV, LLC, a Texas limited liability company, as a Credit Party, dated December 18, 2013. |
| 20. | Consent and Joinder under Credit and Guaranty Agreement adding Movie Grill Concepts XXVI, LLC, a Texas limited liability company, as a Credit Party, dated December 18, 2013. |
| 21. | Pledge Supplement by Movie Grill Concepts XXV, LLC and SMG, dated December 18, 2013. |
| 22. | Pledge Supplement by Movie Grill Concepts XXVI, LLC and SMG, dated December 18, 2013. |
| 23. | Waiver, Consent and Joinder under Credit and Guaranty Agreement adding Movie Grill Concepts XXII, LLC, a Texas limited liability company, as a Credit Party, dated January 6, 2014. |
| 24. | Pledge Supplement by Movie Grill Concepts XXII, LLC and SMG, dated January 6, 2014. |
| 25. | Consent and Joinder under Credit and Guaranty Agreement adding Movie Grill Concepts XXVII, LLC, a Texas limited liability company, as a Credit Party, dated February 7, 2014. |
| 26. | Pledge Supplement by Movie Grill Concepts XXVII, LLC and SMG, dated February 7, 2014. |
| 27. | Waiver, Consent and Joinder under Credit and Guaranty Agreement by Movie Grill Concepts XXVIII, LLC, a Texas limited liability company, and SMG, dated March 28, 2014. |
| 28. | Pledge Supplement by Movie Grill Concepts XXVIII, LLC and SMG, dated March 28, 2014. |
| 29. | Consent and Joinder under Credit and Guaranty Agreement adding Movie Grill Concepts XXIV, LLC, a Texas limited liability company, as a Credit Party, dated April 21, 2014. |
| 30. | Pledge Supplement by Movie Grill Concepts XXIV, LLC and SMG, dated April 21, 2014. |

**Exhibit 3**

US 7428642v.20

| 31. | Waiver, Consent and Joinder under Credit and Guaranty Agreement adding Movie Grill Concepts XXXI, LLC, a Texas limited liability company, as a Credit Party, dated May 14, 2015. |
| 32. | Pledge Supplement by Movie Grill Concepts XXXI, LLC, dated May 14, 2015. |
| 33. | Consent and Joinder under Credit and Guaranty Agreement adding Movie Grill Concepts XXIX, LLC, a Texas limited liability company, as a Credit Party, dated August 5, 2015. |
| 34. | Pledge Supplement by Movie Grill Concepts XXIX and SMG, dated August 5, 2015. |
| 35. | Consent and Joinder under Credit and Guaranty Agreement adding Movie Grill Concepts XXXVI, LLC, a Texas limited liability company, as a Credit Party, dated April 1, 2016. |
| 36. | Pledge Supplement by Movie Grill Concepts XXXVI, LLC and SMG, dated April 1, 2016. |
| 37. | Pledge Supplement by Movie Grill Concepts XX, LLC, dated December 22, 2016. |
| 38. | Waiver, Consent and Joinder under Amended and Restated Credit and Guaranty Agreement adding each of MOVIE GRILL CONCEPTS XLVI, LLC, a Texas limited liability company; MOVIE GRILL CONCEPTS XLVII, LLC, a Texas limited liability company; MOVIE GRILL CONCEPTS XLVIII, LLC, a Texas limited liability company; MOVIE GRILL CONCEPTS XLIX, LLC, a Texas limited liability company and MOVIE GRILL CONCEPTS L, LLC, a Texas limited liability company, as Credit Parties, dated July 31, 2018. |
| 39. | Pledge Supplement by Theodore George Croft Jr., dated February 22, 2019. |
| 40. | Confirmation, Reaffirmation, Joinder and Ratification Agreement adding Holdings as a Credit Party, dated March 29, 2019. |
| 41. | Counterpart Agreement adding Movie Grill Concepts LI, LLC, a Texas limited liability company; Movie Grill Concepts LII, LLC, a Texas limited liability company; Movie Grill Concepts LIII, LLC, a Texas limited liability company; Movie Grill Concepts LIV, LLC, a Texas limited liability company and Movie Grill Concepts LV, LLC, a Texas limited liability company, as Credit Parties, dated November 26, 2019. |
| 42. | Deposit Account Control Agreement dated as of October 25, 2011, by and among SMG, the Agent and Capital One, National Association. |
| 43. | Deposit Account Control Agreement dated as of October 25, 2011, by and among Movie Grill Concepts X, LLC, the Agent and Capital One, National Association. |
| 44. | Deposit Account Control Agreement dated as of October 25, 2011 by and among Movie Grill Concepts XII, LLC, the Agent and Capital One, National Association. |
| 45. | Deposit Account Control Agreement dated as of October 9, 2013 by and among Movie Grill Concepts XII, LLC, the other Credit Parties party thereto from time to time, the Agent and Capital One, National Association. |
| 46. | Supplement to Deposit Account Control Agreement dated as of November 13, 2013 by and among Movie Grill Concepts XVIII, LLC, the Agent and Capital One, National Association. |
| 47. | Supplement to Deposit Account Control Agreement dated as of November 13, 2013 by and among Movie Grill Concepts XXI, LLC, the Agent and Capital One, National Association. |
| 48. | Supplement to Deposit Account Control Agreement dated as of November 7, 2014 by and among Movie Grill Concepts XX, LLC, Movie Grill Concepts XXIV, LLC, Movie Grill Concepts XXVI, LLC, Movie Grill Concepts XXVIII, LLC, the Agent and Capital One, National Association. |
| 49. | Supplement to Deposit Account Control Agreement dated as of February 26, 2015 by and among Movie Grill Concepts XXV, LLC, the Agent and Capital One, National Association. |
| 50. | Supplement to Deposit Account Control Agreement dated as of February 26, 2015 by and among Movie Grill Concepts XXII, LLC, the Agent and Capital One, National Association. |
| 51. | Supplement to Deposit Account Control Agreement dated as of August 31, 2016 by and among Movie Grill Concepts XIX, LLC, Movie Grill Concepts XXIII, LLC, Movie Grill Concepts XXVII, LLC, Movie Grill Concepts XXXI, LLC, the Agent and Capital One, National Association. |
| 52. | Supplement to Deposit Account Control Agreement dated as of August 31, 2017 by and among Movie Grill Concepts XXXVIII, LLC, the Agent and Capital One, National Association. |
| 53. | Supplement to Deposit Account Control Agreement dated as of August 31, 2017 by and among Movie Grill Concepts XXXVII, LLC, the Agent and Capital One, National Association. |
| 54. | Supplement to Deposit Account Control Agreement dated as of August 31, 2017 by and among Movie Grill Concepts XXXVII, LLC, the Agent and Capital One, National Association. |
| 55. | Supplement to Deposit Account Control Agreement dated as of August 31, 2017 by and among Movie Grill Concepts XXXVII, LLC, the Agent and Capital One, National Association. |
| 56. | Supplement to Deposit Account Control Agreement dated as of August 31, 2017 by and among Movie Grill Concepts XXXVI, LLC, the Agent and Capital One, National Association. |
| 57. | Supplement to Deposit Account Control Agreement dated as of March 15, 2017 by and among Movie Grill Concepts XXXVIII, LLC, the Agent and Capital One, National Association. |
| 58. | Supplement to Deposit Account Control Agreement dated as of December 29, 2017 by and among Movie Grill Concepts XX, LLC, the Agent and Capital One, National Association. |
| 59. | Supplement to Deposit Account Control Agreement dated as of December 29, 2017 by and among Movie Grill Concepts XXX, LLC, the Agent and Capital One, National Association. |

**Exhibit 3**

| 60. | Supplement to Deposit Account Control Agreement dated as of February 1, 2019 by and among Movie Grill Concepts XLV, LLC, the Agent and Capital One, National Association. |
| 61. | Supplement to Deposit Account Control Agreement dated as of March 27, 2019 by and among Holdings, the Agent and Capital One, National Association. |
| 62. | Supplement to Deposit Account Control Agreement dated as of November 26, 2019 by and among Movie Grill Concepts XXXII, LLC, the Agent and Capital One, National Association. |
| 63. | Supplement to Deposit Account Control Agreement dated as of November 26, 2019 by and among SMG, the Agent and Capital One, National Association. |
| 64. | Supplement to Deposit Account Control Agreement dated as of November 26, 2019 by and among Movie Grill Concepts XL, LLC, the Agent and Capital One, National Association. |
| 65. | Blocked Account Control Agreement dated as of October 16, 2017, by and among SMG, the other Credit Parties party thereto from time to time, the Agent and JPMorgan Chase Bank, N.A. |
| 66. | Amendment No. 1 to Blocked Account Control Agreement dated as of January 28, 2019, |
| 67. | Trademark Security Agreement dated as of October 25, 2011, executed by Movie Grill Concepts Trademark Holdings, LLC, a Texas limited liability company ("**Trademark Holdings**"), in favor of the Agent, recorded with the United States Patent and Trademark Office (the "**USPTO**") on October 26, 2011, at Reel/Frame 4648/0839. |
| 68. | Trademark Security Agreement dated as of August 31, 2016, executed by Trademark Holdings in favor of the Agent, recorded with the USPTO on September 1, 2015, at Real/Frame 5868/0355. |
| 69. | Trademark Security Agreement dated as of May 11, 2018, executed by Trademark Holdings in favor of the Agent, recorded with the USPTO on August 15, 2018, at Reel/Frame 6413/0926. |
| 70. | Trademark Security Agreement dated as of August 9, 2018, executed by Trademark Holdings in favor of the Agent, recorded with the USPTO on August 9, 2018, at Reel/Frame 6409/0756. |
| 71. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of October 25, 2011, by Movie Grill Concepts I, Ltd., a Texas limited partnership, to Charles S. Brown and the Agent and relating to the property located at Berkeley Square, Plano, TX, recorded in Collin County, TX on October 26, 2011 (No. 20111026001148580). |
| 72. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of October 25, 2011, by Movie Grill Concepts III, Ltd., a Texas limited partnership, to Charles S. Brown and the Agent and relating to the property located at Arlington Highlands, Arlington, TX, recorded in Tarrant County, TX on October 26, 2011 (No. D211259596). |
| 73. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of October 25, 2011, by Movie Grill Concepts VII, LLC, a Texas limited liability company, to Charles S. Brown and the Agent and relating to the property located at 1600 S. Stemmons Fwy., Lewisville, TX 75067, recorded in Denton County, TX on October 26, 2011 (No. 2011-101717). |
| 74. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of October 25, 2011, by Movie Grill Concepts IX, LLC, a Texas limited liability company, to Charles S. Brown and the Agent and relating to the property located at 805 Town and Country Lane, Dallas, TX, recorded in Dallas County, TX on October 25, 2011 (No. 201100279457). |
| 75. | Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases dated as of October 25, 2011, by Movie Grill Concepts XII, LLC, a Texas limited liability company, to the Agent and relating to the property located at 2880 Holcomb Bridge Road, Alpharetta, GA 30022, recorded in Fulton County, GA on October 31, 2011 in Book 50539, Page 321. |
| 76. | First Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Fulton County, GA on September 13, 2013 in Book 53120, Page 652. |
| 77. | Second Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Fulton County, GA on November 13, 2014 in Book 54363, Page 250. |
| 78. | Third Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Fulton County, GA on September 20, 2016 in Book 56638, Page 270. |
| 79. | Fourth Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Fulton County, GA on June 1, 2018 in Book 58850, Page 217. |
| 80. | Fifth Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Fulton County, GA on April 19, 2019 in Book 59925, Page 359. |
| 81. | Sixth Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Fulton County, GA on September 18, 2019 in Book 60536, Page 554. |
| 82. | Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of October 25, 2011, by Movie Grill Concepts XIII, LLC to the Agent and relating to the property located at 1 Rice Lake Square, Wheaton, IL, recorded in DuPage County, IL on November 2, 2011 (No. R2011-132117). |
| 83. | First Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in DuPage County, IL on September 18, 2013 (No. R2013-133543). |
| 84. | Second Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in DuPage County, IL on November 18, 2014 (No. R2014-108453). |
| 85. | Third Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in DuPage County, IL on September 19, 2016 (No. R2016-100855). |

**Exhibit 3**

| | |
|---|---|
| 86. | Fourth Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in DuPage County, IL on June 1, 2018 (No. R2018-048479). |
| 87. | Fifth Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in DuPage County, IL on April 18, 2019 (No. R2019-028845). |
| 88. | Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases dated as of April 5, 2012, by Movie Grill Concepts XIV, LLC to the Agent and relating to the property located at 3900 Venture Pointe, Store #10101, Duluth, GA 30096, recorded in Gwinnet County, GA on April 9, 2012 in Book 51289, Page 833. |
| 89. | First Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Gwinnet County, GA on October 9, 2012 at Book 51701, Page 672. |
| 90. | Second Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Gwinnet County, GA on September 18, 2013 in Book 52523, Page 487. |
| 91. | Third Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Gwinnet County, GA on November 13, 2014 in Book 53230, Page 667. |
| 92. | Fourth Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Gwinnet County, GA on September 20, 2016 in Book 54598, Page 706. |
| 93. | Fifth Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Gwinnet County, GA on July 2, 2018 in Book 55982, Page 178. |
| 94. | Sixth Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Gwinnet County, GA on April 18, 2019 in Book 56535, Page 213. |
| 95. | Seventh Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Gwinnet County, GA on September 19, 2019 in Book 56892, Page 802. |
| 96. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of July 9, 2012, by Movie Grill Concepts XVI, LLC to Charles S. Brown and the Agent and relating to the property located at 13933 N. Central Expy., Dallas, TX 75243, recorded in Dallas County, TX on July 11, 2012 (No. 201200198961). |
| 97. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of February 15, 2013, by Movie Grill Concepts XV, LLC to Barrister's Title Services of the Carolinas, LLC and the Agent and relating to the property located at Epicentre, 210 East Trade St., Charlotte, NC, recorded in Mecklenburg County, NC on February 15, 2013 (No. 2013023619). |
| 98. | First Amendment to Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Mecklenburg County, NC on September 24, 2013 (No. 2013151472). |
| 99. | Second Amendment to Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Mecklenburg County, NC on November 17, 2014 (No. 2014133271). |
| 100. | Third Amendment to Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Mecklenburg County, NC on September 19, 2016 (No. 2016125038). |
| 101. | Fourth Amendment to Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Mecklenburg County, NC on June 4, 2018 (No. 2018068557). |
| 102. | Fifth Amendment to Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Mecklenburg County, NC on April 22, 2019 (No. 2019046846). |
| 103. | Sixth Amendment to Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Mecklenburg County, NC on September 18, 2019 (No. 2019123373). |
| 104. | Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of June 14, 2013, by Movie Grill Concepts XVII, LLC to the Agent and relating to the property located at 3535 W. 86th St., Indianapolis, IN 46268, recorded in Marion County, IN on June 19, 2013 (No. A201300072719). |
| 105. | First Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Marion County, IN on September 19, 2013 (No. A201300114504). |
| 106. | Second Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Marion County, IN on September 20, 2016 (No. A201600103614). |
| 107. | Third Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Marion County, IN on September 18, 2019 (No. A201900091090). |
| 108. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of December 11, 2013, by Movie Grill Concepts XIX, LLC to First American Title Insurance Company and the Agent and relating to the property located at Simi Valley Town Center, Unit B1-100, Simi Valley, CA, recorded in Ventura County, CA on December 12, 2013 (No. 20131212-00198788-0). |
| 109. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of August 28, 2017, by Movie Grill Concepts XX, LLC to First American Title Insurance Company and the Agent and relating to the property located at 2733 Calloway Drive, Bakersfield, CA 93312, recorded in Kern County, CA on October 11, 2017 (No. 217136527). |
| 110. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of October 29, 2013, by Movie Grill Concepts XXI, LLC to Charles S. Brown and the Agent and relating to the property located at 10110 E. Technology Blvd., Dallas, TX 75220, recorded in Dallas County, TX on October 29, 2013 (No. 201300337066). |

**Exhibit 3**

| 111. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of November 21, 2013, by Movie Grill Concepts XX, LLC to First American Title Insurance Company and the Agent and relating to the property located at 5140 Commons Drive, Rocklin, CA 95677, recorded in Placer County, CA on November 26, 2013 (No. 2013-0110033-00). |
| --- | --- |
| 112. | Amended and Restated Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of November 30, 2017, by Movie Grill Concepts XXIII, LLC to Charles S. Brown and the Agent and relating to the property located at Pearland Pkwy. and Beltway 8, Pearland, TX, recorded in Harris County, TX on October 12, 2018 (No. RP-2018-468452). |
| 113. | Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of October 17, 2014, by Movie Grill Concepts XXV, LLC to the Agent and relating to the property located at 53 S. 69th St., Upper Darby, PA 19082, recorded in Delaware County, PA on October 23, 2014 (No. 2014054598). |
| 114. | First Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Delaware County, PA on December 22, 2014 (No. 2014064048). |
| 115. | Second Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Delaware County, PA on September 30, 2016 (No. 2016052361). |
| 116. | Third Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Delaware County, PA on June 12, 2018 (No. 2018027791). |
| 117. | Fourth Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Delaware County, PA on May 2, 2019 (No. 2019021682). |
| 118. | Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of January 31, 2014, by Movie Grill Concepts XXVI, LLC to the Agent and relating to the property located at 210 W. 87th St., Chicago, IL 60620, recorded in Cook County, IL on February 4, 2014 (No. 1403508041), as amended by the |
| 119. | First Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of January 31, 2014 recorded in Cook County, IL on November 14, 2014 (No. 1431844074), the |
| 120. | Second Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of January 31, 2014 recorded in Cook County, IL on September 19, 2016 (No. 1626319223), the |
| 121. | Third Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of January 31, 2014 recorded in Cook County, IL on June 7, 2018 (No. 1815862007), and the |
| 122. | Fourth Amendment to Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of January 31, 2014 recorded in Cook County, IL on April 22, 2019 (No. 1911257099). |
| 123. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of March 11, 2015, by Movie Grill Concepts XXII, LLC to Charles S. Brown and the Agent and relating to the property located at The Village at Cumberland Park, Tyler, TX, recorded in Smith County, TX on March 12, 2015 (No. 20150100011174). |
| 124. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of January 9, 2015, by Movie Grill Concepts XXVII, LLC to Charles S. Brown and the Agent and relating to the property located at 4800 Highway 121, The Colony, TX 75056, recorded in Denton County, TX on January 12, 2015 (No. 2015-3362). |
| 125. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated May 6, 2014, by Movie Grill Concepts XXVIII, LLC to Charles S. Brown and the Prepetition and relating to the property located at 12 Town Center, Colleyville, TX 76034 (Theater Lease), recorded in Tarrant County, TX on May 13, 2014 (No. D214097180), as supplemented by the Correction Affidavit under Section 5.028, Texas Property Code recorded November 26, 2014 (No. D214258798). |
| 126. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated May 6, 2014, by Movie Grill Concepts XXVIII, LLC to Charles S. Brown and the Prepetition and relating to the property located at 12 Town Center, Colleyville, TX 76034 (Restaurant Lease), recorded in Tarrant County, TX on May 13, 2014 (No. D214097193). |
| 127. | Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of August 19, 2014, by Movie Grill Concepts XXIV, LLC to the Prepetition and relating to the property located at 12332 University Mall Court, Tampa, FL 33612, recorded in Hillsborough County, FL on August 20, 2014 (No. 2014275277). |
| 128. | Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of February 12, 2018, by Movie Grill Concepts XXX, LLC to the Prepetition and relating to the property located at 8118 US Hwy. 192, Kissimmee, FL, recorded in Osceola County, FL on August 29, 2018 (No. 2018131088). |
| 129. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of August 31, 2015, by Movie Grill Concepts XXXI, LLC to Charles S. Brown and the Prepetition and relating to the property located at Lincoln Square, Arlington, TX, recorded in Tarrant County, TX on August 31, 2015 (No. D215197315). |
| 130. | Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of July 15, 2016, by Movie Grill Concepts XXXVI, LLC to the Prepetition and relating to the property located at 7718 113th Street N., Seminole, FL 33772, recorded in Pinellas County, FL on July 19, 2016 (No. 2016218951). |
| 131. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of December 4, 2018, by Movie Grill Concepts XXXII, LLC to Barrister's Title Services of the Carolinas, LLC and the Prepetition and relating to the property located at Prosperity Market Shopping Center, 5336 Prosperity Church Road, Charlotte, NC, recorded in Mecklenburg County, NC on December 11, 2018 (No. 2018152601). |
| 132. | First Amendment to Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Mecklenburg County, NC on April 22, 2019 (No. 2019046839). |

**Exhibit 3**

| | |
|---|---|
| 133. | Second Amendment to Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing recorded in Mecklenburg County, NC on September 18, 2019 (No. 2019123459). |
| 134. | Leasehold Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of September 29, 2017, by Movie Grill Concepts XXXVII, LLC to First American Title Insurance Company and the Prepetition and relating to the properties located at 8200 3rd St., Downey, CA 90241, 408, 410 S. Myrtle Ave., Monrovia, CA 91016 and 340 Eureka St., Redlands, CA 92374, recorded in San Bernardino County, CA on December 5, 2017 (No. 2017-0515672). |
| 135. | Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases dated as of May 11, 2018, by Movie Grill Concepts XXXVIII, LLC to the Prepetition and relating to the property located at 40 Powers Ferry Road, Marietta, GA 30067, recorded in Cobb County, GA on May 31, 2018 (No. 018-0066194). |
| 136. | First Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Cobb County, GA on April 18, 2019 (No. 2019-0042844) and the |
| 137. | Second Amendment to Leasehold Deed to Secure Debt, Security Agreement and Assignment of Rents and Leases recorded in Cobb County, GA on March 29, 2019 (No. 2019-0109889). |
| 138. | Leasehold Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of February 22, 2019, by Movie Grill Concepts XLIII, LLC to the Agent and relating to the property located at Willow Grove, PA. |
| 139. | Landlord Personal Property Collateral Access Agreement dated as of December 1, 2016, by Red River Park Central, LLC, as Landlord, to and for the benefit of the Agent and relating to the property located at 12404 Park Central, Dallas, TX 75251. |
| 140. | UCC-1 Financing Statement filed on October 21, 2011 as File No. 11-0030966531 with the Secretary of State of the State of Texas, listing SMG, as debtor, and Agent, as secured party. |
| 141. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295302, amending Initial File No. 11-0030966531 with the Secretary of State of the State of Texas listing SMG as debtor, and Agent, as secured party. |
| 142. | UCC-3 Amendment filed on November 14, 2013 as File No. 13-00361458, amending Initial File No. 11-0030966531 with the Secretary of State of the State of Texas listing SMG as debtor, and Agent, as secured party. |
| 143. | UCC-3 Amendment filed on March 10, 2015 as File No. 15-00071700, amending Initial File No. 11-0030966531 with the Secretary of State of the State of Texas listing SMG as debtor, and Agent, as secured party. |
| 144. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147958, amending Initial File No. 11-0030966531 with the Secretary of State of the State of Texas listing SMG as debtor, and Agent, as secured party. |
| 145. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327392, amending Initial File No. 11-0030966531 with the Secretary of State of the State of Texas listing SMG as debtor, and Agent, as secured party. |
| 146. | UCC-3 Amendment filed on March 8, 2019 as File No. 19-00084505, amending Initial File No. 11-0030966531 with the Secretary of State of the State of Texas listing SMG as debtor, and Agent, as secured party. |
| 147. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229113, amending Initial File No. 11-0030966531 with the Secretary of State of the State of Texas listing SMG as debtor, and Agent, as secured party. |
| 148. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031068222 with the Secretary of State of the State of Texas, listing Movie Grill Concepts VII, LLC, as debtor, and Agent, as secured party. |
| 149. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295353, amending Initial File No. 11-0031068222 with the Secretary of State of the State of Texas listing Movie Grill Concepts VII, LLC as debtor, and Agent, as secured party. |
| 150. | UCC-3 Amendment filed on November 14, 2013 as File No. 13-00361467, amending Initial File No. 11-0031068222 with the Secretary of State of the State of Texas listing Movie Grill Concepts VII, LLC as debtor, and Agent, as secured party. |
| 151. | UCC-3 Amendment filed on March 10, 2015 as File No. 15-00071705, amending Initial File No. 11-0031068222 with the Secretary of State of the State of Texas listing Movie Grill Concepts VII, LLC as debtor, and Agent, as secured party. |
| 152. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147950, amending Initial File No. 11-0031068222 with the Secretary of State of the State of Texas listing Movie Grill Concepts VII, LLC as debtor, and Agent, as secured party. |
| 153. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327383, amending Initial File No. 11-0031068222 with the Secretary of State of the State of Texas listing Movie Grill Concepts VII, LLC as debtor, and Agent, as secured party. |
| 154. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229074, amending Initial File No. 11-0031068222 with the Secretary of State of the State of Texas listing Movie Grill Concepts VII, LLC as debtor, and Agent, as secured party. |
| 155. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031034720 with the Secretary of State of the State of Texas, listing Movie Grill Concepts IX, LLC, as debtor, and Agent, as secured party. |
| 156. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295308, amending Initial File No. 11-0031034720 with the Secretary of State of the State of Texas listing Movie Grill Concepts IX, LLC as debtor, and Agent, as secured party. |
| 157. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147947, amending Initial File No. 11-0031034720 with the Secretary of State of the State of Texas listing Movie Grill Concepts IX, LLC as debtor, and Agent, as secured party. |
| 158. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327380, amending Initial File No. 11-0031034720 with the Secretary of State of the State of Texas listing Movie Grill Concepts IX, LLC as debtor, and Agent, as secured party. |
| 159. | UCC-3 Amendment filed on March 8, 2019 as File No. 19-00084683, amending Initial File No. 11-0031034720 with the Secretary of State of the State of Texas listing Movie Grill Concepts IX, LLC as debtor, and Agent, as secured party. |
| 160. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229071, amending Initial File No. 11-0031034720 with the Secretary of State of the State of Texas listing Movie Grill Concepts IX, LLC as debtor, and Agent, as secured party. |

**Exhibit 3**

| 161. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031034962 with the Secretary of State of the State of Texas, listing Movie Grill Concepts X, LLC, as debtor, and Agent, as secured party. |
| 162. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295309, amending Initial File No. 11-0031034962 with the Secretary of State of the State of Texas listing Movie Grill Concepts X, LLC, as debtor, and Agent, as secured party. |
| 163. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147959, amending Initial File No. 11-0031034962 with the Secretary of State of the State of Texas listing Movie Grill Concepts X, LLC, as debtor, and Agent, as secured party. |
| 164. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327384, amending Initial File No. 11-0031034962 with the Secretary of State of the State of Texas listing Movie Grill Concepts X, LLC, as debtor, and Agent, as secured party. |
| 165. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229075, amending Initial File No. 11-0031034962 with the Secretary of State of the State of Texas listing Movie Grill Concepts X, LLC, as debtor, and Agent, as secured party. |
| 166. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031035599 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XI, LLC, as debtor, and Agent, as secured party. |
| 167. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295312, amending Initial File No. 11-0031035599 with the Secretary of State of the State of Texas listing Movie Grill Concepts XI, LLC,, as debtor, and Agent, as secured party. |
| 168. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147951, amending Initial File No. 11-0031035599 with the Secretary of State of the State of Texas listing Movie Grill Concepts XI, LLC, as debtor, and Agent, as secured party. |
| 169. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327385, amending Initial File No. 11-0031035599 with the Secretary of State of the State of Texas listing Movie Grill Concepts XI, LLC, as debtor, and Agent, as secured party. |
| 170. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229076, amending Initial File No. 11-0031035599 with the Secretary of State of the State of Texas listing Movie Grill Concepts XI, LLC, as debtor, and Agent, as secured party. |
| 171. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031035731 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XII, LLC, as debtor, and Agent, as secured party. |
| 172. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295322, amending Initial File No. 11-0031035731 with the Secretary of State of the State of Texas listing Movie Grill Concepts XII, LLC,, as debtor, and Agent, as secured party. |
| 173. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147952, amending Initial File No. 11-0031035731 with the Secretary of State of the State of Texas listing Movie Grill Concepts XII, LLC, as debtor, and Agent, as secured party. |
| 174. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327386, amending Initial File No. 11-0031035731 with the Secretary of State of the State of Texas listing Movie Grill Concepts XII, LLC, as debtor, and Agent, as secured party. |
| 175. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229077, amending Initial File No. 11-0031035731 with the Secretary of State of the State of Texas listing Movie Grill Concepts XII, LLC, as debtor, and Agent, as secured party. |
| 176. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031035852 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XIII, LLC, as debtor, and Agent, as secured party. |
| 177. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295323, amending Initial File No. 11-0031035852 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIII, LLC, as debtor, and Agent, as secured party. |
| 178. | UCC-3 Amendment filed on November 14, 2013 as File No. 13-00361465, amending Initial File No. 11-0031035852 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIII, LLC, as debtor, and Agent, as secured party. |
| 179. | UCC-3 Amendment filed on March 10, 2015 as File No. 15-00071702, amending Initial File No. 11-0031035852 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIII, LLC, as debtor, and Agent, as secured party. |
| 180. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147953, amending Initial File No. 11-0031035852 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIII, LLC, as debtor, and Agent, as secured party. |
| 181. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327387, amending Initial File No. 11-0031035852 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIII, LLC, as debtor, and Agent, as secured party. |
| 182. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229078, amending Initial File No. 11-0031035852 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIII, LLC, as debtor, and Agent, as secured party. |
| 183. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031038643 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XIV, LLC, as debtor, and Agent, as secured party. |
| 184. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295357, amending Initial File No. 11-0031038643 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIV, LLC, as debtor, and Agent, as secured party. |
| 185. | UCC-3 Amendment filed on November 14, 2013 as File No. 13-00361462, amending Initial File No. 11-0031038643 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIV, LLC, as debtor, and Agent, as secured party. |
| 186. | UCC-3 Amendment filed on March 10, 2015 as File No. 15-00071707, amending Initial File No. 11-0031038643 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIV, LLC, as debtor, and Agent, as secured party. |
| 187. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147954, amending Initial File No. 11-0031038643 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIV, LLC, as debtor, and Agent, as secured party. |
| 188. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327388, amending Initial File No. 11-0031038643 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIV, LLC, as debtor, and Agent, as secured party. |
| 189. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229083, amending Initial File No. 11-0031038643 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIV, LLC, as debtor, and Agent, as secured party. |

**Exhibit 3**

| 190. | UCC-1 Financing Statement filed on December 28, 2012 as File No. 12-0040200019 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XV, LLC, as debtor, and Agent, as secured party. |
|---|---|
| 191. | UCC-3 Amendment filed on March 7, 2013 as File No. 13-00072990, amending Initial File No. 12-0040200019 with the Secretary of State of the State of Texas listing Movie Grill Concepts XV, LLC, as debtor, and Agent, as secured party. |
| 192. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295368, amending Initial File No. 12-0040200019 with the Secretary of the State of Texas listing Movie Grill Concepts XV, LLC, as debtor, and Agent, as secured party. |
| 193. | UCC-3 Amendment filed on November 14, 2013 as File No. 13-00361501, amending Initial File No. 12-0040200019 with the Secretary of State of the State of Texas listing Movie Grill Concepts XV, LLC, as debtor, and Agent, as secured party. |
| 194. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327409, amending Initial File No. 12-0040200019 with the Secretary of State of the State of Texas listing Movie Grill Concepts XV, LLC, as debtor, and Agent, as secured party. |
| 195. | UCC-3 Amendment filed on October 2, 2017 as File No. 17-00333646, amending Initial File No. 12-0040200019 with the Secretary of State of the State of Texas listing Movie Grill Concepts XV, LLC, as debtor, and Agent, as secured party. |
| 196. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229091, amending Initial File No. 12-0040200019 with the Secretary of State of the State of Texas listing Movie Grill Concepts XV, LLC, as debtor, and Agent, as secured party. |
| 197. | UCC-1 Financing Statement filed on May 15, 2018 as File No. 18-0016879757 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XVI, LLC, as debtor, and Agent, as secured party. |
| 198. | UCC-1 Financing Statement filed on May 15, 2018 as File No. 18-0016879878 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XVII, LLC, as debtor, and Agent, as secured party. |
| 199. | UCC-1 Financing Statement filed on May 15, 2018 as File No. 18-0016879999 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XVIII, LLC, as debtor, and Agent, as secured party. |
| 200. | UCC-1 Financing Statement filed on August 22, 2013 as File No. 13-0026979532 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XIX, LLC, as debtor, and Agent, as secured party. |
| 201. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295397, amending Initial File No. 13-0026979532 with the Secretary of the State of Texas listing Movie Grill Concepts XIX, LLC, as debtor, and Agent, as secured party. |
| | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327401, amending Initial File No. 13-0026979532 with the Secretary of the State of Texas listing Movie Grill Concepts XIX, LLC, as debtor, and Agent, as secured party. |
| 202. | UCC-3 Amendment filed on May 22, 2018 as File No. 18-00179215, amending Initial File No. 13-0026979532 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIX, LLC, as debtor, and Agent, as secured party. |
| 203. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229084, amending Initial File No. 13-0026979532 with the Secretary of State of the State of Texas listing Movie Grill Concepts XIX, LLC, as debtor, and Agent, as secured party. |
| 204. | UCC-1 Financing Statement filed on September 17, 2013 as File No. 13-0029542521 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XX, LLC, as debtor, and Agent, as secured party. |
| 205. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327402, amending Initial File No. 13-0029542521 with the Secretary of State of the State of Texas listing Movie Grill Concepts XX, LLC, as debtor, and Agent, as secured party. |
| 206. | UCC-3 Amendment filed on May 22, 2018 as File No. 18-00179217, amending Initial File No. 13-0029542521 with the Secretary of State of the State of Texas listing Movie Grill Concepts XX, LLC, as debtor, and Agent, as secured party. |
| 207. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229092, amending Initial File No. 13-0029542521 with the Secretary of State of the State of Texas listing Movie Grill Concepts XX, LLC, as debtor, and Agent, as secured party. |
| 208. | UCC-1 Financing Statement filed on August 29, 2013 as File No. 13-0027743633 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XXI, LLC, as debtor, and Agent, as secured party. |
| 209. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295401, amending Initial File No. 13-0027743633 with the Secretary of the State of Texas listing Movie Grill Concepts XXI, LLC, as debtor, and Agent, as secured party. |
| 210. | UCC-3 Amendment filed on November 14, 2013 as File No. 13-00361471, amending Initial File No. 13-0027743633 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXI, LLC, as debtor, and Agent, as secured party. |
| 211. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327398, amending Initial File No. 13-0027743633 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXI, LLC, as debtor, and Agent, as secured party. |
| 212. | UCC-3 Amendment filed on May 22, 2018 as File No. 18-00179216, amending Initial File No. 13-0027743633 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXI, LLC, as debtor, and Agent, as secured party. |
| 213. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229093, amending Initial File No. 13-0027743633 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXI, LLC, as debtor, and Agent, as secured party. |
| 214. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031036005 with the Secretary of State of the State of Texas, listing Movie Grill Concepts Trademark Holdings, LLC, as debtor, and Agent, as secured party. |
| 215. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295333, amending Initial File No. 11-0031036005 with the Secretary of the State of Texas listing Movie Grill Concepts Trademark Holdings, LLC, as debtor, and Agent, as secured party. |
| 216. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147948, amending Initial File No. 11-0031036005 with the Secretary of State of the State of Texas listing Movie Grill Concepts Trademark Holdings, LLC, as debtor, and Agent, as secured party. |
| 217. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327381, amending Initial File No. 11-0031036005 with the Secretary of State of the State of Texas listing Movie Grill Concepts Trademark Holdings, LLC, as debtor, and Agent, as secured party. |

**Exhibit 3**

| 218. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229072, amending Initial File No. 11-0031036005 with the Secretary of State of the State of Texas listing Movie Grill Concepts Trademark Holdings, LLC, as debtor, and Agent, as secured party. |
|---|---|
| 219. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031038906 with the Secretary of State of the State of Texas, listing MGC Management I, LLC, as debtor, and Agent, as secured party. |
| 220. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295354, amending Initial File No. 11-0031038906 with the Secretary of State of the State of Texas listing MGC Management I, LLC, as debtor, and Agent, as secured party. |
| 221. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147943, amending Initial File No. 11-0031038906 with the Secretary of State of the State of Texas listing MGC Management I, LLC, as debtor, and Agent, as secured party. |
| 222. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327376, amending Initial File No. 11-0031038906 with the Secretary of State of the State of Texas listing MGC Management I, LLC, as debtor, and Agent, as secured party. |
| 223. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229067, amending Initial File No. 11-0031038906 with the Secretary of State of the State of Texas listing MGC Management I, LLC, as debtor, and Agent, as secured party. |
| 224. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031036247 with the Secretary of State of the State of Texas, listing Movie Grill Partners 3, LLC, as debtor, and Agent, as secured party. |
| 225. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295335, amending Initial File No. 11-0031036247 with the Secretary of State of the State of Texas listing Movie Grill Partners 3, LLC, as debtor, and Agent, as secured party. |
| 226. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147955, amending Initial File No. 11-0031036247 with the Secretary of State of the State of Texas listing Movie Grill Partners 3, LLC, as debtor, and Agent, as secured party. |
| 227. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327389, amending Initial File No. 11-0031036247 with the Secretary of State of the State of Texas listing Movie Grill Partners 3, LLC, as debtor, and Agent, as secured party. |
| 228. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229110, amending Initial File No. 11-0031036247 with the Secretary of State of the State of Texas listing Movie Grill Partners 3, LLC, as debtor, and Agent, as secured party. |
| 229. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031036742 with the Secretary of State of the State of Texas, listing Movie Grill Partners 4, LLC, as debtor, and Agent, as secured party. |
| 230. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295339, amending Initial File No. 11-0031036247 with the Secretary of State of the State of Texas listing Movie Grill Partners 4, LLC, as debtor, and Agent, as secured party. |
| 231. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147956, amending Initial File No. 11-0031036247 with the Secretary of State of the State of Texas listing Movie Grill Partners 4, LLC, as debtor, and Agent, as secured party. |
| 232. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327390, amending Initial File No. 11-0031036247 with the Secretary of State of the State of Texas listing Movie Grill Partners 4, LLC, as debtor, and Agent, as secured party. |
| 233. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229111, amending Initial File No. 11-0031036247 with the Secretary of State of the State of Texas listing Movie Grill Partners 4, LLC, as debtor, and Agent, as secured party. |
| 234. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031036984 with the Secretary of State of the State of Texas, listing Movie Grill Partners 6, LLC, as debtor, and Agent, as secured party. |
| 235. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295341, amending Initial File No. 11-0031036984 with the Secretary of State of the State of Texas listing Movie Grill Partners 6, LLC, as debtor, and Agent, as secured party. |
| 236. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147957, amending Initial File No. 11-0031036984 with the Secretary of State of the State of Texas listing Movie Grill Partners 6, LLC, as debtor, and Agent, as secured party. |
| 237. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327391, amending Initial File No. 11-0031036984 with the Secretary of State of the State of Texas listing Movie Grill Partners 6, LLC, as debtor, and Agent, as secured party. |
| 238. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229112, amending Initial File No. 11-0031036984 with the Secretary of State of the State of Texas listing Movie Grill Partners 6, LLC, as debtor, and Agent, as secured party. |
| 239. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031029017 with the Secretary of State of the State of Texas, listing Movie Grill Concepts I, Ltd., as debtor, and Agent, as secured party. |
| 240. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295304, amending Initial File No. 11-0031029017 with the Secretary of State of the State of Texas listing Movie Grill Concepts I, Ltd., as debtor, and Agent, as secured party. |
| 241. | UCC-3 Amendment filed on November 14, 2013 as File No. 13-00361502, amending Initial File No. 11-0031029017 with the Secretary of State of the State of Texas listing Movie Grill Concepts I, Ltd., as debtor, and Agent, as secured party. |
| 242. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147944, amending Initial File No. 11-0031029017 with the Secretary of State of the State of Texas listing Movie Grill Concepts I, Ltd., as debtor, and Agent, as secured party. |
| 243. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327377, amending Initial File No. 11-0031029017 with the Secretary of State of the State of Texas listing Movie Grill Concepts I, Ltd., as debtor, and Agent, as secured party. |
| 244. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229068, amending Initial File No. 11-0031029017 with the Secretary of State of the State of Texas listing Movie Grill Concepts I, Ltd., as debtor, and Agent, as secured party. |
| 245. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031033951 with the Secretary of State of the State of Texas, listing Movie Grill Concepts III, Ltd., as debtor, and Agent, as secured party. |
| 246. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295305, amending Initial File No. 11-0031033951 with the Secretary of State of the State of Texas listing Movie Grill Concepts III, Ltd., as debtor, and Agent, as secured party. |

**Exhibit 3**

| | |
|---|---|
| 247. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147945, amending Initial File No. 11-0031033951 with the Secretary of State of the State of Texas listing Movie Grill Concepts III, Ltd., as debtor, and Agent, as secured party. |
| 248. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327378, amending Initial File No. 11-0031033951 with the Secretary of State of the State of Texas listing Movie Grill Concepts III, Ltd., as debtor, and Agent, as secured party. |
| 249. | UCC-3 Amendment filed on March 8, 2019 as File No. 19-00084474, amending Initial File No. 11-0031033951 with the Secretary of State of the State of Texas listing Movie Grill Concepts III, Ltd., as debtor, and Agent, as secured party. |
| 250. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229069, amending Initial File No. 11-0031033951 with the Secretary of State of the State of Texas listing Movie Grill Concepts III, Ltd., as debtor, and Agent, as secured party. |
| 251. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031034467 with the Secretary of State of the State of Texas, listing Movie Grill Concepts IV, Ltd., as debtor, and Agent, as secured party. |
| 252. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295306, amending Initial File No. 11-0031034467 with the Secretary of State of the State of Texas listing Movie Grill Concepts IV, Ltd., as debtor, and Agent, as secured party. |
| 253. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147946, amending Initial File No. 11-0031034467 with the Secretary of State of the State of Texas listing Movie Grill Concepts IV, Ltd., as debtor, and Agent, as secured party. |
| 254. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327379, amending Initial File No. 11-0031034467 with the Secretary of State of the State of Texas listing Movie Grill Concepts IV, Ltd., as debtor, and Agent, as secured party. |
| 255. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229070, amending Initial File No. 11-0031034467 with the Secretary of State of the State of Texas listing Movie Grill Concepts IV, Ltd., as debtor, and Agent, as secured party. |
| 256. | UCC-1 Financing Statement filed on October 24, 2011 as File No. 11-0031037016 with the Secretary of State of the State of Texas, listing Movie Grill Concepts VI, Ltd., as debtor, and Agent, as secured party. |
| 257. | UCC-3 Amendment filed on September 17, 2013 as File No. 13-00295346, amending Initial File No. 11-0031037016 with the Secretary of State of the State of Texas listing Movie Grill Concepts VI, Ltd., as debtor, and Agent, as secured party. |
| 258. | UCC-3 Amendment filed on May 6, 2016 as File No. 16-00147949, amending Initial File No. 11-0031037016 with the Secretary of State of the State of Texas listing Movie Grill Concepts VI, Ltd., as debtor, and Agent, as secured party. |
| 259. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327382, amending Initial File No. 11-0031037016 with the Secretary of State of the State of Texas listing Movie Grill Concepts VI, Ltd., as debtor, and Agent, as secured party. |
| 260. | UCC-3 Amendment filed on March 8, 2019 as File No. 19-00084509, amending Initial File No. 11-0031037016 with the Secretary of State of the State of Texas listing Movie Grill Concepts VI, Ltd., as debtor, and Agent, as secured party. |
| 261. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229073, amending Initial File No. 11-0031037016 with the Secretary of State of the State of Texas listing Movie Grill Concepts VI, Ltd., as debtor, and Agent, as secured party. |
| 262. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028636113 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XLII, LLC, as debtor, and Agent, as secured party. |
| 263. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229087, amending Initial File No. 16-0028636113 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XLII, LLC, as debtor, and Agent, as secured party. |
| 264. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028636234 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XLIII, LLC, as debtor, and Agent, as secured party. |
| 265. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229088, amending Initial File No. 16-0028636234 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XLIII, LLC, as debtor, and Agent, as secured party. |
| 266. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028636355 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XLIV, LLC, as debtor, and Agent, as secured party. |
| 267. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229089, amending Initial File No. 16-0028636355 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XLIV, LLC, as debtor, and Agent, as secured party. |
| 268. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028636476 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XLV, LLC, as debtor, and Agent, as secured party. |
| 269. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229090, amending Initial File No. 16-0028636476 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XLV, LLC, as debtor, and Agent, as secured party. |
| 270. | UCC-1 Financing Statement filed on August 1, 2018 as File No. 18-0026823949 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XLVI, LLC, as debtor, and Agent, as secured party. |
| 271. | UCC-1 Financing Statement filed on August 1, 2018 as File No. 18-0026824071 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XLVII, LLC, as debtor, and Agent, as secured party. |
| 272. | UCC-1 Financing Statement filed on August 1, 2018 as File No. 18-0026824192 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XLVIII, LLC, as debtor, and Agent, as secured party. |
| 273. | UCC-1 Financing Statement filed on August 1, 2018 as File No. 18-0026823828 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XLIX, LLC, as debtor, and Agent, as secured party. |
| 274. | UCC-1 Financing Statement filed on August 1, 2018 as File No. 18-0026823707 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS L, LLC, as debtor, and Agent, as secured party. |
| 275. | UCC-1 Financing Statement filed on September 12, 2019 as File No. 19-0034693691 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS LI, LLC, as debtor, and Agent, as secured party. |

**Exhibit 3**

| | |
|---|---|
| 276. | UCC-1 Financing Statement filed on September 12, 2019 as File No. 19-0034693712 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS LII, LLC, as debtor, and Agent, as secured party. |
| 277. | UCC-1 Financing Statement filed on September 12, 2019 as File No. 19-0034693833 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS LIII, LLC, as debtor, and Agent, as secured party. |
| 278. | UCC-1 Financing Statement filed on September 12, 2019 as File No. 19-0034694086 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS LIV, LLC, as debtor, and Agent, as secured party. |
| 279. | UCC-1 Financing Statement filed on September 12, 2019 as File No. 19-0034694107 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS LV, LLC, as debtor, and Agent, as secured party. |
| 280. | UCC-1 Financing Statement filed on May 15, 2019 as File No. 19-0017957483 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XXII, LLC, as debtor, and Agent, as secured party. |
| 281. | UCC-1 Financing Statement filed on November 13, 2013 as File No. 13-0035835098 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XXIII, LLC, as debtor, and Agent, as secured party. |
| 282. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327403, amending Initial File No. 13-0035835098 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXIII, LLC, as debtor, and Agent, as secured party. |
| 283. | UCC-3 Amendment filed on May 22, 2018 as File No. 18-00179218, amending Initial File No. 13-0035835098 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXIII, LLC, as debtor, and Agent, as secured party. |
| 284. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229094, amending Initial File No. 13-0035835098 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXIII, LLC, as debtor, and Agent, as secured party. |
| 285. | UCC-1 Financing Statement filed on April 23, 2014 as File No. 14-0012693258 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XXIV, LLC, as debtor, and Agent, as secured party. |
| 286. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327410, amending Initial File No. 14-0012693258 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXIV, LLC, as debtor, and Agent, as secured party. |
| 287. | UCC-3 Amendment filed on February 21, 2019 as File No. 19-00063912, amending Initial File No. 14-0012693258 with the Secretary of the State of the State of Texas listing Movie Grill Concepts XXIV, LLC, as debtor, and Agent, as secured party. |
| 288. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229095, amending Initial File No. 14-0012693258 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXIV, LLC, as debtor, and Agent, as secured party. |
| 289. | UCC-1 Financing Statement filed on December 19, 2013 as File No. 13-0039514238 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XXV, LLC, as debtor, and Agent, as secured party. |
| 290. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327433, amending Initial File No. 13-0039514238 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXV, LLC, as debtor, and Agent, as secured party. |
| 291. | UCC-3 Amendment filed on October 5, 2018 as File No. 18-00352825, amending Initial File No. 13-0039514238 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXV, LLC, as debtor, and Agent, as secured party. |
| 292. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229097, amending Initial File No. 13-0039514238 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXV, LLC, as debtor, and Agent, as secured party. |
| 293. | UCC-1 Financing Statement filed on December 19, 2013 as File No. 13-0039514470 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XXVI, LLC, as debtor, and Agent, as secured party. |
| 294. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327413, amending Initial File No. 13-0039514470 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXVI, LLC, as debtor, and Agent, as secured party. |
| 295. | UCC-3 Amendment filed on October 5, 2018 as File No. 18-00352826, amending Initial File No. 13-0039514470 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXVI, LLC, as debtor, and Agent, as secured party. |
| 296. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229098, amending Initial File No. 13-0039514470 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXVI, LLC, as debtor, and Agent, as secured party. |
| 297. | UCC-1 Financing Statement filed on April 23, 2019 as File No. 19-0014763243 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XXVII, LLC, as debtor, and Agent, as secured party. |
| 298. | UCC-1 Financing Statement filed on March 28, 2014 as File No. 14-0009792921 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XXVIII, LLC, as debtor, and Agent, as secured party. |
| 299. | UCC-3 Amendment filed on July 23, 2014 as File No. 14-00235834, amending Initial File No. 14-0009792921 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXVIII, LLC, as debtor, and Agent, as secured party. |
| 300. | UCC-3 Amendment filed on March 10, 2015 as File No. 15-00071713, amending Initial File No. 14-0009792921 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXVIII, LLC, as debtor, and Agent, as secured party. |
| 301. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327414, amending Initial File No. 14-0009792921 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXVIII, LLC, as debtor, and Agent, as secured party. |
| 302. | UCC-3 Amendment filed on February 21, 2019 as File No. 19-00063911, amending Initial File No. 14-0009792921 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXVIII, LLC, as debtor, and Agent, as secured party. |
| 303. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229099, amending Initial File No. 14-0009792921 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXVIII, LLC, as debtor, and Agent, as secured party. |
| 304. | UCC-1 Financing Statement filed on August 5, 2015 as File No. 15-0025035162 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XXIX, LLC, as debtor, and Agent, as secured party. |

**Exhibit 3**

| | |
|---|---|
| 305. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327412, amending Initial File No. 15-0025035162 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXIX, LLC, as debtor, and Agent, as secured party. |
| 306. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229096, amending Initial File No. 15-0025035162 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXIX, LLC, as debtor, and Agent, as secured party. |
| 307. | UCC-3 Amendment filed on June 19, 2020 as File No. 20-00272745, amending Initial File No. 15-0025035162 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXIX, LLC, as debtor, and Agent, as secured party. |
| 308. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028636597 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XXX, LLC, as debtor, and Agent, as secured party. |
| 309. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229100, amending Initial File No. 16-0028636597 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXX, LLC, as debtor, and Agent, as secured party. |
| 310. | UCC-1 Financing Statement filed on July 17, 2015 as File No. 15-0022812859 with the Secretary of State of the State of Texas, listing Movie Grill Concepts XXXI, LLC, as debtor, and Agent, as secured party. |
| 311. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327411, amending Initial File No. 15-0022812859 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXXI, LLC, as debtor, and Agent, as secured party. |
| 312. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229101, amending Initial File No. 15-0022812859 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXXI, LLC, as debtor, and Agent, as secured party. |
| 313. | UCC-3 Amendment filed on June 19, 2020 as File No. 20-00272744, amending Initial File No. 15-0022812859 with the Secretary of State of the State of Texas listing Movie Grill Concepts XXXI, LLC, as debtor, and Agent, as secured party. |
| 314. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028636618 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XXXII, LLC, as debtor, and Agent, as secured party. |
| 315. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229102, amending Initial File No. 16-0028636618 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XXXII, LLC, as debtor, and Agent, as secured party. |
| 316. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028636739 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XXXIII, LLC, as debtor, and Agent, as secured party. |
| 317. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229103, amending Initial File No. 16-0028636739 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XXXIII, LLC, as debtor, and Agent, as secured party. |
| 318. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028636850 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XXXIV, LLC, as debtor, and Agent, as secured party. |
| 319. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229104, amending Initial File No. 16-0028636850 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XXXIV, LLC, as debtor, and Agent, as secured party. |
| 320. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028637003 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XXXV, LLC, as debtor, and Agent, as secured party. |
| 321. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229106, amending Initial File No. 16-0028637003 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XXXV, LLC, as debtor, and Agent, as secured party. |
| 322. | UCC-1 Financing Statement filed on April 4, 2016 as File No. 16-0010465295 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XXXVI, LLC, as debtor, and Agent, as secured party. |
| 323. | UCC-3 Amendment filed on October 4, 2016 as File No. 16-00327404, amending Initial File No. 16-0010465295 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XXXVI, LLC, as debtor, and Agent, as secured party. |
| 324. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229107, amending Initial File No. 16-0010465295 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XXXVI, LLC, as debtor, and Agent, as secured party. |
| 325. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028637124 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XXXVII, LLC, as debtor, and Agent, as secured party. |
| 326. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229108, amending Initial File No. 16-0028637124 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XXXVII, LLC, as debtor, and Agent, as secured party. |
| 327. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028637245 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XXXVIII, LLC, as debtor, and Agent, as secured party. |
| 328. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229109, amending Initial File No. 16-0028637245 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XXXVIII, LLC, as debtor, and Agent, as secured party. |
| 329. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028636971 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XXXIX, LLC, as debtor, and Agent, as secured party. |
| 330. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229105, amending Initial File No. 16-0028636971 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XXXIX, LLC, as debtor, and Agent, as secured party. |
| 331. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028635960 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XL, LLC, as debtor, and Agent, as secured party. |
| 332. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229085, amending Initial File No. 16-0028635960 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XL, LLC, as debtor, and Agent, as secured party. |
| 333. | UCC-1 Financing Statement filed on August 31, 2016 as File No. 16-0028636092 with the Secretary of State of the State of Texas, listing MOVIE GRILL CONCEPTS XLI, LLC, as debtor, and Agent, as secured party. |

**Exhibit 3**

| | |
|---|---|
| 334. | UCC-3 Amendment filed on June 19, 2019 as File No. 19-00229086, amending Initial File No. 16-0028636092 with the Secretary of State of the State of Texas listing MOVIE GRILL CONCEPTS XLI, LLC, as debtor, and Agent, as secured party. |
| 335. | UCC-1 Financing Statement filed on March 29, 2019 as File No. 19-0011391287 with the Secretary of State of the State of Texas, listing OHAM Holdings, LLC, as debtor, and Agent, as secured party. |

**Exhibit 3**

US 7428642v.20