# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-32633-SGJ |
| | § | |
| STUDIO MOVIE GRILL HOLDINGS, LLC, | § | Chapter 11 |
| *et al.,*[1] | § | |
| DEBTOR. | § | Jointly Administered |

## JOINT DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION FOR STUDIO MOVIE GRILL HOLDINGS, LLC AND JOINTLY ADMINISTERED DEBTORS[2]

JANUARY 5, 2021

FRANK J. WRIGHT
JEFFERY M. VEVETO
JAY A. FERGUSON
**LAW OFFICES OF FRANK J. WRIGHT, PLLC**
2323 Ross Ave. | Suite 730
Dallas, Texas 75201
Telephone: (214) 935.9100
Emails: frank@fjwright.law; jeff@fjwright.law; jay@fjwright.law

**ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Studio Movie Grill Holdings, LLC (6546) ("**SMG Holdings**"); OHAM Holdings, LLC (0966); Movie Grill Concepts Trademark Holdings, LLC (3096); Movie Grill Concepts I, Ltd. (6645); Movie Grill Concepts III, Ltd. (2793); Movie Grill Concepts IV, Ltd. (1454); Movie Grill Concepts IX, LLC (3736); Movie Grill Concepts VI, Ltd. (6895); Movie Grill Concepts VII, LLC (2291); Movie Grill Concepts X, LLC (6906); Movie Grill Concepts XI, LLC (2837); Movie Grill Concepts XII, LLC (6040); Movie Grill Concepts XIII, LLC (5299); Movie Grill Concepts XIV, LLC (4709); Movie Grill Concepts XIX, LLC (9646); Movie Grill Concepts XL, LLC (4454); Movie Grill Concepts XLI, LLC (4624); Movie Grill Concepts XLII, LLC (2309); Movie Grill Concepts XLIII, LLC (9721); Movie Grill Concepts XLIV, LLC (8783); Movie Grill Concepts XLV, LLC (2570); Movie Grill Concepts XV, LLC (4939); Movie Grill Concepts XVI, LLC (1033); Movie Grill Concepts XVII, LLC (1733); Movie Grill Concepts XVIII, LLC (8322); Movie Grill Concepts XX, LLC (7300); Movie Grill Concepts XXI, LLC (1508); Movie Grill Concepts XXII, LLC (6748); Movie Grill Concepts XXIV, LLC (5114); Movie Grill Concepts XXIX, LLC (5857); Movie Grill Concepts XXV, LLC (4985); Movie Grill Concepts XXVI, LLC (5233); Movie Grill Concepts XXVII, LLC (4427); Movie Grill Concepts XXVIII, LLC (1554); Movie Grill Concepts XXX, LLC (1431); Movie Grill Concepts XXXI, LLC (3223); Movie Grill Concepts XXXII, LLC (0196); Movie Grill Concepts XXXIII, LLC (1505); Movie Grill Concepts XXXIV, LLC (9770); Movie Grill Concepts XXXIX, LLC (3605); Movie Grill Concepts XXXV, LLC (0571); Movie Grill Concepts XXXVI, LLC (6927); Movie Grill Concepts XXXVII, LLC (6401); Movie Grill Concepts XXXVIII, LLC (9657); Movie Grill Concepts XXIII, LLC (7893); Studio Club, LLC (3023); Studio Club IV, LLC (9440); Movie Grill Concepts XI, LLC (2837); Movie Grill Concepts XLI, LLC (4624); Movie Grill Concepts XLVI, LLC (2344); Movie Grill Concepts XLVII, LLC (5866); Movie Grill Concepts XLVIII, LLC (8601); Movie Grill Concepts XLIX, LLC (0537); Movie Grill Concepts L, LLC (5940); Movie Grill Concepts LI, LLC (7754); Movie Grill Concepts LII, LLC (8624); Movie Grill Concepts LIII, LLC (3066); Movie Grill Concepts LIV, LLC (2018); Movie Grill Concepts LV, LLC (4699); Movie Grill Partners 3, LLC (4200); Movie Grill Partners 4, LLC (1363); Movie Grill Partners 6, LLC (3334); and MGC Management I, LLC (3224).

[2] Pursuant to the Final DIP Order, the Debtors shall file a disclosure statement in form and substance acceptable to the Agent. As of the date hereof, the Agent has not accepted or agreed to the terms or provisions of this Disclosure Statement or any transaction contemplated by the Plan. All of the Agent's, the DIP Lenders, and the Prepetition Lenders' claims, rights, and remedies are reserved for all purposes, including the right to obtain treatment and transaction structure different than as set forth in the Plan. The filing of this Disclosure Statement by the Debtors does not and shall not constitute or imply the Agent's consent to any term or provision of this Disclosure Statement (including any exhibits or schedules hereto).

**<u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>**

The Debtors are providing the information in this document (the "<u>Disclosure Statement</u>") to Holders of Claims and Interests for purposes of soliciting votes to accept or reject the Joint Chapter 11 Plan of Reorganization of Studio Movie Grill Holdings, LLC and its debtor affiliates (the "Debtors") (the "Plan").[3] Nothing in this Disclosure Statement may be relied upon or used by any Entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the Risk Factors described in Article VIII herein.

The Plan is supported by the Debtors.

*The Debtors urge Holders of Claims whose votes are being solicited to vote to accept the Plan.*

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and the transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain anticipated events in the Debtors' Chapter 11 Cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records and on various assumptions regarding the Debtors' business. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' business or their future results or operations. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted, and there is no assurance that the statements contained herein will be correct at any time after such date.

---

[3] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in Article I.A of the Plan.

Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims and Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right to File an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan.

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors or any other authorized party may seek to investigate, File, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims and Interests who do not submit ballots to accept or reject the Plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the Restructuring Transactions contemplated thereby.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read the Plan and this Disclosure Statement in its entirety, including Article VIII, entitled "RISK FACTORS," which begins on hereof, before submitting your ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.

The information contained in this Disclosure Statement is included for purposes of soliciting votes for, and Confirmation of, the Plan and may not be relied on for any other purpose. In the event of any inconsistency between this Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws. This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission

(the "<u>SEC</u>") or any similar federal, state, local, or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a– 77aa, together with the rules and regulations promulgated thereunder (the "<u>Securities Act</u>"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. To the extent exemptions from registration under section 1145 of the Bankruptcy Code or applicable federal securities law do not apply, the Securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about the Debtors':

- business strategy;

- acquisition or disposition of assets, including strategy, amount, timing, and ability to effectuate any such transaction;

- financial strategy;

- risks associated with the Chapter 11 process, including the Debtors' ability to develop, confirm, and consummate a plan under Chapter 11 or an alternative restructuring transaction;

- inability to maintain relationships with suppliers, customers, employees, and other third parties as a result of the Chapter 11 filing or other failure of such parties to comply with their contractual obligations;

- failure to satisfy the Debtors' short- or long-term liquidity needs, including their inability to generate sufficient Cash flow from operations or to obtain adequate financing to fund their capital expenditures and meet working capital needs and their ability to continue as a going concern;

- legal proceedings and the effects thereof;

- ability to operate their theaters due to COVID-19 restrictions;

- capital expenditures;

- economic and competitive advantages;

- credit and capital market conditions;

- regulatory changes;

- lease operating expenses, general and administrative expenses and development costs;

- future operating results, including results of acquired  properties; and

- plan, objectives, expectations and intentions.

Statements concerning these and other matters are not guarantees of the Debtors and the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Debtors and the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties, and factors may include: the Debtors' ability to confirm and consummate the Plan; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating the Debtors' business during the Chapter 11 Cases; customer responses to the Chapter 11 Cases; the Debtors' ability to operate their theaters due to COVID-19 restrictions; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; the Debtors' ability to access financing necessary to consummate the Plan; general economic, business, and market conditions; currency fluctuations; interest rate fluctuations; price increases; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing business; financial conditions of the Debtors' customers; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; natural disasters; geopolitical instability; and the effects of governmental regulation on the Debtors' business.

## EXHIBITS & SCHEDULES

**Exhibit A**        Plan of Reorganization

**Exhibit B**        Disclosure Statement Order

**Exhibit C**        Financial Projections

**Exhibit D**        Liquidation Analysis


**Schedule 1**       Assets

**Schedule 2**       Personal Property Taxes

**Schedule 3**       Real Estate Taxes

**Schedule 4**       Sales Taxes

**Schedule 5**       Other Taxes

**Schedule 6**       Secured Debt

**Schedule 7**       Wage Claims

**Schedule 8**       Other Priority Claims

**Schedule 9**       Administrative & Professional Fee Claims

**Schedule 10**      Other Administrative Claims

**Schedule 11**      General Unsecured Claims

**Schedule 12**      Lease Analysis

**Schedule 13**      Personal Injury Litigation

## I.      INTRODUCTION

Studio Movie Grill Holdings, LLC and related, as debtors and debtors in possession (collectively, the "Debtors") submit this disclosure statement (this "<u>Disclosure Statement</u>") pursuant to Section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes to accept or reject the *Joint Plan of Reorganization for Studio Movie Grill Holdings, LLC and Jointly Administered Debtors,* (the "<u>Plan</u>"), filed on January 5, 2021[4]. A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.

**THE DEBTORS BELIEVE THAT THE TREATMENT OF CLAIMS AND INTERESTS UNDER, AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY, THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM HOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES IN A TIMELY MANNER AND STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

The Debtors are in the dine-in movie theater business. In addition to their movie offerings, Debtors' theaters include a bar and lounge area, with direct to seat service for guests before and during their movies. On the Petition Date, the Debtors operated 33 dine-in movie theaters in numerous cities in 10 states, including Arizona, California, Florida, Georgia, Illinois, Indiana, North Carolina, Pennsylvania, Texas and Virginia. The theaters operate under the brand name "Studio Movie Grill." As of December 31, 2019, the Debtors, on a consolidated basis, had assets in the form of cash, accounts receivables, inventory, theater leases, equipment, furniture, and intangibles with a book value of approximately $233 million.

Before the onset of the COVID-19 pandemic and nationwide shutdowns, the Debtors were generating positive cash flow. For example, in 2019, Studio Movie Grill Holdings, LLC had revenue of $251 million and EBITDA of $21 million.

The COVID-19 pandemic and its progeny of state-mandated shutdowns made the Debtors' financial situation extremely difficult. On March 16, 2020, the U.S. federal government issued guidelines to try to slow the spread of COVID-19, which included avoiding eating or drinking in restaurants and bars, and shopping trips or social visits. Within a week, the states in which the Debtors operate theaters began imposing "stay at home" or "lockdown" orders. These orders directed people to stay at home except for "essential" activities, but movie theaters are not deemed essential activities. As a result, the Debtors' theaters were shut down for at least three (3) months, and the a certain subset remaining subject to these orders today. Specifically, the Debtors closed their theaters to protect the health and safety of their employees and customers. Throughout most of the summer of 2020, the Debtors did not show a single movie or sell any food or beverages in their theaters, and the Debtors were compelled to furlough all but approximately 850 of their approximately 7,000 employees.

Certain of the stay at home orders have since expired or restrictions have been modified to allow most movie theaters to operate at partial capacity. On June 19, 2020, the Debtors resumed

---

[4]  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

limited operations in three (3) theaters. Over time, the Company was able to open twenty-one (21) theaters, just prior to filing. After the Petition Date, new state-mandates meant that four (4) theaters had to reclose. There is still significant uncertainty as to whether and when theaters will be permitted to open at full capacity, and whether (and when) people will begin to return to engaging in activities that involve being in public places and in close proximity with others, such as attending movies.

Through the Chapter 11 Cases, the Debtors have been engaged in: (i) identifying which theaters are not profitable, which ones are profitable, and which ones can be profitable; and (ii) renegotiating leases with landlords. To date, the Debtors have filed motions to reject twenty-two (22) lease locations. As of the filing of this Disclosure Statement, the Debtors have rejected thirteen (13) leases covering fifteen (15) theater locations. The Debtors have and continue to negotiate with all landlords. These negotiations have been largely successful, as the Debtors have negotiated revised lease terms with many of their landlords that incorporate some form of percentage rent to weather the current depressed demand for theater experiences.

The Debtors have also dedicated substantial efforts evaluating their options for a viable exit strategy. Those options include a sale of the Debtors' business or a plan of reorganization. Based on discussions their advisers, the DIP Lenders and their advisors, and with the Committee and its advisors, the Debtors have determined that a restructuring of their business through an equity sale implemented through a chapter 11 plan is the best way to maximize the value of the estates. To ensure that this is the optimum option however, the Debtors have undertaken to market a proposed sale of assets of the Debtors to potential buyers (including the Prepetition Lenders) and obtained approval of the Bidding Procedures to create a fair and orderly process to solicit bids on either the stock in the Debtors or their assets, while maintaining the flexibility to reorganize the Debtors.

## III.   OVERVIEW OF THE PLAN

The Plan provides for a reorganization of the Debtors as a going concern, with a reduced number of theaters to focus on profitable locations.

### A.    Treatment of Creditors

Pursuant to the Plan, unless a creditor agrees to less favorable treatment:

- Each Holder of a Class 1 Claim will receive payment in full in Cash or other treatment rendering such Claim Unimpaired or otherwise permitted by the Bankruptcy Code.

- Each Holder of a Class 2 Claim will receive (1) if an Equitization Restructuring occurs, (a) its Pro Rata share of the New Units; plus (b) its Pro Rata share of the Agent Trust Assets; plus (c) its Pro Rata share of the Exit Facility allocable to the Prepetition Lenders' Claims as determined by the Agent, and upon receipt thereof, each such Holder shall become an Exit Facility Lender; or (2) if an Asset Sale Restructuring occurs, (a) all Cash of the Debtors (including, if the Asset Sale Restructuring is to a Third Party Purchaser, the Sale Proceeds) other than the GUC Consideration and the Cash required to fund the Wind-Down Budget, plus (b) its Pro Rata Share of the Agent Trust Assets.

- Each Holder of a Class 3 Claim will receive, at the option of the applicable Debtor(s) with the consent of the Agent, either: (i) payment in full in Cash; (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Claim; or (iv) A new note equal to the

amount of the Allowed Class 3 Claim with a term of five years, interest at the Plan Rate, payable monthly in equal payments of principal and interest, and secured by the Collateral.

- Each Holder of a Class 4 Claim will receive, at the option of the applicable Debtor(s) with the consent of the Agent, either: (i) payment in full in Cash; (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Claim; or (iv) A new note equal to the amount of the Allowed Class 4 Claim with a term of five years, interest at the Plan Rate, payable monthly in equal payments of principal and interest, and secured by the Collateral.

- If Class 5 votes as a Class to accept the Plan, each such Holder of an Allowed GUC Claim in Class 5 shall receive its Pro Rata share of the GUC Consideration. If Class 5 votes as a Class to reject the Plan, each such Holder of an Allowed GUC Claim in Class 5 shall receive such value as such Holders are entitled to receive under section 1129(a)(7) of the Bankruptcy Code as determined by the Court at the Confirmation Hearing. Each Holder of GUC Claims in an aggregate Allowed amount greater than $2,500.00 may irrevocably elect on its Ballot to have such Claim irrevocably reduced to $2,500.00 and treated as a Convenience Class Claim for the purposes of the Plan rather than as a GUC Claim.

- Each Holder of a Class 6 Claim will receive within thirty (30) days after the date such Claim is Allowed payment in Cash in an amount equal to 10% of such Holder's Allowed Convenience Class Claim.

- Class 7 Intercompany Claims shall, at the Agent's election, either be (i) Reinstated as of the Effective Date or (ii) canceled, discharged, released, and extinguished in full as of the Effective Date.

- Claims in Class 8 shall receive no payment under the Plan.

- Class 9 Interests in SMG Holdings shall be deemed canceled, discharged, released, and extinguished, and there shall be no distribution to Holders of Interests in SMG Holdings on account of such Interests.

- Class 10 Other Debtor Interests shall, at the Agent's election, either be (i) Reinstated as of the Effective Date or (ii) canceled, discharged, released, and extinguished in full as of the Effective Date.

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Agent, shall enter into any transaction and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including the Asset Sale Restructuring or the Equitization Restructuring, as applicable, and will take any actions as may be necessary or advisable to effect a corporate restructuring of their respective businesses in accordance with the terms of the Plan. The actions to implement the Restructuring Transactions may include, as applicable, and without limitation: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the Agent may consent, including, if applicable, the formation of any entity or entities that will constitute, in whole or in part, the Reorganized Debtors; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset,

property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the Agent may consent, including the execution and delivery of the Trust Agreement; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable state law; (4) the execution and delivery of the New Organizational Documents; (6) the issuance of the New Units as set forth in the Plan; and (7) all other actions that the Debtors with the Agent's consent or the Reorganized Debtors, as applicable, determine to be necessary or advisable, including making filings or recordings that may be required by law in connection with the Plan.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

## B.    The Trust

### 1.    Creation and Governance of the Trust

The Trust shall be created whether an Equitization Restructuring occurs or an Asset Sale Restructuring occurs.  If an Equitization Restructuring occurs, the Trust shall be established for the distribution of Trust Assets to Holders of Allowed Claims as set forth in the Plan and for the reconciliation by the Trustee of Claims and Interests.  If an Asset Sale Restructuring occurs, the Trust shall be established for the distribution of Trust Assets to Holders of Allowed Claims as set forth in the Plan, the reconciliation of Claims and Interests, and the wind-down of the Debtors' estates.  The Prepetition Lenders shall be Trust Beneficiaries to the extent of their respective interest in the Agent Trust Assets whether an Equitization Restructuring occurs or an Asset Sale Restructuring occurs.

On the Effective Date, the Debtors, the Reorganized Debtors and Trustee shall be authorized to take all actions necessary to establish the Trust in accordance with the Plan and the Trust Agreement.  Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the Trust all of their rights, title and interest in and to all of the Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, other than with respect to the Liens of the Agent, which shall encumber the Trust Assets (other than 50% of Net Avoidance Action Proceeds), the Trust Assets shall automatically vest in the Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax pursuant to section 1146(a) of the Bankruptcy Code. The Trustee shall be the exclusive administrator of the Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the Trustee's duties. The Trust shall be administered by the Trustee. The powers, rights, and responsibilities of the Trustee shall include the authority and responsibility to, among other things, take the actions set forth in the Plan and shall be set forth in the Trust Agreement. The Trustee shall hold and distribute the Trust Assets in accordance with the provisions of the Plan and the Trust Agreement. After the Effective Date, the Debtors and the Reorganized Debtors, if applicable, shall have no interest in the Trust Assets.

### 2.    Trustee and Trust Agreement

The Trustee will, among other things, administer the Trust Assets and will be the Estates' representative with respect to the settlement, release, allowance, disallowance, or compromise of

applicable Claims in accordance with the Plan and the Bankruptcy Code. The Trust Agreement generally will provide for, among other things: (a) the transfer of the Trust Assets to the Trust; (b) the payment of certain reasonable expenses of the Trust from the Trust Assets; and (c) distributions to Trust Beneficiaries, as provided herein and in the Trust Agreement. On and after the Effective Date, the Trustee shall be responsible for all decisions and duties with respect to the Trust and the Trust Assets, except as otherwise provided in the Trust Agreement.

**3.    Tax Treatment**

In furtherance of the Trust, (a) the Trust is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code to the applicable Holders of Claims, consistent with the terms of the Plan; (b) the sole purpose of the Trust shall be the liquidation and distribution of the Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of applicable Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (c) all parties (including, without limitation, the Debtors, the Reorganized Debtors, applicable Holders of Allowed Claims receiving interests in the Trust, and the Trustee) shall report consistently with such treatment; (d) all parties (including the Debtors, the Reorganized Debtors, applicable Holders of Allowed Claims receiving interests in the Trust, and the Trustee) shall report consistently with the valuation of the Trust Assets transferred to the Trust as determined by the Trustee (or its designee); (e) the Trustee shall be responsible for filing all applicable tax returns for the Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (f) the Trustee shall annually send to each holder of an interest in the Trust a separate statement regarding the receipts and expenditures of the Trust as relevant for U.S. federal income tax purposes. In conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Trustee and Trust Beneficiaries) will be required to treat the transfer of the Trust Assets to the Trust, for all purposes of the Internal Revenue Code, as (a) a transfer of the Trust Assets (subject to any obligations relating to those assets) directly to the Trust Beneficiaries (other than to the extent any Trust Assets are allocable to Disputed Claims), followed by (b) the transfer by such beneficiaries to the Trust of Trust Assets in exchange for Trust Interests. For all U.S. federal income tax purposes, all parties must treat the Trust as a grantor trust of which holders of Claims who become Trust Beneficiaries (as determined for U.S. federal income tax purposes) are the owners and grantors. Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Trustee), the Trustee may timely elect to (a) treat any portion of the Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) , which "disputed ownership fund" will be taxable as a "qualified settlement fund" if such portion of the Trust allocable to Disputed Claims consists of passive assets for tax purposes, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the Debtors, the Reorganized Debtors, applicable Holders of Allowed Claims receiving interests in the Trust, and the Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing. The Trustee may request an expedited determination of taxes of the Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust.

**4.    Non-Transferability of Trust Interests**

Any and all Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law. In addition, any and all Trust Interests will not constitute "securities" and will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any Trust Interests constitute "securities," the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer, issuance and distribution under the Plan of the Trust Interests will be exempt from registration under the Securities Act and all applicable state and local securities laws and regulations.

### 5.      Dissolution of the Trust

The Trustee and Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the Trustee under the Plan have been made.

### 6.      Indemnification and Limitation of Liability

The Trustee and each of its respective accountants, agents, assigns, attorneys, bankers, consultants, directors, employees, executors, financial advisors, investment bankers, real estate brokers, transfer agents, independent contractors, managers, members, officers, partners, predecessors, principals, professional persons, representatives, affiliate, employer and successors (each solely in its capacity as such, an "Indemnified Party") shall be indemnified for, and defended and held harmless against, by the Trust and solely from the Trust Assets, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) actually incurred other than with respect to gross negligence, willful misconduct, or fraud on the part of the applicable Indemnified Party (which gross negligence, willful misconduct, or fraud, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the Indemnified Parties in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or the Trust Agreement, as applicable if the applicable Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Trust or its beneficiaries. The amounts necessary for the indemnification provided in this section (including, but not limited to, any costs and expenses incurred in enforcing the right of indemnification in this section) shall be paid out of the Trust Assets. The Trustee shall not be personally liable for the payment of any  Trust expense or claim or other liability of the Trust, and no person shall look to the Trustee personally for the payment of any such expense or liability. The indemnification provided in this section shall survive the death, dissolution, incapacity, resignation or removal of the Trustee, Indemnified Party or the termination of the Trust, and shall inure to the benefit of each Indemnified Party's heirs and assigns.

### C.      Settlement and Compromise

The Plan shall be deemed a motion to approve the good-faith compromise and settlement set forth in the Plan pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement. The compromise, settlement and releases described in the Plan shall be deemed nonseverable from each other and from all other terms of the Plan. The Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise, settlement, and releases set forth in the Plan, as well as a finding by the Bankruptcy Court that such settlement and compromise, and the releases and indemnities provided to effectuate such settlement, were proposed and entered in good faith, are in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests, and are fair, equitable, and reasonable.

In order to implement the good-faith compromise and settlement set forth herein, the Plan groups the Debtors together solely for the purpose of describing treatment of Claims and Interests under the Plan and confirmation of the Plan. To the extent there are no Allowed Claims or Interest with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor. Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim. The grouping of the Debtors in this manner shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal Entities, or cause the transfer of any Assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities.

The Debtors determined that prosecution of the various potential claims resolved by the Plan could mire the Debtors and other parties in interest in time consuming and expensive litigation, and that effectuating a consensual resolution of these matters through the Plan would provide significant value to their Estates, in light of the amounts at stake and the complexity, expense, and likely duration of litigation related thereto.

Pursuant to Rule 408 of the Federal Rules of Evidence, the Plan and this Disclosure Statement (and any exhibits or supplements relating to the foregoing), and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until the Plan is consummated, and then only in accordance with the Plan. In the event the Plan is not consummated, provisions of the Plan and this Disclosure Statement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be binding or probative.

After the Effective Date and without any further notice to or action, order, or approval of the Bankruptcy Court, the Reorganized Debtors or the Trustee (with the consent of the Agent) may compromise and settle, pursuant to Bankruptcy Rule 9019 and in accordance with the provisions of the Plan, Claims against, and Interests in, the Debtors and their Estates, and Causes of Action against other Entities.

## D.    Releases

The Plan contains certain customary debtor and third party releases (as described more fully in Article VIII.D of this Disclosure Statement).

Holders of Claims against or Interests in the Debtors who (a) vote in favor of the Plan or (b) do not vote in favor of the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or Opt Out Form will be deemed to have consented to the release and discharge of all claims and Causes of Action against the Released Parties. By opting out of the Third Party Release, such Holder will also forgo the benefit of obtaining the releases set forth in Article VIII of the Plan if such party would otherwise be a Released Party.

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is Chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors

and similarly situated interest Holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting votes on the Plan, Section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims and Interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on and your distribution under the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to Section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

The Plan constitutes a chapter 11 plan of reorganization for the Debtors, which shall include the classifications set forth below. Subject to Article III of the Plan, to the extent that a Class contains Claims or Interests only with respect to one or more particular Debtors, such Class applies solely to such Debtor.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote |
| Class 2 | Prepetition Lenders' Claims | Impaired | Entitled to Vote |
| Class 3 | Secured Claim of Veritex Community Bank | Impaired | Entitled to Vote |
| Class 4 | Other Secured Creditors | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |

| Class 6 | Convenience Class Claims | Impaired | Entitled to Vote |
| Class 7 | Intercompany Claims | Either Unimpaired or Impaired | Not Entitled to Vote (Deemed to either Accept or Reject) |
| Class 8 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | SMG Holdings Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Other Debtor Interests | Either Unimpaired or Impaired | Not Entitled to Vote (Deemed to either Accept or Reject) |

### D.    What will I receive from the Debtors if the Plan is consummated?

The table below summarizes the treatment and anticipated recoveries on account of all classified Claims against and Interests in, the Debtors under of the Plan. Pursuant to the Plan, the Debtors and the Reorganized Debtors, as applicable, reserve the right to object to the amount or classification of any Claim under the Plan. A successful objection to a Claim may materially impact the recoveries projected below.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[5]**

---

[5] The recoveries set forth herein may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions. "Allowed" means, with respect to any Claim or Interest, except as otherwise provided in the Plan: (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither Disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court, including a Challenge Resolution Stipulation; (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had Disallowed prior to such Final Order); provided that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors', Reorganized Debtors', or GUC Trustee's reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; provided further that no Claim of any Entity subject to Section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. For the avoidance of doubt a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow," "Allowing," and "Allowance" shall have correlative meanings.

| Class | Classified Claims | Plan Treatment (unless less favorable treatment is agreed to by Claimant) | Estimated Allowed Claims Under the Plan | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Each Holder of a Class 1 Claim will receive payment in full in Cash or other treatment rendering such Claim Unimpaired or otherwise permitted by the Bankruptcy Code. | $0 | 100.0% | No recovery |
| 2 | Prepetition Lenders' Claims | Each Holder of a Class 2 Claim will receive (1) if an Equitization Restructuring occurs, (a) its Pro Rata share of the New Units; plus (b) its Pro Rata share of the Agent Trust Assets; plus (c) its Pro Rata share of the Exit Facility allocable to the Prepetition Lenders' Claims as determined by the Agent, and upon receipt thereof, each such Holder shall become an Exit Facility Lender; or (2) if an Asset Sale Restructuring occurs, (a) all Cash of the Debtors (including, if the Asset Sale Restructuring is to a Third Party Purchaser, the Sale Proceeds) other than the GUC Consideration and the Cash required to fund the Wind-Down Budget, plus (b) its Pro Rata Share of the Agent Trust Assets.. | $111,688,122.00 | 100% | 3.4% |
| 3 | Secured Claim of Veritex Community Bank | Each Holder of a Class 3 Claim will receive, at the option of the applicable Debtor(s) with the consent of the Agent, either: (i) payment in full in Cash; (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Claim; or (iv) A new note equal to the amount of the Allowed Class 3 Claim with a term of five years, interest at the Plan Rate, payable monthly in equal payments of principal and interest, and secured by the Collateral. | $1,381,303 | 100% | 0% |

10

| Class | Classified Claims | Plan Treatment (unless less favorable treatment is agreed to by Claimant) | Estimated Allowed Claims Under the Plan | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| 4 | Other Secured Creditors | Each Holder of a Class 4 Claim will receive, at the option of the applicable Debtor(s) with the consent of the Agent, either: (i) payment in full in Cash; (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Claim; or (iv) A new note equal to the amount of the Allowed Class 4 Claim with a term of five years, interest at the Plan Rate, payable monthly in equal payments of principal and interest, and secured by the Collateral. | $2.8 Million | 100% | No recovery |
| 5 | General Unsecured Claims | If Class 5 votes as a Class to accept the Plan, each such Holder of an Allowed GUC Claim in Class 5 shall receive its Pro Rata share of the GUC Consideration. If Class 5 votes as a Class to reject the Plan, each such Holder of an Allowed GUC Claim in Class 5 shall receive such value as such Holders are entitled to receive under section 1129(a)(7) of the Bankruptcy Code as determined by the Court at the Confirmation Hearing. Each Holder of GUC Claims in an aggregate Allowed amount greater than $2,500.00 may irrevocably elect on its Ballot to have such Claim irrevocably reduced to $2,500.00 and treated as a Convenience Class Claim for the purposes of the Plan rather than as a GUC Claim. | $65-80 million[6] | Unknown | No recovery |
| 6 | Convenience Claims | Each Holder of a Class 6 Claim will receive within thirty (30) days after the date such Claim is Allowed payment in Cash in an amount equal to 10% of such Holder's Allowed Convenience Class Claim. | Unknown | 10% | No recovery |
| 7 | Intercompany Claims | Class 7 Intercompany Claims shall, at the Agent's election, either be (i) Reinstated as of the Effective Date or (ii) canceled, discharged, released, and extinguished in full as of the Effective Date. | $563 million | 0% | No recovery |

---

[6] The Debtors estimate that aggregate claims total for certain classes, including Class 5, will be substantially higher in a liquidation, as all unexpired leases and executory contracts would be rejected and treated within this class, as set forth in the Liquidation Analysis attached hereto as **Exhibit D**.

| Class | Classified Claims | Plan Treatment (unless less favorable treatment is agreed to by Claimant) | Estimated Allowed Claims Under the Plan | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| 8 | Subordinated Claims | Claims in Class 8 shall receive no payment under the Plan.. | n/a | n/a | n/a |
| 9 | SMG Holdings Interests | Class 9 Interests in SMG Holdings shall be deemed canceled, discharged, released, and extinguished, and there shall be no distribution to Holders of Interests in SMG Holdings on account of such Interests. | $0.0 | 0.0% | 0.0% |
| 10 | Other Debtor Interests | Class 10 Other Debtor Interests shall, at the Agent's election, either be (i) Reinstated as of the Effective Date or (ii) canceled, discharged, released, and extinguished in full as of the Effective Date. | $0.0 | 0.0% | 0.0% |

### E.    What will I receive under the Plan if I hold an Allowed Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Loan Claim?

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Loan Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

The Debtors estimate that Allowed Administrative Claims will total approximately $1.0 million (including $0.3 million for wages, $0.5 million for cost of goods sold and utilities and $0.2 million for estimated February 2021 sales taxes, all due in the normal course) *excluding* administrative rent that may be owed in respect of rejected leases (a potential liability that the Debtors estimate to be approximately $0.2 million). Administrative rent under leases to be assumed will be paid as cure costs by the Purchaser pursuant to Bankruptcy Code Section 365. The Debtors further estimate that there will be Allowed Other Priority Claims aggregating approximately $0. The Debtors' estimates are the result of the Debtors' and their advisors' careful analysis of available information, including the Debtors' books and records and an analysis of the validity of the Claims asserted against the Debtors. The actual amount of Allowed Administrative Claims and Other Priority Claims is subject to numerous contingencies. Nonetheless, the Debtors have determined that there will be sufficient value to satisfy Allowed Other Secured Claims in full or otherwise render such claims unimpaired under the Plan.

1.      **Administrative Claims**

(a)      **General Administrative Claims**

General Administrative Claims will be satisfied as set forth in Article II.A.1 of the Plan, as summarized herein. Each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either: (a) on the Effective Date; (b) if the General Administrative Claim is not Allowed as of the Effective Date, sixty (60) days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed General Administrative Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Administrative Claim, without any further action by the Holders of such Allowed General Administrative Claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.

Requests for allowance and payment of General Administrative Claims that were (a) not incurred in the ordinary course of the Debtors' business and (b) are not subject to the Administrative Claims Bar Date Order must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. Holders of General Administrative Claims that are (a) not subject to the Administrative Claims Bar Date Order and are required to File and serve a request for payment of such General Administrative Claims by the Administrative Claims Bar Date and do not File and serve such a request by the Administrative Claims Bar Date specified in the Confirmation Order or (b) are subject to the Administrative Claims Bar Date Order but did not timely File and serve such a request in accordance with the Administrative Claims Bar Date Order, shall be forever barred, estopped, and enjoined from asserting such General Administrative Claims against the Debtors or Reorganized Debtors, as applicable, or their respective property, and such General Administrative Claims shall be deemed forever discharged and released as of the Effective Date. Any requests for allowance and payment of General Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date (including those that are subject to the Administrative Claims Bar Date Order) shall not appear on the Claims Register and shall be Disallowed automatically without the need for further action by the Debtors or the Reorganized Debtors, as applicable, or further order of the Bankruptcy Court. To the extent this Article II.A.1 conflicts with Article XII.D of the Plan with respect to fees and expenses payable under section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, Article XII.D of the Plan shall govern. Notwithstanding the foregoing, no request for payment of a General Administrative Claim need be Filed with respect to a General Administrative Claim previously Allowed by Final Order.

The Reorganized Debtors, with the consent of the Agent, may settle General Administrative Claims without further Bankruptcy Court approval. The Reorganized Debtors may also choose to object to any Administrative Claim no later than sixty (60) days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or Reorganized Debtors (or other party with standing), as applicable, object to a timely filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or Reorganized Debtors, as applicable, object to an Administrative Claim, the parties may

13

confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

**(b)      Professional Compensation**

Professional Fee Claims will be satisfied as set forth in Article II.A.2 of the Plan, as summarized herein. The amount of Professional Fee Claims owing to the Professionals will be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account will promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be paid by the Debtors or the Reorganized Debtors.

**2.      Priority Tax Claims**

The Debtors estimate that Allowed Priority Tax Claims will total approximately $4.1 million. Priority Tax Claims will be satisfied as set forth in Article II.B of the Plan and summarized herein. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim will be treated in accordance with the terms set forth in Section 1129(a)(9)(C) or 1129(a)(9)(D) of the Bankruptcy Code, as the case may be, and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with Sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**3.      DIP Facility Claims**

DIP Facility Claims will be satisfied as set forth in Article II.C of the Plan and summarized herein. As of February 28, 2021, the aggregate Allowed DIP Loan Claims is estimated to total $22.8 million (not including the allowed roll-up).

All DIP Facility Claims shall be deemed to be Allowed Secured Claims and Allowed superpriority Administrative Claims in the full amount due and owing under the DIP Facility Loan Documents and the DIP Orders as of the Effective Date.

If an Equitization Restructuring occurs, on the Effective Date, except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each Holder thereof shall receive its Pro Rata share of the Exit Facility.

If an Asset Sale Restructuring occurs, on the Effective Date, except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each Holder thereof shall receive indefeasible payment in full in Cash.

Subject to the provisions of Article III.B Class 2, unless and until Holders of Allowed DIP Facility Claims receive, in an Equitization Restructuring, their Pro Rata share of the Exit Facility, or in an Asset Sale Restructuring, indefeasible payment in full in Cash (or such other treatment consented to by such Holder), then notwithstanding entry of the Confirmation Order and anything to the

contrary in this Plan or the Confirmation Order, (a) none of the DIP Facility Claims shall be discharged, satisfied or released or otherwise affected in whole or in part, and each of the DIP Facility Claims shall remain outstanding, (b) none of the DIP Liens shall be (or deemed to have been) waived, released, satisfied or discharged, in whole or in part, and (c) none of the DIP Facility Loan Documents shall be (or deemed to have been) terminated, discharged, satisfied or released or otherwise affected in whole or in part, and each such DIP Facility Loan Document shall remain in effect.

### F.    What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their business. It is possible that any alternative may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit D**.

### G.    What are the sources of Cash and other consideration required to fund the Plan?

The Debtors will fund distributions under the Plan with, as applicable: (1) Cash on hand; (2) future revenue; and (3) the Exit Facility.

### H.    Are there any regulatory approvals required to consummate the Plan?

No. There are no known regulatory approvals that are required to consummate the Plan.

### I.    Are there risks to owning the New Units upon emergence from Chapter 11?

Yes. *See* Article VIII of this Disclosure Statement, entitled "RISK FACTORS."

### J.    Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VIII.C.5 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article VIII.A.4 of this Disclosure Statement entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

The Reorganized Debtors will have sole power and authority to investigate, prosecute, settle, release or otherwise liquidate, compromise, or resolve the Causes of Action.

**K.    Will any party have significant influence over the corporate governance and operations of the Debtors following consummation of the Plan?**

Subject to approval by an acquirer of the New Units, as of the Effective Date, the Debtors anticipate that the initial Reorganized SMG's Board of Directors will consist of three (3) directors. The identities of the directors and the board observer will be disclosed in the Plan Supplement. As of the Effective Date, the terms of the current members of the boards of directors or managers, as applicable, of each of the Debtors shall expire, and the initial Reorganized SMG's Board of Directors and the boards of directors or managers of each of the other Reorganized Debtors will include those directors and officers set forth in the lists of directors and officers of the Reorganized Debtors included in the Plan Supplement.

After the Effective Date, the officers of each of the Reorganized Debtors will be appointed in accordance with the respective New Organizational Documents. Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of each person proposed to be an officer, Board observer or to serve on the initial board of directors of any of the Reorganized Debtors. To the extent any such officer or director of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such officer. Each such officer will serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and the Governance Term Sheet that will be included in the Plan Supplement.

**L.    What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On or after the Effective Date, the Reorganized SMG Board may adopt and implement a Management Incentive Plan pursuant to which management and key employees will receive a percentage of equity in Reorganized SMG, comprised of New Units. The participants in the Management Incentive Plan, the timing and allocations of the awards to participants, and the other terms and conditions of such awards (including, but limited to, vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights, and transferability) shall be determined by the Reorganized SMG Board.

**M.    Will operation of the Debtors' theaters be affected by the Plan?**

The Debtors believe the Plan provides the best alternative for the Debtors to reorganize and operate their theaters. The Plan provides for the treatment of all Claims against the Debtors' estates and the assumption and rejection of certain Unexpired Leases and Executory Contracts. The Debtors believe the Plan will enable them to successfully restructure their financial obligations and will permit the Debtors to operate their theaters in substantially the same manner as they did prior to the Petition Date, subject to applicable continuation of any COVID-19 laws and regulations.

**N.    What will happen to Executory Contracts and Unexpired Leases under the Plan?**

On the Effective Date, except as otherwise provided in the Plan, (a) all Executory Contracts and Unexpired Leases of the Debtors listed on the Assumed Executory Contract and Unexpired Lease List and (b) all other Unexpired Leases of the Debtors, are deemed to be Assumed Executory Contracts or Unexpired Leases, in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed, assumed and assigned, or rejected by the Debtors; (2) are identified on

the Rejected Executory Contract and Unexpired Lease List; or (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date.

Any Cure Claims under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the Debtors or Reorganized Debtors (as applicable) (with the consent of the Agent) and the other parties to such Executory Contracts or Unexpired Leases, and if applicable, the Purchaser, may otherwise agree. If an Equitization Restructuring or an Asset Sale Restructuring to an Agent Purchaser occurs, the Debtors shall pay the Cure Claims associated with each Assumed Executory Contract or Unexpired Lease. If an Asset Sale Restructuring to a Third Party Purchaser occurs, such Third Party Purchaser shall pay the Cure Claims associated with each Assumed Executory Contract or Unexpired Lease. In the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, payment of the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

The Plan Supplement will include the Assumed Executory Contract and Unexpired Lease List and Rejected Executory Contract and Unexpired Lease List. Any objection by a contract or lease counterparty to a proposed rejection or assumption of an executory contract or unexpired lease or the related cure cost, other than an objection based on the Auction, the proposed assignee(s), or as to the ability of the assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) (each, a "Contract Objection") must be filed by the date set by the Court for objecting to the Plan. **The deadline for any objection with regard to any such proposed rejection or assumption and assignment shall be the Confirmation Objection Deadline. For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.**

For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, may, with the consent of the Agent, add any Executory Contract or Unexpired Lease initially proposed to be assumed to the Rejected Executory Contracts and Unexpired Lease List in accordance with the time limits provided by the Plan for any reason, including if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable cure notice, Assumed Executory Contract and Unexpired Lease List, or the Plan, in which case such Executory Contract or Unexpired Lease shall be deemed rejected as the Effective Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors, and such entity will be liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

**O.      What will happen to Insurance Policies under the Plan?**

As set forth in Article V.E of the Plan, on the Effective Date each of the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, and in the event of an Equitization Restructuring, on the Effective Date, (a) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

**P.      Are the Debtors assuming any indemnification obligations for their current officers and directors under the Plan?**

No.

**Q.      How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled. The Schedule of Retained Causes of Action shall be set forth in the Plan Supplement, in accordance with the Plan.

The Schedule of Retained Causes of Action shall specify which Causes of Action shall be retained by the Reorganized Debtors. Any proceeds from the Retained Causes of Action will be retained by the Reorganized Debtors, and the projected recovery from the Retained Causes of Action is not anticipated to be substantial.

As set forth in Article IV.C.10 of the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtors or the Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action belonging to the Debtors or their Estates that vest in the Reorganized Debtors or the Trust pursuant to the Plan, as applicable, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' and the Trust's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than Causes of Action released by the Debtors pursuant to the releases and exculpations set forth in Article VIII of the Plan or otherwise under this Plan.

The Reorganized Debtors and the Trustee may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors and the Trust. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Reorganized Debtors or Trustee will not pursue any and all available Causes of Action of the Debtors or the Estates against it. The Reorganized Debtors and the Trustee, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors or the Estates against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Reorganized Debtors and the Trustee expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral

18

estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Reorganized Debtors and the Trust reserve and shall retain such Causes of Action of the Debtors and their Estates notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor or its Estate may hold against any Entity shall vest in the Reorganized Debtors or the Trust pursuant to the Plan, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The Reorganized Debtors and the Trust shall retain and may exclusively enforce any and all such causes of Action, and through their authorized agents or representatives shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment, any such Causes of Action (except as otherwise expressly provided in the Plan), or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

### 1.      What Causes of Action are not being preserved?

Any and all claims and Causes of Action that the Debtors could assert against any Released Party are being released pursuant to the Plan and shall not be preserved for prosecution.

### R.      What might affect the recovery to Holders of Allowed GUC Claims?

Except to the extent that a Holder of an Allowed GUC Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed GUC Claim, each such Holder of an Allowed GUC Claim shall receive its Pro Rata share of the GUC Consideration. The actual distribution to a Holder of an Allowed GUC Claim may vary depending on the allowance or disallowance of GUC Claims asserted against the Debtors' estates, and the amount of claims that are treated as Allowed Convenience Claims. The GUC Consideration is based upon cash flows that have been estimated by the Debtors, which are inherently subject to significant variability based on factors related to COVID, the Debtors' business operations, the quality of films released, consumer preferences, and other factors.

If Class 5 votes as a Class to reject the Plan, except to the extent that a Holder of an Allowed GUC Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed GUC Claim, each such Holder of an Allowed GUC Claim in Class 5 shall receive such value as such Holders are entitled to receive under Section 1129(a)(7) of the Bankruptcy Code as determined by the Court at the Confirmation Hearing.

### 1.      How will the final amount of Allowed GUC Claims affect the recovery of Holders of Allowed GUC Claims under the Plan?

The Debtors estimate the amount of Allowed GUC Claims against all Debtors will be approximately $40 million to $45 million. The Debtors' estimate for the Allowed GUC Claims is materially lower than the value of all GUC Claims asserted against the Debtors. The estimate of Allowed GUC Claims is the result of the Debtors' and their advisors' careful analysis of available information, including the Debtors' books and records and an analysis of the validity of the GUC Claims asserted against the Debtors. As part of their analysis, the Debtors and their advisors

determined that certain of the GUC Claims that have been asserted should not be Allowed GUC Claims for various reasons, including that such GUC Claims have been satisfied during these Chapter 11 Cases, are duplicative, or are not properly asserted against the applicable Debtor, among others.

The Debtors' estimate of Allowed GUC Claims, and the corresponding ranges of potential recoveries resulting therefrom, depends on a number of contingencies, including, among others: (a) the determination to be made by the Debtors regarding the assumption and rejection of Executory Contracts and Unexpired Leases; (b) the amount of Claims from the rejection of such Executory Contracts and Unexpired Leases; (c) the amount of Claims Filed by Governmental Units; (d) Claims arising from litigation against the Debtors; and (e) the Claims reconciliation process.

Although the estimate of Allowed GUC Claims is the result of the Debtors' and their advisors' careful evaluation of available information, the ultimate amount of Allowed GUC Claims may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

**2.     How will Claims asserted with respect to rejection damages affect the recovery of Holders of Allowed GUC Claims under the Plan?**

The Debtors currently estimate that Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases total approximately $25 to 352 million in the aggregate. This estimate takes into account large claims that are subject to potential settlement. If the settlements are not approved by the Bankruptcy Court, the actual amount of Claims arising from rejection of Executory Contracts and Unexpired Leases could be materially greater than the Debtors' estimates. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as GUC Claims against the applicable Debtor and shall be treated in accordance with the Plan, unless a different security or priority is otherwise asserted in such Proof of Claim and Allowed in accordance with Article VII of the Plan. Accordingly, to the extent that the actual amount of GUC Claims on account of rejection damages Claims changes, the value of recoveries to Holders of Claims in Class 5 could change as well, and such changes could be material. Similarly, as set forth in the Liquidation Analysis, if the Plan is not confirmed and the Debtors' estates are liquidated, the Debtors anticipate that the amount of rejection damages claims would increase significantly as all unexpired leases and executory contracts would be rejected.

**3.     How will the resolution of certain contingent, unliquidated, and disputed litigation Claims affect the recovery of Holders of Allowed GUC Claims under the Plan?**

The Debtors' estimates of Allowed GUC Claims are based on reasonable estimates of certain contingent, unliquidated, and disputed litigation Claims known to the Debtors as of the date hereof, which generally are considered Unsecured Claims. The actual amount of Allowed GUC Claims could range based on certain contingent, unliquidated, and disputed litigation Claims, some of which were known to the Debtors as of the date hereof, which generally are considered Unsecured Claims.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. Certain of these litigation matters are set forth more fully in Section VII of this Disclosure Statement. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of Claims in Class 5 could change as well, and such changes could be material.

**S.     If the Plan provides that I get a distribution, do I get it upon Confirmation, when the Plan goes effective, or on the Distribution Dates? What is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan" for a discussion of the conditions precedent to consummation and effectiveness of the Plan.

Unless otherwise provided in the Plan, on the Distribution Date (or if a Claim is not an Allowed Claim on the Distribution Date, on the date that such Claim or Interest becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for such Allowed Claim in accordance with its priority and Allowed amount. No interest shall accrue on any Claims from and after the Effective Date. No Holder of a Claim shall recover more than 100 percent of the Allowed amount of such Claim.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.

To the extent any distributions made in accordance with the Plan are subject to disgorgement to the Reorganized Debtors, the Reorganized Debtors shall effectuate the distribution of such disgorged distribution to the Holders of Allowed Claims entitled to such distributions in accordance with the Plan as soon as reasonably practicable. For the avoidance of doubt, to the extent disgorgement of a distribution made to a Holder of a Claim pursuant to the Plan is required, such Holder shall be required to disgorge any distribution but shall not be required to remit interest on such distribution.

**T.     What happens to contingent, unliquidated, and disputed Claims under the Plan?**

As set forth in more detail in Article VII of the Plan, subject to the rights and duties of the applicable Reorganized Debtor(s), after the Effective Date, (a) the applicable Reorganized Debtor(s) shall have the authority, subject to the consent of the Agent, to File, withdraw, or litigate to judgment, objections to all other Claims; (b) the applicable Reorganized Debtor(s) shall have the authority, subject to the consent of the Agent, to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) the Reorganized Debtors shall have the authority, subject to the consent of the Agent, to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Before or after the Effective Date, the Debtors or the Reorganized Debtors or the Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to Section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. § 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been Disallowed or expunged from the Claims Register, but that

either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor or Trustee may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

On or after the Effective Date, the Debtors and the Reorganized Debtors shall establish one or more reserves for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the applicable Debtors and Reorganized Debtors, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim.

**U.     Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, to effectuate the settlements reached with these parties, the Plan includes releases by the Debtors (the "Debtors' Releases") and the Third Party Release, an exculpation provision, and an injunction provision. The Plan provides for releases for (a) the DIP Lenders; (b) the Committee; (c) the individual members of the Committee (both in their capacity as such and as individual creditors); (d) each of the Debtors' current and former directors or officers; and (e) with respect to each of the foregoing (a) through (e), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided that* any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release shall not be a Released Party.

**Importantly, each Holder of a Claim or Interest who either (a) votes in favor of the Plan or (b) is not entitled to vote, abstains from voting, or votes against the Plan and does not opt out of the Third Party Release on a timely submitted Ballot, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and Causes of Action against the Released Parties.**

In addition, the Plan provides for the exculpation of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Committee; (d) the individual members of the Committee; (e) the DIP Lenders; and (f) with respect to each of the foregoing (a) through (e), such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former members, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, predecessors, successors, assigns, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, restructuring advisors, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

The Debtors' Releases, third party releases, and exculpation provisions included in the Plan comply with the Bankruptcy Code and prevailing law because, among other reasons, they are the product of extensive good faith, arm's-length negotiations and were material inducements for the contributions provided by the Released Parties. These provisions were an integral part of the Debtors'

overall restructuring efforts and were an essential element of the negotiations among the Debtors, the Committee and creditors and an integral part of the Plan. In addition, the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring that will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

## 1.    Releases by the Debtors

The Debtors' Releases are fair and equitable, in the best interest of the Debtors' Estates, and well within the Debtors' business judgment.

*First*, the Debtors undertook to investigate potential Estate claims and Causes of Action. The Debtors believe that the potential proceeds of Estate Claims and Causes of Action would not be significant in light of the complex and time consuming litigation that would accompany prosecution thereof and, accordingly, that the settlements embodied in the Plan and the corresponding releases are fair based on the value to the Debtors' Estates and their creditors in light of the cost of developing and prosecuting such Causes of Action.

The Debtors' Releases appropriately offer protection to parties that meaningfully participated in the Debtors' restructuring process, including the DIP Lenders, the Committee and the members thereof. Specifically, these parties have agreed to support the Plan and provide mutual releases to the Released Parties, paving the way to the Debtors' exit from these Chapter 11 Cases.

*Second*, to the extent the Released Parties have indemnification rights against the Debtors under applicable agreements for, among other things, all losses, damages, claims, liabilities, or expenses, including defense costs, for claims subject to the release provisions of the Plan, these claims could directly affect the Debtors' Estates. Moreover, there is no question that directors, managers, and officers provided (and continue to provide) valuable consideration to the Debtors, as they commit substantial time and effort (in addition to their prepetition responsibilities) to the Debtors' Estates and restructuring efforts throughout this chapter 11 process.

*Third*, the Debtors' Releases were vigorously negotiated at arms-length by sophisticated entities that were represented by able counsel and financial advisors and were a necessary and integral element of consideration that these parties required before agreeing to provide the consideration contemplated by the settlements.

*Fourth*, because the Debtors' Releases are consensual, a carve-out for claims and Causes of Action related to actual fraud, gross negligence, or willful misconduct is unnecessary. The Released Parties that benefit from the Debtors' Releases are providing consideration as set forth above, and the Debtors are consenting to the releases, which were a necessary component of the overall bargain that has put the Debtors on the path to a value maximizing restructuring. Such releases are permissible under applicable law and, as a compromise under the Bankruptcy Code, do not require carve-outs for actual fraud, gross negligence, or willful misconduct.

Accordingly, the Debtors submit that the Debtors' Releases are consistent with applicable law, represents a valid settlement and release of claims the Debtors may have against the Released Parties pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, are a valid exercise of the Debtors' business judgment, and are in the best interests of their Estates.

### 2.    Third Party Release

Similarly, the Third Party Release is integral to the Plan and is a condition of the settlements embodied therein. The provisions of the Plan were heavily negotiated by sophisticated parties, represented by competent counsel. The Third Party Release (together with the Debtors' Releases) are key components of the Debtors' restructuring and a key inducement to bring stakeholder groups to the bargaining table. Put simply, the Released Parties were unwilling to provide value to the Debtors' Estates without assurances that they would not be subject to post-emergence litigation or other disputes related to the restructuring. The Third Party Release therefore not only benefits the non-Debtor Released Parties, but also the Debtors' post-emergence enterprise as a whole.

Importantly, the Third Party Release is consensual because it provides Holders of Claims and Interests (other than those Holders who vote to accept the Plan) with the option to opt out of the Third Party Release by checking a box on the Ballot or Opt Out Form provided by the Debtors. Each of the Disclosure Statement, Ballots, and notices of non-voting status state in bold-faced, conspicuous text that Holders of Claims and Interests that do not opt out of the Third Party Release will be bound thereby. Accordingly, upon electing to opt out, such Holders of Claims or Interests do not grant the Third Party Release and no longer have a basis to argue their rights are affected thereby. At the same time, by electing to opt out, such Holders of Claims are excluded from being a Released Party, and also do not receive the benefits of being a Released Party.

The Third Party Release complies with applicable law: ***First***, the Third Party Release is sufficiently specific to put the Releasing Parties on notice of the released claims. ***Second***, the Third Party Release is integral to the Plan and the settlement and compromise therein. The provisions of the Plan were heavily negotiated by sophisticated parties, represented by competent counsel, for which the Third Party Release was a material inducement. ***Third***, as described more fully above, each of the Released Parties under the Third Party Release provided consideration (and are also Releasing Parties themselves, thereby making the release mutual).

Ultimately, the restructuring contemplated by the Plan operates to maximize the Debtors' fresh start by minimizing the possibility of distracting post-emergence litigation or costs associated with the continuation of disputes related to the Debtors' restructuring, and would not be possible absent the support of the Released Parties.

### 3.    Release of Liens.

Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, except with regard to Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.2(b) of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable.

### 4.    Releases by the Debtors.

Pursuant to Section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates, from any and all claims and Causes of Action

whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized Debtors, the Debtors' in- or out-of-court restructuring efforts, the New Organizational Documents, any preference or avoidance claims pursuant to sections 544, 547, 548, or 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or consummation of the Asset Sale Restructuring, the settlement and compromise contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the releases described herein are: (1) in exchange for the good and valuable consideration provided by or on behalf of the Released Parties; (2) a good faith settlement and compromise as set forth herein; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates, asserting any claim or Cause of Action released pursuant to the releases described herein or asserting (directly or indirectly).

### 5.      Releases by Holders of Claims and Interests.

As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized Debtors (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts, any intercompany transactions, transactions pursuant and/or related to the DIP Loan, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Asset Sale Restructuring, the settlement and compromise contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument,

document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

In order to avoid being deemed a Releasing Creditor and granting the releases set forth in Article VIII of the Plan, a creditor casting a ballot for acceptance or rejection of the Plan must indicate its intent to opt out of the releases by checking the "OPT OUT" box on its Ballot. Parties that do not vote may opt out of these releases by submission of an Opt Out Form in advance of the deadline for voting on the Plan. Creditors and other parties in interest who fail to take such action shall be deemed to have consented to the third-party release provision contained in Article VIII.D of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

## 6.     Exculpation.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of any prepetition transactions, the Disclosure Statement, the Plan, the Asset Sale Restructuring, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Filing of the Chapter 11 Cases, the negotiation, terms, or execution of the settlement and compromise effectuated pursuant to Federal Rule of Bankruptcy Procedure 9019, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to or in connection with the Plan and the Restructuring Transactions. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable

law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

       **7.**    **Injunction.**

      Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, Liens or Causes of Action that have been released pursuant to Article VIII.B, Article VIII.C or Article VIII.D of the Plan, or are discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Trust, the Trust Assets, the Trustee, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Liens or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Liens or Causes of Action; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Liens or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Liens or Causes of Action unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; (5) asserting any claim relating to or arising from the Asset Sale Restructuring; and (6) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Liens or Causes of Action released or settled pursuant to the Plan.

      **V.**    **What impact does the Claims Bar Date have on my Claim?**

      On or about November 13, 2020, the Debtors Filed their schedules of assets and liabilities and statement of financial affairs with the Bankruptcy Court pursuant to Section 521 of the Bankruptcy Code (collectively, as amended from time to time, the "Schedules"). The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be Filed in a chapter 11 case.

      The Bar Date by which Proofs of Claims and Interests must be Filed in these Chapter 11 Cases, established pursuant to the 341 Notice, is February 21, 2021, except with respect to Proofs of Claims filed by governmental units and certain other exceptions set forth in the 341 Notice. The deadline for filing claims by Governmental Units (the "Governmental Bar Date") is May 22, 2021. The Administrative Claims Bar Date is being requested to cover Administrative Claims arising or incurred on or before January 31, 2021, with an applicable deadline for Filing requests for allowance and payment of Administrative Claims to be February 15, 2021.In accordance with Bankruptcy Rule 3003(c)(2), if any person or Entity that is required, but fails, to File a Proof of Claim on or before the Bar Date, except in the case of certain exceptions explicitly set forth in the 341 Notice or by further order of the Bankruptcy Court, such person or Entity will be: (1) barred from asserting such Claims against the Debtors in these Chapter 11 Cases; (2) precluded from voting on any plans of

reorganization Filed in these Chapter 11 Cases; and (3) precluded from receiving distributions from the Debtors on account of such Claims in these Chapter 11 Cases. Notwithstanding the foregoing, a Holder of a Claim shall be able to assert, vote upon, and receive distributions under the Plan, or any other plan of reorganization or liquidation in the Chapter 11 Cases, to the extent, and in such amount, as any undisputed, non-contingent, and liquidated Claims identified in the Schedules on behalf of such Claim Holder.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which Proofs of Claim were Filed on or before the Claims Bar Date.

### W.    What is the effect of the Plan on the Debtors' ongoing business?

The Debtors will reorganize under chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to Consummation have been satisfied or waived. *See* Article IX of the Plan. On or after the Effective Date and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On and after the Effective Date, the Reorganized Debtors may maintain or dispose of documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### X.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact:

> *By regular mail, hand delivery, or overnight mail:*
> Law Offices of Frank J. Wright
> 2323 Ross Avenue, Suite 730
> Dallas, Texas 75201
>
>
> *By electronic mail:*
> frank@fjwright.law and jeff@fjwright.law
> with a reference to "SMG Plan Voting" in the subject line
>
> *By telephone:*
> (214) 935-9100

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Noticing Agent at the address above or by downloading the documents from the website of the Debtors' Noticing Agent at https://www.donlinrecano.org/Clients/smgh/Index (free of charge) or the Bankruptcy Court's website at https://www.txnb.uscourts.gov/ (for a fee).

### Y.    What is the deadline to vote on the Plan?

The deadline by which Holders of Claims may vote to accept or reject the Plan (the "Voting Deadline") is **[•], 2021 at 4:00 p.m.** (prevailing Central Time).

**Z.    How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For a vote to be counted, ballots must be completed, signed, returned as directed, and actually *received* by **[•], 2021 at 4:00 p.m.** (prevailing Central Time), the Voting Deadline. *See* Article IX of this Disclosure Statement, entitled "SOLICITATION AND VOTING PROCEDURES."

**AA.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**BB.    When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for **[•], 2021 at [•] a.m. (prevailing Central Time)**. The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be Filed and served on the Debtors, and certain other parties, by no later than **[•], 2021 at [•] a.m. (prevailing Central Time)**. in accordance with the notice of the Disclosure Statement Order attached hereto as **Exhibit B** and incorporated herein by reference.

**CC.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**DD.    Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan will result in meaningful recoveries for creditors and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**EE.    Who supports the Plan?**

The Debtors support the Plan.

## V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.  The Debtors' Business

The Debtors are engaged in the dine-in movie theater business. In addition to its movie offerings, SMG's theaters include a bar and lounge area, with direct to seat service for guests before and during their movies.  Specifically, SMG operated 33 movie theaters in 10 states, including Arizona, California, Florida, Georgia, Illinois, Indiana, North Carolina, Pennsylvania, Texas, and Virginia. All theaters operate under the brand name "Studio Movie Grill."

SMG was conceived in 1993 to modernize the traditional movie-going experience through its combination of first-run movies, alternate, and family programming together with full-service, in theater dining from an extensive American grill menu and full-service bar. SMG strives for an immersive movie-going experience with its custom luxury recliners, laser projection, studio extreme large format auditoriums, and advanced sound system. Service buttons are located at every seat, enabling servers to know instantly when guests need to place an order or request assistance. Servers then deliver food and drinks to guests' seats anytime during the show.

In 2018, SMG was the fastest growing company-owned theater chain and had built the largest hospitality-centric platform in the exhibition industry. SMG swiftly grew from a single location to 353 screens across 10 states. SMG was named to Inc. Magazine's List of "Fastest Growing Private Companies" three years in a row, placed 11th in Box Office Magazine's Giants of the Industry and, in 2019, 50 films put SMG in the Top 10 at the Box Office with key titles grossing as high as #5 in box office receipts. In June 2018, SMG introduced its unique loyalty program, SMG Access, which allows loyal guests to earn rewards, allows them to join SMG in offering movies and meals to underserved community members. To date, this program has earned over 40,000 movies and meals. Prior to the rapid national spread of the novel coronavirus commonly known as COVID-19, SMG had an over twenty-five (25) years of year-to-year growth.

As a result of the national pandemic, state and local governments imposed restrictions on the social, dining, and theater operations regular and necessary to the SMG business. Following the Center for Disease Control COVID-19 guidelines and in compliance with the localized restrictions, SMG shut down all of its theaters for a period of 3 months. During the shutdown, SMG sought out creative ways to attempt to generate revenue, including an attempt to provide carry-out dining services. Beginning on June 19, 2020, SMG, again operating in accordance with CDC guidelines and lifted restrictions, began reopening locations with limited capacity. That being said, demand and supply of films remains limited. Again, SMG has sought creative ways to generate additional revenue within the confines of the CDC guidelines, including open sales to individuals and group to rent out an entire auditorium for a screening or special event. Since mid-March 2020, COVID-19 has resulted in significant adverse business effects on SMG, its operations, and the entire movie industry. Through its Chapter 11 Cases, SMG is but the next in a line of movie theater chains and other in-person entertainment businesses seeking bankruptcy relief. At present, 18 theaters are open at a limited capacity. It remains unknown how long the COVID-19 pandemic will persist and how long the market effects will continue thereafter. SMG anticipates that demand for its services will remain very tenuous until theaters are able to return to full capacity and major motion pictures resume being released for first-run theater showings.

SMG has made, and continues to make, necessary adjustments to its operations in light of the resulting declines in revenue. SMG has sought to reduce operating expenses, lease expenses, and sought a variety of creative solutions to provide interim cash flow, including offering private theater rentals to the public. SMG files these Chapter 11 Cases as part of its ongoing efforts, in order to preserve the value of its assets for the benefit of all stakeholders, including employees, creditors, and equity.

Through the Chapter 11 process, SMG seeks to (i) further increase the profitability of each theater; and (ii) renegotiate lease with landlord and certain business contracts. SMG seeks to use these mechanisms, in conjunction with a restructuring of other debt, to overcome this temporary downturn in the film industry and maximize future profitability.

Through the Chapter 11 proceeding, SMG has been (i) identifying which theaters are not profitable, which ones are profitable and which ones can be profitable; and (ii) seeking to renegotiate leases with landlords and business contracts with vendor and, in turn, rebalance what has become economically untenable for companies in the movie theater industry.

## B.    Corporate Structure, Assets and Operations

The Debtors' holding company is OHAM Holding, LLC ("OHAM"), a Texas limited liability company that was incorporated in March 2019. The membership equity of OHAM is owned as of the Petition Date as follows:

| MEMBER | OWNED PERCENTAGE |
|---|---|
| Brian Schultz | 77.5% |
| Virginia Schultz | 1.0% |
| Theodore Croft | 1.0% |
| SMG Team Equity Holdings, LLC | 7.0% |
| TSO SMG Warrant Investment Aggregator | 13.185% |
| Michael Lambert Trust | 0.315% |

Studio Movie Grill Holdings, LLC, a Texas limited liability company was incorporated in 2011. The membership equity of Studio Movie Holdings, LLC, is owned in totality (100%) by OHAM Holdings, LLC. All other Debtors are owned in totality either directly or indirectly by Studio Movie Grill Holdings, LLC. Accordingly, Brian Schultz and TSO SMG Warrant Investment Aggregator are the only persons that directly or indirectly own 10% or more of any class of OHAM's equity interests. As detailed above, OHAM owns 100% of Studio Movie Grill Holdings, LLC's equity interests and Studio Movie Grill Holdings, LLC owns 100% of all the other Debtor's equity interests.

Movie Grill Concepts Trademark Holdings, LLC, a Texas limited liability company, is the Debtor entity that employs home office, salaried field, and management personnel and is responsible for payroll, benefits (such as insurance) and employee-related obligations (such as payroll tax). Theater level personnel are employed by the theater legal entity.

MGC Management I, LLC, a Texas limited liability company, owns the 1% general partner stake in Movie Grill Concepts I, Ltd., a Texas limited partnership and Plano Theater location, which owns 100% of Studio Club, LLC. Studio Club, LLC was originally setup to hold the liquor license of Movie Grill Concepts I, Ltd.

Movie Grill Partners 3, LLC , a Texas limited liability company, owns the 1% general partner stake in Movie Grill Concepts III, Ltd., a Texas limited partnership and Arlington theater location.

Movie Grill Partners 4, LLC , a Texas limited liability company, owns the 1% general partner stake in Movie Grill Concepts IV, Ltd., a Texas limited partnership and Copperfield theater location, which owns 100% of Studio Club 4, LLC.  Studio Club 4, LLC was originally setup to hold the liquor license of Movie Grill Concepts IV, Ltd.

Movie Grill Partners 6, LLC , a Texas limited liability company, owns the 1% general partner stake in Movie Grill Concepts VI, Ltd., a Texas limited partnership and City Centre theater location.

All other theater level entities are owned 100% by Studio Movie Grill Holdings, LLC.

The Debtor's assets primarily consist of real property leases, FF&E, intangible property and other assets compromising the Debtors' business operations all as further detailed on Schedules 1 and 12.

Figure 1 below depicts the corporate structure of OHAM Holdings and its subsidiaries.



### C.    Prepetition Capital Structure

The following table depicts the Debtors' prepetition capital structure:

| Debt | Approx. Principal and Accrued Interest Outstanding |
|---|---|
|  |  |

|  | (USD) |
|---|---|
| Bank Loan Facility | $106.2 million |
| TowerBrook Subordinated Debt | $83.5 million |
| General Unsecured Claims (GUC) | $65 to $80 million |
| Intercompany Claims | $63.5 million |
| **Total Debt** | **$318.2 to 333.2 million** |

The Debtors' Claims are set forth in more detail below and on Schedules 2-11 attached hereto.

### 1.   Bank Loan Facility

The Debtors are party to a Credit Agreement, dated March 29, 2019 with Goldman Sachs Specialty Lending Group, L.P. as the administrative agent and lender, Crestline Specialty Lending II, L.P., and American National Insurance Company ("Secured Prepetition Lenders") under the USD facility totaling $122.1 million.

The Secured Prepetition Lenders Loan includes all OHAM subsidiaries as Borrowers and OHAM as a Guarantor (as defined in the Secured Prepetition Lenders Credit Agreement) for the entirety of the Obligations (as defined in the Credit Agreement). The amount owed by OHAM and its subsidiaries in respect of the Secured Prepetition Lenders Loan, as of the Petition Date, is $106,188,121.67. The Claims of the holders of Secured Prepetition Lenders Loan Claims are deemed allowed in this aggregate amount under the Plan. The treatment of the Claims of the Holders of the Bank Loan Claims under the Plan represents a good faith, arm's length compromise and settlement between such Holders and the Debtors of all potential claims  and causes of action, in order to facilitate consummation of the Plan.

### 2.   TowerBrook Subordinated Debt

OHAM is party to a Securities Purchase Agreement, dated March 29, 2019 with TSO SMG Note Investment Aggregator L.P. and Michael Lambert Trust u/d/t 3/1/93 as the Note Purchaser totaling USD $75.0 million. As of the petition date, including accrued paid-in-kind ("PIK") interest, the outstanding balance was $83,481,999.21.  The treatment of the Claims of the Holders of the TowerBrook Claims under the Plan represents a good faith, arm's length compromise and settlement between such Holders and the Debtors of all potential claims and causes of action, in order to facilitate consummation of the Plan.

### 3.   GUC Claims

As of the Petition Date, the Debtors estimated they had approximately $42 million in principal and accrued interest outstanding in respect of GUC Claims. The Debtors anticipate additional amounts of GUC Claims may result from the rejection of various leases and executory contracts in these Chapter 11 Cases, with such additional GUC Claims estimated to be not less than $25-35 million. The sum of these two estimates is $67-77 million inclusive of "Litigation Claims" relating to the employment, construction, vendors, and intellectual property. The Debtors currently estimate that the range of possible GUC Claims, including lease and executory contract rejection damages claims, will total $65

to 80 million. The treatment of the Claims of the Holders of the GUC Claims under the Plan represents a good faith, arm's length compromise and settlement between such Holders and the Debtors of all potential claims and causes of action, in order to facilitate consummation of the Plan.

### 4. Intercompany Claims

As of the Petition Date, Intercompany Claims totaled approximately $563 million. Intercompany Claims consist of accounting transfers between the Debtors. At the consolidating level, the intercompany assets and liabilities net to $0. Under the Plan, Holders of Intercompany Claims will receive no distribution. The treatment of the Claims of the Holders of the Intercompany Claims under the Plan represents a good faith, arm's length compromise and settlement between such Holders and the Debtors of all potential claims and causes of action, in order to facilitate consummation of the Plan.

### 5. Interests in OHAM Holdings, LLC

As of the Petition Date, the Interests in OHAM were held by Brian Shultz (77.5%), Virginia Schultz (1.0%), Theodore Croft (1.0%), SMG Team Equity Holding, LLC (7.0%), TSO SMG Warrant Investment Aggregator (13.185%), and Micheal Lambert Trust (0.315%). The Interests in OHAM are not publicly traded. Under the Plan, Holders of Interests will receive no distribution. The treatment of the Claims of the Holders of the Interests under the Plan represents a good faith, arm's length compromise and settlement between such Holders and the Debtors of all potential claims and causes of action, in order to facilitate consummation of the Plan.

### 6. Interests in Studio Movie Grill Holdings, LLC

As of the Petition Date, the interests in Studio Movie Grill Holdings, LLC were wholly owned by OHAM. These Interests are not publicly traded.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Adverse Market Conditions and Liquidity Constraints

The difficulties faced by the Debtors are consistent with those faced industry-wide. As described herein, government stay at home orders related to the COVID-19 pandemic forced the Debtors – and all movie theater operators – to close their theaters in March 2020. While the Debtors have now opened a portion of their theaters, due to COVID-19, the Debtors have generally had access to limited new, first- run movies to show in their theaters, as the movie studios have released few new first run movies.

### B.    Proactive Approach to Addressing Liquidity Constraints

Since the Petition Date, the Debtors have been evaluating and re-evaluating all aspects of their business to improve efficiency and reduce costs. Most notably, the greatest impact (other than the rent reductions from the Lease renegotiations) include optimizing the man-hours needed to operate each theater, and reducing the supplies and services expenses at each location. As a result of this ongoing analysis, the Debtors have implemented a number of initiatives designed to further this strategy.

In addition, the Debtors are implementing the following initiatives:

•    Key Employee Incentive Plan targeted to, among other things, provide bonuses dependent on the success of this bankruptcy case.

•    Consolidating vendors – Several small providers of supplies and services are being consolidated, in order to reduce expenses in these categories

•    Offering To Go Food – SMG implemented takeout food options including curbside pickup and partnered with GrubHub to offer food delivery.

•    Private screening and alternative events – In order to generate additional revenue, SMG offers consumers the option to rent theater space for private screenings of first run and classic movies.  Additionally, they have offered live sports and E-Sports watch parties, Zoom business meetings, and other group meetings.

The Debtors believe these efforts will improve efficiency and increase profits.

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief

On the Petition Date, the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations following the commencement of the Chapter 11 Cases. On October 27, 2020, the Bankruptcy Court entered orders approving the Debtors' motion for joint administration (ECF No. 48) and motion to pay pre-petition wages & benefits (ECF No. 50). On October 29, 2020, the Bankruptcy Court entered orders approving the Debtors' (i) an interim order for motion seeking approval of proposed adequate assurance of payment for future utility services and procedures for resolving adequate assurance requests (ECF No. 81), (ii) interim order for motion to honor customer programs (ECF No. 84), (iii) motion to continue all insurance policies and agreements (ECF No. 85), (iv) Order granting complex chapter 11 treatment (ECF No. 94), (v) motion authorizing Debtor's to pay all or a portion of the prepetition claims of certain critical vendors (ECF No. 97). On October 30, 2020, the Bankruptcy Court entered an order approving the Debtors' (i) a motion seeking authorization to pay pre-petition sales taxes, franchise taxes and similar taxes and fees (ECF No. 103). On November 5, 2020, the Bankruptcy Court entered an order approving the Debtors' (i) extension of time for the Debtors to file their schedules of assets and liabilities and statements of financial affairs (ECF No. 130).

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at the website maintained by the Noticing Agent at https://www.donlinrecano.com/Clients/smgh/Index

### B.    Additional Chapter 11 Relief

During the initial stage of the Chapter 11 Cases, the Debtors also filed the following motions:

### 1. DIP Motions

On October 26, 2020, the Debtors filed the Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 (I) Authorizing Debtors to (A) Use Cash Collateral on a Limited Basis and (B) Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (ECF No. 15), requesting authority to borrow up to $22,800,000 from Goldman Sachs. This motion was approved on an interim basis by order dated October 27, 2020 (ECF No. 52) and on a final basis by order dated December 1, 2020 (ECF No. 280).

### 2. Cash Management Motion

On October 23, 2020, the Debtors Filed the Debtors' Motion to maintain bank accounts. / Debtors Emergency Motion Pursuant to Sections 105, 345, 364, 363, 503, 1107 and 1108, Authorizing (i) Maintenance of Existing Bank Accounts; (ii) Continuance of Existing Cash Management System, Bank Accounts and Checks and Related Forms; (iii) Continued Performance of Intercompany Transactions; (iv) Limited Waiver of Section 345(b) Deposit and Investment Requirements; and (v) Granting Related Relief  (ECF No. 5) (the "Cash Management Motion"). On October 29, 2020, the Court entered an order approving the Cash Management Motion (ECF. No 96).

### 3. Lease Rejection Motions

The Debtors also Filed several other motions on the Petition Date seeking relief to facilitate their operation in the ordinary course, including:

- First Lease Rejection Motion: On October 23, 2020, the Debtors filed a motion seeking to reject seven unexpired leases of real property (ECF No. 33). On October 30, 2020, the Bankruptcy Court entered an order approving the motion (ECF No. 101).

- Second Lease Rejection Motion: On October 23, 2020, the Debtors filed a second motion seeking to reject fifteen unexpired leases of real property (ECF No. 17). On December 11, 2020, the Bankruptcy Court entered an order approving two of the unexpired leases of real property (ECF No. 333). The remaining thirteen unexpired leases of real property have been adjourned to December 22, 2020, to permit the parties additional time to negotiate.

### 4. Motion to Defer Rent

On October 23, 2020, the Debtors filed the *Motion regarding pre or post petition contracts / Motion for Entry of an Order (I) Suspending and Extending Time for Performance of Obligations Arising Under Unexpired Real Property Leases; (II) Establishing Temporary Case Administration Procedures; and (III) Granting Related Relief* (ECF No. 11) (the "Rent Deferral Motion"). In the Rent Deferral Motion, the Debtors' posited that their obligation to pay rent under seventeen unexpired leases of real property during the first sixty days of the Chapter 11 Cases should be deferred for "cause" due to the COVID-19 restrictions implemented by various state issued stay at home orders. The Debtors further asserted that the stay

at home orders effected a taking of their property, and therefore needed additional liquidity by deferring the payments until the 61st day. The Rent Deferral Motion was opposed by a number of landlords. The Debtors have negotiated agreements with numerous landlords to resolve these disputes, and remain in discussions with several landlords. On November 30, 2020, the Bankruptcy court enter an order approving the deferral of rent payment until December 22, 2020 (*See* ECF No. 249)

**C.      Other Procedural and Administrative Motions**

The Debtors also Filed several other motions to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Claims Agent Application. The *Amended Application to employ Donlin, Recano & Company, Inc. to Serve as Noticing, Balloting and Administrative Agent / as Claims Agent* (ECF No. 90) (the "Claims Agent Application"), Filed on October 29, 2020, seeking authorization to employ Donlin, Recano & Company ("DRC") to act as the Noticing, Balloting and Administrative Agent for the Debtors. On December 10, 2020, the Bankruptcy Court entered an order approving the Claims Agent Application on a final basis (ECF No. 330).

- Utilities Motion. The *Debtors' Emergency Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payments* (the "Utilities Motion") (ECF No. 8) was filed on October 23, 2020. On November 24, 2020, 2020, the Bankruptcy Court entered an order approving the Utilities Motion (ECF No. 235).

- Key Employee Incentive Plan. The Debtors' *Motion Pursuant to 11 U.S.C. §§ 363 and 503 (I) Authorizing the Debtors to Implement a Key Employee Incentive Plan and (II) Granting Related Relief* .(the "KEIP Motion") was filed on November 17, 2020 (ECF No. 194). On December 11, 2020, the Bankruptcy Court entered an order approving the KEIP Motion (ECF No. 331).

**D.      Retention of Professionals**

The Debtors Filed applications for, and the Bankruptcy Court entered orders approving, the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:

- Law Offices of Frank J Wright, as counsel to the Debtors (ECF No. 327);

- CR3 Partners, LLC, as Chief Restructuring Officer and additional personnel (ECF No. 328);

- Donlin, Recano & Company, as notice and balloting agent (ECF No.330);

- Keen-Summit Capital Partners, as lease restructuring advisors;

- EFA Partners, LLC, as financial advisor to the Debtors (ECF No.326); and

- Blackbox Management Group, LLC, as Management Consultant to the debtors (ECF No. 325).

**E.    Appointment of Official Creditors' Committee; Retention of Committee Professionals**

On November 16, 2020, the U.S. Trustee Filed the *Appointment of The Official Unsecured Creditors Committee* (ECF No. 173), notifying parties in interest that the U.S. Trustee had appointed the Committee in the Chapter 11 Cases. The following creditors were appointed as Committee members:

**1.  Michael Esqueda**
4212 Lightning Court
Bakersfield, CA 93312
661-496-4151
Michaelesqueda94@gmail.com

**2.  Segars Group LLC**
Attn: Barry D. Segars, President
14355 Providence Road
Milton, GA 30004
770-757-7279
678-624-7708-fax
bsegars@segarsgroup.com

**3.  BwanaTheater Partners, LLC**
Attn: Lauren Goldstein, Co-Managing Member
6632 Telegraph Road, #193
Bloomfield Hills, MI 48301
248-885-8480
248-630-2637-fax
laurenfgoldstein@me.com

**4.  Spirit Realty, L.P.**
Attn: Daniel Rosenberg, Sr. Vice President
2727 North Harwood Street, Ste. 300
Dallas, TX 75201
972-476-1958
drosenberg@spiritrealty.com

**5.  Performance Food Group, Inc.**
d/b/a Vistar Corporation
Attn: Bradley Boe, Director of Credit
188 Inverness Drive West, 7th Floor
Englewood, CO 80112
303-662-7121
303-898-8137-cell
Brad.boe@pfgc.com

The Committee has retained Pachulski Stang Ziehl & Jones LLP ("Pachulski") and Norton Rose Fulbright US LLP ("Norton") as its legal counsel, and Dundon Advisers LLC. ("Dundon") as its financial advisor. Application to retain Pachulski (ECF No. 336), Norton (ECF No. 337), and Dundon were entered on December 11, 2020. They are scheduled to be heard on January 6, 2021.

### F.    Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into certain Executory Contracts and Unexpired Leases. The Debtors, with the assistance of their advisors, reviewed the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code. As set forth above in Section II.B.3, the Debtors have concluded that certain Unexpired Leases were uneconomic, and have rejected or moved to reject such Unexpired Leases.

The Debtors filed the *Notice of Executory Contracts and Unexpired Leases That May Be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Cost with Respect Thereto* (ECF No. 347) and the Amended Notice of Executory Contracts and Unexpired Leases That May Be Assumed and Assigned in Connection with the Sale of the Debtors' Assets and the Proposed Cure Cost with Respect Thereto (ECF No. 364) (collectively, the "Assumption Notices"), respectively, notifying creditors of the executory contracts and unexpired leases that may be assumed and assigned under the Plan, the proposed cure amount for each such contract or lease, and the steps a counterparty may take to protect its interests in respect of such contract or lease, including in respect of the proposed cure amount.

Pursuant to the Plan, the Debtors will be filing a Plan Supplement containing the Assumed Executory Contract and Unexpired Lease List and Rejected Executory Contract and Unexpired Lease List. Any Assume/Reject Objection as relating to the Plan Supplement will be subject to the deadline established in the Disclosure Statement Order.

Any Executory Contracts or Unexpired Leases not addressed during the Chapter 11 Cases will be treated in accordance with Article V of the Plan, as summarized in Article IV.N of this Disclosure Statement.

### G.    Other Litigation Matters

#### 1.    Prepetition Litigation

In the ordinary course of business, the Debtors are parties to a number of lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations, including the personal injury litigation listed in Schedule 13 and:

- **Michael Esqueda Employment Litigation.** Termed for gross misconduct (March 2020) - Scheduled to combine actions with Burns and mediate, now postponed to March 2021.

- **Latoya Burns Employment Litigation.** Abandoned job, no-showed

multiple shifts. She filed class action for meal period violations, denial of overtime and inaccurate wage statements. Scheduled to combine actions with Esqueda and mediate, now postponed to March 2021.

- **Ricky Cabral Employment Litigation.** Termed for gross misconduct

- **Kevin Patrick Employment Litigation.** Termed as result of investigation indicating inappropriate behavior.

- **Dashawna Tate Employment Litigation.** Termed as result of investigation indicating inappropriate behavior.

- **Abigail Putman Employment Litigation.**

- **Kamat Damani Employment Litigation.** Termed for physical altercation with guest.

- **Rachel Artman Employment Litigation.** Voluntarily resigned.

- **Craig Cheesman Employment Litigation.**

- **Omar Oliver Employment Litigation.**

- **Panterra Construction Litigation and Disgorgement.** Failure to pay for certain change orders submitted after the construction of the job was completed and counter claim for disgorgement.

- **CM Corp and Sub Contractor Construction Litigation.** General contractor and certain sub-contractors filed lawsuits based on unpaid construction work at the Citrus Heights development.

- **EMJ Construction and Sub Contractor Construction Litigation.** General contractor and certain sub-contractors filed lawsuits based on unpaid construction work at the Prosperity Village development.

- **Graycor Construction Company, Inc. and Sub Contractor Construction Litigation.** General contractor and certain sub-contractors filed lawsuits based on unpaid construction work at the Willow Grove development location.

- **Segars Group, LLC and Sub Contractor Construction Litigation.** General contractor and certain sub-contractors filed lawsuits based on unpaid construction work at the Northpoint development location.

- **Spirit (Spirit Master Funding X, LLC (CA lease) and Spirit Realty, L.P. (Marietta lease) Litigation.** filed lawsuits based on breach of contract for on

unpaid rent at three southern California locations and Marietta, GA locations.
.

- **WG Park-Anchor B Limited Partnership (PREIT) Litigation.** filed lawsuits based on breach of contract for unpaid rent at Willow Grove development location.

- **Veritex Community Bank Litigation.** filed lawsuits based on breach of contract for unpaid lease on equipment.

- **AT&T Litigation.** AT&T and SMG entered into a contract for certain network services (MPLS). AT&T never provided the services.

### 2.    Automatic Stay Motions

With certain exceptions, the Filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

Following commencement of the Chapter 11 Cases, certain litigation counterparties have Filed, or may File in the future, requests to modify or lift the automatic stay to continue pursuing prepetition litigation against the Debtors or the Debtors' counterparties or to effectuate certain contractual rights.  The Debtors will evaluate all requests for relief from the automatic stay on a case-by-case basis and object or resolve on a consensual basis, as appropriate.

In addition, certain parties may attempt to take actions in violation of the automatic stay. The Debtors will evaluate all such actions on a case-by-case basis and object or resolve on a consensual basis, as appropriate.

### H.    Postpetition Restructuring and Sale Process

Following the Petition Date, the Debtors continued to engage with their stakeholders, including the Committee, the DIP Lenders, their landlords, and their other prepetition unsecured creditors, to develop a go-forward path based on a reorganization of their business under a chapter 11 plan.

### 1.    Marketing Process

The Debtors engaged in a dual-track restructuring, pursuant to which they conducted a robust marketing process for some or all of their assets while engaging in negotiations with creditors to reorganize their business under a chapter 11 plan. In early November 2020, EFA Partners compiled

an initial list of potential buyers and sent the list to the lender's financial adviser, FTI, for their review.

EFA Partners, the Debtors' financial advisor, sent teasers to potential strategic buyers in the theater industry, strategic, non-theater buyers, and potential financial buyers. Via email and during phone calls, EFA Partners described the opportunity including renegotiated leases significantly lowering operating expense profile, the key selling points of the Debtors' food and beverage program, and the relatively low upfront capital outlay for buyers as a Stalking Horse bidder. EFA Partners prepared and populated an online data room with relevant materials on the Debtors' business. The data room provides potential purchasers with information regarding the Debtors' business, operations and assets. Each of the bidders that has executed an NDA has entered the data room and accessed the Debtors' company information.

EFA Partners had calls with additional potential buyers and sent each of them a teaser and NDA. Each week in November and December, EFA Partners solicited responses by email and by phone from bidders that did not respond to initial emails and phone calls.

In furtherance of the sale process, on November 5, 2020, the Debtors Filed the *DEBTORS' MOTION FOR (I) ENTRY OF AN ORDER APPROVING (A) BID PROCEDURES; (B) THE FORM AND MANNER OF NOTICE; (C) THE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) ENTRY OF AN ORDER APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND UNEXPIRED LEASES* (the "Bid Procedures Motion") (ECF No. 133). The Bid Procedures Motion sought (i) entry of an order in the form of Exhibit A thereto (the "Bidding Procedures Order") (a) approving the proposed bidding procedures attached as Annex 1 to the Bidding Procedures Order (the "Bidding Procedures") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of substantially all or any portion or combination of their assets, including new equity in Holdings issued pursuant to a plan of reorganization (the "Assets") through one or more sales of the Assets (each, a "Transaction"); (b) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (c) approving the form and manner of notice of the Auction (defined below) and sale hearing (the "Sale Notice") and Assumption and Assignment Procedures (the "Assumption Notice"), (d) approving the procedures governing the Debtors' selection of one or more stalking horse bidders (each, a "Stalking Horse Bidder"), if any, and the provision of Bid Protections (defined therein) to such Stalking Horse Bidder(s), if necessary; and (e) scheduling (1) a date for an auction if the Debtors receive one or more timely and acceptable Qualified Bids (defined below) (the "Auction") and (2) a final hearing (the "Sale Hearing") to approve one or more Transactions, as necessary, and (f) granting related relief.

The Bid Procedures Motion was approved at a hearing on December 8, 2020, and the Bid Procedures Order was entered on December 11, 2020 (ECF No. 335).

## 2. Negotiations with Creditors

In parallel with their marketing process, the Debtors continued to engage with all key stakeholders regarding the terms of a consensual plan of reorganization in the event the Debtors were unable or elect not to sell substantially all of their assets, or pursue the Plan as proposed. To that end,

the Debtors facilitated extensive formal and informal discussions with their landlords and certain trade creditors. The Debtors continue to engage in negotiations and discussions with their creditors.

### I.       Expected Timetable of the Chapter 11 Cases

The Debtors expect they will emerge from chapter 11 under the Plan by the end of March 2021. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

### A.       Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1.       Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.       The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

### 3.       The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In  the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or proceed with a sale of all or substantially all of the Debtors'  assets

pursuant to section 363 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right, upon reasonable prior notice to and in consultation with the Committee, to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non- accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.    Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such

nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under  chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and Executory Contracts.

### 7. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim, as the Debtors may seek to investigate, File, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims such Claim is subject to an objection. Any Holder of a Claim thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 8. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that ultimately will be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

9.      **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third party releases that may otherwise be asserted against the Debtors, the Reorganized Debtors, or the Released Parties. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

10.     **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holder of a Claim or Interest, or any other Entity; (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; or (d) be used by the Debtors or any Entity as evidence (or otherwise) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

11.     **Risk of Loss of Exclusive Right to Propose a Plan**

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

12.     **Continued Risk upon Confirmation**

Even if the Plan is consummated, the Reorganized Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the movie theater industry, potential revaluing of their assets due to chapter 11 proceedings, changes in consumer demand for in-theater movie viewing, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

Further, even if the Debtors' debts are reduced and/or discharged through the Plan, the Reorganized Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

B.      **Risks Related to the Debtors' Operations During and After These Chapter 11 Cases**

The Debtors face substantial risks for the duration of the Chapter 11 Cases, which may impact their business while in Chapter 11 and afterwards. The Debtors, with the assistance of their advisors, have considered these risks in formulating the Plan.

### 1. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

During the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions (including the corporate transactions necessary or desirable to implement the Plan); (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, and certain other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations and potential for a loss of, or a disruption in the materials or services received from suppliers, contractors or service providers with whom the Debtors have commercial relationships; (e) ability of third parties to seek and obtain Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Court approval to terminate or shorten the exclusive period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' business plan.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' business plan.

### 2. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that suppliers will lose confidence in the Debtors' ability to

reorganize their business successfully and will seek to limit their relationship with the Debtors.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. Further, the Debtors may experience significant costs and delays due to litigation during the Chapter 11 Cases. The DIP Loan may not be sufficient to support day-to-day operations in the event of a prolonged restructuring process and the Debtors may be required to seek additional debtor in possession financing to fund operations. It is uncertain whether the Debtors will be unable to secure additional funding. If the Debtors are unable to obtain such financing on favorable terms or at all, chances of successfully reorganizing the Debtors' business may be seriously jeopardized, the likelihood that the Debtors instead will be required to liquidate their assets may be enhanced, and, as a result, any claims and securities in the Debtors could become further devalued or become worthless.

Further, the Debtors cannot predict the ultimate settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 3. Financial Results May Be Volatile and May Not Reflect Historical Trends, Which May Reduce Amounts Payable to Unsecured Creditors

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as operation of their theaters will be subject to ongoing changes in government regulations, including stay at home orders. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. As a result, the estimates are inherently imprecise evaluations of theater attendance and future net revenues. Of note, a primary component of the estimated recoveries to general unsecured creditors is the TLCF to be paid2.5% of the Reorganized Debtors' Theater Level Cash Flow generated in 2022, 2023, and 2024. To the extent that the Debtors performance is worse than projected in those years, the proceeds from the that note to the GUC Claims Trust will be negatively impacted. The potential variance could cause a significant decrease in the projected recoveries to unsecured creditors.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 4. The Debtors' Operations May Be Restricted By the Availability of DIP Financing

The Debtors' principal sources of liquidity historically have been internally generated Cash flows from operations, borrowings under certain credit agreements, dispositions of non-strategic

assets, and intercompany loans. During the pendency of the Chapter 11 Cases, the Debtors' liquidity depends mainly on Cash generated from operating activities and available funds under the DIP Loan.

The Debtors' future ability to operate their theaters is uncertain and will be affected by the levels of Cash flow from operations, development activities, and other events or circumstances beyond the Debtors' control. If market or other economic conditions deteriorate, the Debtors' ability to continue to operate may be impaired. Additionally, the pendency of the District Court Case— specifically the attachment by debtor in possession loans or any other funds advanced by Goldman Sachs to the Debtors in these bankruptcy cases—may affect the ability of the Debtors to obtain DIP Financing, and thus may restrict their operations.

> ## 5.    Uncertainty Concerning the Debtors' Ability to Re-Open Their Theaters Profitably, Due to Stay at Home Orders and the Unavailability of New Films

The Debtors' post-confirmation operations are subject to uncertainty, due to various state issued stay at home orders and the potential unavailability of new films to show in their theaters. The stay at home orders may preclude the Debtors from operating their theaters at a capacity sufficient to generate profits, and the unavailability of new, first-run films may similarly impact attendance and revenues.

## C.    Risks Related to Recoveries Provided Under the Plan

Certain risks may affect the recoveries provided under the Plan.

### 1.    Timing and Amount of Distributions

Various factors will impact the amount of recoveries that Holders of Allowed Claims receive, including, without limitation, the degree to which objections to Claims are successful. Further, due to the nature of litigation, it may take years to fully adjudicate, decide, or resolve objections to Claims. As a result, Holders of Allowed Claims may not receive final distributions in accordance to the Plan for a prolonged period of time following the Effective Date.

### 2.    The Debtors May Not Be Able to Achieve their Projected Financial Results

The Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

If the Debtors do not achieve their projected financial results, the value of the New Units will be negatively affected. The Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial

condition or results of operations reflected in the Debtors' historical financial statements. As noted above, if the Debtors underperform their financial projections, recoveries to unsecured creditors will be reduced.

### 3.    Certain Tax Implications of the Plan

Consummation of the Plan may result in significant tax implications for the Debtors and Holders of Claims. Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of Claims.

### 4.    The Reorganized Debtors May Not Be Able to Operate Profitably

The Reorganized Debtors' ability operate profitably and generate sufficient cash flow to sustain their business remain subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.

### 5.    The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases or by the Resolution of Pending Litigation Unrelated to the Chapter 11 Proceedings

The Reorganized Debtors may become parties to litigation or litigation in which the Debtors are already a party may not be resolved in the Reorganized Debtors' favor. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of any litigation. The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

### 6.    Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Reorganized Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' Filing of their Petitions or before confirmation of the Plan (a) would be subject to compromise and/or treatment under the Plan and/or (b) would be discharged in accordance with the terms of the Plan. However, the Debtors may assume certain prepetition agreements that include certain indemnification obligations. As such, the Reorganized Debtors may retain liabilities under such agreements that may be material. Further, any Claims not ultimately discharged through the Plan could  be asserted against the Reorganized Debtors and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines will be set forth in the Disclosure Statement Order, form of which is attached hereto as **Exhibit B**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.*

<u>THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY</u>. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of Claims against a debtor are entitled to vote on a chapter 11 plan. The table in Article IV.C of this Disclosure Statement, entitled

"Am I entitled to vote on the Plan?," provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 2, 3, 4, 5 and 6 (collectively, the "<u>Voting Classes</u>"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from Holders of Claims and Interests in Classes 1, 7, 8, 9 and 10. Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

*The Voting Record Date is* **[•].** The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.    Voting on the Plan

*The Voting Deadline is [•], at 4:00 p.m. (prevailing Central Time)*. In order to be counted as votes to accept or reject the Plan, ballots must be returned as directed and *received* by the Voting Deadline.

### D.      Ballots Not Counted

*No Ballot will be counted toward Confirmation if, among other things*: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means other than as specifically set forth in the ballots; (3) it was cast by an Entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' Schedules as contingent, unliquidated, or disputed for which the applicable Claims Bar Date has passed and no Proof of Claim was timely Filed; (5) it was cast for a Claim that is subject to an objection pending as of the date that is fourteen (14) days before the Voting Deadline (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Noticing Agent), an administrative agent, an indenture trustee, or the Debtors' financial or legal advisors instead of the Noticing Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order (and attachments) for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE EMAIL FRANK J. WRIGHT (FRANK@FJWRIGHT.LAW) AND JEFFERY M. VETETO (JEFF@FJWRIGHT.LAW) AND REFERENCE "Studio Movie Grill" IN THE SUBJECT LINE OR CALL THE PHONE NUMBER LISTED ON YOUR BALLOT.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL *NOT* BE COUNTED.**

---

## X.      CONFIRMATION OF THE PLAN

### A.      Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

If any Parties intend to seek discovery in connection with Confirmation of the Plan, such

Parties are encouraged to seek such discovery as soon as possible, because there is no guarantee that there will be sufficient funds to finance the Chapter 11 Cases if the Confirmation Hearing is delayed due to protracted Plan discovery.

### B. Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the Debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' business may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their business, which is reflected in the New Units to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of William Snyder, its Chief Restructuring Officer, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors prepared forecasted, post reorganized financial projections (the "Financial Projections") for the annual periods ending December 31, 2021 (fiscal year 2021) through December 31, 2023 (fiscal year 2023) (the "Projection Period"). The Financial Projections were prepared based on a number of assumptions made by the Debtors' management team as to the future performance of the Reorganized Debtors, and reflect management's judgement and expectations regarding its future operations and financial position. The

Financial Projections are based on an assumption that the Plan is consummated on or around February 28, 2021; to the extent that the Effective Date occurs before or after such date, recoveries on account of Allowed Claims could be impacted. Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "RISK FACTORS" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accepts the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of votes with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right, in consultation with the Committee, to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether

a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.    Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. The Debtors concluded that the best method for determining such value  was through a market test via the Auction process. Accordingly, the Debtors have undertaken a  conducted a robust marketing process for the sale of some or all of their assets, including seeking proposals for the acquisition of the New Units under a chapter 11 plan. The Debtors believe the Auction process will provide a good indication of the true value of the Debtors.

To complement the Auction process, the Debtors' financial advisors are preparing a separate Valuation Analysis, which, if necessary, the Debtors will include in the Plan Supplement. The Debtors anticipate that the enterprise valuation, as set forth in the Valuation Analysis, may be substantially less than the value ascribed to the Debtors' assets in their Petitions and subsequently Filed Schedules. The value of the Debtors' assets as listed on the Debtors' Schedules was based on net book values as of November 25, 2020 (unless otherwise noted), and as set forth in the Schedules (as amended), such values were not calculated in accordance with Generally Accepted Accounting Principles ("GAAP"). Book values of assets prepared in  accordance with GAAP generally do not reflect the current performance of the assets or the impact of COVID-19 and the stay at home orders that have impacted the Debtors' operations, and may differ materially from the actual value and/or performance of the underlying assets. Given the dramatic impact of COVID-19 on the Debtors' operations over the past six months, and the continued impact going forward, this difference is material. As such, the value listed in the Petitions and the subsequently Filed Schedules cannot be, and was not, used to determine the Debtors' enterprise valuation.

### G.    The Plan Supplement

The Debtors will File certain documents that provide additional details regarding implementation of the Plan in the Plan Supplement, which will be Filed with the Bankruptcy Court in accordance with the Disclosure Statement Order (or such later date as may be approved by the Bankruptcy Court). The Plan Supplement will include documents in accordance with the Disclosure Statement Order. The Debtors  may amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

Copies of the Plan Supplement documents will be available on the website of the Debtors' Notice and Claims Agent at  https://www.donlinrecano.com/Clients/smgh/Index or the Bankruptcy Court's website at https://ecf.txnb.uscourts.gov/ (for a fee).

## XI.    CERTAIN SECURITIES LAW MATTERS

### A.    New Units

As discussed herein, the Plan provides for the reorganized Debtors to distribute the New Units to the Purchaser. The New Units may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

### B.    Issuance and Resale of New Units under the Plan

#### 1.    Private Placement Exemptions

The offering, issuance, and distribution of the New Units pursuant to the Plan will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. Section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements. In reliance upon these exemptions, the offer, issuance, and distribution of New Units pursuant to the Plan will not be registered under the Securities Act or any applicable state "Blue Sky" laws, and the New Units issued pursuant to the Plan will be considered "restricted securities" and may not be transferred, encumbered, or otherwise disposed of in the absence of such registration or an exemption therefrom under the Securities Act or under such laws and regulations thereunder. The New Units issued under the Plan will bear a legend relating to the transfer restrictions applicable thereto. The new equity underlying the Management Incentive Plan, if applicable, will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.

**RECIPIENTS OF NEW UNITS ARE ADVISED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW.**

#### 2.    Resale of New Units; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an Entity that is not an "issuer": (a) purchases a claim

against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. While there is no precise definition of a "controlling" stockholder, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of New Units by Entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Holders of New Units who are deemed to be "underwriters" may be entitled to resell their New Units pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Units would depend upon various facts and circumstances applicable to that Person. Given the complex nature of the question of whether a particular person may be an underwriter and other issues arising under applicable securities laws, accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Units and, in turn, whether any Person may freely resell New Units. **The Debtors recommend that potential recipients of New Units consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law.**

3.      **New Units / Management Incentive Plan**

The participants in the Management Incentive Plan, the timing and allocations of the awards to participants, and the other terms and conditions of such awards (including, but not limited to, vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights, and transferability) shall be determined by the Reorganized Studio Movie Grill Holdings, LLC Board. The Management Incentive Plan shall dilute all of the  New Units (if applicable).

## XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims. This summary is  based on the Internal  Revenue Code of 1986, as  amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass- through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Units as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Further, this summary assumes that a Holder of a Claim  holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under

the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes).

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.    **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

The Debtors are pass through entities for tax purposes.

C.    **Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.    **Recapitalization Treatment - Determination of "Security" Status**

The U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the Claims surrendered constitute "securities" of SMG Holdings for United States federal income tax purposes. Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment,

the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Holders should consult their own tax advisors regarding the status of their claims as securities.

### 2.    U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 2, Class 3, Class 4, Class 5, and Class 6 Claims

There is substantial uncertainty regarding the consideration that a Holder will receive in respect of its Claim. Pursuant to the Plan, such consideration will depend upon, among other things, the resolution of Claim objections, which resolution cannot be predicted. Holders should consult with their own tax advisors regarding the potential tax consequences of the Plan. As a result of the foregoing, the following discussion is general in nature.

Pursuant to the Plan, except to the extent that a U.S. Holder of an Allowed Class 2, Class 3, Class 4, Class 5, or Class 6 Claim (such Holders, "U.S. Plan Recipients") agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claim, the U.S. Plan Recipient shall receive the distribution set forth in the Plan.

To the extent that a U.S. Plan Recipient's Allowed Claim does not qualify as a "security" of any of the Debtors, or if such Holder receives in respect of its claim only Cash and/or "other property," such Holder of such Claim will be treated as exchanging such Claim for such Holder's Pro Rata share of the consideration received pursuant to the Plan in a taxable exchange under section 1001 of the Tax Code. Accordingly, subject to the rules regarding accrued but untaxed interest, each Holder of such Claim should recognize gain or loss equal to the difference between (1) the amount of Cash and the fair market value of the non-consideration received and (2) such Holder's adjusted basis, if any, in such Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the non-cash consideration received should equal the fair market value of such property as of the date such property is distributed to the Holder. A Holder's holding period for the non-cash consideration received should begin on the day following the date it receives such property.

The above discussion assumes that the distribution under the Plan is treated, for U.S. federal income tax purposes, as a direct distribution from the Debtors to the relevant Holders of Claims. It is possible that the IRS could apply a different characterization, in which case the treatment described above could vary.

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

### 3.    Accrued Interest

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

### 4.      Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent

of the accrued, but not recognized, market discount.

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.

### 5.    Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 6.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning Shares of New Units

Any distributions made with respect to New Units will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles.

To the extent that a non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its New Units.  Any such distributions in excess of a non-U.S. Holder's basis in its New Units (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange, as discussed below.

Except as described below, dividends paid with respect to New Units held by a non- U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A non-U.S. Holder generally will  be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-BEN-E (or a successor form) upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.

Dividends paid with respect to New Units held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty

applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

To the extent the FIRPTA rules (discussed below) are applicable to any Non-U.S. Holder (and subject to the rules discussed below regarding less-than-5% Holders if the New Units is regularly traded on an established securities market), distributions that are taxable as dividends will be subject to withholding, as described above. However, distributions that are not taxable as dividends but, instead, are treated as a return of capital or gain will be subject to withholding on an amount of 15 percent of the gross amount of any such distribution.

### 7.    Sale, Redemption, or Repurchase of New Units

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of its Pro Rata share of consideration received under the Plan unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States);

- in the case of the sale of New Units, Reorganized Debtors are or have been, during a specified testing period, a "United States real property holding corporation" (a "USRPHC") for U.S. federal income tax purposes; or

- such Non-U.S. Holder receives a "flow-through" interest (including pursuant to assets held in a "liquidating trust") in assets that constitutes a "U.S. real property interest" (a "USRPI").

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable

to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Units under FIRPTA and be required to file U.S. federal income tax returns. Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Units will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.

In general, while the FIRPTA provisions will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period and (b) such interest is regularly traded on an established securities market, the Debtors currently anticipate that, as of the Effective Date, such interests will *not* be regularly traded on an established securities market.

If the fourth exception applies, FIRPTA will generally be applicable to any such USRPI.

The Reorganized Debtors may constitute a USRPHC as of the Effective Date, in which case the New Units will constitute a United States real property interest for the period required under the Tax Code. Non-U.S. Holders who may receive or acquire New Units in connection with the Restructuring Transactions are urged to consult a U.S. tax advisor with respect to the U.S. tax consequences applicable to their acquisition, holding, and disposition of such New Units.

## 8.     FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends (for U.S. federal income tax purposes), if any, on shares of New Units). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. Although FATCA withholding rules could apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends, proposed regulations indefinitely suspend such withholding requirements.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder.

## D.     Information Reporting and Back-Up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made

to a Holder of a Claim under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors and the Committee recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Submitted on this 5th day of January, 2020.

STUDIO MOVIE GRILL HOLDINGS, LLC
OHAM HOLDINGS, LLC
MOVIE GRILL CONCEPTS VII, LLC
MOVIE GRILL CONCEPTS IX, LLC
MOVIE GRILL CONCEPTS X, LLC
MOVIE GRILL CONCEPTS XI, LLC
MOVIE GRILL CONCEPTS XII, LLC
MOVIE GRILL CONCEPTS XIII, LLC
MOVIE GRILL CONCEPTS XIV, LLC
MOVIE GRILL CONCEPTS XV, LLC
MOVIE GRILL CONCEPTS XVI, LLC
MOVIE GRILL CONCEPTS XVII, LLC
MOVIE GRILL CONCEPTS XVIII, LLC
MOVIE GRILL CONCEPTS XIX, LLC
MOVIE GRILL CONCEPTS XX, LLC
MOVIE GRILL CONCEPTS XXI, LLC
MOVIE GRILL CONCEPTS XXII, LLC
MOVIE GRILL CONCEPTS XXIII, LLC
MOVIE GRILL CONCEPTS XXIV, LLC
MOVIE GRILL CONCEPTS XXV, LLC
MOVIE GRILL CONCEPTS XXVI, LLC
MOVIE GRILL CONCEPTS XXVII, LLC
MOVIE GRILL CONCEPTS XXVIII, LLC
MOVIE GRILL CONCEPTS XXIX, LLC
MOVIE GRILL CONCEPTS XXX, LLC
MOVIE GRILL CONCEPTS XXXI, LLC
MOVIE GRILL CONCEPTS XXXII, LLC
MOVIE GRILL CONCEPTS XXXIII, LLC
MOVIE GRILL CONCEPTS XXXIV, LLC

MOVIE GRILL CONCEPTS XXXV, LLC
MOVIE GRILL CONCEPTS XXXVI, LLC
MOVIE GRILL CONCEPTS XXXVII, LLC
MOVIE GRILL CONCEPTS XXXVIII, LLC
MOVIE GRILL CONCEPTS XXXIX, LLC
MOVIE GRILL CONCEPTS XL, LLC
MOVIE GRILL CONCEPTS XLI, LLC
MOVIE GRILL CONCEPTS XLII, LLC
MOVIE GRILL CONCEPTS XLIII, LLC
MOVIE GRILL CONCEPTS XLIV, LLC
MOVIE GRILL CONCEPTS XLV, LLC
MOVIE GRILL CONCEPTS XLVI, LLC
MOVIE GRILL CONCEPTS XLVII, LLC
MOVIE GRILL CONCEPTS XLVIII, LLC
MOVIE GRILL CONCEPTS XLIX, LLC
MOVIE GRILL CONCEPTS L, LLC
MOVIE GRILL CONCEPTS LI, LLC
MOVIE GRILL CONCEPTS LII, LLC
MOVIE GRILL CONCEPTS LIII, LLC
MOVIE GRILL CONCEPTS LIV, LLC
MOVIE GRILL CONCEPTS LV, LLC
MOVIE GRILL CONCEPTS TRADEMARK
    HOLDINGS, LLC
MOVIE GRILL PARTNERS 3, LLC
MOVIE GRILL PARTNERS 4, LLC
MOVIE GRILL PARTNERS 6, LLC
MGC MANAGEMENT I, LLC

By: _/s/ William Snyder_
Name: William Snyder
Title: CRO

By: _/s/ William Snyder_
Name: William Snyder
Title: CRO

MOVIE GRILL CONCEPTS I, LTD.

By: MGC MANAGEMENT I, LLC, its general partner

By: _/s/ William Snyder_
Name: William Snyder
Title: CRO

MOVIE GRILL CONCEPTS III, LTD.

By: Movie Grill Partners 3, LLC, its general partner

By: _/s/ William Snyder_
Name: William Snyder
Title: CRO

MOVIE GRILL CONCEPTS IV, LTD.

By: Movie Grill Partners 4, LLC, its general partner

By: _/s/ William Snyder_
Name: William Snyder
Title: CRO

MOVIE GRILL CONCEPTS VI, LTD.

By: Movie Grill Partners 6, LLC, its general partner

By: _/s/ William Snyder_
Name: William Snyder
Title: CRO

STUDIO CLUB, LLC


By: _/s/ William Snyder_____
Name: William Snyder
Title: CRO


STUDIO CLUB 4, LLC


By: _/s/ William Snyder_____
Name: William Snyder
Title: CRO


**LAW OFFICES OF FRANK J. WRIGHT, PLLC**


By:   _/s/ Frank J. Wright_____
Frank J. Wright
Texas Bar No. 22028800
Jeffery M. Veteto
Texas Bar No. 24098548
Jay A. Ferguson
Texas Bar No. 24094648

2323 Ross Avenue
Suite 730
Dallas, Texas 75201
Telephone:    (214) 935-9100
Emails: frank@fjwright.law
        jeff@fjwright.law
        jay@fjwright.law

**COUNSEL TO DEBTORS
AND DEBTORS-IN-POSSESION**